# EXHIBIT 5
# TO DECLARATION OF JOSEPH A. CULIG IN SUPPORT OF NETAIRUS' RENEWED MOTION FOR JMOL PURSUANT TO FED.R.CIV.P. 50(b)

1

```
 1              UNITED STATES DISTRICT COURT
 2             CENTRAL DISTRICT OF CALIFORNIA
 3                          ---
 4             THE HONORABLE JOHN A. KRONSTADT
 5           UNITED STATES DISTRICT JUDGE PRESIDING
 6
 7   NetAirus Technologies, Inc.,  )
 8                  Plaintiff,     )
 9                                 )
10   vs.                           )   CV10-3257-JAK
11                                 )
12   Apple, Inc.,                  )
13                  Defendant.     )
14   _____  )
15
16
17        REPORTER'S TRANSCRIPT OF TRIAL PROCEEDINGS
18                   Day 4 - P.M. Session
19                   Los Angeles, California
20                 Friday, November 15, 2013
21
22   Pamela A. Batalo, CSR, FCRR, RMR
     Official Reporter
23   Roybal Federal Building
     255 East Temple Street
24   Room 181-I
     Los Angeles, California  90012
25   (213) 687-0446
```

United States District Court, Central District of California

EXHIBIT 5 - PAGE 094

```
 1   APPEARANCES:
 2
 3    FOR PLAINTIFF:         NIRO, SCAVONE, HALLER & NIRO
 4                           BY:  DEAN D. NIRO
 5                                RAYMOND P. NIRO
 6                                TAHITI ARSULOWICZ
 7                                ROBERT A. CONLEY
 8                                JOSEPH A. CULIG
 9                           181 W. MADISON STREET, SUITE 4600
10                           CHICAGO, IL 60602
11
12                           ORUM & ROTH, LLC
13                           BY:  MARK D. ROTH
14                           53 W. JACKSON BOULEVARD, SUITE 620
15                           CHICAGO, IL  60604
16
17    FOR DEFENDANT:         MILBANK, TWEED, HADLEY & MCCLOY, LLP
18                           BY:  MARK C. SCARSI
19                                HANNAH CANNOM
20                                CHRIS L. HOLM
21                                ASHLEE N. LIN
22                           601 S. FIGUEROA STREET
23                           LOS ANGELES, CA 90017
24
25
```

United States District Court, Central District of California

EXHIBIT 5 - PAGE 095

```
 1   APPEARANCES CONTINUED:

 2

 3     FOR DEFENDANT:          MILBANK, TWEED, HADLEY & MCCLOY, LLP

 4                             BY:  CHRISTOPHER J. GASPAR

 5                             ONE CHASE MANHATTAN PLAZA

 6                             NEW YORK, NY   10005

 7

 8                             JACKIE HARLOW

 9                             IP LITIGATION COULSEL

10                             APPLE

11                             1 INFINITE LOOP

12                             MS 36-3NYJ

13                             CUPERTINO, CA   95014

14

15

16

17

18

19

20

21

22

23

24

25
```

1  previously.
2  (Whereupon, the video deposition of Steven Sinclair was played
3  for the jury.)
4       THE COURT:  That concludes the examination.  Thank
5  you.
6       Are you going to call the live witness at this time?
7       MR. NIRO:  Yes, your Honor.  My agreement with counsel
8  and as a convenience to the witness, with the Court's
9  permission, we will call Mr. Noellert, but the examination will
10 begin by defendant's counsel.
11      THE COURT:  Ladies and Gentlemen, again I appreciate
12 counsel working together.  Mr. Noellert is going to be called by
13 Apple.  We are not in Apple's case yet.  They are going to call
14 this witness out of order to accommodate everyone's schedule.
15      After Apple has examined the witness, the plaintiff
16 will have the opportunity to cross-examine, and Apple may
17 conduct redirect.
18      Mr. Scarsi, will you call the next witness, please.
19      MR. SCARSI:  Thank you, your Honor.  Apple calls
20 Mr. William Noellert, please.
21                William Noellert was sworn
22      THE CLERK:  Please have a seat.
23      MR. SCARSI:  Good afternoon --
24      THE CLERK:  Can you please state your full name and
25 spell it for the record.

```
 1         THE WITNESS:  Sure.  It's William Noellert,
 2  N-O-E-L-L-E-R-T.
 3         THE COURT:  Good afternoon, Mr. Noellert.
 4         THE WITNESS:  Good afternoon.
 5         THE COURT:  Please proceed, Mr. Scarsi.
 6                    DIRECT EXAMINATION
 7  BY MR. SCARSI:
 8  Q.  Good afternoon, Mr. Noellert.  I know you have been in the
 9  courtroom for most of the trial.  How does it feel to be finally
10  in the box?
11  A.  I'm glad the time has come.
12  Q.  Who are you employed by, Mr. Noellert?
13  A.  I am currently employed by Apple.
14  Q.  What is your job at Apple?
15  A.  I am a manager in the -- an engineering manager in the RF
16  Design Group.
17  Q.  What is the RF Design Group?
18  A.  We are responsible for developing all of the wireless
19  hardware for any iOS product.
20  Q.  And just to make sure we are on the same page, what is an
21  iOS product?
22  A.  That is any product that is going to use the iOS operating
23  system.  That would consist of iPhone, iPad, iPod Touch.
24  Q.  And you said you were in the RF group.  What does RF mean?
25  A.  It stands for *radio frequency*.
```

```
 1   Q.   How is he as a boss?
 2   A.   He is a great boss.  He is very fair, and once you have
 3   kind of earned his trust, he leaves you alone and just lets you
 4   get your work done.
 5   Q.   So you started working on the iPhone 3G.  Did you come to
 6   work on any other versions of the iPhone?
 7   A.   Yes.  I worked -- I worked on the iPhone 3G and then the
 8   iPhone 4, the iPhone 5, and then I worked on some iPads, the
 9   iPad 2 and the recently released iPad Air and the iPad Mini with
10   the retina display.
11   Q.   Now, you said you worked on the iPhone 4.  What aspect of
12   the iPhone 4 did you work on?
13   A.   On the iPhone 4 I was responsible for the cellular receiver
14   design and the GPS radio design.
15   Q.   In this case we have heard a lot about cellular and Wi-Fi
16   transmit powers.  Are you familiar with the Wi-Fi and cellular
17   transmit power for the iPhone 4?
18   A.   Yes, I am.
19   Q.   And what's the transmit power for the iPhone 4 with respect
20   to the Wi-Fi signal?
21   A.   So we will set the transmit power for Wi-Fi to 15 dBm.
22   It's a target power that we set in the factory.  And -- but it
23   has some tolerance on it.  We allow it to go slightly above or
24   slightly below.  It's very difficult to kind of pinpoint it
25   right on.
```

1  Q.   Why do you set it to 15?
2  A.   15 turned out to be -- well, so we'd like to set it as high
3  as we possibly can, but there are other specifications we have
4  to comply with, some the 802.11 standard, some the FCC
5  standards, and so 15 is kind of as high as we can go without
6  exceeding any of the other specifications.
7  Q.   Now, you mentioned dBm or 15 dBm.  What is a dBm?
8  A.   Well, as mentioned earlier today, it's a measure of power.
9  It relates directly to watts like a light bulb.  A hundred watt
10 power of a light bulb, that would actually translate to 50 dBm.
11 So -- and it's a direct translation, and engineers -- or we
12 typically use it because it makes the dB scale -- the dB scale
13 is the logarithmic scale, and it makes it very easy or easier
14 when you need to talk about really, really small numbers or
15 really big numbers.
16 Q.   And what does dBm actually measure?  What is that?
17 A.   It is a measure of power and it's relative to 1 milliwatt.
18 Q.   We have seen some negative numbers.  Is it possible to have
19 negative dBm?
20 A.   It is.  On the logarithmic scale, a negative number just
21 means it's less than the reference.  So in this case, a negative
22 number just means it's smaller than 1 milliwatt and a positive
23 number means it's larger than 1 milliwatt.
24 Q.   We have talked about the iPhone 4 transmit power.  Can a
25 user of the iPhone 4 change that transmit power for the Wi-Fi

```
 1  signal?
 2  A.   No, they can't change that.
 3  Q.   If I take my iPhone 4 to the Apple Store, can I get them to
 4  change the Wi-Fi power?
 5  A.   No.  They don't -- they can't do that.
 6  Q.   And where is it set?
 7  A.   It's set when the -- when the device is manufactured in the
 8  factory.
 9  Q.   When I'm transmitting with Wi-Fi, does that power level go
10  up and down?
11  A.   No.  It is set to a constant level.
12  Q.   If I'm sending email over Wi-Fi, what power level is that
13  email going to be sent out at?
14  A.   It will be sent at 15 dBm, within the tolerance.
15  Q.   Now, we also talked about Wi-Fi power for the cellular
16  radio -- I'm sorry -- transmit power for the cellular radio.
17  What is the transmit power set at for the cellular radio in the
18  iPhone 4?
19  A.   For the cellular radio, we need to comply with a different
20  specification, and it requires us to meet a very wide range of
21  powers.  So we have to be able to transmit as low as minus 50
22  dBm up to 23 or 24 dBm.
23  Q.   And why does the cell phone have to range across that power
24  range?
25  A.   It has to do with the way the system is designed.  The way
```

```
1        THE COURT:  Thank you.
2                    (Jury In)
3        THE COURT:  Please be seated.
4        Mr. Noellert, would you please restate your name.
5        THE WITNESS:  William Noellert.
6        THE COURT:  Do you understand that you remain under
7  oath?
8        THE WITNESS:  I do.
9        THE COURT:  Okay.  Please proceed, Mr. Conley.
10                   CROSS-EXAMINATION
11 BY MR. CONLEY:
12 Q.   Good afternoon, Mr. Noellert?
13 A.   Good afternoon.
14 Q.   During your testimony you made reference to something SJ
15 said.  Do you recall that testimony?
16 A.   Yes.
17 Q.   Who is SJ?
18 A.   Steve Jobs.
19 Q.   As an employee of Apple, did you generally embrace the
20 statements that were made by Steve Jobs?
21 A.   I don't really recall, but I guess I would say yes.
22 Q.   Do you ever recall Mr. Jobs making any statements about
23 borrowing ideas from others with respect to the design of the
24 iPhone technology?
25 A.   No, I don't.
```

```
1   Q.   Do you ever recall Mr. Jobs stating that Apple is shameless
2   about stealing great ideas?
3   A.   No, I don't remember that.
4   Q.   You had your deposition taken in this case a little over
5   two years ago.  Do you remember that?
6   A.   I do, yes.
7   Q.   I think it was about May of 2011; is that right?
8   A.   I don't recall the exact time.
9   Q.   Okay.  Do you recall at the time you had your deposition
10  taken that you actually owned an iPhone 4?
11  A.   Yes.  I believe so.
12  Q.   And you used that product?
13  A.   Yes.
14  Q.   You used it on a day basis while you owned it?
15  A.   Yes.
16  Q.   Did you use it to make voice call?
17  A.   I did.
18  Q.   Did you use it to surf the internet?
19  A.   I did.
20  Q.   Did you use the FaceTime feature of that telephone?
21  A.   I believe so, yes.
22  Q.   Did you ever use the contacts feature of the phone?
23  A.   I did.
24  Q.   Did you ever use the calendar feature of the phone?
25  A.   I did.
```

1  Q.   Did you use the iPhone 4 to send and receive emails?
2  A.   Yes.
3  Q.   And did you do that over cellular network?
4  A.   Most likely, yes.
5  Q.   Would you also have done that over a Wi-Fi network?
6  A.   Likely, yes.
7  Q.   And at your place of employment, Apple had a Wi-Fi network;
8  correct?
9  A.   They do, yes.
10 Q.   And have you connected to that Wi-Fi network?
11 A.   Yes, I have.
12 Q.   Would have you connected to that Wi-Fi network with your
13 iPhone 4 that you owned at the time?
14 A.   Very likely, yes.
15 Q.   Now, with respect to the emails that you would have sent
16 over the cellular network, those emails would have been
17 transmitted through the cellular radio of the device; correct?
18 A.   Yes.  That's correct.
19 Q.   And from a component standpoint, what goes into the
20 cellular radio hardware of the device?
21      MR. SCARSI:  Objection, your Honor.  Outside the scope
22 of direct and not relevant to the --
23      THE COURT:  Sustained.
24 BY MR. CONLEY:
25 Q.   Apple designed the Wi-Fi radio that is in the iPhone 4;

54

```
 1   correct?
 2   A.   That's correct.
 3   Q.   And Apple incorporated the Wi-Fi radio into that product?
 4   A.   Yes.
 5   Q.   That was Apple's choice, nobody made Apple do that?
 6   A.   I would assume so.
 7   Q.   Now, the iPhone 4 is I think we've established capable of
 8   connecting to both a cellular network and a Wi-Fi network;
 9   correct?
10   A.   It is capable of doing both, yes.
11   Q.   Now, if the iPhone 4 is connected to a Wi-Fi network, but
12   then you move beyond the range of that Wi-Fi network, will the
13   iPhone 4 attempt to connect to the cellular network?
14   A.   Well, it's -- it's always trying to connect to the cellular
15   network, regardless of where you are.
16   Q.   If you move beyond the range of the Wi-Fi network, will the
17   iPhone connect to a cellular network without you having to
18   interact with the product?
19   A.   I guess more than likely, it's already connected to the
20   cellular network.  Usually you're connected to both
21   simultaneously.
22            MR. CONLEY:  Your Honor, may I read from page 21,
23   lines 9 through 24 of Mr. Noellert's deposition.
24            THE COURT:  Did you say lines 9 through 24.
25            MR. CONLEY:  Yes, your Honor.
```

United States District Court, Central District of California

EXHIBIT 5 - PAGE 105

55

```
1              THE COURT:  Any objection?
2              MR. SCARSI:  One second, your Honor.  Sorry,
3    your Honor.  Can I get that page 1 more time.
4              MR. CONLEY:  Page 21, lines 9 through 19 -- I'm sorry.
5    9 through 24.
6              MR. SCARSI:  No objection, your Honor.
7              THE COURT:  All right.  You may read that.
8              MR. CONLEY:
9         Q. And when you walk out of the door or when you walk
10   out of the range of the network, what does the iPhone do at that
11   juncture if you want to send an email?
12            A. If the iPhone could no longer see the Wi-Fi
13   network?
14            Q. Correct.
15            A. It could send the email over the cellular network.
16            Q. And it does that without any prodding by the user;
17   correct?
18            A. I do not have to interact with the device in any
19   way to make it do that.
20   Q.   Do you recall giving that testimony?
21   A.   Yes.
22   Q.   I believe you testified on direct examination that the
23   transmit power range for the Wi-Fi radio in the iPhone 4 was
24   approximately 14 to 15 dBms; is that correct?
25   A.   That's correct.
```

United States District Court, Central District of California

EXHIBIT 5 - PAGE 106

```
 1  Q.   You also testified that the maximum transmit power level
 2  for the cellular radio is up to about 24 dBms; correct?
 3  A.   That's correct.
 4  Q.   And it's technically possible, is it not, for the cellular
 5  radio to operate at a higher transmit power level than that
 6  which the Wi-Fi radio network operates at?
 7  A.   Yes.  It is technically possible.
 8  Q.   And Apple actually calibrates the Wi-Fi radio transmit
 9  power to be at the level of 15 dBms; correct?
10  A.   Yes.  Within a tolerance, correct.
11  Q.   That's a value that Apple selects?
12  A.   Yes.  That's a value that Apple selects.
13  Q.   The network, such as  AT&T, doesn't mandate that Apple uses
14  that specific value; correct?
15  A.   That is correct.
16  Q.   Does Apple ever declare the maximum transmit value of the
17  cellular radio to any government body such as the FCC?
18  A.   Yes.  We are required to do so.
19  Q.   And Apple actually calibrates the device to make sure that
20  it is able to operate at that transmit power level, does it not?
21  A.   Yes.  We calibrate the device at the factory.
22  Q.   Now, it's possible that at least in some instances where
23  data is being sent over the iPhone 4 cellular network that the
24  transmit power of that radio exceeds 15 dBms; correct?
25  A.   I'm sorry.  Would you mind repeating the question.
```

```
 1  Q.    Sure.  Let me maybe put up an exhibit that might help us.
 2  This is exhibit -- this is DTX 727.  And we are looking at
 3  page 29.
 4  A.    Okay.
 5          MR. SCARSI:  Excuse me, your Honor.  Just want to note
 6  for the record that what we are looking at is a marked up copy
 7  of the exhibit.
 8          THE COURT:  Ladies and Gentlemen, I have discussed
 9  this with you before.  It's highlighted and you will not be
10  getting the exhibit in the highlighted form.  Go ahead, please.
11  BY MR. CONLEY:
12  Q.    Do you recognize the information that appears on this page?
13  A.    I do, yes.
14  Q.    Do you see that towards the right of each graph there is
15  some highlighted areas; correct?
16  A.    I see those, yes.
17  Q.    What do those represent?
18  A.    Those represent the likelihood that the device would
19  transmit at those given power levels.
20  Q.    And the highlighted power levels are all above 15 dBms;
21  correct?
22  A.    It's a little difficult for me to see but I believe so,
23  yes.
24  Q.    Let me try to put up a demonstrative to make it a little
25  bit easier for you to see.  This is PDX 190.
```

1  A.  Okay.
2  Q.  Do you recognize the probability curve that appears on that
3  document?
4  A.  It looks similar, yes.
5  Q.  And in this demonstrative, are you able to see more easily
6  the data that is above 15-dBms on that graph?
7  A.  Yes.  It actually looks like you highlighted one that's
8  equal to 15 as well, but, yes, I see that.
9  Q.  And if you look at the pie chart to the right of that
10  figure, do you see the number 7.5 percent?
11  A.  I do, yes.
12  Q.  Do you have an understanding of what that would be
13  representative of based on this demonstrative?
14  A.  I would assume that would be the, you know, amount of -- if
15  you added up the times it was above 15.
16  Q.  I want to show you one other demonstrative, Mr. Noellert.
17  This is PDX 189.  Similar set of questions.  Do you recognize
18  the graph that appears in the left side of that figure as being
19  similar to the graph that we looked at on defendant's
20  Exhibit 727?
21  A.  I agree.  It's similar.
22  Q.  And again you see in the pie chart there is a number there,
23  2.4 percent.  Do you see that?
24  A.  I do see it.
25  Q.  What would that be indicative of?

```
 1   A.   Adding up likely all the bars you marked in red.
 2   Q.   Now, you testified about how you used your iPhone 4 when
 3   you owned that device; correct?
 4   A.   Yes.
 5   Q.   Would the probability curves that you see here apply to
 6   your own use of that device?
 7   A.   Likely, yes.
 8   Q.   And the same would be true with respect to any other user
 9   of an iPhone 4; correct?
10   A.   These curves are very general.  They would probably apply
11   to any phone.
12   Q.   Now, in your direct examination, you made reference to ten
13   thousand -- excuse me.  Ten million units of a device.  Do you
14   recall that?
15   A.   Yes.
16   Q.   Do you have any knowledge with respect to the number of
17   iPhone 4s that have been sold in the United States in the past
18   year?
19   A.   No, I don't know the number.
20   Q.   Would you be surprised to know that it's in the millions?
21   A.   No.  That would not surprise me.
22   Q.   Okay.  If we assume for a moment that in the order of ten
23   million units were sold, and that an average user, such as
24   yourself, sends 50 emails a day or 50 emails a month, pardon me,
25   over the Wi-Fi network, that would equate to about 600 emails
```

1  per year by a user; correct?
2  A.   Okay.
3  Q.   And if I multiplied that by ten million units sold, it
4  would be somewhere in the order of about six million -- pardon,
5  six billion uses of email over Wi-Fi per year; correct?
6  A.   I believe that's correct.
7  Q.   Now, if I take that number of six billion emails per year
8  and I apply that to the probability data that you see in
9  plaintiff's demonstrative 189, doing the math, I believe it
10 comes out to about 1 hundred 44 million emails.  Is that
11 correct?
12 A.   That would assume all of the emails were sent over
13 cellular.
14 Q.   And the same would be true with respect to plaintiff's
15 demonstrative 190 except there we have a larger percentage so it
16 would be in the order of magnitude of about 4 hundred 50 million
17 emails per year, correct?
18 A.   I'll trust you on the number.  Many.
19           MR. CONLEY:  No further questions for this witness.
20           THE COURT:  Any redirect, Mr. Scarsi.
21           MR. SCARSI:  No, your Honor.
22           THE COURT:  Mr. Noellert, thank you for your
23 testimony.  You are excused.
24           Mr. Conley, Mr. Niro, would you call the next witness,
25 please.