**EXHIBIT 6**
**TO DECLARATION OF JOSEPH A. CULIG IN SUPPORT**
**OF NETAIRUS' RENEWED MOTION FOR JMOL PURSUANT**
**TO FED.R.CIV.P. 50(b)**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

HONORABLE JOHN A. KRONSTADT

UNITED STATES DISTRICT JUDGE PRESIDING

- - -

```
NETAIRUS TECHNOLOGIES, LLC,        )
                                   )
                PLAINTIFF,         )
                                   )
VS.                                )  CV10-3257-JAK
                                   )
APPLE, INC.,                       )
                                   )
                DEFENDANT.         )
_____)
```

REPORTER'S TRANSCRIPT OF TRIAL PROCEEDINGS

**DAY FIVE, MORNING SESSION**

LOS ANGELES, CALIFORNIA

TUESDAY, NOVEMBER 19, 2013, 8:30 AM

_____

ALEXANDER T. JOKO, CSR NO. 12272
FEDERAL OFFICIAL COURT REPORTER
255 EAST TEMPLE STREET, ROOM 181-F
LOS ANGELES, CA 90012
AJ_CSR@YAHOO.COM

EXHIBIT 6 - PAGE 112

1    **APPEARANCES OF COUNSEL:**

2    FOR PLAINTIFF:        ORUM & ROTH LCC
                           BY:  MARK DANIEL ROTH
3                          53 WEST JACKSON BOULEVARD
                           SUITE 620
4                          CHICAGO, IL 60604-3750

5                          NIRO HALLER AND NIRO LTD
                           BY:  RAYMOND P. NIRO, SR.
6                               DEAN D. NIRO
                                TAHITI ARSULOWICZ
7                               ROBERT A. CONLEY
                                JOSEPH A. CULIG
8                          181 WEST MADISON STREET
                           SUITE 4600
9                          CHICAGO, IL 60602

10

11   FOR DEFENDANT:        MILBANK TWEED HADLEY AND MCCLOY LLP
                           BY: MARK C. SCARSI
                                ASHLEY LIN
12                              HANNAH LYNN CANNOM
                                CHRIS L. HOLM
13                         601 SOUTH FIGUEROA STREET
                           3RD FLOOR
14                         LOS ANGELES, CA 90017

15

16                         JACKIE HARLOW
                           IP LITIGATION COUNSEL
                           APPLE
17                         1 INFINITE LOOP
                           MS 36-3NYJ
18                         CUPERTINO, CA 95014

19

20

21

22

23

24

25

EXHIBIT 6 - PAGE 113

1                          I N D E X

2                                                    **PAGE**

3     **DR. JEFFREY RODRIGUEZ**

4     DIRECT EXAMINATION BY MR. GASPAR.................. 22

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

EXHIBIT 6 - PAGE 114

1        **DIRECT EXAMINATION**

2    BY MR. GASPAR:

3    Q    GOOD MORNING, PROFESSOR RODRIGUEZ.

4         WOULD YOU PLEASE INTRODUCE YOURSELF TO THE

5    JURY AND THE JUDGE.

6    A    GOOD MORNING.  MY NAME IS JEFF RODRIGUEZ.

7    Q    WHAT DO YOU DO FOR A LIVING, PROFESSOR RODRIGUEZ?

8    A    I'M A PROFESSOR AT THE UNIVERSITY OF ARIZONA.

9    Q    HOW LONG HAVE YOU BEEN AT THE UNIVERSITY OF

10   ARIZONA?

11   A    SINCE 1990.

12   Q    AND WHAT IS YOUR TITLE THERE?

13   A    I'M AN ASSOCIATE PROFESSOR OF ELECTRICAL AND

14   COMPUTER ENGINEERING.

15   Q    CAN YOU TELL US A LITTLE BIT ABOUT YOUR EDUCATIONAL

16   BACKGROUND.

17   A    SURE.  I GOT MY BACHELOR'S DEGREE IN ELECTRICAL

18   ENGINEERING FROM THE UNIVERSITY OF TEXAS AT AUSTIN IN

19   1984.

20         AFTER THAT, I CONTINUED ON TO GRADUATE SCHOOL

21   AND GOT MY MASTER'S DEGREES ALSO IN ELECTRICAL

22   ENGINEERING FROM MIT, THE MASSACHUSETTS INSTITUTE OF

23   TECHNOLOGY.

24         AND THEN FOLLOWING THAT, I PROCEEDED TO GET MY

25   PH.D.  I EARNED MY PH.D. DEGREE IN 1990 ALSO IN

EXHIBIT 6 - PAGE 115

1    ELECTRICAL ENGINEERING FROM THE UNIVERSITY OF TEXAS AT

2    AUSTIN.

3    Q    IS THE UNIVERSITY OF TEXAS KNOWN FOR ITS ELECTRICAL

4    ENGINEERING PROGRAM?

5    A    YES.  THEY HAVE A HIGHLY RANKED ELECTRICAL

6    ENGINEERING PROGRAM.

7    Q    IS THE SAME TRUE FOR THE MASSACHUSETTS INSTITUTE OF

8    TECHNOLOGY?

9    A    YES.  MIT IS ROUTINELY RANKED AMONG THE TOP SEVERAL

10   OR IF NOT THE TOP ELECTRICAL ENGINEERING PROGRAM IN THE

11   COUNTRY.

12   Q    IT SOUNDS LIKE YOU STARTED AT UNIVERSITY OF TEXAS

13   AND THEN WENT TO MIT AND THEN CAME BACK TO THE

14   UNIVERSITY OF TEXAS.

15            CAN YOU TELL US WHY THAT HAPPENED?

16   A    WELL, THAT'S TRUE.  I GOT MY MASTER'S DEGREE AT

17   MIT.  AND IMMEDIATELY AFTER THAT, I GOT MARRIED.  MY

18   WIFE WAS STILL IN SCHOOL IN TEXAS.  SO I WENT BACK TO

19   THE UNIVERSITY OF TEXAS TO GET MY PH.D.

20   Q    WHAT'S "CONNECTION ONE"?

21   A    CONNECTION ONE IS A RESEARCH CENTER FUNDED IN PART

22   BY THE NATIONAL SCIENCE FOUNDATION.  I SERVED AS THE

23   CO-DIRECTOR OF THAT RESEARCH CENTER FOR ABOUT FIVE

24   YEARS.  IT'S A COOPERATIVE RESEARCH CENTER THAT

25   INVOLVES PARTICIPATION FROM MULTIPLE UNIVERSITIES, AS

EXHIBIT 6 - PAGE 116

1    WELL AS MULTIPLE COMPANIES THAT FORM A CONSORTIUM.

2    THAT RESEARCH CENTER FUNDS A VARIETY OF RESEARCH

3    PROJECTS IN THE AREA OF TELECOMMUNICATION CIRCUITS AND

4    SYSTEMS, ESPECIALLY WIRELESS COMMUNICATION SYSTEMS.

5    Q    WHAT KIND OF CLASSES DO YOU TEACH AT THE UNIVERSITY

6    OF ARIZONA?

7    A    I TEACH A NUMBER OF CLASSES AT BOTH THE

8    UNDERGRADUATE AND GRADUATE LEVELS.  LET ME RUN THROUGH

9    A FEW EXAMPLES.

10          AT THE UNDERGRADUATE LEVEL, I TEACH A COURSE

11   ON ELECTRIC CIRCUIT THEORY WHERE I TEACH THE BASIC

12   PRINCIPLES OF ELECTRIC CIRCUITS, HOW TO DO CALCULATIONS

13   FOR VOLTAGES AND CURRENTS IN A CIRCUIT, HOW TO DO POWER

14   CALCULATIONS, THE POWER OR WATTAGE USED BY ELECTRIC

15   CIRCUITS.

16          FOLLOWING THAT, THE NEXT COURSE I TEACH IS

17   CALLED "SIGNALS AND SYSTEMS."  THAT COURSE INVOLVES THE

18   DESIGN OF CIRCUITS IN ORDER TO PERFORM SPECIFIC

19   FUNCTIONS.  SO I TEACH HOW TO COMBINE DIFFERENT

20   ELECTRICAL COMPONENTS TOGETHER IN ORDER TO PERFORM A

21   PARTICULAR TASK.

22          ONE OF THE FOCUSES IN THAT COURSE IS REFERRED

23   TO AS "SIGNAL FILTERING," WHICH MEANS HOW DO YOU DESIGN

24   AN ELECTRIC CIRCUIT TO SELECT OR FILTER CERTAIN

25   FREQUENCY COMPONENTS IN SIGNALS.  YOU MAY NOT REALIZE

EXHIBIT 6 - PAGE 117

1    IT, BUT I THINK YOU'RE PROBABLY FAMILIAR WITH THIS KIND

2    OF TECHNOLOGY.  IF YOU HAVE EVER LOOKED AT TREBLE AND

3    BASS KNOBS ON STEREO EQUIPMENT, THAT'S WHAT THIS IS

4    ABOUT.  IT LETS YOU ADJUST HOW MANY HIGH FREQUENCY OR

5    HIGH-PITCHED SOUNDS ARE COMING OUT VERSUS HOW MANY LOW

6    FREQUENCY OR LOW-PITCHED SOUNDS COME OUT.  THERE'S

7    ELECTRIC CIRCUITS THAT HELP PERFORM THAT TASK.

8                    AFTER THAT COURSE, THERE'S A FEW GRADUATE

9    COURSES THAT I TEACH REGULARLY.  ONE OF THEM IS CALLED

10   "DIGITAL SIGNAL PROCESSING."  IN THAT COURSE, I TEACH

11   TECHNIQUES FOR PROCESSING WHAT ARE REFERRED TO AS

12   "DIGITAL SIGNALS."  SO THAT INCLUDES HARDWARE AND

13   SOFTWARE FOR PROCESSING VOICE SIGNALS AND IMAGES AND

14   VIDEO.

15                   AND THEN I TEACH SPECIFIC COURSES CALLED

16   "DIGITAL IMAGE PROCESSING AND DIGITAL IMAGE ANALYSIS"

17   WHERE I TEACH SPECIFIC TECHNIQUES FOR PROCESSING

18   PICTURES IN ORDER TO MAKE THEM LOOK BETTER, RESTORE

19   THEM FROM DAMAGE OR FIND OBJECTS OR TEXTURE OF PATTERNS

20   IN IMAGES, THINGS LIKE THAT.

21   Q    DO YOU HAVE ANY PATENTS, PROFESSOR RODRIGUEZ?

22   A    I DO NOT.

23        SINCE I WORK IN ACADEMIA, I PUBLISH THE

24   RESULTS OF MY WORK RATHER THAN FILING FOR PATENTS.

25   Q    HAVE YOU CONSULTED FOR COMPANIES IN PATENT

EXHIBIT 6 - PAGE 118

1    LITIGATION OTHER THAN THIS PARTICULAR CASE IN WHICH

2    WE'RE NOW INVOLVED?

3    A    YES, I HAVE.

4    Q    IS THAT A BIG PART OF YOUR WORK?

5    A    NO.  IT'S A RELATIVELY SMALL PART OF MY ACTIVITY.

6    Q    DO YOU USUALLY CONSULT ON BEHALF OF THE PARTY WHO

7    OWNS THE PATENT OR THE PARTY WHO IS ACCUSED OF

8    INFRINGEMENT?

9    A    NEITHER.  IN THE CASES I HAVE BEEN INVOLVED WITH,

10   I'D SAY IT'S PRETTY EQUALLY MIXED, PLAINTIFF'S SIDE

11   VERSUS DEFENDANT'S SIDE.

12   Q    WHAT'S THE BEST WAY FOR US TO THINK ABOUT YOUR

13   PRIMARY AREAS OF EXPERTISE?

14   A    THE WORK I DO FOCUSES PRIMARILY ON SIGNAL

15   PROCESSING FOR WIRELESS COMMUNICATION AND OTHER

16   APPLICATIONS.

17   Q    YOU MENTIONED "SIGNAL PROCESSING."

18        WHAT'S AN EXAMPLE OF "SIGNAL" IN THAT CONTEXT?

19   A    A SIGNAL YOU CAN THINK OF AS ANALOG OR DIGITAL DATA

20   THAT REPRESENTS THINGS LIKE VOICE SIGNALS, IMAGES OR

21   PICTURES OR VIDEO.

22        IN THE TECHNICAL COMMUNITY, WE REFER TO THOSE

23   AS "SIGNALS."

24   Q    CAN YOU GIVE US AN EXAMPLE OF THE TYPE OF SIGNAL

25   PROCESSING WORK THAT YOU DO?

EXHIBIT 6 - PAGE 119

```
 1      A     SURE.

 2           SO ONE PROJECT THAT'S RELEVANT IS A PROJECT

 3      WHERE WE DEVELOP SOME NEW TECHNIQUES FOR REDUCING ERROR

 4      IN THE TRANSMISSION OF VIDEO SIGNALS OVER WIRELESS

 5      NETWORKS.

 6           YOU MAY HAVE EXPERIENCED ISSUES WHERE IF

 7      YOU'RE WATCHING A MOVIE OVER A WIRELESS NETWORK, SAY ON

 8      A NOTEPAD OR SOMETHING, THAT IF THE RECEPTION BECOMES

 9      POOR, YOU CAN ALL OF A SUDDEN LOSE THE SIGNAL.  RIGHT?

10           IN THE OLDEN DAYS, WHEN YOU GOT POOR

11      RECEPTION, YOU WOULD START SEEING A WHOLE BUNCH OF

12      SNOWY NOISE ALL OVER THE SCREEN.  NOW YOU DON'T SEE

13      THAT AS OFTEN.  INSTEAD, YOU JUST LOSE THE SIGNAL

14      ENTIRELY OR, RIGHT BEFORE THAT, SOMETIMES YOU'LL SEE

15      WHAT IS CALLED "BLOCKING ARTIFACTS."  YOU WILL SEE

16      LITTLE RECTANGLES ON THE SCREEN WHERE THE PIXELS OR THE

17      INFORMATION IS MESSED UP.  THAT'S AN ARTIFACT FROM THE

18      VIDEO COMPRESSION TECHNIQUES THAT ARE USED.  AND SO WE

19      DEVELOPED SOME SPECIFIC METHODS FOR TRYING TO RECOVER

20      FROM THOSE KINDS OF BLOCKING ERRORS.  WHEN -- WHEN A

21      PIECE OF THE PICTURE DOESN'T GET RECEIVED PROPERLY, HOW

22      CAN YOU FILL IN THAT GAP BY ANALYZING THE SURROUNDING

23      AREAS OF THE PICTURE OR LOOKING AT THE PREVIOUS PICTURE

24      THAT WAS ALREADY TRANSMITTED.  SO THAT'S AN EXAMPLE

25      WHERE WE'VE USED THAT TECHNOLOGY.
```

EXHIBIT 6 - PAGE 120

1    Q    HAVE YOU DONE ANY WORK WITH VOICE SIGNALS?

2    A    YES.  WE'VE ALSO DONE WORK WITH SIGNAL PROCESSING

3    FOR VOICE APPLICATIONS.  I WORKED ON NEW METHODS FOR

4    VOICE OVER IP.  VOICE OVER IP REFERS TO A METHOD FOR

5    VOICE COMMUNICATION OVER INTERNET CONNECTIONS.

6            SO YOU MAY HAVE HEARD OR USED SKYPE, WHICH IS

7    A WAY OF HAVING A PHONE CALL OVER THE INTERNET RATHER

8    THAN PAYING REGULAR TELEPHONE CHARGES.  THAT

9    APPLICATION PRESENTS SOME TECHNICAL CHALLENGES BECAUSE

10   WHEN VOICE SIGNALS ARE COMMUNICATED OVER AN INTERNET

11   CONNECTION, THE VOICE GETS CHOPPED UP INTO SMALL LITTLE

12   PIECES KNOWN AS "PACKETS."  AND WHEN THOSE PACKETS OF

13   INFORMATION ARE TRANSMITTED OVER A COMMUNICATION

14   NETWORK, THEY DON'T ALWAYS ARRIVE AT THE SAME TIME.

15   AND SO THE RECEIVER HAS TO FIGURE OUT A WAY TO REORDER

16   THESE PACKETS AND GET THEM PLAYED BACK IN THE PRECISE

17   TIMING.

18           SO WE WORKED ON TECHNIQUES TO FACILITATE THAT

19   AT THE RECEIVER END BY COMING UP WITH OPTIMAL DESIGN

20   TECHNIQUES FOR WHAT'S REFERRED TO AS THE "JITTER

21   BUFFER" AT THE RECEIVER.

22   Q    HAVE YOU DONE WORK WITH ANTENNA SIGNALS?

23   A    YES.  I'VE ALSO WORKED ON THE DESIGN OF SMART

24   ANTENNA ARRAYS.  THIS IS AN APPLICATION WHERE YOU CAN

25   ACHIEVE BETTER PERFORMANCE BY HAVING NOT JUST ONE

EXHIBIT 6 - PAGE 121

1    ANTENNA, BUT MULTIPLE ANTENNAS.  SOME WIRELESS

2    COMMUNICATIONS USE THIS TECHNIQUE.

3            SO WE DEVELOPED METHODS FOR DESIGNING THE

4    ANTENNA PARAMETERS SO THAT YOU CAN TUNE THE ANTENNA SO

5    THAT IT'S SENSITIVE TO SPECIFIC DIRECTIONS.  IN CASE

6    YOU WANT TO MAKE IT SO IT'S LESS SENSITIVE TO SOME

7    INTERFERENCE FROM ONE PARTICULAR DIRECTIONAL SECTOR,

8    YOU CAN DO THAT.

9    Q    NOW, DOES THE SIGNAL PROCESSING WORK THAT YOU HAVE

10   DONE HAVE APPLICATIONS OUTSIDE OF THE

11   TELECOMMUNICATIONS AND WIRELESS AREA?

12   A    YES.  SOME OF THE WORK I DO I ENJOY BECAUSE IT LETS

13   ME APPLY SOME OF THESE SIGNAL PROCESSING TECHNIQUES TO

14   OTHER TOTALLY DIFFERENT APPLICATIONS.

15           ONE BIG APPLICATION AREA IS IN THE BIOMEDICAL

16   FIELD.  RECENTLY I TEAMED UP WITH THE DEPARTMENT OF

17   LINGUISTICS AT THE UNIVERSITY OF ARIZONA TO WORK ON AN

18   INTERESTING PROJECT.  THE PROJECT INVOLVED THE SPEECH

19   ANALYSIS.  BUT SPECIFICALLY WHAT WE DID WAS, WE TOOK AN

20   ULTRASOUND SENSOR.  SAME KIND OF ULTRASOUND SENSOR

21   THAT'S USED DURING PREGNANCY TO GET MOVIES OF THE BABY.

22   WELL, WE TOOK THAT KIND OF ULTRASOUND SENSOR AND

23   POSITIONED IT UNDER THE CHIN OF A PERSON WHILE THE

24   PERSON IS SPEAKING.  WHAT DOES THAT DO?  WELL, IT LETS

25   YOU SEE A MOVIE OF YOUR TONGUE MOVING AS YOU'RE

EXHIBIT 6 - PAGE 122

```
1    SPEAKING.

2             SO THIS HAS INTERESTING APPLICATIONS IN THE

3    STUDY OF SPEECH PRODUCTION.  AND, SPECIFICALLY, WE'VE

4    WORKED ON TRYING TO USE THIS AS A SPEECH AID FOR

5    CHILDREN THAT HAVE SPEECH DISORDERS OR DIFFICULTY

6    LEARNING HOW TO PRODUCE CERTAIN SOUNDS.

7             AS YOU MIGHT EXPECT, IT CAN BE CHALLENGING TO

8    EXPLAIN TO SOMEONE HOW TO MOVE THEIR TONGUE IN ORDER TO

9    MAKE A CERTAIN SOUND.  YOU KNOW, IT'S HARDER TO SAY,

10   WELL, MOVE THE BACK OF YOUR TONGUE A LITTLE HIGHER

11   TOWARD THE ROOF OF YOUR MOUTH.  IT'S HARD TO VISUALIZE

12   THAT.  SO, INSTEAD, THE IDEA IS TO HAVE A T.V. SCREEN

13   IN FRONT OF THE CHILD WHILE HE'S SPEAKING.  AND HE CAN

14   SEE HIS TONGUE MOVING AS HE'S TALKING.  AND WE CAN

15   SUPERIMPOSE LIKE A RED CURVE THAT SHOWS THE TARGET

16   POSITION OF WHERE THE TONGUE SHOULD BE IN ORDER TO MAKE

17   A PARTICULAR SOUND.  AND THEN IT'S LIKE A VIDEO GAME.

18   YOU CAN TELL THE CHILD, WELL, TRY TO GET YOUR TONGUE TO

19   LINE UP WITH THE TARGET CURVE.

20            SO THE LINGUISTICS DEPARTMENT CONTACTED ME FOR

21   HELP IN DOING THE IMAGE ANALYSIS TO DO THE AUTOMATIC

22   TRACKING OF THE TONGUE FROM THIS ULTRASOUND VIDEO

23   SEQUENCE.

24   Q    LET ME EXPLORE JUST ONE MORE ASPECT OF YOUR

25   BACKGROUND.  WHAT IS THE "IEEE"?
```

EXHIBIT 6 - PAGE 123

1    A    THE IEEE IS THE INTERNATIONAL PROFESSIONAL

2    ORGANIZATION IN MY RESEARCH AREA.  IT STANDS FOR THE

3    INSTITUTE OF ELECTRONIC -- SORRY.  THE INSTITUTE OF

4    ELECTRICAL AND ELECTRONICS ENGINEERS.

5    Q    AND DO YOU HAVE A PARTICULAR ROLE WITH THAT

6    ORGANIZATION?

7    A    I'M A SENIOR MEMBER IN THE IEEE.  AND I AM PRETTY

8    ACTIVE IN ORGANIZATION OF VARIOUS PROFESSIONAL

9    CONFERENCES AND SYMPOSIA.

10   Q    WHAT DOES IT TAKE TO BECOME A SENIOR MEMBER OF THE

11   IEEE?

12   A    BECOMING A SENIOR MEMBER IS SOMETHING THAT HAPPENS

13   OVER TIME AFTER YOU'VE -- WELL, IF YOU'RE AN ACADEMIA,

14   ONCE YOU'VE BEEN PROMOTED AND RECEIVED YOUR TENURE,

15   SOON THEREAFTER, USUALLY, YOUR RANK WITHIN THE IEEE

16   GOES UP TO SENIOR MEMBER.

17        MR. GASPAR:  AT THIS POINT, YOUR HONOR, WE

18   WOULD TENDER PROFESSOR RODRIGUEZ AS AN EXPERT IN

19   TELECOMMUNICATIONS, WIRELESS COMMUNICATION AND SIGNAL

20   PROCESSING.

21        MR. NIRO:  NO OBJECTION.

22        THE COURT:  THE MOTION IS GRANTED.

23   BY MR. GASPAR:

24   Q    SO, PROFESSOR RODRIGUEZ, AS AN EXPERT IN THIS CASE,

25   HAVE YOU CONSIDERED SOME MATERIALS GENERALLY?

EXHIBIT 6 - PAGE 124

1    A    YES.  I HAVE REVIEWED A NUMBER OF MATERIALS RELATED

2    TO THIS CASE.

3    Q    WITHOUT GOING THROUGH EVERY ONE OF THEM, GENERALLY

4    WHAT DID YOU CONSIDER?

5    A    I LOOKED AT THE PATENT ITSELF THAT'S AT ISSUE HERE,

6    THE PROSECUTION HISTORY FOR THAT PATENT.  I'VE ALSO

7    LOOKED AT A NUMBER OF PUBLICATIONS OF -- INVOLVING

8    PRIOR ART TO THIS PATENT.  I'VE LOOKED AT SOME OF THE

9    PLEADINGS AND OTHER DOCUMENTS AS WELL.

10   Q    NOW, HAVE YOU FORMED SOME MAIN CONCLUSIONS THAT WE

11   SHOULD KEEP IN MIND AS WE LISTEN TO YOUR TESTIMONY

12   TODAY?

13   A    WELL, BASED ON MY REVIEW OF ALL THE MATERIALS, I

14   HAVE COME TO THE CONCLUSION THAT, FIRST, THE '380

15   PATENT IS INVALID FOR A NUMBER OF REASONS.

16        SECOND, THAT THE I-PHONE 4 DOES NOT INFRINGE

17   THE CLAIMS THAT HAVE BEEN ASSERTED IN THIS CASE.

18   Q    LET'S TALK A LITTLE BIT MORE IN DETAIL ABOUT THE

19   REASONS FOR THOSE CONCLUSIONS.  AND LET'S START WITH --

20   I BELIEVE YOU MENTIONED "INVALIDITY."  MY FIRST

21   QUESTION TO YOU ABOUT INVALIDITY IS, WHAT IS THE

22   WRITTEN DESCRIPTION RULE, AS YOU UNDERSTAND IT?

23   A    THE WRITTEN DESCRIPTION RULE IN PATENT LAW REQUIRES

24   THAT AT THE TIME THE PATENT APPLICATION IS FILED, THE

25   INVENTOR OR PATENTEE HAS TO LAY OUT A DETAILED

EXHIBIT 6 - PAGE 125

1    DESCRIPTION OF WHAT HIS INVENTION IS.  IT HAS TO BE

2    SUFFICIENTLY DESCRIBED SO THAT A PERSON HAVING ORDINARY

3    SKILL IN THE ART WOULD BE ABLE TO READ THAT WRITTEN

4    DESCRIPTION IN THE PATENT AND UNDERSTAND HOW TO REPEAT

5    OR HOW TO MAKE THE CLAIMED INVENTION.

6    Q    DID YOU FORM ANY SPECIFIC CONCLUSIONS ABOUT WHETHER

7    NETAIRUS'S PATENT VIOLATES THE WRITTEN DESCRIPTION

8    RULE?

9    A    YES.  AFTER CAREFULLY STUDYING THE PATENT, AS WELL

10   AS THE PROSECUTION HISTORY FOR THAT PATENT, I CAME TO

11   THE CONCLUSION THAT THERE ARE SEVERAL KEY ELEMENTS IN

12   THE PATENT CLAIMS THAT ARE NOT ADEQUATELY DESCRIBED IN

13   THE PATENT SPECIFICATION.

14   Q    NOW, DID YOU PREPARE SOME SLIDES TO HELP US

15   UNDERSTAND YOUR OPINIONS TODAY?

16   A    YES, I DID.

17          MR. GASPAR:  YOUR HONOR, AT THIS POINT, I

18   WOULD LIKE TO DISPLAY WHAT'S BEEN MARKED AS DEFENDANT'S

19   DEMONSTRATIVE EXHIBIT NUMBER 85.

20          THE COURT:  OKAY.  ANY OBJECTION TO THAT BEING

21   PUBLISHED?

22          MR. DEAN NIRO:  NO OBJECTION.

23          THE COURT:  THANK YOU.

24   BY MR. GASPAR:

25   Q    SO, PROFESSOR RODRIGUEZ, WHAT ARE YOU CONVEYING ON

EXHIBIT 6 - PAGE 126

1    DEMONSTRATIVE NUMBER 85?

2    A    THIS IS A SUMMARY OF THE THREE MAIN ELEMENTS THAT I

3    DIDN'T FIND ADEQUATELY DESCRIBED IN THE SPECIFICATION

4    FOR THE '380 PATENT.

5    Q    AND WHAT WERE THOSE THREE MAIN ELEMENTS?

6    A    WELL, FIRST, THE CLAIMS OF THE PATENT REQUIRE A

7    HANDSET THAT CAN SEND AND RECEIVE E-MAIL.  I LOOKED

8    CAREFULLY AND COULDN'T FIND THAT IN THE PATENT

9    SPECIFICATION.

10              SECOND, THE ASSERTED CLAIMS REQUIRE A

11   HANDSET THAT CAN SELECTIVELY COMMUNICATE AS DESCRIBED,

12   AS WE'LL TALK ABOUT LATER.  I COULDN'T FIND THAT IN THE

13   PATENT SPECIFICATION EITHER.

14              AND, THIRD, THE PATENT REQUIRES A HANDSET

15   THAT CAN PERFORM PDA FUNCTIONS.  AGAIN, I COULDN'T FIND

16   THAT DESCRIBED IN THE PATENT SPECIFICATION EITHER.

17   Q    LET'S START WITH E-MAIL, WHICH IS THE TOP OF THE

18   THREE POINTS THAT YOU'VE SHOWN US ON THIS SLIDE.

19              DOES THE CONCEPT OF E-MAIL APPEAR IN THE

20   PATENT CLAIMS?

21   A    YES.

22   Q    LET ME SHOW YOU DEMONSTRATIVE EXHIBIT NUMBER 86.

23              IS THIS THE ASPECT OF THE CLAIMS THAT YOU HAD

24   IN MIND?

25   A    YES.  CLAIMS 1 AND 7, WHICH ARE PART OF THE

EXHIBIT 6 - PAGE 127

1   ASSERTED CLAIMS IN THIS CASE, REFER TO A HANDSET THAT

2   CAN SEND AND RECEIVE DATA FORMATTED FOR COMPUTER

3   E-MAIL.

4   Q    SO IS IT CORRECT THAT E-MAIL THEN APPEARS

5   EFFECTIVELY IN ALL OF THE ASSERTED CLAIMS?

6   A    THAT'S CORRECT.

7   Q    LET ME SHOW YOU WHAT HAS BEEN MARKED AS DEFENDANT'S

8   DEMONSTRATIVE EXHIBIT NUMBER 87.

9         WHAT ARE YOU CONVEYING WITH THIS SLIDE?

10  A    SO AS I EXPLAINED, I WENT THROUGH THE MAIN BODY OF

11  THE PATENT, THE PATENT SPECIFICATION, AND TRIED TO LOOK

12  FOR PLACES WHERE IT DESCRIBED A HANDSET SENDING E-MAIL.

13  I ONLY FOUND THREE PLACES IN THE PATENT SPECIFICATION

14  THAT MENTIONED "E-MAIL."  SO THIS IS ONE OF THEM.  AND

15  AS YOU CAN SEE, IT MENTIONS THAT THE COMPUTER SYSTEM

16  CAN SEND E-MAIL.  IT'S VERY CLEAR IN THIS SENTENCE IN

17  THIS PARAGRAPH THAT IT'S DESCRIBING E-MAIL THAT'S

18  PERFORMED BY THE COMPUTER SYSTEM, NOT THE HANDSET.  AND

19  THE PRECISE LANGUAGE IN THE CLAIMS THAT HAVE BEEN

20  ASSERTED REQUIRES A HANDSET THAT CAN SEND AND RECEIVE

21  E-MAIL, NOT A COMPUTER SYSTEM.  THEY'RE TWO DIFFERENT

22  THINGS IN THIS PATENT.

23  Q    SO I THINK YOU JUST SAID THAT THERE WERE THREE

24  LOCATIONS IN THE PATENT SPECIFICATION THAT MENTIONED

25  E-MAIL; IS THAT CORRECT?

EXHIBIT 6 - PAGE 128

```
1    A    YES.  IF YOU LOOK AT THE NEXT SLIDE, I THINK I HAVE

2    ANOTHER EXCERPT.  THIS IS ANOTHER LOCATION IN THE BODY

3    OF THE PATENT THAT MENTIONS "E-MAIL."  AGAIN, IT REFERS

4    TO E-MAIL FUNCTIONS THAT MAY BE IMPLEMENTED IN THE

5    COMPUTER SYSTEM, NOT THE HANDSET.

6           THE CLERK:  MR. GASPAR, WHAT DEMONSTRATIVE WAS

7    THAT?

8           MR. GASPAR:  THE ONE PROFESSOR RODRIGUEZ JUST

9    SPOKE TO IS DEFENDANT'S DEMONSTRATIVE EXHIBIT NUMBER

10   88.

11          I'LL NOW DISPLAY DEFENDANT'S

12   DEMONSTRATIVE EXHIBIT NUMBER 89.

13   BY MR. GASPAR:

14   Q    PROFESSOR RODRIGUEZ, WHAT IS THIS SLIDE SHOWING US?

15   A    THIS IS THE THIRD PLACE I FOUND IN THE BODY OF THE

16   PATENT THAT MENTIONED "E-MAIL."  AGAIN, HERE YOU CAN

17   SEE THAT IT REFERS TO ELECTRONIC MAIL PERFORMED BY THE

18   COMPUTER SYSTEM, NOT THE HANDSET.  THAT'S ALSO SHOWN IN

19   THE ASSOCIATED FIGURE SHOWN BELOW ON THAT ILLUSTRATION.

20   Q    WHAT IS YOUR CONCLUSION ABOUT THE WRITTEN

21   DESCRIPTION RULE AS IT RELATES TO THIS PORTION OF THE

22   CLAIM THAT CONCERNS E-MAIL?

23   A    SO SINCE I COULDN'T FIND ANY MENTION IN THE BODY OF

24   THE PATENT, IN THE PATENT SPECIFICATION OF A HANDSET

25   SENDING E-MAIL, I HAD TO CONCLUDE THAT THERE'S NO
```

EXHIBIT 6 - PAGE 129

1    ADEQUATE WRITTEN DESCRIPTION OF THAT FEATURE.

2    Q    NOW, WE'VE JUST TALKED ABOUT THE WRITTEN

3    DESCRIPTION OF THE E-MAIL FEATURE.  I BELIEVE YOU ALSO

4    MENTIONED THAT THERE WAS A CONCERN ABOUT THE WRITTEN

5    DESCRIPTION FOR THE "SELECTIVITY OF COMMUNICATION"

6    PORTION; IS THAT RIGHT?

7    A    THAT'S CORRECT.

8    Q    LET ME SHOW YOU WHAT'S BEEN LABELED AS DEFENDANT'S

9    DEMONSTRATIVE EXHIBIT 90.

10           AND WHAT IS BEING DISPLAYED HERE?

11   A    SO, HERE, WE'RE LOOKING AT CLAIMS 1 AND 7, TWO OF

12   THE CLAIMS INVOLVED IN THIS CASE.  AND IT EXPLAINS A

13   KEY ELEMENT OF THE CLAIMS BEING "COMMUNICATING

14   SELECTIVELY FIRST AND SECOND DATA TO AND FROM A BASE

15   UNIT."

16           WELL, THE KEY ELEMENT HERE IS THAT IT'S USING

17   SAID HANDSET UNIT TO COMMUNICATE SELECTIVELY.  THAT'S

18   WHAT IT SAYS IN ELEMENT 1(C) ON THAT TOP ILLUSTRATION

19   ON THE SLIDE.  IT SAYS, "USING SAID HANDSET UNIT TO

20   COMMUNICATE SELECTIVELY."  SO THERE HAS TO BE A WAY FOR

21   THAT HANDSET TO SELECT WHETHER TO COMMUNICATE TO WHAT'S

22   REFERRED TO AS A "LOCAL AREA COMMUNICATION BASE UNIT"

23   OR TO AN "EXTERNAL WIDE AREA NETWORK."

24           SINCE IT REQUIRES THAT IT'S THE HANDSET THAT

25   SELECTS BETWEEN THIS TYPE -- THE TWO TYPES OF

EXHIBIT 6 - PAGE 130

1    COMMUNICATION, I WENT TO THE PATENT SPECIFICATION

2    LOOKING FOR A DISCLOSURE OF THAT ELEMENT.

3    Q    SO IS IT CORRECT THAT ALL OF THE ASSERTED CLAIMS IN

4    THIS CASE REQUIRE THE HANDSET TO PERFORM THIS SELECTIVE

5    COMMUNICATION?

6    A    YES.  ALL OF THE CLAIMS THAT HAVE BEEN ASSERTED IN

7    THIS CASE HAVE THIS PRINCIPLE ELEMENT.

8    Q    YOU JUST MENTIONED ASPECTS OF THE DISCLOSURE AS IT

9    CONCERNS THE SELECTIVE COMMUNICATION REQUIREMENT.

10          LET ME SHOW YOU WHAT'S BEEN MARKED AS

11   DEFENDANT'S DEMONSTRATIVE EXHIBIT NUMBER 91.

12          WHAT IS THIS SHOWING US?

13   A    SO I LOOKED CAREFULLY THROUGH THE PATENT TO FIND

14   PLACES WHERE IT TALKED ABOUT SELECTIVE COMMUNICATION.

15   AND ONE OF THE PLACES WHERE I FOUND IT MENTIONED IS --

16   AS SHOWN IN THIS SLIDE WHERE IT SAYS THAT THE BASE UNIT

17   CAN BE DESIGNED TO SWITCH BETWEEN A HIGH AND LOW-LEVEL

18   TRANSMITTING AND RECEIVING POWER LEVELS.

19          THE PROBLEM HERE IS THAT IT'S REFERRING TO THE

20   BASE UNIT SWITCHING BETWEEN HIGH AND LOW POWER LEVELS,

21   NOT THE HANDSET.  AND THE WAY THE CLAIMS OF THE PATENT

22   WERE DRAFTED, IT VERY CLEARLY REQUIRES A HANDSET THAT

23   CAN SWITCH BETWEEN THESE TWO MODES.  SO THIS IS

24   DESCRIBING SOMETHING ELSE.

25          INDEED, ELSEWHERE IN THE BODY OF THE PATENT,

EXHIBIT 6 - PAGE 131

 1   IT EXPLAINS WHAT THE BASE UNIT IS.  AND IT EQUATES THE

 2   BASE UNIT WITH THE COMPUTER SYSTEM, NOT THE HANDSET.

 3   Q    IS THIS THE ONLY ASPECT OF THE WRITTEN DESCRIPTION

 4   THAT YOU CONSIDERED WHEN YOU WERE FORMING YOUR

 5   CONCLUSIONS ABOUT THE WRITTEN DESCRIPTION RULE AND THE

 6   SELECTIVE COMMUNICATION ASPECT?

 7   A    NO.  THERE'S ANOTHER PLACE WHERE IT'S DISCUSSED AS

 8   WELL.  ON THE NEXT SLIDE, IT'S SHOWN.

 9            MR. GASPAR:  WHICH IS DEFENDANT'S

10   DEMONSTRATIVE 92 FOR THE RECORD.

11   BY MR. GASPAR:

12   Q    WHAT IS THIS SLIDE SHOWING US?

13   A    SO, HERE, YOU'LL SEE ANOTHER EXCERPT FROM THE

14   PATENT SPECIFICATION.  AND IT EXPLAINS THAT THERE MAY

15   BE SWITCHES OR INDICATORS LOCATED ALONG ONE EDGE OF THE

16   BASE UNIT.

17            AGAIN, ELSEWHERE IN THE PATENT, IT EXPLAINS

18   THAT THE BASE UNIT IS THE COMPUTER SYSTEM RATHER THAN

19   THE HANDSET.

20            AND THOSE SWITCHES ALLOW CHANGING MODES

21   BETWEEN HIGH AND LOW POWER.  IT REFERS TO A HIGH/LOW

22   POWER TRANSMIT SWITCH.  THIS IS ONE OF THE SWITCHES

23   LOCATED ALONG ONE EDGE OF THE BASE UNIT OR COMPUTER

24   SYSTEM, NOT THE HANDSET.

25   Q    AND WAS THERE AN ADDITIONAL PORTION OF THE

EXHIBIT 6 - PAGE 132

1    SPECIFICATION THAT YOU CONSIDERED ON THIS TOPIC?

2    A    YES.  I BELIEVE THAT'S SHOWN IN THE NEXT SLIDE.

3    Q    NOW, WHAT'S BEING DISPLAYED IS DEMONSTRATIVE

4    EXHIBIT 93.

5           WHAT IS THIS SLIDE TELLING US?

6    A    SO HERE'S ANOTHER EXCERPT FROM THE PATENT THAT MAY

7    SHED SOME LIGHT ON THIS SELECTIVITY.  SO THE FIRST PART

8    OF THIS PARAGRAPH, IT'S NOT HIGHLIGHTED.  BUT IT SAYS,

9    "SINCE LESS POWER IS REQUIRED FOR THE HANDSET, IT CAN

10   BE THINNER AND SMALLER THAN A STANDARD CELLULAR

11   HANDSET."  SO THIS IS EXPLAINING THAT THE HANDSET -- SO

12   THIS IS EXPLAINING THAT THE HANDSET IS DESIGNED TO

13   OPERATE AT LESS POWER, A LOWER POWER.  IT'S NOT SAYING

14   THAT IT ALSO CAN OPERATE AT HIGH POWER.  IT DOESN'T SAY

15   ANYTHING ABOUT IT SWITCHING BETWEEN LOW AND HIGH.  IT

16   SAYS IT OPERATES AT LESS POWER.

17          AND IF YOU PUT THIS IN THE CONTEXT OF THE

18   SURROUNDING TEXT IN THE PATENT, IT BECOMES CLEAR.  THE

19   WHOLE IDEA BEHIND THIS INVENTION -- THE KIND OF

20   INVENTION IN THIS PATENT IS TO COME UP WITH A NEW

21   SYSTEM SO THAT YOU CAN MINIMIZE THE HARMFUL --

22   POTENTIALLY HARMFUL EFFECTS OF HAVING A HIGH POWER

23   ELECTRONIC DEVICE SO CLOSE TO YOUR HEAD.

24          SO AS EXPLAINED IN THE PATENT, THE IDEA WAS TO

25   KIND OF SEPARATE THE FUNCTIONALITY SO THAT THE HANDSET

EXHIBIT 6 - PAGE 133

1    CAN OPERATE AT A LOWER POWER THAT'S HOLDING -- THAT'S

2    BEING HELD NEXT TO YOUR HEAD.  AND THEN YOU HAVE A

3    NOTEBOOK COMPUTER THAT YOU COULD, FOR EXAMPLE, CARRY

4    UNDER YOUR ARM, IN A CASE PERHAPS.  AND SO THE HANDSET

5    CAN THEN TALK TO THE NOTEBOOK COMPUTER.  AND THEN THE

6    NOTEBOOK COMPUTER CAN RELAY YOUR MESSAGES ON TO

7    WHEREVER THEY NEED TO GO AT A HIGHER POWER.  SO THE

8    NOTEBOOK COMPUTER IS DOING THE HIGH POWER

9    COMMUNICATIONS, AND THE HANDSET IS DOING THE LOW POWER

10   PROCESSING.  SO THAT WAS THE IDEA BEHIND THIS PATENT.

11   SO THAT'S WHY IT'S REFERRING HERE TO THE HANDSET USING

12   LESS POWER.

13          SO THE PROBLEM IS, IT DOESN'T SAY THE HANDSET

14   CAN SWITCH BETWEEN LOW AND HIGH.  IN FACT, IT'S -- THE

15   WHOLE IDEA BEHIND THE PATENT IS THE HANDSET IS ALWAYS

16   LOW POWER.

17   Q    WITH YOUR DETAILED EXPLANATION OF WHAT THE PATENT

18   DISCLOSURE PROVIDES AND THE DEMONSTRATIVE SLIDES THAT

19   YOU'VE SHOWN US, EXCERPTS OF THE PATENT, WHAT

20   CONCLUSION HAVE YOU COME TO CONCERNING THE WRITTEN

21   DESCRIPTION RULE AND THE SELECTIVE COMMUNICATION ASPECT

22   OF THE CLAIMS?

23   A    SO SINCE I COULDN'T FIND A DESCRIPTION IN THE BODY

24   OF THE PATENT, THE PATENT SPECIFICATION, FOR A HANDSET

25   THAT CAN SWITCH BETWEEN HIGH AND LOW POWER, I HAD TO

EXHIBIT 6 - PAGE 134

1    CONCLUDE THAT THIS DOESN'T MEET THE REQUIREMENTS -- THE

2    LEGAL REQUIREMENT FOR WRITTEN DESCRIPTION.

3    Q    NOW, I THINK THERE WAS ONE OTHER AREA OF CONCERN

4    THAT YOU RAISED ABOUT THE WRITTEN DESCRIPTION RULE.

5         WAS THAT CONCERNING THE PDA FUNCTIONALITY?

6    A    THAT'S CORRECT.

7    Q    LET ME SHOW YOU WHAT'S BEEN MARKED AS DEFENDANT'S

8    DEMONSTRATIVE EXHIBIT NUMBER 94.

9         WHAT'S BEING SHOWN HERE?

10   A    HERE, WE SEE CLAIMS 2 AND 7.  AND BOTH OF THOSE

11   CLAIMS REFER TO A HANDSET UNIT THAT'S CONFIGURED AS A

12   PERSONAL DIGITAL ASSISTANT, A PDA.  SO THAT MEANS IT

13   NEEDS TO HAVE FUNCTIONALITY LIKE, YOU KNOW, CONTACTS OR

14   NOTEPAD OR, YOU KNOW, THINGS OF THAT NATURE.

15   Q    DO ALL OF THE ASSERTED CLAIMS IN THIS CASE, THOSE

16   THAT ARE ASSERTED AGAINST APPLE, INCLUDE THIS PDA

17   REQUIREMENT?

18   A    YES, THEY DO.

19   Q    OKAY.  AND DID YOU LOOK IN THE PATENT SPECIFICATION

20   TO SEE IF YOU COULD FIND THE PDA FUNCTIONALITY IN THE

21   HANDSET?

22   A    YES.  I LOOKED THROUGH THE BODY OF THE PATENT TO

23   SEE WHETHER THERE WAS A DETAILED DESCRIPTION OF HOW YOU

24   WOULD IMPLEMENT THIS.

25   Q    LET ME SHOW YOU DEFENDANT'S DEMONSTRATIVE EXHIBIT

EXHIBIT 6 - PAGE 135

1    NUMBER 95.

2          WHAT'S BEING CONVEYED HERE?

3    A    SO THIS IS A SECTION OUT OF THE PATENT

4    SPECIFICATION THAT DISCUSSES A PDA.  BUT NOTE THAT THE

5    HEADING OF THIS PARAGRAPH IS "DESCRIPTION OF PRIOR

6    ART."  SO IN THE PATENT BODY, IT'S CUSTOMARY TO START

7    OFF WITH AN INTRODUCTION OR BACKGROUND SUMMARY OF WHAT

8    EXISTED BEFORE THIS CLAIMED INVENTION.  SO THIS IS

9    DISCUSSING DEVICES THAT WERE ALREADY ON THE MARKET,

10   ALREADY AVAILABLE.  SO IT'S EXPLAINING THAT PDA'S ARE

11   SMALL HAND-HELD UNITS WITH A DISPLAY AND KEYPAD, ET

12   CETERA.  OKAY.  THIS IS NOT DESCRIBING THE CLAIMED

13   INVENTION.  THIS IS PART OF THE BACKGROUND PARAGRAPH OF

14   THE PATENT, THE PRIOR ART.

15   Q    DID YOU ALSO CONSIDER THE DESCRIPTION OF THE

16   INVENTION PORTION OF THE PATENT WHEN YOU WERE THINKING

17   OF THIS QUESTION?

18   A    I DID.

19   Q    LET ME SHOW YOU DEFENDANT'S DEMONSTRATIVE EXHIBIT

20   NUMBER 96.

21          WHAT IS BEING SHOWN HERE?

22   A    SO NOW WE'RE TO THE PART OF THE PATENT

23   SPECIFICATION THAT'S DESCRIBING THE CLAIMED INVENTION

24   TITLED "BACKGROUND OF THE INVENTION" -- OR -- YES.

25          SO, HERE, IT'S DESCRIBING A NOTEBOOK-LIKE

EXHIBIT 6 - PAGE 136

1    COMPUTER STRUCTURE THAT'S CAPABLE OF PERFORMING

2    PERSONAL-DIGITAL-ASSISTANT-LIKE FUNCTIONS.  SO AS WE

3    SEE, IT'S NOT REFERRING TO A HANDSET THAT'S PERFORMING

4    PDA FUNCTIONS.  IT'S REFERRING TO THE NOTEBOOK-LIKE

5    COMPUTER STRUCTURE PERFORMING THE PDA FUNCTIONS.

6              AND THE PATENT IS VERY CLEAR THAT THE CLAIMED

7    INVENTION CONSISTS OF TWO SEPARATE COMPONENTS, A

8    HANDSET AND A NOTEBOOK-LIKE COMPUTER.

9              SO, HERE, IT'S EXPLAINING THAT THE PDA

10   FUNCTIONS ARE LOCATED ON THE NOTEBOOK-LIKE COMPUTER,

11   NOT ON THE HANDSET.

12   Q    ARE THERE OTHER ASPECTS OF THE PATENT SPECIFICATION

13   WHICH DESCRIBES THE INVENTION THAT YOU CONSIDERED?

14   A    YES.  THIS IS DISCUSSED AT ANOTHER LOCATION IN THE

15   PATENT AS WELL.

16   Q    DEFENDANT'S DEMONSTRATIVE EXHIBIT NUMBER 97 IS NOW

17   DISPLAYED.

18             WHAT CAN YOU TELL US ABOUT THIS SLIDE?

19   A    THIS SLIDE SHOWS THAT IT'S THE -- IT'S THE PC

20   COMPUTER THAT IS DOING THE -- WHAT THEY'RE REFERRING TO

21   AS "PDA COMPUTING," SO PERFORMING THE PDA FUNCTIONS.

22   AGAIN, IT'S NOT THE HANDSET THAT'S BEING DISCUSSED

23   HERE.  THIS IS THE BASE UNIT OR NOTEBOOK-LIKE COMPUTER

24   THAT IT'S REFERRING TO THAT'S PERFORMING THE PDA

25   FUNCTIONS.

EXHIBIT 6 - PAGE 137

1    Q    NOW, AT THE BEGINNING OF YOUR TESTIMONY TODAY, YOU

2    MENTIONED THE TERM "FILE HISTORY."  AND THAT WAS

3    SOMETHING THAT YOU REVIEWED, I THINK YOU SAID.

4            WHAT DOES "FILE HISTORY" MEAN?

5    A    SO THE FILE HISTORY OR PROSECUTION HISTORY, THIS IS

6    A BIG STACK OF DOCUMENTS THAT REPRESENTS ALL THE

7    COMMUNICATIONS BACK AND FORTH BETWEEN THE INVENTOR AND

8    THE PATENT AND TRADEMARK OFFICE.  IT STARTS OFF WITH

9    THE ORIGINAL PATENT APPLICATION DOCUMENT.  AND THEN IT

10   INCLUDES THE CORRESPONDENCE BACK TO THE INVENTOR ABOUT

11   WHETHER THE PATENT OFFICE IS APPROVING CERTAIN CLAIMS

12   OR DISAPPROVING CERTAIN CLAIMS, AND THEN RESPONSES FROM

13   THE PATENTEE, AND BACK AND FORTH AND BACK AND FORTH

14   UNTIL THE FINAL ISSUANCE OF THE PATENT.

15   Q    IS THERE ANYTHING IN THE FILE HISTORY THAT YOU

16   CONSIDERED WHEN YOU WERE THINKING OF THIS QUESTION

17   ABOUT THE WRITTEN DESCRIPTION RULE AND THE PDA

18   REQUIREMENT?

19   A    I DID.  SO IN ORDER TO DETERMINE THAT THERE'S

20   SUFFICIENT WRITTEN DESCRIPTION, I REVIEWED NOT JUST THE

21   PATENT ITSELF, BUT ALSO ALL OF THE COMMUNICATIONS IN

22   THAT PROSECUTION HISTORY SO THAT I MAKE SURE THAT I

23   REALLY UNDERSTOOD WHAT WAS DESCRIBED.

24   Q    NOW, DID THE PATENT EXAMINERS THAT WERE LOOKING AT

25   THE PATENT APPLICATION MAKE ANY STATEMENTS ABOUT THE

EXHIBIT 6 - PAGE 138

1    WRITTEN DESCRIPTION RULE AND THIS PDA FUNCTION?

2    A    YES, THEY DID.  AND I HAVE PREPARED SOME SLIDES TO

3    SHOW THAT.

4    Q    LET ME DISPLAY DEFENDANT'S DEMONSTRATIVE EXHIBIT

5    NUMBER 98.

6            WHAT'S BEING SHOWN HERE?

7    A    SO, HERE, I'M SHOWING SEVERAL EXCERPTS FROM

8    CORRESPONDENCE FROM ONE OF THE PATENT EXAMINERS AT THE

9    PATENT AND TRADEMARK OFFICE.  HE'S SPECIFICALLY

10   SAYING -- WELL, HE'S REFERRING TO A COUPLE OF THE

11   CLAIMS THAT HAD BEEN INCLUDED IN THE ORIGINAL PATENT

12   APPLICATION.  AND HE'S CONCLUDING THAT -- AFTER HIS

13   REVIEW, HE'S CONCLUDING THAT THE SPECIFICATION -- THE

14   PATENT APPLICATION, HE'S CONCLUDING THAT IT FAILS TO

15   PROVIDE FOR THE HANDSET UNIT TO PRIMARILY BE A PERSONAL

16   DIGITAL ASSISTANT DEVICE, BUT, INSTEAD, PROVIDES FOR

17   THE BASE TO BE A PDA.  AND, REMEMBER, THE BASE OR BASE

18   UNIT IS EXPLAINED IN THE PATENT, THAT THAT'S REFERRING

19   TO THE NOTEBOOK-LIKE COMPUTER, NOT THE HANDSET.

20           SO THE PATENT EXAMINER ALSO FOUND THAT THE

21   PATENT SPECIFICATION DOESN'T DESCRIBE A HANDSET UNIT

22   WITH PDA FUNCTIONS.  IT'S DESCRIBING THIS BASE NOTEBOOK

23   COMPUTER WITH A HANDSET -- WITH THE PDA-LIKE FUNCTIONS.

24           AND THERE'S A COUPLE OF OTHER QUOTES FROM THAT

25   SAME -- MR. KINCAID, THE PATENT EXAMINER, THAT EXPLAINS

EXHIBIT 6 - PAGE 139

1    THIS.

2    Q    NOW, IS MR. KINCAID -- EXAMINER KINCAID, I SHOULD

3    SAY, THE ONLY EXAMINER THAT SPOKE TO THIS ISSUE IN THE

4    FILE HISTORY?

5    A    NO.  I'VE GOT ANOTHER SLIDE WITH AN EXCERPT FROM

6    ANOTHER PATENT EXAMINER.

7    Q    LET ME DISPLAY DEFENDANT'S DEMONSTRATIVE EXHIBIT

8    NUMBER 99.

9         WHAT IS THIS SLIDE SHOWING?

10   A    EXAMINER BHATTACHARYA ALSO MADE STATEMENTS IN THE

11   PROSECUTION HISTORY REGARDING THIS TOPIC.  AS WE SEE

12   HERE, HE SAYS THAT "THE SPECIFICATION FAILS TO PROVIDE

13   SUPPORT FOR A HANDSET UNIT CONFIGURED TO A PDA.

14   NOWHERE DOES THE SPECIFICATION DISCLOSE A HANDSET

15   CONFIGURED TO A PDA THAT COMMUNICATES WIRELESSLY WITH

16   THE BASE UNIT.  THE PDA IS MENTIONED INTERCHANGEABLY

17   WITH A NOTEBOOK COMPUTER, NOT A HANDSET."

18   Q    SO DURING YOUR REVIEW OF THE FILE HISTORY, WAS

19   THERE ANYTHING OTHER THAN THESE STATEMENTS BY THE

20   EXAMINER THAT CAUGHT YOUR EYE?

21   A    YES.  THERE'S ALSO SOME DRAWINGS THAT SHED SOME

22   LIGHT ON THIS AS WELL.

23   Q    LET ME DISPLAY FOR YOU DEFENDANT'S DEMONSTRATIVE

24   EXHIBIT NUMBER 100.

25        WHAT'S BEING SHOWN HERE?

EXHIBIT 6 - PAGE 140

1    A    SO, HERE, I'M SHOWING TWO OF THE DRAWINGS THAT SHOW

2    UP IN THE PROSECUTION HISTORY.  THE TOP DRAWING IS

3    TAKEN FROM THE ORIGINAL PATENT APPLICATION DATED 1997.

4    THAT'S WHEN IT WAS SUBMITTED.  AND IT SHOWS, IN THE

5    UPPER-LEFT CORNER OF THAT DRAWING, A HANDSET UNIT.

6    THAT'S BEEN HIGHLIGHTED IN YELLOW.

7            LATER, SOME SEVEN YEARS LATER, IN 2004, A --

8    THIS WAS AFTER THE PATENT EXAMINERS OBJECTED TO THE

9    DESCRIPTION OF A HANDSET UNIT CONFIGURED AS A PDA.

10   RIGHT?  WE SAW IN THE PREVIOUS SLIDE THAT THE PATENT

11   EXAMINERS COULDN'T FIND MENTION OF A HANDSET UNIT

12   THAT'S A PDA.

13           SO IN RESPONSE TO THAT, THE INVENTOR OR

14   PATENTEE SUBMITTED A REVISED DRAWING.  AND THAT'S SHOWN

15   HERE AS THE 2004 DRAWING.

16           AND THE DIFFERENCE IS, YOU CAN SEE THAT THE

17   UPPER-LEFT BOX IS LABELED NOW "A HANDSET/PDA UNIT."

18   INSTEAD OF JUST "HANDSET UNIT," IT'S NOW LABELED AS

19   "HANDSET/PDA UNIT."  SO I SAW THIS AS AN ATTEMPT FOR

20   THE INVENTOR TO TRY TO CHANGE THE APPLICATION LATER IN

21   THE PROCESS TO TRY TO FIT IN A REFERENCE TO A HANDSET

22   CONFIGURED AS A PDA.

23           MY UNDERSTANDING OF THE LAW IS, THAT IF IT'S

24   NOT IN THE ORIGINAL PATENT APPLICATION, THEN THAT'S NOT

25   SUFFICIENT.  IT'S TOO LATE.  YOU CAN'T GO AND CHANGE IT

EXHIBIT 6 - PAGE 141

```
 1    LATER.  THE PATENT LAW REQUIRES THAT YOUR INVENTION HAS
 2    TO BE FULLY DISCLOSED IN YOUR ORIGINAL PATENT
 3    APPLICATION.
 4    Q    AND JUST SO WE'RE CLEAR, WHICH OF THE TWO DIAGRAMS
 5    SHOWN ON DEFENDANT'S DEMONSTRATIVE EXHIBIT 100 WAS PART
 6    OF THE ORIGINAL PATENT APPLICATION FILING?
 7    A    THE TOP DRAWING FROM 1997.  THAT'S THE ONE THAT'S
 8    PART OF THE ACTUAL PATENT FILING.
 9    Q    SO IN VIEW OF ALL THE INFORMATION THAT YOU'VE JUST
10    EXPLAINED TO US ABOUT THE PDA-CLAIMED FEATURE AND THE
11    WRITTEN DESCRIPTION RULE AND YOUR ANALYSIS OF THAT
12    RULE, WHAT CONCLUSION HAVE YOU COME TO?
13    A    SO AFTER GOING THROUGH THE PATENT AND THE
14    PROSECUTION HISTORY IN SOME DETAIL, I HAD TO COME TO
15    THE CONCLUSION THAT THERE IS NO WRITTEN DESCRIPTION FOR
16    A HANDSET UNIT THAT DOES PDA-LIKE FUNCTIONS.
17    Q    OKAY.  SO NOW WE'VE DISCUSSED THE WRITTEN
18    DESCRIPTION RULE.  LET ME CHANGE GEARS A LITTLE BIT TO
19    A DIFFERENT TYPE OF INVALIDITY QUESTION.
20         HAVE YOU HEARD OF THE "OBVIOUSNESS QUESTION"
21    IN PATENT LAW?
22    A    YES, I HAVE.
23    Q    AND HAVE YOU FORMED AN OPINION ABOUT WHETHER OR NOT
24    THE ASSERTED CLAIMS IN THIS CASE ARE OBVIOUS?
25    A    YES, I HAVE.
```

EXHIBIT 6 - PAGE 142

1    Q    AND WHAT, GENERALLY SPEAKING, IS THAT OPINION?

2    A    SO AFTER REVIEWING THE MATERIALS IN THIS CASE, I

3    CAME TO THE CONCLUSION THAT THE ASSERTED CLAIMS OF THE

4    '380 PATENT WOULD HAVE BEEN OBVIOUS TO A PERSON OF

5    SKILL IN THE ART.

6    Q    NOW, WHAT DOES IT MEAN FOR A PATENT CLAIM TO BE

7    OBVIOUS?

8    A    WELL, TO DO THAT ANALYSIS, ONE HAS TO THINK IN THE

9    EYES OF WHAT'S REFERRED TO AS A "PERSON HAVING ORDINARY

10   SKILL IN THE ART AT THE TIME OF THE CLAIMED INVENTION."

11   AND THE STANDARD IS TO TEST WHETHER OR NOT THERE WAS --

12   WELL, BASICALLY WHETHER IT HAD ALREADY BEEN DONE

13   BEFORE.  SO WAS THERE A DESCRIPTION IN PRIOR

14   PUBLICATIONS OR "PRIOR ART", AS IT'S REFERRED TO, OF

15   ALL OF THE KEY ELEMENTS OF THE CLAIMS OR NOT?

16            AND IN DOING THAT ANALYSIS, ONE IS PERMITTED

17   TO NOT LOOK JUST FOR ONE REFERENCE, BUT YOU CAN LOOK

18   FOR A COMBINATION OF REFERENCES OF PRIOR ART THAT,

19   TAKEN TOGETHER, WOULD HAVE DISCLOSED ALL OF THE KEY

20   ELEMENTS OF THE PATENT CLAIMS.

21   Q    NOW, YOU MENTIONED A COUPLE OF TIMES THIS "PERSON

22   OF ORDINARY SKILL IN THE ART."

23            WHAT IS THE DEFINITION OF A "PERSON OF

24   ORDINARY SKILL IN THE ART" IN THIS CASE HERE?

25   A    SO A "PERSON HAVING ORDINARY SKILL IN THE ART,"

EXHIBIT 6 - PAGE 143

```
 1      THIS IS A THEORETICAL INDIVIDUAL THAT POSSESSES
 2      KNOWLEDGE RELATED TO THE SUBJECT MATTER OF THE PATENT.
 3      AND SO IN DOING -- IN DEFINING EXACTLY WHAT THAT TYPE
 4      OF PERSON IS, YOU LOOK AT THE TECHNOLOGY AREA FOR THE
 5      PATENT.
 6                AND, HERE, THE PATENT INVOLVES TOPICS SUCH AS
 7      WIRELESS COMMUNICATIONS, SIGNAL PROCESSING, THINGS OF
 8      THAT NATURE.  SO IN THE CONTEXT OF THIS PATENT, A
 9      PERSON OF ORDINARY SKILL IN THE ART WOULD BE A PERSON
10      THAT HAS, FOR EXAMPLE, A BACHELOR'S DEGREE IN
11      ELECTRICAL ENGINEERING OR A BACHELOR'S DEGREE IN
12      COMPUTER ENGINEERING COMBINED WITH A COUPLE OF YEARS OF
13      EXPERIENCE IN THE INDUSTRY OR, EQUIVALENTLY, MAYBE A
14      GRADUATE DEGREE IN A FIELD THAT'S RELATED TO WIRELESS
15      COMMUNICATIONS OR SIGNAL PROCESSING.
16      Q    SO ARE YOU A PERSON OF AT LEAST ORDINARY SKILL IN
17      THE ART AS DEFINED IN THIS CASE?
18      A    YES.  I WOULD MEET THAT REQUIREMENT.  OF COURSE,
19      I'VE HAD EDUCATION BEYOND THAT AS WELL.
20                MR. GASPAR:  YOUR HONOR, AT THIS POINT, WE MAY
21      TALK ABOUT SOME DOCUMENTS.  MAY I APPROACH THE WITNESS
22      WITH A BINDER OF DOCUMENTS AND ALSO THE BENCH?
23                THE COURT:  YES, YOU MAY.
24                DO YOU HAVE A SET FOR MR. NIRO?
25                MR. GASPAR:  YES, WE DO.
```

EXHIBIT 6 - PAGE 144

```
 1              THE COURT:  THANK YOU.

 2      BY MR. GASPAR:

 3      Q    SO, PROFESSOR RODRIGUEZ, I JUST HANDED YOU A LARGE

 4      BOOK OF MATERIALS.  WE PROBABLY WON'T LOOK AT ALL OF

 5      THEM.  BUT LET ME START BY DRAWING YOUR ATTENTION TO

 6      WHAT'S BEEN MARKED AS DEFENDANT'S TRIAL EXHIBIT 1541.

 7              WHAT IS THAT EXHIBIT?

 8      A    THIS EXHIBIT IS AN ARTICLE THAT WAS PUBLISHED IN

 9      THE SAN FRANCISCO CHRONICLE.

10      Q    DID YOU RELY ON THIS DEFENDANT'S TRIAL EXHIBIT 1541

11      IN YOUR OBVIOUSNESS ANALYSIS?

12      A    YES, I DID.

13      Q    AND DOES IT HAVE A DATE ON IT?

14      A    YES.  IT'S DATED MARCH 14TH, 1996.

15      Q    IS THAT DATE ONE YEAR OR MORE BEFORE MR. DITZIK

16      FILED HIS PATENT APPLICATION?

17      A    YES, IT IS.  THE PARENT FILING DATE OF THE PATENT

18      WAS 1997 -- APRIL 1997.  SO THIS IS MORE THAN ONE YEAR

19      BEFORE THAT DATE.

20      Q    GENERALLY, WHAT DOES THIS ARTICLE FROM THE

21      SAN FRANCISCO CHRONICLE TELL US THAT YOU WERE MOST

22      CONCERNED ABOUT?

23      A    THIS SAN FRANCISCO CHRONICLE ARTICLE, THIS IS A

24      ANNOUNCEMENT OF THE NOKIA 9000 COMMUNICATOR, WHICH IS A

25      CELL PHONE OR SMARTPHONE.
```

EXHIBIT 6 - PAGE 145

1   Q    AND WHICH PAGE OF THE SAN FRANCISCO CHRONICLE

2   EXHIBIT THAT'S IN FRONT OF YOU ARE YOU CONSIDERING AND

3   TALKING ABOUT?

4   A    IT IS THE SECOND PAGE OF THIS ARTICLE THAT'S

5   NUMBERED AS 1541-00002.  AND IT CONTINUES ON TO THE

6   NEXT PAGE, -003.

7   Q    SO THESE TWO PARTICULAR PAGES?

8   A    TWO PARTICULAR PAGES.

9   Q    SO IS ONE OF THE PAGES BEING DISPLAYED NOW FOR THE

10  JURY?

11  A    YES.  THIS IS THE FIRST PAGE OF THIS ARTICLE.

12  Q    AND, GENERALLY, WHAT IS IT THAT YOU FOCUSED ON ON

13  THIS PAGE?

14  A    SO IN THIS PAGE, THERE'S A FEW THINGS THAT I RELIED

15  ON.  FIRST, THE PICTURE THAT'S SHOWN SHOWS A WOMAN

16  HOLDING A HANDSET.  THAT IS THE NOKIA 9000

17  COMMUNICATOR, A CELL PHONE.

18          IN THE TEXT OF THE ARTICLE, IT GOES ON TO

19  EXPLAIN THAT THIS IS A CELL PHONE.  IT CAN SEND AND

20  RECEIVE E-MAIL.  IT CAN DO PDA-LIKE FUNCTIONS, THINGS

21  OF THAT SORT.

22  Q    WHAT IS SHE HOLDING UP TO HER HEAD IN THAT PICTURE?

23  A    THERE, YOU SEE IT'S A HANDSET.  IT FITS IN THE

24  HAND, AND IT OPERATES AS A CELL PHONE.

25  Q    WHAT IS SHE HOLDING IN HER OTHER HAND?

EXHIBIT 6 - PAGE 146

```
 1    A    HER OTHER HAND IS SHOWING THE SAME DEVICE.  SHE

 2    ACTUALLY HAS TWO OF THESE NOKIA 9000'S THAT SHE'S

 3    HOLDING.  SO SHE'S HOLDING ONE UP TO HER HEAD AND

 4    PRESUMABLY GETTING READY TO TALK ON IT.  AND SHE'S GOT

 5    A SECOND COPY OF ONE OF THESE NOKIA 9000'S THAT SHE'S

 6    HOLDING IN HER OTHER HAND.  AND THAT ONE SHE HAS OPENED

 7    UP.  SO IT'S A CLEVER LITTLE DEVICE.  THEY'VE DESIGNED

 8    IT SO THAT IT OPENS --

 9            MR. DEAN NIRO:  OBJECTION.  HEARSAY.  GOING TO

10    THE TRUTH OF THE MATTER ASSERTED.

11            THE COURT:  OKAY.  IN THE FUTURE, PLEASE LET

12    THE WITNESS -- DON'T INTERRUPT THE WITNESS, PLEASE.

13            WE'LL STRIKE "SO IT'S A CLEVER LITTLE

14    DEVICE.  THEY'VE DESIGNED IT SO THAT IT OPENS."  STRIKE

15    THAT.

16            THIS NEWSPAPER ARTICLE IS BEING OFFERED

17    FOR WHAT IT SAYS AND HOW IT WAS VIEWED BY THE WITNESS,

18    NOT FOR ITS TRUTH.

19            GO AHEAD.

20    BY MR. GASPAR:

21    Q    SO JUST TO CLARIFY THAT, PROFESSOR RODRIGUEZ.  DID

22    YOU RELY ON THIS PARTICULAR ARTICLE IN YOUR ANALYSIS OR

23    DID YOU RELY ON THE ACTUAL PHONE FOR YOUR ANALYSIS?

24    A    I RELIED ON THIS ARTICLE.

25    Q    OKAY.  DOES THIS ARTICLE MENTION A PARTICULAR
```

EXHIBIT 6 - PAGE 147

```
1    CELLULAR NETWORK THAT THE PHONE WORKED WITH?

2    A    YES, IT DID.

3    Q    WHICH CELLULAR NETWORK WAS THIS?

4    A    IT MENTIONS THAT IT OPERATED ON THE GSM CELLULAR

5    NETWORK.

6    Q    WHAT IS THE "GSM CELLULAR NETWORK"?

7    A    IT'S AN ACRONYM.  IT STANDS FOR GLOBAL SYSTEM FOR

8    MOBILE.  IT WAS A POPULAR CELLULAR NETWORK AT THE TIME.

9    Q    AND WAS THAT A NETWORK THAT WORKED IN THE

10   UNITED STATES?

11   A    NO.  THIS WAS -- AT THAT TIME, IT WAS PRIMARILY

12   USED IN EUROPE.

13   Q    LET ME DIRECT YOUR ATTENTION TO WHAT'S BEEN LABELED

14   IN YOUR BINDER AS DEFENDANT'S TRIAL EXHIBIT 696.

15            DO YOU SEE THAT?

16   A    YES.

17   Q    WHAT IS DEFENDANT'S EXHIBIT 696?

18   A    EXHIBIT 696 IS PART OF THE GSM STANDARD.

19   Q    NOW, DID YOU RELY ON THIS DEFENDANT'S TRIAL EXHIBIT

20   696 IN YOUR OBVIOUSNESS ANALYSIS?

21   A    YES, I DID.

22   Q    AND WHAT'S THE DATE ON THIS DOCUMENT?

23   A    THIS DOCUMENT IS DATED SEPTEMBER 1995.

24   Q    '95.

25            IS THAT MORE THAN ONE YEAR BEFORE MR. DITZIK'S
```

EXHIBIT 6 - PAGE 148

1    PATENT APPLICATION WAS FILED?

2    A    YES, IT IS.

3    Q    NOW, WAS THERE SOMETHING IN PARTICULAR THAT YOU

4    FOCUSED ON IN DEFENDANT'S TRIAL EXHIBIT 696?

5    A    YES.  THIS DOCUMENT EXPLAINS THAT THERE ARE TWO

6    TYPES OF BASE TRANSCEIVER STATIONS THAT ARE PART OF THE

7    GSM CELLULAR NETWORK, REFERRED TO AS THE -- BY THEIR

8    ACRONYMS "BTS," AND ALSO A "MICRO BTS."

9    Q    LET ME DIRECT YOUR ATTENTION TO DEFENDANT'S TRIAL

10   EXHIBIT 695.

11            DO YOU HAVE THAT IN YOUR BINDER?

12   A    YES.

13   Q    WHAT IS DEFENDANT'S EXHIBIT 695?

14   A    THIS IS A DOCUMENT THAT FORMS ANOTHER PART OF THE

15   GSM STANDARD.

16   Q    IS THIS A DOCUMENT ON WHICH YOU RELIED IN YOUR

17   OBVIOUSNESS ANALYSIS?

18   A    YES, IT IS.

19   Q    WHAT'S THE DATES ON THIS DOCUMENT?

20   A    THIS DOCUMENT IS DATED FEBRUARY 1995.

21   Q    AND THAT ALSO IS MORE THAN ONE YEAR BEFORE

22   MR. DITZIK'S PATENT APPLICATION WAS FILED?

23   A    YES, IT IS.

24   Q    WAS THERE SOMETHING IN PARTICULAR IN THIS NEW

25   DOCUMENT, TRIAL EXHIBIT 695, THAT YOU FOCUSED ON?

EXHIBIT 6 - PAGE 149

```
 1    A    YES.  THIS DOCUMENT DESCRIBES A FEATURE CALLED

 2    "ADAPTIVE POWER CONTROL" THAT'S UTILIZED IN THE GSM

 3    CELLULAR NETWORK.

 4    Q    LET ME SWITCH GEARS A LITTLE BIT AND DISPLAY, AT

 5    THIS POINT, DEFENDANT'S DEMONSTRATIVE EXHIBIT NUMBER

 6    101.

 7          MR. DEAN NIRO:  WE OBJECT, YOUR HONOR, ON THE

 8    BASIS THAT WE TALKED ABOUT THIS MORNING.

 9          MR. GASPAR:  I BELIEVE YOU OVERRULED THAT

10    OBJECTION.

11          THE COURT:  OBJECTION IS NOTED.  THE OBJECTION

12    IS OVERRULED.

13                PLEASE PROCEED.

14    BY MR. GASPAR:

15    Q    SO, PROFESSOR RODRIGUEZ, THERE'S A LONG VERTICAL

16    RED LINE ON THIS DEMONSTRATIVE.

17          DO YOU SEE THAT?

18    A    YES.  THAT MARK --

19          THE COURT:  ONE SECOND.

20          JUST TO BE CLEAR, LADIES AND GENTLEMEN,

21    YOU HAVE SEEN A LOT OF THINGS CALLED "DEMONSTRATIVE

22    EXHIBITS."  AND THEY'RE TO ILLUSTRATE.  THEY'RE NOT

23    EVIDENCE.

24          GO AHEAD, PLEASE.

25          READ THE QUESTION, PLEASE.
```

EXHIBIT 6 - PAGE 150

```
 1              (RECORD READ)

 2              THE WITNESS:  YES.  THAT LINE MARKS THE PARENT

 3     FILING DATE OF THE '380 PATENT.

 4     BY MR. GASPAR:

 5     Q    SO WHAT'S THE SIGNIFICANCE OF THE MATERIALS THAT

 6     ARE SHOWN TO THE LEFT OF THAT RED LINE?

 7     A    SO TO THE LEFT OF THAT RED LINE, WE SEE THE GSM

 8     STANDARD DOCUMENTS AND THE NOKIA 9000 COMMUNICATOR

 9     PUBLICATION FROM THE SAN FRANCISCO CHRONICLE.  AND

10     THOSE THREE DOCUMENTS WERE DATED MORE THAN A YEAR

11     BEFORE THE PARENT FILING DATE OF THE '380 PATENT.

12     Q    SO WITH THOSE THREE DOCUMENTS IN MIND, CAN YOU TELL

13     US HOW YOU CAME TO YOUR CONCLUSION THAT THE ASSERTED

14     CLAIMS IN THIS CASE ARE OBVIOUS IN VIEW OF THE PRIOR

15     ART?

16     A    I WENT THROUGH THOSE DOCUMENTS CAREFULLY LOOKING

17     FOR DISCLOSURE OF THE KEY ELEMENTS OF THE ASSERTED

18     CLAIMS IN THE '380 PATENT.  AND THOSE DOCUMENTS, AND A

19     COUPLE OF RELATED DOCUMENTS THAT I'LL MENTION, DID

20     INDEED DISCLOSE ALL OF THE KEY FEATURES THAT ARE PART

21     OF THE ASSERTED CLAIMS IN THIS CASE.

22     Q    NOW, DID YOU PREPARE SOME SLIDES TO HELP US

23     UNDERSTAND THAT COMPARISON WORK THAT YOU DID?

24     A    YES.

25              MR. GASPAR:  LET ME PRESENT THEN FOR THE JURY
```

EXHIBIT 6 - PAGE 151

1    AND FOR THE COURT DEFENDANT'S DEMONSTRATIVE EXHIBIT

2    107.

3    BY MR. GASPAR:

4    Q    WHAT DOES DEMONSTRATIVE EXHIBIT NUMBER 107 SHOW US,

5    PROFESSOR RODRIGUEZ?

6    A    SO THE NEXT FEW SLIDES ARE GOING TO WALK THROUGH

7    CLAIM-BY-CLAIM, ELEMENT-BY-ELEMENT EXACTLY HOW THESE

8    PRIOR REFERENCES DISCLOSE THE KEY FEATURES IN THE

9    CLAIMS.

10          SO CLAIM 1, WHICH IS PART OF THE CLAIMS THAT

11   ARE AT ISSUE IN THIS CASE, REQUIRES A HANDSET UNIT THAT

12   CAN COMMUNICATE.  WELL, THE SAN FRANCISCO CHRONICLE

13   ARTICLE DID INDEED DISCLOSE A NOKIA CELLULAR PHONE THAT

14   FITS IN THE HAND.  AND, YES, IT CAN BE USED FOR

15   COMMUNICATION.

16   Q    YOU MENTIONED THE ELEMENT-BY-ELEMENT COMPARISON.

17   LET ME DISPLAY DEFENDANT'S DEMONSTRATIVE EXHIBIT 108.

18          WHY HAS THIS BEEN PREPARED?

19   A    SO I THOUGHT IT WOULD BE HELPFUL TO HAVE A LITTLE

20   CHECKLIST AS WE GO ALONG.

21          SO HERE WE'VE ADDRESSED THE VERY FIRST ELEMENT

22   IN CLAIMS 1, 2 AND 3.  AND THAT IS A HANDSET.  SO THAT

23   IS DISCLOSED IN THAT NOKIA COMBINATION.

24   Q    SO LET'S TURN OUR ATTENTION BACK TO THE CLAIM

25   LIMITATIONS A LITTLE BIT.  IN PARTICULAR, DEFENDANT'S

EXHIBIT 6 - PAGE 152

1    DEMONSTRATIVE EXHIBIT NUMBER 109.

2            MR. GASPAR:  CAN WE HAVE THAT DISPLAYED,

3    PLEASE?

4    BY MR. GASPAR:

5    Q    WHAT'S BEING SHOWN ON THIS SLIDE?

6    A    SO THIS SLIDE ADDRESSES THE NEXT KEY FEATURE OF THE

7    CLAIMS.  AND THAT IS, COMMUNICATION WITH A LOCAL AREA

8    COMMUNICATION BASE UNIT.

9            SO, HERE, THE LOCAL AREA COMMUNICATION BASE

10   UNIT IS DISCLOSED IN THE GSM STANDARD DOCUMENTS AS A

11   GSM MICRO BTS.

12   Q    SO YOU MENTIONED THE GSM STANDARD DOCUMENT EARLIER.

13   LET ME SHOW YOU A DEMONSTRATIVE EXHIBIT, WHICH IS

14   NUMBER 111, THAT HIGHLIGHTS SOME PORTIONS OF THAT.

15           MR. GASPAR:  IF WE COULD HAVE 111 UP, PLEASE.

16   BY MR. GASPAR:

17   Q    WHAT'S BEING DISPLAYED IN DEMONSTRATIVE EXHIBIT

18   111?

19   A    SO THIS IS AN EXCERPT OUT OF THAT GSM STANDARDS

20   DOCUMENT.  AND THE HIGHLIGHTED TEXT SHOWN REFERS TO A

21   MICRO BTS THAT'S DIFFERENT FROM A NORMAL BTS.

22           WELL, WHAT'S A BTS?  "BTS" STANDS FOR BASE

23   TRANSCEIVER STATION.  SO YOU CAN THINK OF A NORMAL BTS

24   AS A CELL TOWER.  CONVENTIONAL CELL TOWERS, YOU'VE

25   PROBABLY SEEN THEM AROUND TOWN ON TOP OF BUILDINGS.

EXHIBIT 6 - PAGE 153

1    SO IN ADDITION TO A NORMAL BTS THAT MAY BE FAR

2    AWAY FROM YOU, MAYBE A COUPLE OF MILES, THERE'S ALSO A

3    AN OPTION IN THE GSM STANDARD FOR A DEVICE KNOWN AS A

4    "MICRO BTS."  THIS IS A SMALLER FORM OF A BASE

5    TRANSCEIVER STATION.  AND IT'S EXPLAINED AT THE END OF

6    THIS EXCERPT THAT IT ALLOWS A SMALLER AND CHEAPER

7    ALTERNATIVE FOR EXTERNAL STREET DEPLOYMENT IN LARGE

8    NUMBERS.  SO THIS IS A DEVICE THAT YOU COULD HAVE NEAR,

9    FOR EXAMPLE, AN OFFICE BUILDING IF YOU WANTED TO MAKE

10   SURE THAT THE PEOPLE IN YOUR OFFICE BUILDING ALWAYS HAD

11   GREAT CELLULAR RECEPTION.

12        OKAY.  SO THERE'S TWO KINDS OF BASE

13   TRANSCEIVER STATIONS, A MICRO BTS THAT WOULD BE MORE

14   NEARBY, AND A REGULAR CELL TOWER OR NORMAL BTS THAT

15   WOULD BE NORMALLY A BIT FARTHER AWAY.

16   Q    LET ME DIRECT YOUR ATTENTION BACK TO A SLIDE THAT

17   WE SAW A MOMENT AGO, DEFENDANT'S DEMONSTRATIVE EXHIBIT

18   109.

19        NOW, ON THIS DEMONSTRATIVE EXHIBIT, THE CLAIM

20   LANGUAGE APPEARS ON THE LEFT-HAND SIDE; IS THAT RIGHT?

21   A    YES.

22   Q    AND ONE OF THE HIGHLIGHTS YOU HAVE SAYS, "LOCAL

23   AREA COMMUNICATION BASE UNIT."

24        IS THAT RIGHT?

25   A    YES.

EXHIBIT 6 - PAGE 154

1    Q    DOES THAT LOCAL AREA COMMUNICATION BASE UNIT IN THE

2    CLAIM CORRESPOND TO SOMETHING THAT YOU JUST MENTIONED

3    THAT YOU FOUND IN THE GSM STANDARD?

4    A    YES.  SO ONE OF THOSE MICRO BTS DEVICES THAT WOULD

5    BE LOCATED RELATIVELY NEARBY, SAY, AN OFFICE BUILDING,

6    WOULD QUALIFY AS A LOCAL AREA COMMUNICATION BASE UNIT

7    BECAUSE IT -- IT'S SOMETHING THAT YOUR HANDSET, YOUR

8    CELL PHONE COULD COMMUNICATE TO AND FROM WHILE BEING A

9    RELATIVELY SHORT DISTANCE AWAY.

10   Q    AND I THINK YOU SAID THIS ALREADY; BUT WHERE,

11   AGAIN, IS THAT MICRO BTS UNIT PLACED?  WHERE WOULD

12   SOMEBODY FIND IT?

13   A    AS IT'S EXPLAINED IN THAT EXCERPT FROM THE GSM

14   STANDARDS DOCUMENT, IT WOULD TYPICALLY BE PLACED NEAR

15   AN OFFICE BUILDING OR ON STREET CORNERS RELATIVELY

16   NEARBY THE USERS.

17   Q    NOW, LET ME DIRECT YOUR ATTENTION TO THE CLAIM

18   LANGUAGE AGAIN, AND THIS TIME DEFENDANT'S DEMONSTRATIVE

19   EXHIBIT 112.

20        NOW, THERE'S SOME HIGHLIGHTED LANGUAGE ON THE

21   LEFT-HAND SIDE OF THIS SLIDE.

22        WHAT'S THE PURPOSE OF THE HIGHLIGHTING THERE?

23   A    SO, HERE, I'M ILLUSTRATING OR HIGHLIGHTING THE NEXT

24   KEY ELEMENT IN THE CLAIMS.  AND THIS IS A REQUIREMENT

25   THAT THE HANDSET MUST COMMUNICATE DATA TO AND FROM AN

EXHIBIT 6 - PAGE 155

1    EXTERNAL WIDE AREA NETWORK.

2    Q    IS THERE AN ASPECT OF THE GSM STANDARD THAT

3    CORRESPONDS TO THIS EXTERNAL WIDE AREA NETWORK?

4    A    YES.  IN THAT EXCERPT FROM THE STANDARDS DOCUMENT

5    THAT I JUST SHOWED, WE SAW THAT IT REFERS TO A NORMAL

6    BTS OR CELL TOWER.  SO, THEREFORE, WE SEE THAT THERE

7    WAS INDEED A DISCLOSURE OF A DEVICE, A NORMAL BTS, THAT

8    ACTS AS AN EXTERNAL WIDE AREA NETWORK.  SO THIS IS A

9    CELL TOWER DEVICE THAT A CELLULAR PHONE HANDSET COULD

10   COMMUNICATE BACK AND FORTH TO AND FROM.

11   Q    NOW, HAVE YOU HEARD THE TERM "ADAPTIVE POWER

12   CONTROL" BEFORE?

13   A    YES.

14   Q    WHAT DOES THAT TERM MEAN?

15   A    ADAPTIVE POWER CONTROL IS A FEATURE -- IT'S A

16   REQUIRED FEATURE OF ALL HANDSETS THAT OPERATE IN A

17   CELLULAR NETWORK.

18   Q    CAN I DIRECT YOUR ATTENTION TO DEMONSTRATIVE

19   EXHIBIT 113.

20        AND WHAT'S BEING DISPLAYED HERE IN

21   DEMONSTRATIVE EXHIBIT 113?

22   A    SO, HERE, I'M SHOWING A COUPLE OF EXCERPTS FROM ONE

23   OF THE GSM STANDARDS DOCUMENTS THAT DISCLOSES THAT THE

24   HANDSETS HAVE ADAPTIVE CONTROL OF THE RF TRANSMIT POWER

25   FROM AN MS.  "MS" STANDS FOR THE MOBILE STATION, THE

EXHIBIT 6 - PAGE 156

1    HANDSET, THE CELL PHONE.

2            AND IT GOES ON TO EXPLAIN THAT THE -- IT USES

3    THE RECEIVE SIGNAL QUALITY AS A CRITERION IN THE RF

4    POWER CONTROL.  SO WHAT THIS MEANS IS, THAT THE BASE

5    TRANSCEIVER STATION AND MICRO BASE TRANSCEIVER STATION,

6    THEY CONSTANTLY MONITOR THE RECEIVED SIGNAL QUALITY AND

7    SIGNAL STRENGTH COMING FROM THE DIFFERENT HANDSETS.

8    AND IF IT NOTICES THAT SOMEBODY'S CELL PHONE IS REALLY

9    LOUD AND IT'S RECEIVING A REALLY STRONG SIGNAL, THEN

10   IT -- IN ORDER TO MAKE SURE THAT THAT ONE USER DOESN'T

11   DROWN OUT THE CONVERSATIONS FROM EVERYBODY ELSE AROUND,

12   IT SENDS A DIRECTIVE BACK TO THAT SPECIFIC CELL PHONE

13   AND SAYS, HEY, QUIET DOWN, TURN YOUR POWER DOWN.  AND

14   THIS IS ALL DONE AUTOMATICALLY INSIDE THE CELL PHONE.

15   Q    DOES THE CONCEPT THAT YOU JUST EXPLAINED OF

16   ADAPTIVE POWER CONTROL IN THE GSM STANDARD RELATE AT

17   ALL TO THE PATENTS AND THE CLAIMS IN THIS CASE?

18   A    YES, IT DOES.  THIS IS A FUNCTION THAT SHOWS UP IN

19   ONE OF THE CLAIMS.

20           MR. GASPAR:  LET ME THEN DISPLAY FOR THE COURT

21   AND FOR THE JURY DEFENDANT'S DEMONSTRATIVE EXHIBIT 115.

22   BY MR. GASPAR:

23   Q    WHAT'S BEING SHOWN IN DEMONSTRATIVE EXHIBIT 115?

24   A    SO, HERE, WHAT I'M SHOWING IS, ON THE LEFT, THE

25   CLAIM LANGUAGE WHICH SAYS THAT IT'S A REQUIREMENT THAT

EXHIBIT 6 - PAGE 157

1    THE TRANSMIT POWER LEVEL OF THE HANDSET UNIT, WHEN

2    TRANSMITTING TO THE LOCAL AREA BASE UNIT, IS LOWER THAN

3    WHEN TRANSMITTING TO THE EXTERNAL NETWORK.  SO THIS

4    MEANS THAT THE HANDSET UNIT HAS TO BE ABLE TO TRANSMIT

5    AT TWO DIFFERENT POWER LEVELS DEPENDING ON WHETHER IT'S

6    TALKING TO A NEARBY COMMUNICATION BASE UNIT OR TO A

7    MORE DISTANT CELL TOWER OR EXTERNAL WIDE AREA NETWORK.

8              THE PART SHOWN ON THE RIGHT-HAND SIDE OF THIS

9    SLIDE IS A TABLE FROM ONE OF THE GSM STANDARD DOCUMENTS

10   THAT SHOWS THE SPECIFIC POWER LEVELS THAT THE BTS

11   DEVICES OPERATE AT.  AND IT SHOWS THAT THE NORMAL BTS

12   OPERATES AT A POWER LEVEL UP TO 640 WATTS, WHEREAS THE

13   MICRO BTS, THE MORE NEARBY BASE TRANSCEIVER STATION,

14   ONLY OPERATES UP TO A QUARTER OF A WATT.  SO THAT

15   CORROBORATES THE REST OF THE INFORMATION IN THE GSM

16   STANDARDS DOCUMENTS THAT -- IT CLARIFIES THAT THE --

17   THAT A HANDSET OPERATING WITHIN A GSM CELLULAR NETWORK

18   DOES OPERATE AT DIFFERENT POWER LEVELS DEPENDING UPON

19   WHETHER IT'S TALKING TO A NEARBY MICRO BTS OR TO A MORE

20   DISTANT CELL TOWER OR NORMAL BTS.

21   Q    IS THE TRANSMIT POWER LEVEL HIGHER WHEN A HANDSET

22   IS TALKING TO A MICRO BTS OR WHEN IT'S TALKING TO THE

23   CELL TOWER, ACCORDING TO YOUR ANALYSIS OF THESE

24   DOCUMENTS?

25   A    SINCE THE -- SO IT WOULD BE HIGHER WHEN

EXHIBIT 6 - PAGE 158

1    TRANSMITTING TO A NORMAL BTS OR CELL TOWER.

2            AND THE REASON IS, IF THE HANDSET IS FARTHER

3    AWAY -- AS IT WOULD TYPICALLY BE FOR A CELL TOWER

4    VERSUS A MICRO BTS.  IF THE HANDSET IS FARTHER AWAY,

5    THEN THE CELL TOWER MAY HAVE -- MAY BE RECEIVING A

6    LOWER SIGNAL LEVEL FROM THAT HANDSET.  AND SO IT WILL

7    SEND THE DIRECTIVE BACK TO THAT CELL PHONE AND SAY,

8    HEY, I'M HAVING A HARD TIME HEARING YOU.  TURN UP YOUR

9    TRANSMIT POWER.  THIS IS ALL DONE AUTOMATICALLY INSIDE

10   THE CELL PHONE.

11   Q    SO WE'VE TALKED ABOUT ADAPTIVE POWER CONTROL AND

12   POWER LEVELS.  LET ME DISPLAY DEFENDANT'S DEMONSTRATIVE

13   EXHIBIT 117 SO WE CAN SORT OF SEE WHERE WE ARE.

14           THE COURT:  LADIES AND GENTLEMEN, WE'RE HAVING

15   A -- THERE'S A FIRE DRILL.  WE'RE GOING TO TAKE A BRIEF

16   RECESS.

17            **(BREAK IN THE PROCEEDINGS)**

18

19

20

21

22

23

24

25

EXHIBIT 6 - PAGE 159

1      **CERTIFICATE OF OFFICIAL REPORTER**

2

3      COUNTY OF LOS ANGELES          )
                                       )
4      STATE OF CALIFORNIA            )

5

6                  I, ALEXANDER T. JOKO, FEDERAL OFFICIAL

7      COURT REPORTER, IN AND FOR THE UNITED STATES DISTRICT

       COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY

8      CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED

9      STATES CODE, THAT THE FOREGOING IS A TRUE AND CORRECT

10     TRANSCRIPT OF THE STENOGRAPHICALLY REPORTED PROCEEDINGS

11     HELD IN THE ABOVE-ENTITLED MATTER, AND THAT THE

12     TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE

13     REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED

14     STATES.

15     DATE:  NOVEMBER 19, 2013

16

17

18                      /S/ ALEXANDER T. JOKO
                        _____
19                      ALEXANDER T. JOKO, CSR NO. 12272
                        FEDERAL OFFICIAL COURT REPORTER
20

21

22

23

24

25

EXHIBIT 6 - PAGE 160