**EXHIBIT 7**
**TO DECLARATION OF JOSEPH A. CULIG IN SUPPORT**
**OF NETAIRUS' RENEWED MOTION FOR JMOL PURSUANT**
**TO FED.R.CIV.P. 50(b)**

1                  UNITED STATES DISTRICT COURT

2                 CENTRAL DISTRICT OF CALIFORNIA

3                           ---

4              THE HONORABLE JOHN A. KRONSTADT

5            UNITED STATES DISTRICT JUDGE PRESIDING

6

7    NetAirus Technologies, Inc.,        )

8                     Plaintiff,         )

9                                        )

10   vs.                                 )    CV10-3257-JAK

11                                       )

12   Apple, Inc.,                        )

13                     Defendant.        )

14   _____    )

15

16

17          REPORTER'S TRANSCRIPT OF TRIAL PROCEEDINGS

18                 Day 5 - P.M. Session

19                Los Angeles, California

20               Tuesday, November 19, 2013

21

22   Pamela A. Batalo, CSR, FCRR, RMR
     Official Reporter
23   Roybal Federal Building
     255 East Temple Street
24   Room 181-I
     Los Angeles, California  90012
25   (213) 687-0446

EXHIBIT 7 - PAGE 161

```
 1   APPEARANCES:

 2

 3    FOR PLAINTIFF:        NIRO, SCAVONE, HALLER & NIRO

 4                         BY:  DEAN D. NIRO

 5                              RAYMOND P. NIRO

 6                              TAHITI ARSULOWICZ

 7                              ROBERT A. CONLEY

 8                              JOSEPH A. CULIG

 9                         181 W. MADISON STREET, SUITE 4600

10                         CHICAGO, IL 60602

11

12                         ORUM & ROTH, LLC

13                         BY:  MARK D. ROTH

14                         53 W. JACKSON BOULEVARD, SUITE 620

15                         CHICAGO, IL  60604

16

17    FOR DEFENDANT:        MILBANK, TWEED, HADLEY & MCCLOY, LLP

18                         BY:  MARK C. SCARSI

19                              HANNAH CANNOM

20                              CHRIS L. HOLM

21                              ASHLEE N. LIN

22                         601 S. FIGUEROA STREET

23                         LOS ANGELES, CA 90017

24

25
```

```
1   APPEARANCES CONTINUED:

2

3     FOR DEFENDANT:          MILBANK, TWEED, HADLEY & MCCLOY, LLP

4                            BY:  CHRISTOPHER J. GASPAR

5                            ONE CHASE MANHATTAN PLAZA

6                            NEW YORK, NY  10005

7

8                            JACKIE HARLOW

9                            IP LITIGATION COULSEL

10                           APPLE

11                           1 INFINITE LOOP

12                           MS 36-3NYJ

13                           CUPERTINO, CA  95014

14

15

16

17

18

19

20

21

22

23

24

25
```

United States District Court, Central District of California

EXHIBIT 7 - PAGE 163

```
 1                    INDEX FOR NOVEMBER 19, 2013

 2

 3                      INDEX OF WITNESSES

 4
     WITNESSES:                                           PAGE
 5
     JEFFREY RODRIGUEZ
 6      DIRECT EXAMINATION BY MR. GASPAR                     6
        CROSS-EXAMINATION BY MR. DEAN NIRO                  36
 7      REDIRECT EXAMINATION BY MR. GASPAR                  67
     THOMAS BLACKBURN
 8      DIRECT EXAMINATION BY MR. ROTH                     103
        CROSS-EXAMINATION BY MR. SCARSI                    151
 9      REDIRECT EXAMINATION BY MR. ROTH                   169

10

11                          EXHIBITS

12

13   PLAINTIFF'S EXHIBITS:                MARKED     RECEIVED

14   107, 141, 142, 148, 195, 210, 217,             205

15   219, 233, 234, 235, 236, 237, 238,

16   307, 369, 376, 379, 383, 384, 385,

17   387, 396, 398, 427, 527, 530, 533,

18   535, 539, 545, 563, 579 AND 593

19   389                                            181

20   464                                            182

21   467                                            183

22   482                                            197

23   513                                            199

24

25
```

United States District Court, Central District of California

EXHIBIT 7 - PAGE 164

| | DEFENSE EXHIBITS: | MARKED | RECEIVED |
|---|---|---|---|
| 1 | | | |
| 2 | 655, 727, 845, 850, 853, 147 AT | | 206 |
| 3 | 141, AND 147 | | |
| 4 | 710, 711, 853, 1306, 845, AND 850 | | 206 |
| 5 | 894, 895, 896, 897 AND 900 | | 204 |

| | |
|---|---|
| 1 | Los Angeles, California, Tuesday, November 19, 2013 |
| 2 | 10:26 a.m. |
| 3 | -oOo- |
| 4 | Jeffrey Rodriguez, previously sworn |
| 5 | (Jury Out) |
| 6 | THE COURT:  Back on the record.  No jurors are |
| 7 | present.  The evacuation drill is completed, so we will resume. |
| 8 | (Jury In) |
| 9 | THE COURT:  Please be seated.  Welcome back, Ladies |
| 10 | and Gentlemen. |
| 11 | Professor Rodriguez, would you please restate your |
| 12 | name. |
| 13 | THE WITNESS:  Jeffrey Rodriguez. |
| 14 | THE COURT:  Do you understand you remain under oath? |
| 15 | THE WITNESS:  Yes, I do. |
| 16 | THE COURT:  Thank you. |
| 17 | Mr. Gaspar, please proceed. |
| 18 | MR. GASPAR:  Thank you, your Honor. |
| 19 | DIRECT EXAMINATION |
| 20 | BY MR. GASPAR: |
| 21 | Q.   Professor Rodriguez, we have just had a fire drill and |
| 22 | evacuation.  Before we did, you were telling us about your |
| 23 | obviousness analysis; is that right? |
| 24 | A.   Yes. |
| 25 | Q.   You told us about the Nokia 9000 and the GSM standard, to |

EXHIBIT 7 - PAGE 166

1    some extent?

2    A.    Yes.

3    Q.    And I believe we were comparing aspects of the claimed

4    invention to aspects of the prior art; is that right?

5    A.    That's right.

6    Q.    Just to re-orient as a summary kind of what we had done so

7    far on this question of the obviousness analysis, I have

8    displayed Demonstrative 117.  Do you see that?

9    A.    Yes.

10   Q.    What is this telling us in summary form?

11   A.    So this shows that so far we've been through the first four

12   key elements of the asserted claims, and I've shown that the

13   prior art has disclosed each of these elements.  The handset was

14   disclosed by that *San Francisco Chronicle* article that showed a

15   picture of the handset.

16         The local area base unit and external wide area

17   network, communication to those two items was disclosed in the

18   GSM standards documents that talked about the Micro BTS and the

19   normal BTS, and then the transmit power of the handset, that was

20   disclosed also in one of those GSM documents that talked about

21   the adaptive power control mechanism whereby the handset

22   transmits to the Micro BTS and the BTS at different power

23   levels.

24   Q.    Now, I see the email to the local area is the next item on

25   your checklist.  Do I have that right?

EXHIBIT 7 - PAGE 167

A.    Yes.

Q.    So we talked a little bit about email in the claims before.

Let me display for you Defendant's Demonstrative Exhibit 118.

And what is shown on the left-hand side of this screen?

A.    Here we see the next key element in the asserted claims

that requires that the handset has to communicate email.

Q.    And what's being shown on the right-hand side here?

A.    On the right-hand side I've shown the first page of that

*San Francisco Chronicle* article again where I've indicated a

highlighted part of the text that explains that the Nokia 9000

is a cell phone that can send and receive email as well, so it

satisfies the element in this claim as well.

Q.    So the word *email* appears up there on both the left-hand

side and the right-hand side, but my next question is about

something else.  What's an SMS text message?

A.    SMA text messages are a different form of communication

than email.  Email, as I'm sure you are familiar, is a

communication method where you send a message from one user to

another user and in doing so, you're sending it using a

particular protocol and that involves identifying the targeted

person by a user name at some domain name.  It's referred to as

a domain name.  So it could be, you know, user@gmail.com.

That's an example of a domain name.

          And that differs from SMS text messaging.  If you send

a text message, you're not identifying the recipient using a

EXHIBIT 7 - PAGE 168

1   domain name.  It's a different form of messaging.

2   Q.   You mentioned SMS text messaging.  Have you heard of GSM

3   text messaging?

4   A.   Sometimes people use the term *GSM text messaging* again to

5   refer to SMS text messaging.  That's the standard protocol that

6   is used for text messaging on the GSM cellular network.

7   Q.   Is an email sent over GSM cellular network the same thing

8   as a GSM text message?

9   A.   No.  Over GSM cellular network you can send a message two

10  different ways.  You can send a conventional text message using

11  the SMS protocol, or instead you could send a regular email over

12  the cellular network where you are identifying a user at a

13  particular domain.  So that would be email.  The first using

14  just text messaging, that's SMS messaging which is different.

15  Q.   Now, we talked a little bit earlier about a part of the

16  claims that concerned PDA functions.  Do you remember that?

17  A.   Yes.

18  Q.   Let me display Defendant's Demonstrative Exhibit 119 and

19  ask you what's being shown here.

20  A.   So here we see the next key element in Claim 2 which is

21  that the handset must have PDA functions.  The right-hand side

22  of the slide shows the cover of that *San Francisco Chronicle*

23  article again where it says that it can also serve as a portable

24  organizer.  So this discloses a cell phone device that can also

25  serve as a PDA.

EXHIBIT 7 - PAGE 169

1  Q.   Now, let me go to the next element in Claim 3 which is

2  shown on Defendant's Demonstrative Exhibit 120.  What is this

3  demonstrative exhibit showing us?

4  A.   Here we see the next claim element which requires that the

5  handset must also serve as a cellular telephone unit.  Well,

6  that *San Francisco Chronicle* article explains that the Nokia

7  9000 is indeed a cellular phone.  So it meets the requirement of

8  this claim.

9  Q.   Have we now discussed all the aspects of Claims 1, 2 and 3?

10 A.   Yes, we have.

11 Q.   Let me display Defendant's Demonstrative Exhibit 121.

12 What's your summary and representation here as shown on

13 Defendant's Demonstrative Exhibit 121?

14 A.   So here we see we've identified all of the key elements of

15 Claims 1, 2 and 3, and the *San Francisco Chronicle* article gave

16 us the disclosure of the handset, it gave us the disclosure of

17 email, it also disclosed that the Nokia does -- is a PDA and it

18 disclosed that the Nokia device is a cellular telephone, and we

19 saw that the GSM standards documents provided disclosure of the

20 other elements, the external wide area network, the local area

21 communication base unit and the transmit power requirement.

22 Q.   Can I have the ELMO for just a minute, Mr. Nguyen.

23       Now, Professor Rodriguez, is Claim 7 also asserted

24 against Apple?

25 A.   Yes, it is.

1  Q.    And you've reviewed the elements of Claim 7 as well?

2  A.    That's correct.

3  Q.    Let me show you the slide that we just looked at,

4  Defendant's Demonstrative Exhibit 121 and also Defendant's

5  Demonstrative Exhibit 122.  I'm going to put these next to one

6  another.

7            With those two exhibits next to one another, what do

8  we make of the coverage of Claims 1, 2, and 3 as compared to the

9  coverage of Claim 7?

10 A.    So Claim 7 is very similar to the elements that are

11 presented in Claims 1, 2, and 3.  There are some slight wording

12 differences mainly, but many of the elements are the same

13 between the two sets of claims.

14 Q.    With that similarity in mind, let me quickly display for

15 you Defendant's Demonstrative Exhibit 123.  So what's shown on

16 123?

17 A.    Okay.  So now we're going through the elements of Claim 7.

18 Before we did Claim 1, 2 and 3.  Now we're looking at Claim 7.

19            Claim 7 starts off with a method for handset unit

20 communication.  Looking at that same *San Francisco Chronicle*

21 article, we again see it's showing a picture of a handset and it

22 describes the cellular phone.  So it's disclosing that element

23 of Claim 7.

24 Q.    And then the next demonstrative is 124.  This shows some

25 more claim language, I believe.

A.    So the next part of Claim 7 requires directly communicating

bi-directional wireless voice and computer data.  So it's a

little different wording than was used in Claim 1, but still

it's met by the description in that *San Francisco Chronicle*

article which explains that the Nokia 9000 is a phone capable of

sending and receiving faxes and emails, as well as connecting to

the Internet.  So clearly it's a phone that can do

bi-directional, wireless, voice and -- communication.  You can

talk and hear the other person talking, so it's bi-directional,

and it can communicate voice as well as computer data since it's

referring to email.  Email is definitely computer data.

Q.   Now, let me display for you some more claim language from

Claim 7.  This is Defendant's Demonstrative Exhibit 125.

        Now, is this demonstrative showing us claim language

that concerns the local area base unit?

A.   Yes.  So the next part of Claim 7 requires communication to

and from a local area base unit, very similar to the

corresponding element that we saw in Claim 1, and this is met,

again, by looking at that GSM standards document that refers to

a Micro BTS that's nearby as opposed to the more distant cell

tower BTS.

Q.   The next demonstrative exhibit is No. 126.  It shows

language from the claim on the left side.  In particular

highlighted is the *external wide area network*.  Do you see that?

A.   Yes.  So here I'm showing that the next element of Claim 7

United States District Court, Central District of California

EXHIBIT 7 - PAGE 172

13

```
1    requires that the handset communicate to and from an external
2    wide area network.  As before, that's shown in the prior
3    documents by looking at the GSM standards document where it
4    explains that there is a BTS or cell tower that the cellular
5    phone can communicate with.
6    Q.    Now, we talked at some length, when we were talking about
7    Claims 1, 2, and 3 -- about the transmit power level
8    requirement.  Do you recall that?
9    A.    Yes.
10   Q.    Is there a similar requirement in Claim 7?
11   A.    Yes, there is.
12   Q.    Let me display Defendant's Demonstrative Exhibit 127.  Does
13   this show the text of the claim that includes that requirement?
14   A.    Yes.  So here the wording is almost the same as it was in
15   Claim 1.  It requires that the handset use a -- use a transmit
16   power level to the local base area unit that's lower than the
17   power required to transmit to the external wide area network.
18          And, again, this is provided for in the GSM standard
19   by that adaptive power control function that's a requirement of
20   all GSM phones, such that the transmit power is adjusted
21   automatically based on how far away the base transceiver station
22   is.
23          As I explained earlier, the powers level is adjusted
24   up and down based on how far away the BTS is so when it's
25   communicating to a Micro BTS, it's nearby.  It will be
```

EXHIBIT 7 - PAGE 173

| | |
|---|---|
| 1 | communicating at a lower power than when it's communicating to |
| 2 | the more distant cell tower or normal BTS where it would be |
| 3 | using a higher power. |
| 4 | Q.   Now, I know we've covered this already, but I will ask it |
| 5 | just for completeness sake given that we are looking at Claim 7 |
| 6 | in particular.  Does Claim 7 have an email requirement? |
| 7 | A.   Yes, it does. |
| 8 | Q.   Let me display Defendant's Demonstrative Exhibit 128. |
| 9 | What's shown on this slide? |
| 10 | A.   So here the next element of Claim 7 requires that the |
| 11 | handset communicate email and that *San Francisco Chronicle* |
| 12 | article does indeed say that the Nokia 9000 is a cell phone that |
| 13 | can also send and receive email, so it meets that claim |
| 14 | requirement as well. |
| 15 | Q.   And let me display that same claim text in another |
| 16 | demonstrative exhibit which is Defendant's Demonstrative |
| 17 | Exhibit 129.  What is this slide showing? |
| 18 | A.   This shows that the next requirement for the -- meeting |
| 19 | this claim is that the handset be configured to have PDA |
| 20 | functions.  The *San Francisco Chronicle* article explains that |
| 21 | the Nokia 9000 is a personal -- portable organizer which |
| 22 | indicates that it meets this requirements. |
| 23 | Q.   So have we touched on all the elements of Claim 7 now? |
| 24 | A.   Yes. |
| 25 | Q.   Let me show Defendant's Demonstrative Exhibit 130.  What is |

1    the summary here showing us?

2    A.    So this summary shows that the Nokia combination, the

3    combination of the Nokia device and looking at that GSM

4    standards documents shows that the Nokia device is indeed a

5    handset, it communicates to local area base unit and an external

6    wide area network.  We got that from the GSM document that

7    talked about Micro BTS and normal BTS.  It communicates voice

8    and data.  Got that by looking at the *San Francisco Chronicle*

9    article.  It adjusts the transmit power of the handset based on

10   how far away the BTS is.  We found that in the GSM standards

11   document.  And it can send email and it operates as a PDA as

12   disclosed in that *San Francisco Chronicle* article.

13   Q.    Now, are Claims 9, 10, 11 and 12 also asserted against

14   Apple?

15   A.    Yes, they are.

16   Q.    Let's very quickly look at those.  If I could have

17   displayed Defendant's Demonstrative Exhibit 131, please.  What

18   is being shown in this slide?

19   A.    Here we see that the primary requirement for meeting claim

20   9 is the ability for the handset to communicate to the Internet.

21   And the *San Francisco Chronicle* article discloses that, yes, the

22   Nokia 9000 can indeed communicate with the Internet.

23   Q.    And is the text of Claim 9 shown there on the left-hand

24   side of the screen?

25   A.    Yes, it is.

1   Q.    Let me show you the text of Claim 10, which is on

2   Defendant's Demonstrative Exhibit 132.  Is that the text of

3   Claim 10 on the left?

4   A.    Yes.  So the left-hand side shows the text of Claim 10

5   which requires an earset unit.

6   Q.    And let me direct your attention in your book very quickly

7   to Defendant's Trial Exhibit No. 710.  Do you see that?

8   A.    Yes.

9   Q.    What is Defendant's Trial Exhibit 710?

10  A.    This is a patent that was issued to Vangarde.

11  Q.    Is this patent something that you considered in your

12  obviousness analysis?

13  A.    Yes, it is.

14  Q.    What is the date on this patent?

15  A.    The date on this patent is April 2, 1996, which is more

16  than a year before the parent filing date of the '380 patent.

17  Q.    What, in particular, did you focus on in this document

18  during your analysis?

19  A.    So the claim language required that the handset be also --

20  also be configured with an earset unit so that you could have

21  hands-free operation.

22        Well, at the time there were many, many, many

23  instances of handsets and earset units that were prevalent, so

24  the Vangarde patent is one such disclosure.  It discloses how

25  you can adapt a handheld device with a headset or earset unit in

EXHIBIT 7 - PAGE 176

1    order to get hands-free operation.

2    Q.    Let's turn back to Defendant's Demonstrative Exhibit 132.

3          I believe you mentioned that the text of Claim 10 is

4    on the left-hand side?

5    A.    Yes.

6    Q.    What's on the right-hand side?

7    A.    On the right-hand side I'm showing the Vangarde patent, an

8    illustration of the Vangarde patent, which clearly shows that

9    you could connect the mobile device with an earset unit which

10   would satisfy the requirements for this claim.

11   Q.    Let's look at that top figure, if we can, in this

12   demonstrative exhibit.  What is the device that looks like a

13   letter C?

14   A.    That would be the earset.

15   Q.    And then what's the device just to the left of that?

16   A.    That is the cell phone.

17   Q.    Okay.  Let's move next to Claim 11, and in particular,

18   Defendant's Demonstrative Exhibit 133.  What's being shown in

19   this demonstrative exhibit?

20   A.    Claim 11 requires that the handset serve as a cellular

21   telephone unit, and this is disclosed in that *San Francisco*

22   *Chronicle* article, which is shown on the right where it says

23   that the Nokia device is a cellular phone.

24   Q.    Now let's go to Defendant's Demonstrative Exhibit 134,

25   please.  What is shown on the left there?

```
 1   A.    This is the requirement for Claim 12 that the handset must

 2   be able to send and receive email.  Again, as we saw before, the

 3   San Francisco Chronicle article says that the Nokia 9000 is a

 4   phone that's capable of sending and receiving email, so it meets

 5   the requirements for Claim 12.

 6   Q.    So let me turn then to Defendant's Demonstrative

 7   Exhibit 135.  What is this summary telling us?

 8   A.    So this summarizes those last few claims that we talked

 9   about.  The Nokia combination shows -- disclosed that the device

10   can access the Internet.  That meets Claim 9.  The Vangarde

11   patent is an example of a disclosure that shows that you can

12   hook up one of these wireless devices to an earset unit.  That

13   meets the requirement for Claim 10.

14         The San Francisco Chronicle article also discloses

15   that the Nokia device is a cellular telephone unit and it can

16   send and receive email.  So that meets the requirements for

17   Claims 11 and 12.

18   Q.    Now, having looked at each element in detail for each of

19   the asserted claims, my last question about this combination of

20   prior art, the Nokia 9000, the GSM standard and the Vangarde,

21   why would a person of ordinary skill in the art have thought to

22   combine those references together?

23   A.    Well, the San Francisco Chronicle article that disclosed

24   this Nokia 9000 cell phone, it went on to explain that it's a

25   GSM phone and that it operates under the GSM cellular network.
```

```
1          So a person having ordinary still in the art at the

2    time would know that in order to figure out how that phone

3    functions, you could look at the GSM standards document that

4    describes in detail all of the principles for GSM cell phone

5    communication.

6          The Vangarde patent is a -- is a publication that was

7    available at the time that shows how you could adapt such a

8    phone to also be configured with an earset or headset unit for

9    hands-free operation.  A person in the field at that time would

10   know to look for these other publications.

11   Q.   Now, we've talked about this group of prior art, including

12   the Nokia 9000.  Was there another group of prior art that you

13   considered in your obviousness analysis?

14   A.   Yes.

15   Q.   And is that a separate analysis from the one we just heard

16   or is it something additional to it?

17   A.    It's a separate analysis.  So that Nokia combination was

18   one example I found in the prior art that discloses all of the

19   features of the asserted claims, but I found an additional

20   device that was disclosed in the prior art that also

21   demonstrates these -- some of these same claim elements.

22   Q.   Let me direct your attention in your book then to

23   Defendant's Trial Exhibit 881, and in particular, to page 3 of

24   that exhibit.  Do you have that in front of you?

25   A.   Yes.
```

```
1   Q.    What is being shown on page 3 there?

2   A.    This is an article that was published in a magazine called

3   Byte Magazine that describes a smartphone device called Simon.

4   It was made by IBM.

5   Q.    Did you rely on this article in your obviousness analysis?

6   A.    Yes, I did.

7   Q.    What is the date of this article?

8   A.    This article is dated December 1994.

9   Q.    Was that one year before Mr. Ditzik's patent application?

10  A.    Yes, it is.

11  Q.    Generally speaking, what does this article say about the

12  IBM Simon device?

13  A.    This article discloses the IBM Simon as a cell phone that

14  also has PDA functionality and can also send and receive email.

15  Q.    And what's the black thing that's pictured there in the

16  upper right-hand corner?

17  A.    That's a picture of one of these Simon cell phones.

18  Q.    What is the green portion of it that is shown in the middle

19  of the black body?

20  A.    The green portion in the middle of that black handset is a

21  display that shows various functionality available on this

22  phone.

23  Q.    Now, did this phone operate on a particular cellular

24  network?

25  A.    Yes, it did.
```

EXHIBIT 7 - PAGE 180

1  Q.   Which one was that?

2  A.   At the time, the IBM Simon was operating on an analog

3  network referred to as Amps.

4  Q.   We talked about the GSM cellular network earlier.  Is that

5  a different cellular network?

6  A.   Yes, it is.

7  Q.   Taking into account this article about the Simon device and

8  also the documents that you mentioned earlier about the GSM

9  cellular network, would a person of ordinary skill have, at the

10  time in 1997 -- have thought to consider those references

11  together?

12  A.   Yes.  As I explained, the GSM cellular network was in

13  widespread use, primarily in Europe.  It's since become in wide

14  use in the United States.  But at the time, someone working in

15  the field would have certainly wanted to develop a device that

16  could also work on the GSM cellular network in order to open up

17  a broader market for the device.

18  Q.   Okay.  Now, did you do the same sort of element-by-element

19  comparison of the claims on the one hand that are asserted in

20  this case to the Simon device and the GSM standard on the other

21  hand?

22  A.   Yes, I did.

23  Q.   What conclusion did you come to?

24  A.   I came to the conclusion that the Simon device, combined

25  with a couple of other publications, does disclose all of the

EXHIBIT 7 - PAGE 181

22

1    key features in the asserted claims.

2    Q.    So let me start with Defendant's Demonstrative Exhibit 150.

3          What does Defendant's Demonstrative Exhibit 150 tell

4    us?

5    A.    So this lists the key claim elements for Claims 1, 2,

6    and 3, and the Simon combination, that is, the Simon device

7    combined with the GSM standards documents that I mentioned

8    before discloses each of those key elements of Claims 1, 2, and

9    3.

10   Q.    So if I could beg your patience for just a little while

11   longer, we've seen the claims a lot and you have just described

12   for us how the claim elements appear for Claims 1, 2, and 3 and

13   how the Simon combination fits with that.

14         Let me very quickly show you some demonstrative

15   exhibits that concern the disclosures in the Simon article that

16   we just mentioned, in particular, Defendant's Demonstrative

17   Exhibit 143.

18         Now, I believe you said this before, but does the

19   Simon article that is shown on the right-hand side of

20   Demonstrative Exhibit 143 disclose a handset unit?

21   A.    Yes.  That Simon article that was published in *Byte*

22   *Magazine* clearly shows that the Simon device is a handheld

23   cellular phone, so it meets the handset requirement for Claim 1.

24   Q.    And Defendant's Demonstrative Exhibit 144 is now displayed.

25   It shows claim language concerning communication back and forth

EXHIBIT 7 - PAGE 182

1   between a local area communication base unit; is that right?

2   A.   Yes.  So the next key element of Claim 1 requires

3   communication with a local area communication base unit, and as

4   I explained, the GSM standards documents discuss the concept of

5   two different types of base transceiver stations, a nearby Micro

6   BTS and a farther away cell tower or BTS, so the Micro BTS meets

7   the requirements for having a local area communication base

8   unit.

9   Q.   Now, turning to Defendant's Demonstrative Exhibit 145, this

10  shows the part of the claim that concerns the external wide area

11  network; right?

12  A.   Yes.  So the next key element is communication with an

13  external wide area network.  Again, the GSM standards documents

14  explain that the cell phone can communicate with a cell tower or

15  normal BTS which serves as an external wide area network.

16  Q.   Defendant's Demonstrative Exhibit 146, the next one,

17  highlights the transmit power level aspect of the claim.  How

18  does that fit into your review of the Simon prior art and the

19  GSM standard?

20  A.   The GSM standards documents, as you recall, discuss that

21  adaptive power control feature which allows the cell phone or

22  requires the cell phone to adjust its power up and down as

23  dictated by the BTS, so if it's communicating with a nearby

24  Micro BTS, it's going to be transmitting at a lower power than

25  if it's transmitting to a more distant cell tower or normal BTS.

1  So that meets the requirements of this claim element.

2  Q.    Okay.  Flipping to the next slide, which is Defendant's

3  Demonstrative Exhibit 147, we see this claim language that we've

4  seen a number of times today concerning email; is that right?

5  A.    Yes.  And the Simon article in *Byte Magazine* clearly

6  explains that the Simon can send and receive email, so it meets

7  this claim limitation or claim element.

8  Q.    Slide Defendant's Demonstrative Exhibit 148 shows claim

9  language we've seen before concerning PDA functions; is that

10  right?

11  A.    Yes.  And, again, the -- that article about the Simon

12  clearly says that it's a milestone in the evolution of the PDA

13  so it explains that it's a device that has PDA functionality so

14  it meets the requirements of Claim 2.

15  Q.    Now, I believe the last portion of Claim 3 was the cellular

16  telephone unit requirement; is that right?

17  A.    That's correct.

18  Q.    Let me show you Defendant's Demonstrative Exhibit 149 that

19  shows that claim language on the left.  What's shown on the

20  right?

21  A.    So Claim 3 requires that the handset serve as a cell phone,

22  and that article about the Simon clearly says that the Simon is

23  essentially a cellular phone.  That's disclosing that it meets

24  the requirement for Claim 3.

25  Q.    So what is your conclusion about Claim 3 as compared to the

EXHIBIT 7 - PAGE 184

1    Simon and the GSM prior art?   Claims 1, 2, and 3, I should say?

2    A.    That based on going through those three claims element by

3    element, I find all of those elements in the -- this publication

4    about the Simon or in the GSM standards documents.   Each of

5    those elements is disclosed by the prior art.

6    Q.    Now, did you perform an element-by-element comparison of

7    the Simon combination prior art with Claim 7?

8    A.    I did.

9    Q.    Let me show you Defendant's Demonstrative Exhibit 157.   So

10   what is shown here?

11   A.    So here is a summary of the key elements of Claim 7

12   illustrating that the Simon combination does indeed disclose

13   each of those key elements.

14   Q.    So I think we've covered this a number of times, so I'll

15   just ask you questions rather than show you slides for each, but

16   does the Simon article disclose a method for handset unit --

17   excuse me -- handset unit communication?

18   A.    Yes, it does.   I could kind of walk you through this

19   summary here.

20         The -- that Simon article in *Byte Magazine* disclosed a

21   number of these key elements of Claim 7.   It showed a picture of

22   the handset which disclosed that, yes, it indeed meets that

23   handset requirement.   That article also explained that the Simon

24   device can serve as a cell phone sending voice and data, voice

25   and email, so it meets that voice and data requirement.

EXHIBIT 7 - PAGE 185

```
 1            It also meets the email requirement because that
 2    article said it sends email.  And it meets the PDA requirement
 3    because that article explained that it serves as a PDA.  So that
 4    leaves two of these key elements, the communication with the
 5    local area base unit and the communication with the external
 6    wide area network and a third one, transmit power requirement.
 7            Those three requirements I found in the GSM standards
 8    documents.  Those GSM standards documents explain communication
 9    to a Micro BTS which serves as a local area base unit, and it
10    describes communication to a regular cell tower or normal BTS,
11    which serves as communication with an external wide area
12    network, so it meets those requirements.
13            And finally, those GSM standards documents describe
14    the adaptive power control feature that allows and requires
15    every cell phone in the network to adjust its power level based
16    on how far away it is from one of those BTSs, and so that
17    indicates that such a device would be transmitting at a lower
18    power when it's communicating with a Micro BTS and at a higher
19    power when it's communicating with a more distant normal BTS.
20    So that meets the requirement for transmit power in Claim 7.
21    Q.   So what's your overall conclusion based on this
22    element-by-element comparison of the Claim 7 requirements on the
23    one hand and the Simon prior art combination on the other?
24    A.   So since I was able to find each and every one of these
25    elements in the prior art, I conclude that Claim 7 would have
```

1    been obvious based on this Simon combination.

2    Q.    Now, did you also consider Claims 9, 10, 11 and 12?

3    A.    Yes, I did.

4    Q.    With regard to the Simon combination?

5    A.    Yes, I did.

6    Q.    Let me quickly direct your attention to Defendant's Trial

7    Exhibit 711 in your binder.  Do you have that?

8    A.    Yes.

9    Q.    What is Defendant's Exhibit 711?

10   A.    This is a patent that was issued to Billstrom.

11   Q.    What is the date on this patent?

12   A.    The date on this patent is June 1995.

13   Q.    That's more than one year before Mr. Ditzik filed his

14   application?

15   A.    Yes.  It is more than one year before the parent filing

16   date of the '380 patent.

17   Q.    Did you rely on this Defendant's Trial Exhibit 711 in your

18   obviousness analysis?

19   A.    Yes, I did.

20   Q.    Was there a particular part of this that you relied on?

21   A.    Yes.  This patent describes a technique that one can use to

22   allow a device operating on a GSM cellular network to

23   communicate with the Internet.

24   Q.    With the Internet?

25   A.    That's correct.

United States District Court, Central District of California

EXHIBIT 7 - PAGE 187

1   Q.    Okay.  Let me show you Defendant's Demonstrative

2   Exhibit 158.

3          What's being shown on this demonstrative exhibit?

4   A.    So here we see on the left-hand side of the screen the

5   claim language from Claim 9 which explains that the handset must

6   be able to communicate with the Internet.

7          Well, this Billstrom patent discloses precisely such a

8   scheme.  A person in the field at the time would have been

9   familiar with techniques such as this described in the Billstrom

10  patent which provides for a method for a GSM device to access

11  the Internet using the techniques described in that patent.

12         So this, combined with the Simon device itself, would

13  allow one information about how to have a handset that can

14  access the Internet.

15  Q.    Let's turn to Claim 10, which is shown on Defendant's

16  Demonstrative Exhibit 159.  Now, Claim 10 mentioned that earset

17  unit requirement; is that right?

18  A.    That's correct.

19  Q.    I believe you mentioned earlier that the Vangarde patent

20  shows that?

21  A.    That's correct.

22  Q.    Does the Vangarde patent fit into your analysis with the

23  Simon device?

24  A.    Yes.  That same reference discloses how one could combine a

25  cell phone with an earset or headset device in order to provide

United States District Court, Central District of California

EXHIBIT 7 - PAGE 188

1   hands-free operation, and a person in the field at the time

2   would have been well aware of such an option, so this discloses

3   the key limitation -- the key element of Claim 10.

4   Q.    Let me quickly show you two more slides concerning this

5   obviousness.   First, Defendant's Demonstrative Exhibit 160.

6   This shows Claim 11; right?

7   A.    Yes.   So Claim 11 requires that the handset operate as a

8   cellular telephone unit.   This is disclosed in that article

9   about the Simon where it says that the Simon is essentially a

10  cellular phone.   So this meets the requirements for Claim 11.

11  Q.    And then I know we had talked about email before, but let

12  me show you Claim 12 of the patent, which is Defendant's

13  Demonstrative Exhibit 161.   What sort of disclosure in the Simon

14  article can we focus on here?

15  A.    So Claim 12 requires that the handset communicate with --

16  communicate email and that Simon article has a line that says

17  that the Simon can add fax and email functions, so this

18  discloses that the Simon device does indeed communicate email,

19  so it meets the requirements for Claim 12.

20  Q.    So we talked a lot about element-by-element comparisons

21  with different prior art.   Let me show you one last summary

22  slide, which is Defendant's Demonstrative Exhibit 162.   What

23  does this tell us?

24  A.    Here is a summary of what we've talked about with regard to

25  Claims 9 through 12.   The Billstrom patent is what demonstrated

1  how you can adapt a GSM -- a phone on the GSM network to access

2  the Internet.  We saw by looking at the Vangarde patent that it

3  would be very easy to adapt a Simon device with an earset unit

4  for hands-free operation.

5          The Simon article that was published in *Byte Magazine*

6  explained that the Simon is indeed a cellular telephone unit and

7  that it can send and receive email, so it meets all of those

8  requirements.

9  Q.   So now I think we've come to the end of the

10  element-by-element comparison of the asserted claims with the

11  Simon combination; is that right?

12  A.   That's correct.

13  Q.   And what's your overall conclusion concerning the

14  obviousness analysis as it relates to the Simon combination?

15  A.   So since I was able to find each and every element of every

16  one of those elements in the prior art of that Simon

17  combination, I came to the conclusion that those claims would

18  have been obvious to a person having ordinary skill in the art.

19  Q.   Professor Rodriguez, when did you start working on this

20  case?

21  A.   2011.

22  Q.   2011.  Did you provide an invalidity opinion back in 2011?

23  A.   Yes, I did.

24  Q.   And do you recall generally what that opinion was back

25  then?

1   A.    That report I wrote in 2011 explained that I had reviewed

2   the documents at the time and I came to the conclusion that the

3   claims that had been asserted at that time were invalid based on

4   some of the prior art.

5   Q.   So I want to explore with you just one last topic.  I don't

6   think it will take very long.

7           We have talked a lot about your invalidity analysis,

8   invalidity based on the written description rule on the one hand

9   and invalidity based on the obviousness analysis on the other.

10  Did you provide any opinions about the question of infringement

11  in this case?

12  A.    Yes.

13  Q.   Now, what is your understanding about what NetAirus must

14  prove to establish infringement in this case?

15  A.    NetAirus must prove that the accused devices, the iPhone 4,

16  practiced each and every step of a claim that's been asserted in

17  this case.

18  Q.   Each and every step?

19  A.    Yes.

20  Q.   Now, have you heard the term *direct infringement*?

21  A.    Yes.

22  Q.   What's direct infringement?

23  A.    Direct infringement refers to a scenario where Apple, the

24  defendant, would have practiced the steps of an asserted claim

25  directly by themselves.

EXHIBIT 7 - PAGE 191

1   Q.    Have you heard the term *induced infringement*?

2   A.    Yes.

3   Q.    And what does that mean, as you understand it?

4   A.    My understanding is that induced infringement refers to a

5   scenario where Apple would have encouraged other users to

6   infringe the -- one of the asserted claims of this patent.

7   Q.    Now, let's go back to direct infringement for a minute.

8   Have you considered whether or not Apple directly infringes --

9   let me back up a minute.

10          Have you considered whether Apple's iPhone 4, as Apple

11  uses it, directly infringes the patent claims asserted here?

12  A.    I -- I did address that question.

13  Q.    And what was your conclusion?

14  A.    My conclusion is that the Apple -- that Apple has not used

15  the iPhone 4 in a manner that infringes the -- well, let me

16  rephrase this.

17          My opinion is that NetAirus has not shown that Apple

18  has used the iPhone 4 in a way that infringes any of the

19  asserted claims.

20  Q.    And let's focus on induced infringement for a moment.  Have

21  you considered whether or not Apple induces anyone to infringe

22  the asserted claims of the patent here using the iPhone 4?

23  A.    I analyzed that question as well.

24  Q.    And what was your conclusion there?

25  A.    My conclusion was or is that NetAirus has not shown that

1    Apple has induced any other entity to infringe the asserted

2    claims of the patent.

3    Q.    Now, let's get a little bit more specific about the reasons

4    for that set of conclusions.  Let me show you the claims again,

5    and in particular, Defendant's Demonstrative Exhibit 164.

6    Before -- while that's being put up, was there a particular part

7    of the asserted claims that you thought deserved particular

8    focus?

9    A.    Yes.

10   Q.    And which part was that?

11   A.    The element of the claims that requires two different power

12   transmit levels.

13   Q.    Two different power transmit levels?

14   A.    Yes.

15   Q.    Was that element found in all of the asserted claims?

16   A.    Yes.

17   Q.    What's being displayed here on Defendant's Demonstrative

18   Exhibit 164?

19   A.    Here we see part of the language from Claim 1 that requires

20   that the transmit power level of the handset unit when

21   transmitting to the local area communication base unit is lower

22   than when transmitting to the external wide area network.

23   Q.    Now, how does this claim element fit into your analysis

24   about infringement that you just testified about?

25   A.    Well, I examined the evidence that NetAirus had put forth

EXHIBIT 7 - PAGE 193

1   to determine whether or not they had shown that the Apple iPhone

2   4 actually performs this step of the claims.

3   Q.    Let's take a quick look at that.  Could I please have

4   Defendant's Demonstrative Exhibit 168.

5           What is being shown on the left-hand side of

6   Defendant's Demonstrative Exhibit 168?

7   A.    So the left-hand side of this slide shows an industry

8   standard probability curve, a distribution that indicates how

9   likely it is that a cellular phone device transmits at different

10  power levels.  And the way to interpret this graph is those --

11  those vertical blue bars, the height of each of those vertical

12  blue bars indicates what's the probability or how often does it

13  occur that such a cell phone transmits at that corresponding

14  power level.

15          What may be hard to read on this slide is that on that

16  bottom horizontal line, horizontal axis, it's showing different

17  transmit power levels.  So from the far left it starts at about

18  minus 50 dBm, which is a measurement of power, going up to a

19  maximum of like around 20 dBm on the far right side.

20          I've highlighted a position on that graph with that

21  vertical red line showing the location for 15 dBm, which is the

22  power level that the iPhone 4 uses when transmitting over a

23  Wi-Fi network.

24  Q.    Now, does this probability curve shown on the left-hand

25  side of the screen that's shown right now prove that Apple

EXHIBIT 7 - PAGE 194

1   infringes?

2   A.    No, it does not.

3   Q.    And why not?

4   A.    Well, for -- for the following reasons.  First of all, this

5   is just an industry standard curve that shows general patterns

6   in use of cell phones.  It does not refer specifically to a

7   scenario where the cell phones are transmitting email.  So that

8   would be a different type of analysis that would need to be

9   done.

10          But also it shows that for most of the normal usage,

11  the transmit power levels are at a level that's much lower than

12  the 15 dBm power level associated for Wi-Fi communication.

13  Q.    So let me now very quickly show you another probability

14  curve that we've seen in the case here.  This is on Defendant's

15  Demonstrative Exhibit 169.  Have you seen this before?

16  A.    Yes, I have.

17  Q.    Now, does this document show that Apple infringes?

18  A.    No, it does not.

19  Q.    And are the reasons the same as the ones you just mentioned

20  with regard to the earlier slide?

21  A.    Yes.  Again, this is just a generic chart that shows

22  general usage patterns for all cell phones, for representative

23  cell phones, and it again shows that most of the time the

24  transmit power is below the 15 dBm power level for Wi-Fi.  Only

25  about seven and a half percent of the time does such a phone

1    transmit at a higher power level.

2    Q.    So you said below 15, I believe?

3    A.    Yes.

4    Q.    Now, we've heard a lot about Wi-Fi radio transmit power and

5    also the cellular radio transmit power in the iPhone 4 during

6    this trial.  Have you been here for that testimony?

7    A.    Yes.

8    Q.    Now, based on your analysis, does Apple control the iPhone

9    4's cellular radio transmit power?

10   A.    No.  Apple would have no control over the cellular transmit

11   power for the iPhone.  As I explained, that's dictated by the

12   GSM standard.  The GSM standard requires that all cell phones on

13   the network comply with the adaptive power control feature of

14   the GSM cellular network.  So the iPhone 4 sets its power level

15   based on commands it receives from the cell towers.

16          MR. GASPAR:  At this point, your Honor, I will pass

17   the witness.

18          THE COURT:  Okay.  Thank you.

19          Mr. Niro, cross-examination.

20          MR. DEAN NIRO:  Your Honor, to help the witness and

21   the Court, we prepared some books of exhibits.  We will

22   approach.

23                        CROSS-EXAMINATION

24   BY MR. DEAN NIRO:

25   Q.    Good morning, Dr. Rodriguez.  I'd like to start by looking

United States District Court, Central District of California

EXHIBIT 7 - PAGE 196

1    at Defendant's Exhibit 108.  And it's Defendant's Demonstrative

2    Exhibit 108.  That's the claim chart with respect to the Nokia

3    combinations; correct?

4    A.   Yes.

5    Q.   But this doesn't contain the actual language from the

6    claims, does it?

7    A.   This is just a summary of what I explained about each of

8    those elements.

9    Q.   It doesn't contain the terms chosen by Mr. Ditzik, the

10   inventor; is that right?

11   A.   It contains some of the words that were used in those

12   claims to express the key features that were required in the

13   claims.

14   Q.   But it doesn't include all of the words, does it?

15   A.   Oh, no.  This is just a synopsis of the claim elements.

16   Q.   And it doesn't contain the words that were reviewed by the

17   patent office; is that correct?

18   A.   These words were a part of the claims, and I'm sure those

19   were reviewed by the patent office.

20   Q.   But it doesn't contain all the words that were reviewed by

21   the patent office; is that correct?

22   A.   Oh, no, of course not.  This is just a summary of the key

23   phrases for those claim elements in those claims.

24   Q.   It's a summary, it's modified; right?

25   A.   No.  These are the -- these are the claim -- the key

```
1    elements of those claims that were in those -- in the claim
2    language for those claims.
3    Q.    But you modified the actual claims, didn't you?
4    A.    Which -- which one are you referring to?
5    Q.    If you are referring to Claims 1, 2, and 3, in DDX 108, you
6    modified the actual claims, didn't you?
7    A.    No.  The word handset is the same word that appears in
8    Claim 1.  I didn't modify that word.
9    Q.    But this is not the entire claim?
10   A.    No.  Of course not.  This is just a synopsis of what was in
11   those claims.
12   Q.    It's shortened; right?
13   A.    Yes.
14   Q.    It's a shortened version?
15   A.    Yes.
16   Q.    And some of the words were left off?
17   A.    Yes.  This is just a synopsis.
18   Q.    Let me show you PDX 61.  I will zoom in a little bit.
19          And let's look -- this you understand to be all the
20   words of Claims 1, 2, and 3; correct?
21   A.    It appears to be so, yes.
22   Q.    And I want to look at element C in particular where it
23   says, using said handset unit to communicate selectively the
24   first and second data to and from the local communication base
25   unit and to communicate third and fourth data to and from an
```

1    *external wide area network.*

2            Do you see that?

3    A.    Yes.

4    Q.    I'd like to go back to your chart, 108, if we could.

5            There is no word *selectively* in there, is there?

6    A.    That's correct.

7    Q.    You shortened this chart to eliminate the term *selectively*?

8    A.    Again, I just showed a synopsis of the key elements that

9    were required by those claims.

10   Q.    Sir, can you answer my question.

11           THE COURT:  Excuse me.  If you have an objection to an

12   answer, raise it with me, not with the witness.  Thank you.

13           MR. DEAN NIRO:  I'm sorry.

14   Q.    Sir, my question is did you shorten this chart in DDX 108

15   to eliminate the term *selectively*?

16   A.    No, I did not specifically choose to eliminate any

17   particular term.

18   Q.    It's not in that chart, though, is it?

19   A.    The word *selectively* is not on this synopsis.

20   Q.    And the same with respect to Claim 7, it says, *Transmitting*

21   *a first wireless radio frequency, RF signal, comprising said*

22   *data selectively to said local area base unit.*

23           That's part of Claim 7 of this patent; is that

24   correct?

25   A.    Yes.

EXHIBIT 7 - PAGE 199

```
 1   Q.    And in your chart that we looked at earlier with respect to

 2   Claim 7, that doesn't use the word selectively; is that correct?

 3   A.    Which chart are you referring to?

 4   Q.    Give me a second.  DDX 130.

 5   A.    Correct.  This -- this synopsis shows the key elements of

 6   Claim 7, and the word selectively was not one of the ones on

 7   this chart.

 8   Q.    Now, Professor Rodriguez, you were here for the testimony

 9   of Mr. Blackburn; correct?

10   A.    That's correct.

11   Q.    And the testimony of Mr. Ditzik; right?

12   A.    That's correct.

13   Q.    And you heard Mr. Ditzik testify that he owns 18 patents;

14   is that correct?

15   A.    I don't remember the precise number, but I remember that he

16   holds a number of patents.

17   Q.    And Mr. Blackburn owns 37 patents?

18   A.    I recall that he owns a number of patents as well.

19   Q.    Okay.  Now, on all your work you've done over the years,

20   you haven't received a single United States patent, have you?

21   A.    I have not.  As I explained, I work in academia so I choose

22   to publish my work in journals and conferences instead of filing

23   for patents.

24         MR. DEAN NIRO:  Your Honor, I move to strike the

25   second part of that answer.
```

```
 1              THE COURT:  That's fine.  Thank you.  Please proceed.
 2              MR. GASPAR:  Thank you very much, your Honor.
 3                           REDIRECT EXAMINATION
 4  BY MR. GASPAR:
 5  Q.   Professor Rodriguez, you were asked a series of questions
 6  at the beginning of your cross-examination about some of the
 7  summary slides that you prepared about Claim 7.
 8              Do you recall that?
 9  A.   Yes.
10  Q.   And I think you were asked questions about whether or not
11  the word selectively was on those summary slides.
12              Do you recall those questions?
13  A.   Yes.
14  Q.   Now, let me show you a slide that we talked about as well
15  which is Defendant's Demonstrative Exhibit 125.
16              Now, this was a slide that we discussed in your direct
17  testimony; is that right?
18  A.   That's correct.
19  Q.   And is the portion of the claim language directly as it's
20  shown in the patent shown on the left-hand side?
21  A.   Yes.  The left-hand side of the slide shows the precise
22  language from the claim itself.
23  Q.   And can you just read the language that's shown there
24  behind the little letter B?
25  A.   Sure.  Under B of claim 7 it says Transmitting a first
```

EXHIBIT 7 - PAGE 201

1  *wireless radio frequency's, RF, signal comprising said data*

2  *selectively to said local area base unit.*

3  Q.   And then did you provide some further analysis of how that

4  part of the claim language compares to the Nokia 9000 prior art

5  combination?

6  A.   Yes, I did.

7  Q.   Okay.  So is it fair to say that we had discussed in your

8  direct examination the *selectively* aspect of the claim language?

9  A.   Yes.  I had explained how the GSM standard document

10  discloses how the communication is selectively partitioned

11  between the Micro BTS and the normal BTS.

12  Q.   Okay.  Now, there's some different questions during your

13  cross-examination about your statements of your understanding of

14  the rules of invalidity.

15       Do you recall those questions?

16  A.   Yes.

17  Q.   And you were asked who provided you the information about

18  the invalidity rules.

19       Do you recall that?

20  A.   Yes.

21  Q.   Now, during your direct examination, did you provide what

22  your understanding is of the written description rule?

23  A.   Yes, I did.

24  Q.   Can I just ask you to state that again so we heard it

25  again?

United States District Court, Central District of California

EXHIBIT 7 - PAGE 202

1    A.    Sure.  As it was explained to me, my understanding is that

2    the written description requirement requires that the inventor

3    or patentee has to fully explain all the details of the claimed

4    invention in the original patent application.  So there's a

5    portion of the patent that's referred to as the patent

6    specification, which is separate from the patent claims, and the

7    patent specification has to provide a written description of all

8    the details of how you would design, build, implement, whatever,

9    the claimed invention.  And it has to be disclosed in sufficient

10   detail so that a person having ordinary skill in the art would

11   be able to read that description and understand what exactly the

12   invention was.

13   Q.    Now, was that written description rule that you've just

14   described in your own words the one that you applied in your

15   written description analysis?

16   A.    Yes, it is.

17   Q.    Now, I also asked you in direct a question about what your

18   understanding is of the rule of patent obviousness.

19         Do you recall that?

20   A.    Yes.

21   Q.    And what is your understanding of that?  Can you explain it

22   to us again?

23   A.    My understanding of the obviousness requirement is that in

24   order to have a patent be valid, it has to be new and novel,

25   which means that if you have a person of ordinary skill in the

EXHIBIT 7 - PAGE 203

1   and small.  It says, quote, the following is an examiner's

2   Statement of Reasons for allowance.

3           Do you see that?

4   A.   Yes.

5   Q.   Now, can I ask you to read the remainder of that page and

6   then the next page, which ends in 21, and tell me if there's any

7   statement at all in the examiner's Statement of Reasons for

8   allowance that mentions the written description rule.

9   A.   I see no mention of the written -- of written description.

10  It does not address written description at all.

11  Q.   In the Statement of Reasons for allowance?

12  A.   That's correct.

13  Q.   Okay.  My last set of questions concerns the last set of

14  questions that Mr. Niro asked you on cross-examination which

15  concerned the claims that emerged from the reexamination

16  procedure.

17          Do you remember those questions?

18  A.   Yes.

19  Q.   And is it your understanding that the asserted claims in

20  this case came out of the patent office after the reexam and

21  having been changed from what they were originally?

22  A.   Yes.  That's correct.

23  Q.   Now, thinking back to what the claims were originally

24  before they were changed and comparing that to the claims as

25  they emerged after reexamination that had been changed, was that

EXHIBIT 7 - PAGE 204

1 power level limitation that we discussed in the non-infringement

2 portion of your direct examination altered at all?

3 A.    No, it was not.

4 Q.    Okay.  And you were asked on cross-examination whether you

5 provided another non-infringement report after the reexamination

6 ended; is that right?

7 A.    That's right.

8 Q.    And I think you said you did not provide another report; is

9 that right?

10 A.    That's right.

11 Q.    Is there a reason why you didn't provide one?

12 A.    The -- the elements of those claims involving the power

13 limitation hadn't changed and the non-infringement arguments

14 that were in my analysis hadn't changed with respect to that, so

15 the original claims that had been asserted were not practiced by

16 the iPhone 4 because they don't practice the -- because there

17 was no evidence provided whatsoever that the iPhone 4 practices

18 that power requirement of the claims.  And after reexam, the

19 exact same power requirement was still there in all those

20 claims.  So still I have the same conclusion based on the same

21 evidence that they have not shown that the iPhone 4 practices

22 that power requirement.

23         MR. GASPAR:  I have no further questions, your Honor.

24         THE COURT:  Professor Rodriguez, thank you for your

25 testimony.  You are excused.

EXHIBIT 7 - PAGE 205

1           THE WITNESS:  Thomas Blackburn.

2           THE COURT:  Mr. Blackburn, do you understand you

3    remain under oath?

4           THE WITNESS:  Yes, I do.

5              Thomas Blackburn, previously sworn

6           THE COURT:  Mr. Blackburn will be the final live

7    witness in the trial.  There may be some other evidence but he

8    will be the final live witness.  It is our plan to complete his

9    testimony today.

10          We will then plan to have you come back tomorrow; I

11   will read you the final jury instructions; each counsel will

12   have the opportunity to present closing arguments, first

13   plaintiff, then defendant, and then plaintiff may respond to

14   defendant.

15          After that, I will read you some concluding

16   instructions and the case will be presented to you for your

17   deliberations.

18          So we're on schedule.  I say that because again we had

19   the unexpected fire drill today as well as this longer pause

20   than expected but we're on schedule and very grateful for your

21   timeliness each day.

22          Second, Ms. Belton, you presented a question which is

23   being -- I don't have it in my hand at the moment, it's being

24   copied.  Ms. Bellon, excuse me.  Thank you for your question.

25          What I have conferred -- I've conferred with counsel

EXHIBIT 7 - PAGE 206

1   about this and what I think is the best approach here is to have

2   counsel -- counsel will address your question in the course of

3   their respective closing arguments.  Okay?  Thank you.

4           Okay.  Mr. Roth, please proceed.

5                       DIRECT EXAMINATION

6   BY MR. ROTH:

7   Q.    Good afternoon again, Mr. Blackburn.

8   A.    Good afternoon.

9   Q.    You were sitting here today when Mr. Rodriguez testified;

10  is that correct?

11  A.    That's correct.

12          MR. ROTH:  Your Honor, for the -- I'm going to use two

13  demonstratives which Apple has requested be confidential.  So I

14  would ask that we turn off that monitor.

15          THE COURT:  Thank you.

16  BY MR. ROTH:

17  Q.    Mr. Blackburn, I'm going to show you what we had marked

18  during the last time you were here in court as Plaintiff's

19  Demonstrative 146.  And this contains certain power transmission

20  levels that Apple has asked be deemed restricted to only certain

21  eyes, so obviously we can't show that to the people in the

22  audience.

23          My question to you is we've been through this, these

24  power transmission levels; is that correct?

25  A.    Yes.

EXHIBIT 7 - PAGE 207

```
 1    you call somebody that's perfect in language.  So you sometimes
 2    use words that may not be as clear.
 3              So you can amend those -- those words as long as it
 4    doesn't, you know, fail to still meet the written description of
 5    your patent.
 6    Q.   We have heard some discussion, both early on in the case
 7    and what Mr. Rodriguez testified about, about a person of skill
 8    in the art.
 9              Do you know what a person of skill in the art is?
10    A.   Yes.
11    Q.   What is a person of skill in the art?
12    A.   As Dr. Rodriguez testified, it's a -- it's a theoretical
13    person that would have the skill to understand the patent,
14    understand the written description, and would be able to -- just
15    as the patentee did, to understand how to build and operate the
16    claimed invention.
17    Q.   Are you aware of the significance of a person of skill in
18    the art with respect to interpreting a patent?
19    A.   Yes.
20    Q.   What is your understanding in that regard?
21    A.   That a person of ordinary skill is somebody that can, you
22    know, accurately interpret what the patent is describing and how
23    to perform the functions or how to build a device that is, you
24    know, in the patent.
25    Q.   And do you have an opinion in this case as to the level of
```

1   education and experience that a person of skill in the art would

2   have in analyzing this particular patent?

3   A.   Yes.

4   Q.   What's your opinion?

5   A.   My personal opinion is based on my experience and my

6   career, is that it would be a person with a bachelor of science

7   degree in electrical engineering, that it would be a person that

8   had at least one year or two years, possibly one year at least

9   of industry experience.  Actually, you know, working in the

10  industry, you know, performing testing, you know, building

11  equipment and -- that would be relevant to the patent.

12  Q.   I want to turn our attention to the written description.

13  You understand that Apple is saying that this patent that we're

14  suing about lacks written description?  You understand that;

15  right?

16  A.   Yes.

17  Q.   Do you have knowledge of whether patent examiners review a

18  patent to determine whether it has an appropriate written

19  description during the prosecution of patent?

20  A.   Yes, I do.

21  Q.   From your review of the patent prosecution history in this

22  case, did examiners review the patent to determine whether it

23  had adequate written description?

24  A.   Yes, they would have.

25  Q.   Why do you say that they did that?

```
1    A.    That's normal process.   In the -- in the process of going
2    through my own patents several times, the issue would come up
3    that something wasn't disclosed in the written description and
4    so I had to again submit a response to why I felt the written
5    description did disclose that particular element that was in the
6    patent.
7    Q.    Now I want to focus on -- Apple brought up three issues
8    with respect to written descriptions so I want to take those one
9    at a time.
10             The first issue is that there is no written
11   description for the handset to send email.
12             Are you aware of that?
13   A.    Yes.
14   Q.    Okay.   Do you have an opinion as to whether there is
15   sufficient written description in the specification in the
16   patent application for one of ordinary skill in the art to
17   understand that the handset can send and receive email?
18   A.    Yes, I do.
19   Q.    What's your opinion?
20   A.    My opinion is that there is sufficient evidence or
21   sufficient written description in the patent to describe this
22   disclosure of sending email over the -- using the handset.
23   Q.    And this exact issue came up in the prosecution history,
24   didn't it?
25   A.    Yes, it did.
```

EXHIBIT 7 - PAGE 210

```
1    Q.    Let me show you -- back to our prosecution history -- PTX

2    219, and specifically this is page 1959.

3             What are we looking at here, Mr. Blackburn?

4    A.    Can you move it down a little bit?

5    Q.    Certainly.

6    A.    No.  Just move the -- yes.

7             So we're looking at a letter that Mr. Ditzik submitted

8    to the patent office where he says please find below or attached

9    an office communication concerning this application or

10   proceedings.  Actually this was to Richard Ditzik.

11   Q.    Okay.  Let me direct your attention to page 4 of that

12   document.  I want to direct your attention to the highlighted

13   portion.  Page 4, by the way, it ends in 1963.

14             Is this an examiner's rejection of the claim for

15   failing to provide written description with respect to the

16   handset sending email?

17   A.    Yes.  The examiner, in reference to Claims 50, 52 and 53,

18   state that the instant specification fails to provide for the

19   handset unit to be adapted to email functions, personal

20   productivity functions or computer telephony functions but it

21   most provides for the base to.

22   Q.    So at this time it appears that the email functions are

23   contained in Claim 50.

24             Is that your understanding?

25   A.    Yes.  That's correct.
```

EXHIBIT 7 - PAGE 211

1   Q.    Was that claim renumbered at some point?

2   A.    Yes.  I believe it was numbered to 68 or something like

3   that.

4   Q.    Let me show you part of the prosecution history, PTX 219.

5   Specifically, this document ends in 1991.

6              Can you tell us what this shows?

7   A.    This is a response to a final office action and it was sent

8   April 4th, 2003.  Or -- yeah.  Actually, the date of this letter

9   was May 2nd, 2003, in response to the final office action that

10  was sent to Mr. Ditzik on April 4th.

11  Q.    Okay.  Let me direct your attention now to page 5 of that

12  document.  The Bates stamp number is 1995.  I want to direct

13  your attention to Claim 68.

14             Is Claim 68 what we have previously seen was Claim 50?

15  A.    Yes, it is.

16  Q.    Let me direct your attention again to the prosecution

17  history, PTX 219 and specifically an amendment that Mr. Ditzik

18  filed.  I want to specifically refer you to page 12 of that

19  document, which ends in Bates stamp 1999.

20             Is this an argument that Mr. Ditzik made to the

21  examiners as to why there's written description for the handset

22  unit performing email functions?

23  A.    Yes, it is.  And he says as evidence to this, you know,

24  he's referring to a part of his specification that he's using in

25  this argument.

1    Q.    What did Mr. Ditzik argue in that regard?

2    A.    He says *many types of computer application programs may be*

3    *executed by the computer system --*

4              THE COURT:  Slow down, please.

5              THE WITNESS:  *For example, one or more telephony*

6    *programs, office personal productivity programs, electronic mail*

7    *or voicemail, and Internet web browsing programs may be used.*

8    *Other PDA, PC or workstation programs may also be executed.  One*

9    *or more programs, algorithms or routines may be used to control*

10   *this multiple program or system modes.  This may include program*

11   *coordination, scheduling and execution.  Programs to control the*

12   *mobile communications relay functions may be embodied.*

13   BY MR. ROTH:

14   Q.    Now, this language that Mr. Ditzik was citing, is this

15   actually contained in the patent -- the specification for the

16   380 patent?

17   A.    Yes, it is.

18   Q.    Let me direct your attention to Plaintiff's Exhibit 210 and

19   specifically to the last page of that document.

20              Is the same language that Mr. Ditzik cited in his

21   response to the examiners on that issue contained in column 13,

22   lines 23 through 31?

23   A.    Yes, it is.

24   Q.    Does the language that we see in column 13 relate to a

25   particular line or figure in the patent?

United States District Court, Central District of California

EXHIBIT 7 - PAGE 213

```
 1   A.    Yes.  I believe this is referring to Figure 8.

 2   Q.    Let me show you Figure 8 of the 380 patent.  Again, this is

 3   Plaintiff's Exhibit 210.

 4          Do we see a disclosure in Figure 8 for a program that

 5   would fulfill the email function in a handset?

 6   A.    Yes.  This is a flow chart of the different things that

 7   the -- the system can perform.  And here he shows in block 81

 8   that he talks about a handset communication control.  And then

 9   just below that, as one of the programs that the handset can

10   run, is -- is email or voicemail programs.

11   Q.    And is that email program that I'm circling here

12   Illustration 88?

13   A.    Yes.

14   Q.    Do you have an opinion as to whether a person of ordinary

15   skill in the art would understand that this disclosure in a

16   specification discloses written descriptions sufficient to

17   support the claim limitation that the handset can send and

18   receive email?

19   A.    Yes, I do.

20   Q.    What is that opinion?

21   A.    My opinion is in reading the written description and

22   looking at this flow chart, that there is written description

23   talking about a handset that runs an email program.

24   Q.    Let's go back to the prosecution history once more.

25   Plaintiff's Exhibit 219.  This document ends in 2112.
```

```
 1              Can you tell us what this document is?
 2   A.   This is a document sent by the patent office giving notice
 3   of allowance and issuance of the patent.
 4   Q.   Let me direct your attention to the page of that Notice of
 5   Allowance which ends in 2115.
 6              And first of all, what is the title of this document
 7   that we're looking at?
 8   A.   Notice of Allowability.
 9   Q.   Okay.  And I want to direct your attention to the checked
10   box No. 2.
11              What does that say?
12   A.   That says The allowed claims are 54, 55 through 58, 60
13   through 62 and 64 through 70.
14   Q.   Now, what is the significance of the Notice of Allowability
15   with respect to the written description requirement for the
16   handset having email capability?
17   A.   Yes.  We saw that the -- the -- originally the patent
18   office issued a rejection letter stating that the written
19   description did not include enough information to show him that
20   the handset was capable of communicating -- of sending email.
21              After Mr. Ditzik responded and pointed out the
22   paragraph in his written description and his flow chart, showing
23   that this handset was capable of sending email, the patent
24   office then responded with this Notice of Allowability showing
25   that that Claim 68, which Mr. Ditzik responded to, was now
```

EXHIBIT 7 - PAGE 215

1  allowed by the patent office.

2  Q.   So did Mr. Ditzik overcome the written description argument

3  that was advanced by the examiner?

4  A.   Yes, he did.

5  Q.   Now, did you form an opinion as to whether independently

6  the specification supports the claim that a handset unit can

7  send and receive email?

8  A.   Yes, I did.

9  Q.   What did you base that opinion on?

10 A.   I looked at the patent and I looked at the -- Mr. Ditzik's

11 arguments.  I looked at the -- when I looked at the

12 specification of the patent, the written description, as being

13 one of a person of ordinary skill in the art, it was my opinion

14 that there was adequate written description to perform this step

15 of the patent claim.

16 Q.   In your report -- let me move back to PTX 210 -- one of the

17 sections that you cited was column 6, lines 49 through 53.  Let

18 me zoom in on that.

19      How does this support your opinions that there's

20 adequate written description to support the handset having email

21 functions?

22 A.   Well, the -- as we saw, the title of the patent is a

23 wireless handset communication, and so here he's talking about

24 capabilities, other capabilities such as fax, send/receive,

25 speech recognition, voice processing, voicemail, telephony and

```
 1    email functions may be implemented in the computer system.  So
 2    that is another part of the specification which allowed me to
 3    form my opinion that the handset was capable of sending email.
 4    Q.   And was your opinion also based on the same language that
 5    the examiner relied on in allowing this claim, that is, column
 6    13, lines 23 through 30?
 7    A.   Yes, it was.
 8    Q.   You talked about -- just now about the handset being part
 9    of the system; is that correct?
10    A.   Yes.
11    Q.   Let me show you the cover page for Plaintiff's 210.
12              What is the title of this patent that we're here
13    about?
14    A.   So we see the title of this patent is Wireless Handset
15    Communication System.
16    Q.   And is that title -- I'm sorry.  Let me turn your attention
17    to the abstract.  And specifically to the last sentence in that
18    abstract.
19              Does this lend support to your opinion that the
20    handset unit is part of the system that's disclosed in the
21    patent?
22    A.   Yes, it does.
23    Q.   Okay.  How so?
24    A.   It talks about the system which in the title is talking
25    about a handset -- wireless handset system.  It says *the system*
```

1   *may be capable of performing personal digital assistant, PDA,*

2   *cellular telephone, conventional notebook computer, desktop*

3   *computer functions.*

4   Q.   Let me direct your attention -- again, this is Plaintiff's

5   Exhibit 210, the patent.  And specifically column 3, lines

6   approximately 52 to 57.

7        Does this further support your position that the

8   handset is part of the system that's claimed in the patent?

9   A.   Yes.  So here Mr. Ditzik is talking about a computer

10  system, and he goes on to say that *as used herein, can also be*

11  *referred to as a portable computer system, computer display unit*

12  *or base unit and shall also include the terms personal computer,*

13  *notebook computer, subnotebook computer or personal digital*

14  *assistant, PDA.*

15  Q.   Now, the opinion that you rendered that there's adequate

16  written description in the specification to support the claim

17  limitation that the handset can send and receive emails, is that

18  consistent with what the patent office did in issuing this

19  patent?

20  A.   Yes.

21  Q.   Now, I want to turn to the next written description issue

22  that Apple raised which was that there's no written description

23  to support selective communication.

24       I want to direct your attention again to Plaintiff's

25  Exhibit No. 210.  This is -- this is the patent that we keep

EXHIBIT 7 - PAGE 218

125

1  coming back to.

2         And specifically can you tell us when this patent

3  application for this particular patent was filed?

4  A.    This part of it was filed September 8th, 1999.

5  Q.    And the date of issuance of the patent is what?

6  A.    September 5, 2006.

7  Q.    So we're talking about a period of about seven years; is

8  that correct?

9  A.    Yes.

10 Q.    During the entire seven-year period of time when this

11 patent was being reviewed, did any examiner who looked at the

12 file ever raise an issue that there was no written description

13 to support the selective communication function?

14 A.    No, they did not.

15 Q.    Do you have an opinion as to whether the patent contains a

16 written description to support that the handset communicates

17 selectively?

18 A.    Yes, I do.

19 Q.    What is that opinion?

20 A.    My opinion is that the handset can communicate

21 selectively -- selectively.

22 Q.    And that is supported by the specification?

23 A.    Yes, it is.

24 Q.    I want to direct your attention to -- let me back up a

25 minute.

EXHIBIT 7 - PAGE 219

```
 1              For your opinion, did you review the patent
 2   specification?
 3   A.    Yes, I did.
 4   Q.    And you formed your opinions based on the specification; is
 5   that true?
 6   A.    Yes, it is.
 7   Q.    Let me direct your attention to the patent, Exhibit 210,
 8   and specifically column 11.  Is there language in column 11 that
 9   supports your opinion that the handset can selectively
10   communicate?
11   A.    Yes.  Starting at line 37 -- I'm not sure what column this
12   was.  I can't see it.
13   Q.    That's actually column 11.
14   A.    Column 11, starting around line 37, it says, The
15   communication means disclosed herein may make use of long
16   distance or short distance communications techniques, methods
17   and equipment.
18              So here we're talking about the -- at least two
19   different means which use long distance or short distance
20   communication.
21   Q.    Let me direct your attention to Figure 7 in the patent.
22   And I want to -- again, this is Exhibit 210.  Is the long and
23   short distance means of communication called out in Figure 7?
24   A.    Yes, it is.
25   Q.    How so?
```

United States District Court, Central District of California

EXHIBIT 7 - PAGE 220

1  A.    We see that the handset is capable of communicating to this

2  external wide area communication network so that would be the

3  long distance communication.

4         And then the handset is also able to communicate with

5  this notebook unit.  That would be the short distance.

6  Q.   Did your opinion also rely on -- in part on the abstract of

7  the patent?

8  A.   Yes, it did.

9  Q.   Let me direct your attention to the cover page or face page

10  of the patent Exhibit 210.  What about this abstract supports

11  your opinion that there is adequate written description?

12  A.   Normally when communicating with a long distance

13  communication and a short distance communication, it could make

14  use of different antennas that are used to transmit the

15  different signals.  So here we see in this abstract it says,

16  *Wireless communication devices may include one or more*

17  *telephone-like handsets and/or earset.  The wireless*

18  *communication devices may include one or more antenna.*

19         So this is telling me that the fact that it could have

20  more than one antenna, that it has the capability of

21  transmitting to a, you know -- a long-distance communication or

22  a short-distance communication.

23  Q.   So, Mr. Blackburn, do you have an opinion as to whether

24  there is adequate written description in the patent

25  specification to support the selective communication function in

1   a handset?

2   A.   Yes.

3   Q.   What is your opinion?

4   A.   It is my opinion that the specification in the patent

5   supports the claimed element of transmitting to a local area or

6   a wide area network selectively.

7   Q.   And is that opinion that you hold consistent with the

8   patent office's action of issuing the patent?

9   A.   Yes, it is.

10   Q.   The last written description issue that Apple raised is

11   that they said there is no handset -- there is no written

12   description for the handset to be a PDA.  You recall that;

13   correct?

14   A.   Yes.

15   Q.   Was the subject of whether there was adequate written

16   description to support the handset being a PDA something that

17   was raised during the prosecution history?

18   A.   Yes.  Several times.

19   Q.   Okay.  Could you explain how that came up?

20   A.   In one of the first office actions, it stated that the

21   written description did not disclose a handset with PDA

22   functionality, and eventually that was allowed based on this

23   back and forth between the patentee and the patent office and

24   responses and communication with the patent office, that

25   particular element was allowed.

EXHIBIT 7 - PAGE 222

1    Q.   Let's dig into that just a little bit.  Let me show you

2    again -- we're back to our prosecution history, Plaintiff's

3    Trial Exhibit 219.  And I want to focus you on an office action.

4    This is from the patent office to Mr. Ditzik.  And what is the

5    date of that office action?

6    A.   This is June 19, 2002.

7    Q.   Now let me refer you to page 4 of that document.  The Bates

8    stamp ends in 1922.  Can you tell us what we see here in this

9    office action?

10   A.   So in this office action, we see that regarding Claim 23,

11   the examiner is stating that *the instant specification fails to*

12   *provide for the handset unit to primarily be a personal digital*

13   *assistant device, but instead provides for the base to be a PDA.*

14   Q.   Let me show you now -- back to our prosecution history.

15   This is PTX 219.  And this ends in 1931.

16        Is this a response that Mr. Ditzik filed with respect

17   to a rejection to the claim because of the lack of -- alleged

18   lack of written description?

19   A.   Yes, it is.

20   Q.   Let me refer you to page 7 of 20 of that document.  And the

21   Bates stamp number ends in 1937.

22        Did Mr. Ditzik argue that the patent specification

23   does indeed provide written description for the handset to be a

24   PDA?

25   A.   Yes, he did.

United States District Court, Central District of California

EXHIBIT 7 - PAGE 223

1    Q.   Can you tell us in summary what Mr. Ditzik argued?

2    A.   We see here at the top of the page, it says *the examiner*

3    *states that it appears to be limited to a control of a base*

4    *unit.*  But Mr. Ditzik says, *however, the examiner may have*

5    *missed the disclosed nexus between the wireless handset and the*

6    *PDA, personal digital assistant.  This is evidenced by the*

7    *definition of a PDA in the specification.*

8          So Mr. Ditzik quotes a section of his written

9    description where he says *notebook computers have a relatively*

10   *large, flat panel display device, a full alphanumeric keyboard*

11   *and battery power.  PDAs are small handheld units with a small*

12   *LCD display, small keypad and touch pen.  PDAs are designed to*

13   *be placed in one's pocket or purse for maximum portability.*

14         And then further down, he again says *this is evidenced*

15   *when the applicant states in the specification another object of*

16   *this invention involves hardware and program software to control*

17   *cellular or PCS communications, combined with a lightweight*

18   *mobile notebook or PDA-like unit.*

19         So Mr. Ditzik is then saying that *the above quote*

20   *shows program control equivalence among the cellular handset,*

21   *notebook, and PDA.  And therefore the disclosure teaches a PDA*

22   *and handset control software equivalence.*

23   Q.   And the part in the response that we see indented here, is

24   that part of the specification for the '380 patent?

25   A.   Yes, it is.

1    Q.    Is the same true as we move down the page to see this other

2    quoted part -- is that part of the specification?

3    A.    Yes.   That's also part.

4    Q.    Back to our prosecution history, Plaintiff's Trial

5    Exhibit 219, I specifically want to refer you to the page that

6    bears Bates stamp 2017.  Can you tell us the significance of

7    line 3 in this advisory action that we see?

8    A.    Yes.   In this advisory action, it says that *the applicant's*

9    *reply has overcome the following rejections.*  1112-1 is

10   referring to the written description aspect, and he says

11   regarding 1112 to Claims 54 through 56 -- 54 through 61, that

12   the applicant has overcome the rejections.

13   Q.    What is the significance of that with respect to the

14   written description, whether Mr. Ditzik's patent met the written

15   description requirement of a handset configured to a PDA?

16   A.    That shows that after Mr. Ditzik responded and cited

17   certain parts of his written description that he felt was

18   pertinent to this element, that the examiner, in reviewing that,

19   came to the same conclusion, that the written description

20   regarding this claimed disclosure was met by the written

21   description in the patent.

22   Q.    Was the issue of whether the handset could be a PDA and

23   whether that was specifically described in the written

24   description raised again during the prosecution history?

25   A.    Yes, it was.

1   Q.    And did Mr. Ditzik argue once again that there was

2   sufficient support to one of ordinary skill in the art that they

3   would understand that the handset could be a PDA?

4   A.    Yes.  In this examination, you know, sometimes a new

5   examiner will look at it and come up with the same reasons for

6   rejection.  So, again, Mr. Ditzik responded with a similar

7   argument that his -- his specification did disclose that element

8   and the patent examiner agreed with him by allowing that -- that

9   patent and by saying that the 1112 requirement had been met.

10  Q.    Let me show you Mr. Ditzik's response to that second

11  action.  What is the date on this document?

12  A.    This is August 29th, 2004.

13  Q.    I specifically want to refer your attention to page 5,

14  which is Bates stamped 2102.

15           Is this Mr. Ditzik's argument as to why the patent

16  discloses that the handset can be a PDA?

17  A.    Yes.

18  Q.    Can you tell us what's represented here, at least in the

19  first portion of that response by Mr. Ditzik?

20  A.    It says *As shown below, applicant's specification discloses*

21  *that the handset unit 14 may include a small PDA unit, and the*

22  *base unit may also be a PDA unit that is larger and comprises of*

23  *more components and functions, including relay functions.  Shown*

24  *below is a simplified form of Figure 7.  This shows the*

25  *applicant's useful, novel, and non-obvious communication path*

EXHIBIT 7 - PAGE 226

1   *structure, which is not taught in the prior art.*

2   So this is Mr. Ditzik's -- what he calls a simplified

3   drawing where it's showing that the handset could contain a PDA

4   unit and this handset PDA unit could connect with, again, an

5   external wide area network and a base station which is closer

6   than the wide area network.

7   Q.   And we see here -- does Mr. Ditzik cite that the prior

8   examiner had already ruled on this issue?

9   A.   Yes, he does.  He says, *However as accepted in paper 35 by*

10  *the previous examiner, the specification does provide enabling*

11  *support for a hand unit configured to a PDA.  This is evidenced*

12  *by the specification stating.*

13  Q.   And then there is actually a citation to the specification

14  on the next page which ends in Bates stamp 2103; is that

15  correct?

16  A.   Yes.  These are the -- this is the same part of the

17  specification that Mr. Ditzik cited to the first examiner.

18  Q.   And is the language that Mr. Ditzik cited that we see here

19  on the screen -- is that actually contained in the specification

20  for the '380 patent?

21  A.   Yes, it is.

22  Q.   After Mr. Ditzik filed this response, was the claim

23  allowed?

24  A.   Yes, it was.

25  Q.   I'm referring back to the prosecution history, PTX 219, and

EXHIBIT 7 - PAGE 227

134

1    specifically Bates stamp 2112.  Can you tell us what this is,

2    sir?

3    A.    This is another Notice of Allowance and this was sent to

4    Mr. Ditzik by a second examiner, Sam Bhattacharya.

5    Q.    Let me direct you to the second page of that document.

6    What is the title of that second page?  That's Bates stamp

7    21115.

8    A.    Notice of Allowability.

9    Q.    What is the significance of the Notice of Allowability?

10   A.    The significance is that this shows that certain claims are

11   allowed, and we see in No. 2 that the patent examiner has

12   checked that box, and basically it says *the allowed claims are*

13   and it -- again, it lists the 54, 55 through 58, 60 through 62

14   and 64 through 70.

15   Q.    So at this point in time, did Mr. Ditzik once again

16   overcome any objection to the written description requirement

17   that a handset can be a PDA?

18   A.    Yes.

19   Q.    Now, you were here for Mr. Rodriguez's testimony; right?

20   A.    Yes, I was.

21   Q.    And one thing that Mr. Rodriguez said is that the first

22   time we see this figure about or discussion of a handset/PDA

23   unit was in what we had previously seen as PTX 219, which is

24   Bates stamp 2102, which is 2004.  Do you recall that testimony?

25   A.    Yes.