**EXHIBIT 8**
**TO DECLARATION OF JOSEPH A. CULIG IN SUPPORT**
**OF NETAIRUS' RENEWED MOTION FOR JMOL PURSUANT**
**TO FED.R.CIV.P. 50(b)**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

HONORABLE JOHN A. KRONSTADT

UNITED STATES DISTRICT JUDGE PRESIDING

- - -

```
NETAIRUS TECHNOLOGIES, LLC,        )
                                   )
                PLAINTIFF,         )
                                   )
VS.                                )  CV10-3257-JAK
                                   )
APPLE, INC.,                       )
                                   )
                DEFENDANT.         )
_____)
```

REPORTER'S TRANSCRIPT OF TRIAL PROCEEDINGS

**DAY SIX**

LOS ANGELES, CALIFORNIA

WEDNESDAY, NOVEMBER 20, 2013, 8:30 AM

_____

ALEXANDER T. JOKO, CSR NO. 12272
FEDERAL OFFICIAL COURT REPORTER
255 EAST TEMPLE STREET, ROOM 181-F
LOS ANGELES, CA 90012
AJ_CSR@YAHOO.COM

EXHIBIT 8 - PAGE 229

1    **APPEARANCES OF COUNSEL:**

2    FOR PLAINTIFF:      ORUM & ROTH LCC
                         BY:  MARK DANIEL ROTH
3                        53 WEST JACKSON BOULEVARD
                         SUITE 620
4                        CHICAGO, IL 60604-3750

5                        NIRO HALLER AND NIRO LTD
                         BY:  RAYMOND P. NIRO, SR.
6                             DEAN D. NIRO
                              TAHITI ARSULOWICZ
7                             ROBERT A. CONLEY
                              JOSEPH A. CULIG
8                        181 WEST MADISON STREET
                         SUITE 4600
9                        CHICAGO, IL 60602

10
     FOR DEFENDANT:      MILBANK TWEED HADLEY AND MCCLOY LLP
11                       BY: MARK C. SCARSI
                              ASHLEY LIN
12                            HANNAH LYNN CANNOM
                              CHRIS L. HOLM
13                       601 SOUTH FIGUEROA STREET
                         3RD FLOOR
14                       LOS ANGELES, CA 90017

15                       CHRISTOPHER J. GASPAR
                         MILBANK TWEED HADLEY AND MCCLOY LLP
16                       1 CHASE MANHATTAN PLAZA
                         NEW YORK, NY 10005-1413
17
                         JACKIE HARLOW
18                       IP LITIGATION COUNSEL
                         APPLE
19                       1 INFINITE LOOP
                         MS 36-3NYJ
20                       CUPERTINO, CA 95014

21

22

23

24

25

EXHIBIT 8 - PAGE 230

```
1    COURT'S INSTRUCTION, AND THE EVIDENCE THAT'S PRESENTED.

2    THE MOST COMPELLING OF WHICH IS THEIR OWN ADMISSIONS AS

3    TO WHAT COUNTS AND HOW THAT COMPARES TO WHAT'S IN THE

4    PATENTED INVENTION.

5              THANK YOU.  I'LL BE BACK AFTER MR. SCARSI

6    PRESENTS HIS CLOSING.

7         THE COURT:  THANK YOU, MR. NIRO.

8         MR. SCARSI, WOULD YOU PLEASE PROCEED.

9         MR. SCARSI:  THANK YOU VERY MUCH, YOUR HONOR.

10             LADIES AND GENTLEMEN OF THE JURY, THANK

11   YOU FOR YOUR TIME AND ATTENTION THIS PAST WEEK.  I KNOW

12   IT'S BEEN A LONG WEEK.  WE'VE HAD SOME LONG DAYS.

13   WE'VE GONE THROUGH A LOT OF TECHNICAL SUBJECT MATTER.

14   AND WE HAVE TAKEN YOU AWAY FROM YOUR JOBS AND YOUR

15   FAMILY.  AND WE APPRECIATE YOUR SERVICE BECAUSE YOU ARE

16   A CRITICAL PART OF THIS PROCESS.

17             NOW THAT THE EVIDENCE IS CLOSED, SOMEONE

18   NEEDS TO LISTEN TO THE ARGUMENTS AND SIFT THROUGH THE

19   EVIDENCE AND DECIDE WHO IS GIVING IT TO YOU STRAIGHT,

20   WHO IS TELLING THE TRUTH AND WHO IS RIGHT.  AND THAT'S

21   YOUR JOB, A CRITICAL ONE.  AND WE THANK YOU FOR IT.

22             BEFORE I GET TO MY SLIDES, THERE WAS A

23   FEW THINGS I WANTED TO CLEAR UP FROM WHAT MR. NIRO SAID

24   IN OPENING AND WHAT MR. NIRO JUST SAID IN CLOSING.

25   FIRST WAS THIS NOTION THAT MR. DITZIK DIDN'T WANT TO BE
```

EXHIBIT 8 - PAGE 231

1    HERE.  THIS IS ALL APPLE'S FAULT THAT WE'RE HERE.  HE

2    JUST WANTED TO TALK TO APPLE ABOUT LICENSING.  AND YOU

3    KNOW FROM THE EVIDENCE THAT THAT'S NOT TRUE.

4    MR. DITZIK TESTIFIED ON THE STAND THAT HE NEVER

5    CONTACTED APPLE.  HE JUST FILED A LAWSUIT.  AND, IN

6    FACT, THE FIRST TIME APPLE HEARD ABOUT THE PATENT, THE

7    '380 PATENT, WAS WHEN APPLE GOT SERVED WITH THE

8    COMPLAINT.  I KNOW THERE WAS A QUESTION ABOUT THAT FROM

9    THE JURY.  AND THE REEXAMINATION HAPPENED AFTER THAT

10   POINT, AFTER MR. DITZIK SUED APPLE.

11            NOW, WHY DID MR. DITZIK SUE APPLE?  WHY

12   DIDN'T HE TALK TO APPLE?  WELL, HE DIDN'T EXPLAIN THAT

13   TO YOU.  BUT WE THINK IT'S BECAUSE HE KNOWS SOMETHING

14   ABOUT THIS PATENT.  HE KNOWS THAT THE PATENT CLAIMS

15   DON'T MATCH THE DISCLOSURE.  THAT'S A PROBLEM.  IT'S A

16   PROBLEM FOR THIS PATENT.  AND HE KNOWS THAT THAT WOULD

17   HAVE COME UP HAD HE SAT DOWN WITH APPLE AND DISCUSSED

18   THE PATENT.  AND HE FIGURED IF HE JUST FILED THE

19   LAWSUIT, MAYBE APPLE WOULD JUST PAY HIM OFF FOR FILING

20   A LAWSUIT.

21            BUT THERE'S A PROBLEM.  COMPANIES LIKE

22   APPLE, THEY CAN'T JUST PAY PEOPLE OFF FOR INVALID

23   PATENTS.  BECAUSE IF THEY DID, THE NEXT DAY THEY WOULD

24   HAVE 15 MORE LAWSUITS ON THEIR HANDS.  AND THEN INSTEAD

25   OF HAVING A COMPANY THAT HIRES ENGINEERS TO DEVELOP AND

EXHIBIT 8 - PAGE 232

1   DESIGN PRODUCTS, THEY WOULD BE DOING NOTHING BUT HIRING

2   LAWYERS TO DEFEND LAWSUITS.  AND THAT MIGHT BE GOOD FOR

3   US LAWYERS, IT'S NOT GOOD FOR THE COMPANIES, AND IT'S

4   NOT GOOD FOR THE ECONOMY.

5           NOW, ONE OTHER POINT I WANTED TO JUST

6   BRIEFLY BRING UP.  MR. NIRO TALKED A LOT ABOUT THE

7   REEXAMINATION AND ABOUT THE PATENT OFFICE PROCEEDINGS.

8   AND HE TELLS YOU THAT YOU DON'T NEED TO DO ANYTHING

9   BECAUSE THE PATENT OFFICE HAS ALREADY DONE IT.  THAT'S

10  NOT YOUR JOB, HE TELLS YOU.  YOU SHOULD JUST TAKE WHAT

11  THE PATENT OFFICE DID.  BUT HE'S WRONG ABOUT THAT.

12  THAT IS YOUR JOB.  YOU KNOW SOMETHING ABOUT THE PATENT

13  OFFICE AFTER SITTING THROUGH THE TESTIMONY THIS WEEK.

14  YOU KNOW, FIRST OF ALL, THAT THE PATENT OFFICE HAS A

15  LOT OF WORK.  THEY'RE DOING HUNDREDS OF THOUSANDS OF

16  PATENT APPLICATIONS.  SOMETIMES THEY MAKE MISTAKES.

17  AND YOU SAW EVIDENCE IN THIS CASE OF SOME MISTAKES THAT

18  THE PATENT OFFICE MADE.  THE PATENT OFFICE, AT ONE

19  POINT, HELPED MR. DITZIK WRITE CLAIMS.  AND THEN OTHER

20  EXAMINERS INVALIDATED THOSE CLAIMS.  THEY SAID THOSE

21  CLAIMS WERE INVALID.

22           YOU ALSO SAW EVIDENCE OF THE PATENT

23  OFFICE GOING BACK AND FORTH AND BACK AND FORTH ON THIS

24  WRITTEN DESCRIPTION ISSUE.  AGAIN, THE PATENT OFFICE

25  DOESN'T ALWAYS GET IT RIGHT.

EXHIBIT 8 - PAGE 233

```
1          YOU KNOW SOMETHING ELSE ABOUT THE PATENT

2    OFFICE HERE, THE PATENT OFFICE DIDN'T HAVE THIS SIMON

3    AND NOKIA ARTICLES THAT DR. RODRIGUEZ RELIED ON.  WE

4    HAD PLENTY OF TESTIMONY ON THAT.  AND WE ACTUALLY

5    DRILLED DOWN TO THAT ONE DOCUMENT THAT HAD AN EXHIBIT A

6    HIGHLIGHTED.  AND, APPARENTLY, THAT WAS THE DISCLOSURE

7    OF DR. RODRIGUEZ'S EARLY EXPERT REPORT.  BUT MR. DITZIK

8    ADMITTED AND MR. BLACKBURN ADMITTED THAT THOSE ARTICLES

9    THAT DR. RODRIGUEZ CITED NEVER WENT TO THE PATENT

10   OFFICE.  SO THE PATENT OFFICE DOESN'T HAVE ALL THE

11   FACTS.

12          NOW, YOU HEARD SOMETHING ELSE ABOUT THE

13   PATENT OFFICE.  YOU HEARD THAT THE PATENT OFFICE

14   PROCEEDINGS ARE SOMETHING -- THEY'RE CALLED "EX PARTE

15   PROCEEDINGS."  NOW, EX PARTE IS A LATIN WORD.  AND IT

16   MEANS "ONE-SIDED."  THE PATENT OFFICE PROCEEDINGS ARE

17   ONE-SIDED.  THAT MEANS THAT MR. DITZIK IS THE ONLY ONE

18   THAT CAN TALK TO THE PATENT OFFICE ON BEHALF OF HIM AND

19   HIS PATENT.  AND THE REEXAMINATION, ALTHOUGH APPLE DID

20   FILE THE REEXAMINATION AFTER MR. DITZIK SUED APPLE, THE

21   REEXAMINATION, APPLE REQUESTED IT.  BUT AFTER THAT,

22   APPLE COULDN'T PRESENT ANY ARGUMENT TO THE PATENT

23   OFFICE.  IT'S ONE-SIDED PROCEEDINGS, EX PARTE

24   ONE-SIDED.

25          NOW, UNDER OUR LAW WHEN SOMEBODY SUES
```

EXHIBIT 8 - PAGE 234

1  SOMEBODY ON A PATENT, WE SAY EX PARTE PROCEEDINGS.

2  THEY'RE NOT GOOD ENOUGH.  ONE-SIDED PROCEEDINGS AREN'T

3  RIGHT BECAUSE YOU NEED TO HEAR FROM BOTH SIDES.  YOU,

4  THE JURY, ARE PART OF THE PATENT SYSTEM.  YOU, THE

5  JURY, ARE THE ONLY GROUP THAT GETS TO HEAR ALL THE

6  EVIDENCE, ALL THE ARTICLES, EVERYTHING ANYBODY CAN

7  BRING TO BEAR.  AND IT'S NOT EX PARTE.  YOU CAN HEAR

8  FROM BOTH SIDES.  THAT'S WHY WE BRING THESE QUESTIONS

9  TO A JURY.

10              IF IT WAS AS IF MR. NIRO SAID IT OUGHT TO

11 BE, WE WOULDN'T EVEN HAVE -- JURIES WOULDN'T BE ALLOWED

12 TO JUDGE VALIDITY OF PATENTS.  BUT YOU ARE HERE BECAUSE

13 IT'S NOT AN EX PARTE PROCEEDING.  IT'S NOT ONE-SIDED.

14 IT'S BOTH SIDES.

15              NOW, MY JOB IN CLOSING ARGUMENT IS TO TRY

16 TO SIFT THROUGH THE EVIDENCE AND HIGHLIGHT FOR YOU WHAT

17 I THINK THE EVIDENCE SHOWS.  AND SO I'VE PREPARED SOME

18 SLIDES TO DO THAT.

19              FIRST, I WAS GOING TO TALK ABOUT

20 INFRINGEMENT AND TALK TO YOU ABOUT HOW THE EVIDENCE

21 SHOWS THERE, AND THEN INVALIDITY.  AND I'M GOING TO BE

22 TALKING ABOUT BOTH THE WRITTEN DESCRIPTION THING WE

23 TALKED ABOUT AND THE OBVIOUSNESS SECTION OF THAT.  AND

24 THEN I'M GOING TO GO THROUGH AND SHOW YOU SOME SLIDES

25 THAT I THINK HELP TO SHOW WHY, BY FINDING THE PATENT TO

EXHIBIT 8 - PAGE 235

```
 1    BE NOT INFRINGED AND INVALID, YOU'RE DOING THE RIGHT

 2    THING IN THIS CASE.  YOU'RE DOING THE FAIR THING.

 3                SO LET'S TALK ABOUT NON-INFRINGEMENT.

 4    YOU'RE GOING TO HEAR -- HAVE JURY INSTRUCTIONS.  AND

 5    HIS HONOR READ YOU THE JURY INSTRUCTIONS HERE.  AND FOR

 6    INFRINGEMENT, NETAIRUS HAS TO PROVE IT.  THEY'VE GOT TO

 7    PROVE DIRECT INFRINGEMENT.  AND THEY'VE GOT SHOW THAT

 8    APPLE ALONE, NOT ITS CUSTOMERS OR SOME OTHER PARTY,

 9    PERFORMED EACH STEP OF THE CLAIMS.  NOW, THIS IS AN

10    IMPORTANT INSTRUCTION BECAUSE IT TELLS YOU, TO PROVE

11    INFRINGEMENT, THEY'VE GOT TO PROVE EACH STEP.  THAT

12    MEANS IF THERE'S ONE STEP MISSING, THERE'S NO

13    INFRINGEMENT.

14                MR. NIRO TOOK DR. RODRIGUEZ TO TASK FOR

15    NOT GOING THROUGH EVERY STEP OF THE CLAIM ON

16    INFRINGEMENT.  BUT UNDER THE LAW, DR. RODRIGUEZ ONLY

17    HAS TO SHOW ONE TO FIND NON-INFRINGEMENT.  IF ONE THING

18    IS MISSING, THERE'S NO INFRINGEMENT.  THAT'S WHAT THE

19    JUDGE'S INSTRUCTION SAYS.  THAT'S WHAT THE TEST IS.

20    YOU'VE GOT TO HAVE EVERYTHING.  SO IF ONE THING IS

21    MISSING, THERE'S NO INFRINGEMENT.

22                NOW, LET'S LOOK AT THE EVIDENCE.  AGAIN,

23    IT'S NETAIRUS' JOB TO PROVE THIS INFRINGEMENT.  IT'S

24    NOT APPLE'S JOB TO PROVE NON-INFRINGEMENT.  NETAIRUS

25    HAS TO PROVE IT.  THEY'VE GOT TO CONVINCE YOU THAT
```

EXHIBIT 8 - PAGE 236

1    THERE'S INFRINGEMENT.  AND THEY HAD THREE MAIN PIECES

2    OF EVIDENCE HERE -- OR THREE GROUPS OF EVIDENCE.  THEY

3    HAVE MR. DITZIK'S TESTIMONY.  THEY HAVE MR. BLACKBURN'S

4    TESTING.  AND THEN THEY HAD MR. BLACKBURN'S VISIT TO

5    THE APPLE STORE.  AND I WANT TO TALK ABOUT EACH ONE OF

6    THESE SEPARATELY.

7             FIRST OF ALL, MR. DITZIK'S TESTIMONY.

8    NOW, MR. DITZIK TESTIFIED, ESSENTIALLY, THAT HE

9    INVENTED THE I-PHONE.  HE INVENTED THE FEATURES OF THE

10   PHONE.  THEY WERE ALL IN HIS PATENT.  AND I THINK THE

11   ARGUMENT GOES, SINCE HE INVENTED THE I-PHONE AND APPLE

12   MAKES THE I-PHONE, APPLE MUST INFRINGE.  BUT, AGAIN,

13   WHEN YOU SEE MR. DITZIK'S ACTUAL PATENT, YOU WILL

14   REALIZE THAT THAT EVIDENCE JUST DOESN'T HOLD UP.

15            AND I'LL JUST COMMENT ON, MR. NIRO IN

16   CLOSING, DIDN'T SHOW YOU THE PATENT FIGURES, DIDN'T

17   TALK ABOUT THE PATENT, DIDN'T HIGHLIGHT THE CLAIMS.

18   WE'RE HERE TO TALK ABOUT THE PATENT.  THAT'S WHAT THIS

19   CASE IS ABOUT.

20            SO LET'S LOOK AT SOME OF MR. DITZIK'S

21   TESTIMONY.  MR. NIRO ASKED HIM ON DIRECT WHAT HE WAS

22   WORKING ON.  HE SAID, "CELL PHONE SYSTEMS."  AND

23   MR. NIRO SAID, "LET'S STOP AND TALK ABOUT THAT.  DID

24   YOU INVENT THAT TECHNOLOGY?"  MR. DITZIK SAID HE

25   INVENTED CELL PHONE SYSTEMS.  MR. NIRO SHOWED YOU THIS

EXHIBIT 8 - PAGE 237

64

1    CHART IN HIS CLOSING, ALL THESE FEATURES OF THE

2    I-PHONE, 19 DIFFERENT FEATURES.  APPARENTLY, HE'S TAKEN

3    THE POSITION THAT MR. DITZIK INVENTED ALL OF THOSE

4    FEATURES OF THE I-PHONE.  AGAIN, THAT'S NOT IN HIS

5    PATENT.  YOU WON'T FIND A SINGLE PATENT CLAIM THAT'S

6    GOT ALL THESE 19 FEATURES IN IT.  AND, CERTAINLY, YOU

7    WON'T FIND IT IN THE DISCLOSURE.

8              MR. DITZIK -- AGAIN, THIS IS ONE

9    NETAIRUS' SLIDES.  HE SAYS HE INVENTED ALL THESE

10   FEATURES IN THE PHONE.  APPARENTLY, MR. DITZIK INVENTED

11   A CALCULATOR IN A PHONE.  MR. DITZIK INVENTED CONTACTS

12   IN A PHONE.  MR. DITZIK INVENTED FACETIME.  THIS IS ALL

13   OF THEIR TESTIMONY.  AND, AGAIN, IT DOESN'T MATCH

14   WHAT'S ACTUALLY IN THE PATENT.

15             THIS IS WHAT'S IN THE PATENT.  MR. DITZIK

16   DID INVENT SOMETHING.  HE INVENTED A CONCEPT CALLED --

17   HE CALLED THIS "RELAY CONCEPT."  ESSENTIALLY, WHAT THAT

18   WAS IS, TRYING TO USE YOUR LAPTOP COMPUTER -- THAT HAD

19   EXISTED AT THE TIME -- TRYING TO USE YOUR LAPTOP

20   COMPUTER AS YOUR CELL PHONE.

21             AND WHAT'S THE POINT OF THAT?  WELL, IF

22   YOUR LAPTOP COMPUTER IS YOUR CELL PHONE, YOU CAN TAKE

23   THE HANDSET OUT OF THE COMPUTER.  AND YOU CAN TALK ON

24   THE HANDSET THROUGH THE COMPUTER TO THE CELL TOWER.

25   THE POINT BEHIND THAT IS, YOU WOULD HAVE LOW POWER BY

EXHIBIT 8 - PAGE 238

```
 1   YOUR HEAD, AND YOU WOULDN'T HAVE TO HAVE ANY HEALTH
 2   RISKS TO HAVE HIGH POWER THERE.  AND THAT'S RIGHT IN
 3   THE SPECIFICATION ITSELF.  IT'S RIGHT IN THE PATENT.
 4   THAT'S MR. DITZIK'S IDEA.  HE DID HAVE AN IDEA.  HE DID
 5   COME UP WITH AN INVENTION.  THIS IS MR. DITZIK'S
 6   INVENTION, LOW ELECTRICAL POWER BY YOUR HEAD AND USING
 7   YOUR LAPTOP AS THE -- SORT OF A RELAY DEVICE.
 8                   AND WE TALKED WITH HIM ABOUT THAT.  WE
 9   TRIED TO ESTABLISH THAT THAT WAS HIS INVENTION.  AND HE
10   AGREED THAT EVERY CLAIM HE FILED WITH THE ORIGINAL
11   SPECIFICATION HAD THIS RELAY CONCEPT.  THE WORD WAS IN
12   ALL OF THE CLAIMS.  THAT WAS MR. DITZIK'S INVENTION.
13                   AND, AGAIN, WE SAID THIS RELAY CONCEPT,
14   THE RELAY DEVICE IS IN THE NOTEBOOK COMPUTER, USING THE
15   NOTEBOOK COMPUTER TO RELAY COMMUNICATIONS FROM THE
16   EARSET OR THE HANDSET TO THE WIDE AREA NETWORK.  HIS
17   INVENTION WAS USING THE COMPUTER AS A CELL PHONE SO YOU
18   CAN HAVE LOW ELECTRICAL POWER BY YOUR HEAD.  AND,
19   AGAIN, THIS IS NOT THE I-PHONE.
20                   MR. DITZIK DID NOT INVENT PUTTING
21   TECHNOLOGY SUCH AS E-MAIL, PDA, WEB BROWSER, SIRI,
22   FACETIME, HE DIDN'T INVENT PUTTING ALL THOSE THINGS ON
23   THE PHONE.  IF HE DID, YOU WOULD BE ABLE TO SEE IT IN
24   THE PATENT.  AND IF IT WAS IN THE PATENT, COUNSEL WOULD
25   HAVE SHOWED IT TO YOU.
```

EXHIBIT 8 - PAGE 239

1          THE BEST EVIDENCE OF WHAT MR. DITZIK

2     INVENTED -- IN FACT, THE ONLY LEGALLY RECOGNIZABLE

3     EVIDENCE IS IN THE SPECIFICATION.  IF IT WAS THERE, YOU

4     WOULD HAVE SEEN IT BY NOW.  AND YOU WOULD HAVE SEEN IT

5     IN MR. NIRO'S CLOSING.

6          NOW, WHAT'S THE NEXT PIECE OF EVIDENCE

7     THEY HAVE TO TRY TO PROVE INFRINGEMENT?  AND, AGAIN,

8     IT'S THEIR BURDEN TO PROVE INFRINGEMENT.  IT WAS

9     MR. BLACKBURN'S TESTING.  MR. BLACKBURN, IT'S IMPORTANT

10    TO NOTE, HAD NO EXPERIENCE TESTING CELL PHONE POWER.

11    WE ASKED HIM, "HAVE YOU SEEN ANY DOCUMENTS THAT SHOWED

12    THE TYPICAL TRANSMIT POWER FOR CELL PHONES?"  HE SAYS,

13    "I HAD NOT SEEN THOSE DOCUMENTS, NO."  WE ASKED HIM,

14    "IT'S TRUE THAT, PRIOR TO THIS CASE, YOU HAVEN'T SEEN

15    ANY TEST DATA FOR CELL PHONES?"  HE SAID, "I HAVE NOT

16    SEEN TEST DATA FROM AN ACTUAL PHONE."  DIDN'T HAVE

17    EXPERIENCE DOING THIS.

18          AND, AGAIN, YOU KNOW THAT THE POWER

19    LEVELS ARE MEASURED WITH THIS CONCEPT CALLED "DBM."

20    AND MR. NOELLERT TESTIFIED TO THIS.  IT'S, ESSENTIALLY,

21    TAKING DECIBELS RELATIVE TO MILLIWATTS.  AND HE

22    TESTIFIED IT'S ON A LOGARITHMIC SCALE.  MR. BLACKBURN

23    DIDN'T EVEN UNDERSTAND THIS.  HE DIDN'T EVEN KNOW WHAT

24    "DBM" STOOD FOR.

25          NOW, I'M NOT TAKING HIM TO TASK FOR NOT

EXHIBIT 8 - PAGE 240

1    KNOWING THAT BECAUSE, CERTAINLY, I DIDN'T KNOW THAT

2    BEFORE THIS CASE.  BUT HE PUTS HIMSELF OUT AS AN

3    EXPERT.  HE PUTS HIMSELF OUT AS SOMEBODY THAT'S GOT

4    SPECIALIZED KNOWLEDGE ON THIS.  AND IT TURNED OUT HE

5    DIDN'T HAVE ANY.

6              NOW, LET'S TALK ABOUT HIS TESTING.  WE

7    ASKED MR. BLACKBURN ABOUT THE DEVICE HE USED FOR HIS

8    TESTING.  AND HE WOULDN'T GIVE US THE MODEL NUMBER.  WE

9    ASKED HIM, "IS THERE A MANUAL WITH A COMPANY NAME ON IT

10   SOMEWHERE?"  HE WOULDN'T -- HE SAID, "NO."

11             HE SHOWED US A MANUAL THAT HAD NO COMPANY

12   NAME, NO COPYRIGHT DATE, NO PAGE NUMBERS.  WE ASKED

13   HIM, "CAN YOU TELL US SOMETHING ABOUT THIS METER SO WE

14   CAN EVALUATE IT?  SO WE CAN LOOK AT YOUR TESTING?  DO

15   YOU HAVE THE RECEIPT?"  "YEAH, I HAVE THE RECEIPT; BUT

16   IT'S AT HOME."  "CAN WE HAVE IT?"  "I WILL LOOK FOR

17   IT."  WE ASKED HIM ON THE STAND TODAY, "DO YOU HAVE THE

18   RECEIPT?"  "I DON'T HAVE IT."  WE NEED TO KNOW

19   SOMETHING ABOUT THIS METER.

20             WE FOUND OUT SOMETHING YESTERDAY ABOUT

21   THE METER THAT WAS PRETTY INTERESTING.  YOU'LL SEE IN

22   THE SPECIFICATIONS THAT THE METER MEASURES UP TO 300

23   MEGAWATTS.  THAT'S WHAT THE METER CAN MEASURE UP TO.

24   MR. BLACKBURN TESTIFIED YESTERDAY THAT WI-FI IS AT 400

25   MEGAWATTS.  HIS METER WOULDN'T EVEN TEST THE WI-FI HE

EXHIBIT 8 - PAGE 241

```
 1    WAS TRYING TO TEST.  AND, AGAIN, WE DON'T KNOW ANYTHING

 2    ABOUT THIS METER.  HE WOULDN'T GIVE IT TO US.

 3              I THOUGHT IT WAS INTERESTING.  I EXPECTED

 4    HIM TO BRING IT HERE.  I FIGURED WE HAD TALKED SO MUCH

 5    ABOUT THE TESTING IN THIS LITIGATION BACK AND FORTH,

 6    THAT I THOUGHT FOR SURE HE WAS GOING TO BRING THE METER

 7    ON THE STAND.  HE HAD HIS I-PHONE 4.  YOU SAW THAT.

 8    WHY DIDN'T HE BRING HIS METER AND DO SOME TESTING?  IF

 9    IT WAS RELIABLE TESTING, IF IT PROVED SOMETHING, IF IT

10    PROVED INFRINGEMENT, HE WOULD HAVE DONE IT FOR YOU ON

11    THE STAND.  IF HE COULD DO IT AT A BUNCH OF STARBUCKS

12    IN SAN JOSE AND HE CAN DO IT AT THE APPLE STORE, HE

13    CERTAINLY COULD HAVE BROUGHT IT TO COURT.  AND HE

14    DIDN'T BRING THE METER.

15              BUT I DON'T THINK HE ACTUALLY DID ANY OF

16    THIS TESTING.  AND LET'S TALK BRIEFLY ABOUT IT.  HIS

17    FIRST REPORT THAT HE PUT OUT WAS IN JUNE 2011.  NO TEST

18    RESULTS IN THE REPORT.  HE JUST ASSUMED THAT THE POWER

19    LEVEL LIMITATION WAS MET.  THAT WAS THE SUBSTANCE OF

20    HIS INFRINGEMENT ANALYSIS WAS, I'M JUST GOING TO ASSUME

21    THE POWER LEVEL WAS MET.

22              DR. RODRIGUEZ SUBMITS A REPORT, SHOWS THE

23    CURVES THAT SHOW THE TRANSMIT POWER AND SAYS, "DOESN'T

24    LOOK LIKE THERE'S INFRINGEMENT."

25              MR. BLACKBURN COMES BACK A WEEK LATER --
```

EXHIBIT 8 - PAGE 242

1    EXCUSE ME, 10 DAYS LATER AFTER GETTING DR. RODRIGUEZ'S

2    REPORT AND NOW SAYS, "I HAVE DONE TESTING."  HE SAYS,

3    "I'VE DONE TESTING WITH THIS RF METER."  AND HE SAYS --

4    AND THIS IS THE PARAGRAPH WHERE HE SAYS THAT THE METER

5    ONLY MEASURES UP TO 3 GIGAHERTZ.  THAT'S 300 MEGAHERTZ,

6    WHICH MEANS IT WOULDN'T EVEN CATCH THE WI-FI SIGNAL.

7    AND HE GIVES US HIS SPECIFIC TEST RESULTS.  HE TELLS US

8    A RANGE OF VALUES THAT HE WAS ABLE TO GLEAN FROM THAT.

9              AND WE SAY TO HIM, "CAN WE HAVE THE

10   BACK-UP?  CAN WE HAVE YOUR NOTES AND THINGS?"  AND SO

11   HE SAYS, "SURE."  HE COMES BACK AND GIVES US HIS NOTES.

12   WHAT HAPPENS WHEN WE LOOK AT THE NOTES AND WE LOOK AT

13   THE TEST RESULTS?  WE REALIZE THAT THE TEST RESULTS ARE

14   DATED JULY 25TH.  HIS NOTES WHERE HE SAYS HE TOOK THE

15   TESTING ARE DATED A WEEK LATER, JULY 11TH.  NOW,

16   MR. NIRO SAID HE DID LATER TESTING.  BUT IF YOU

17   REMEMBER THE TESTIMONY ON THE STAND, I ASKED HIM, "DID

18   YOU DO ANY OTHER TESTING?"  HE SAID, "I DID SOME

19   TESTING IN 2013."  I SAID, "DID YOU DO ANY TESTING

20   BETWEEN JUNE 25TH AND 2013?"  HE SAID, "NO."  SO THIS

21   CAN ONLY TELL YOU ONE THING.  IT CAN TELL THAT THE TEST

22   RESULTS WERE MADE UP, BUT I THINK THAT'S THE EVIDENCE

23   HERE.

24              NOW, LET'S TALK ABOUT THE EXPERTS BECAUSE

25   MR. NIRO LIKES TO TELL YOU THAT THE EXPERTS CANCEL

EXHIBIT 8 - PAGE 243

1   THEMSELVES OUT, THAT YOU GOT AN EXPERT HERE AND AN

2   EXPERT THERE.  YOU CAN JUST IGNORE THEM BECAUSE THEY

3   CANCEL EACH OTHER OUT.  BUT THAT'S NOT TRUE.  IT'S NOT

4   TRUE IN THIS CASE BECAUSE DR. RODRIGUEZ HAS BEEN

5   WORKING IN THIS FIELD FOR SOME 20-SOMETHING YEARS.

6   HE'S BEEN WORKING IN THIS FIELD CONTINUOUSLY.  HE'S

7   WRITTEN ARTICLES.  HE'S BEEN INVOLVED IN THE IEEE.  HE

8   KNOWS THIS STUFF.  THIS IS HIS JOB.  THIS IS THE FIELD

9   THAT HE WORKS IN.

10              MR. BLACKBURN DOESN'T KNOW THIS STUFF.

11  HE DIDN'T KNOW ABOUT POWER LEVEL TESTING BEFORE THE

12  CASE STARTED, DIDN'T KNOW WHAT DBM WAS.  HE CERTAINLY

13  DIDN'T DO ANY OF HIS OWN TESTS.

14              DR. RODRIGUEZ SUBMITTED SEVERAL EXPERT

15  REPORTS IN THIS CASE.  AND IN EACH REPORT, HE DESCRIBED

16  THE BACKGROUND OF THE TECHNOLOGY, HOW IT ALL WORKS.  IT

17  ALL CAME FROM DR. RODRIGUEZ'S EXPERIENCE.

18              MR. BLACKBURN'S EXPERIENCE CAME FROM

19  WIKIPEDIA.  IT CAME FROM THE WEB.  MR. BLACKBURN,

20  BEFORE THIS CASE, WENT ONLINE -- OR HAD SOMEBODY GO

21  ONLINE AND PULL A BUNCH OF STUFF OFF THE WEB, AND HE

22  COPIED IT VERBATIM INTO HIS REPORT.

23              THE EXPERTS DON'T CANCEL EACH OTHER OUT.

24  MR. BLACKBURN CANCELED HIMSELF OUT.

25              DR. RODRIGUEZ TESTIFIED IN THIS CASE

EXHIBIT 8 - PAGE 244

1    ABOUT POWER LEVELS ALONG WITH MR. NOELLERT.  AND

2    MR. NOELLERT TOLD YOU THAT, IN TYPICAL OPERATION OF THE

3    APPLE I-PHONE 4, IT GOES FROM MINUS 13 TO POSITIVE 5.

4    HE SAID THAT'S THE RANGE ON THAT DBM SCALE, AND THAT

5    WOULD BE THE TYPICAL RANGE OF THE PHONE.  WHY IS THAT

6    TESTIMONY IMPORTANT?  WELL, IT'S IMPORTANT FOR TWO

7    REASONS:  ONE, IT WAS UNCONTROVERTED.  NOBODY DISPUTED

8    THIS TESTIMONY IN THE RECORD.  NETAIRUS DIDN'T BRING IN

9    A SINGLE WITNESS TO TELL YOU THAT MR. NOELLERT WAS

10   WRONG.  THEY DIDN'T DISPUTE THIS AT ALL.  THIS IS

11   UNCONTROVERTED TESTIMONY.

12                AND WHY IS IT IMPORTANT?  IT ACTUALLY

13   PROVES NON-INFRINGEMENT.  MR. NOELLERT SAID THE PHONE

14   OPERATES SUCH THAT IT'S IN THIS SECTION THAT I'VE

15   HIGHLIGHTED HERE.  AND THAT RED LINE IS WHERE THE WI-FI

16   SIGNAL IS.  ACCORDING TO MR. NOELLERT'S TESTIMONY,

17   TESTIMONY THAT WAS UNCONTROVERTED IN THIS CASE,

18   TESTIMONY THAT NOBODY DISPUTED, THERE'S NO

19   INFRINGEMENT.

20                AND, NOW, MR. BLACKBURN DIDN'T COME UP

21   WITH ANY RELIABLE EVIDENCE.  BUT HE DID DO ONE THING.

22   HE ACTUALLY CORROBORATED THE FACT THAT THERE'S NO

23   INFRINGEMENT BASED ON BILL NOELLERT'S TESTIMONY.  HE

24   SAID, IF THE CELL PHONE IS OPERATING SUCH THAT THE CELL

25   POWER IS LESS THAN WI-FI POWER, IT'S NOT INFRINGING.

EXHIBIT 8 - PAGE 245

```
 1    THAT WOULD BE CORRECT.  HE SAID, "YEAH, THAT WOULD BE
 2    CORRECT."  SO MR. NOELLERT'S TESTIMONY, WHICH WAS
 3    UNCONTROVERTED IN THIS CASE, CONFIRMS THAT THERE'S NO
 4    INFRINGEMENT.  AND MR. BLACKBURN AGREES WITH THAT
 5    RELATIONSHIP.  IF THE POWER LEVELS ARE LIKE
 6    MR. NOELLERT TESTIFIED TO, THERE'S NO INFRINGEMENT.
 7    AND THERE'S NOT A STITCH OF EVIDENCE IN THE RECORD THAT
 8    MR. NOELLERT IS NOT CORRECT.  AND, I MEAN, THIS IS HIS
 9    JOB.  HE KNOWS HOW THESE PHONES WORK.  HE TOLD YOU THAT
10    HE'S FOCUSED ON THAT NORMAL RANGE BECAUSE THAT'S HOW HE
11    DOES OPTIMIZATION.  THAT'S WHY HE TRIES TO TINKER WITH
12    THE ELECTRONICS, MAKE THEM WORK A LITTLE BIT BETTER
13    DURING THAT NORMAL POWER RANGE.  THAT TESTIMONY
14    ESTABLISHES NON-INFRINGEMENT.
15                AND, AGAIN, THIS WAS NETAIRUS' JOB.  THEY
16    WERE SUPPOSED TO PROVE INFRINGEMENT.  THEY DIDN'T PROVE
17    INFRINGEMENT AT ALL.  IN FACT, THEY HAD NO COMPETENT
18    EVIDENCE OF IT.  APPLE PROVED NON-INFRINGEMENT.
19                NOW -- AND, AGAIN, DR. RODRIGUEZ
20    CONFIRMED THAT BECAUSE THIS POWER LEVEL THING IS IN
21    EVERY CLAIM, ALL YOU HAVE TO DO IS SHOW THIS ONE THING
22    ISN'T MET, AND YOU'VE GOT NON-INFRINGEMENT.
23                NOW LET'S TALK ABOUT THIS INDUCING
24    INFRINGEMENT ISSUE HERE.  AND THIS IS -- REQUIRES TWO
25    THINGS, AS YOU HEARD IN THE JURY INSTRUCTIONS.  THERE'S
```

EXHIBIT 8 - PAGE 246

```
1     GOT TO BE PROOF THAT SOMEBODY INFRINGED.  AND THERE'S

2     GOT TO BE PROOF THAT APPLE DIRECTED OR INDUCED THAT

3     PERSON TO INFRINGE.  SO APPLE HAS GOT TO INTENTIONALLY

4     INDUCE SOMEBODY TO PERFORM THE METHOD OF THE CLAIM.

5     AND I DON'T THINK WE EVEN GET TO INDUCING INFRINGEMENT

6     BECAUSE THEY HAVEN'T SHOWN DIRECT INFRINGEMENT.

7     THERE'S NO DIRECT INFRINGEMENT, SO THERE CAN BE NO

8     INDUCING INFRINGEMENT.  IF THERE'S NO DIRECT

9     INFRINGEMENT, THEN THIS TEST FAILS.

10                 BUT WE'LL TALK ABOUT WHAT NETAIRUS TRIED

11    TO SHOW WITH RESPECT TO INDUCING INFRINGEMENT.  AND

12    THIS WAS THEIR THIRD SET OF EVIDENCE.  THIS IS

13    MR. BLACKBURN'S VISIT TO THE APPLE STORE.  AND HERE,

14    APPARENTLY, MR. BLACKBURN TESTIFIED THAT HE VISITED AN

15    APPLE STORE.  AND HE HAD A PRETTY SUBSTANTIAL

16    INTERACTION WITH AN APPLE STORE EMPLOYEE WHERE HE ASKED

17    THE APPLE STORE EMPLOYEE TO SEND AN E-MAIL OVER WI-FI.

18    HE ASKED THE APPLE STORE EMPLOYEE TO SEND AN E-MAIL

19    OVER CELL.  AND HE ASKED THE APPLE STORE EMPLOYEE TO

20    CHECK HIS CONTACTS.  HE ASKED THE APPLE STORE EMPLOYEE

21    TO PUT A CALENDAR APPOINTMENT IN THERE.  HE ASKED AN

22    APPLE STORE EMPLOYEE TO MAKE A FACETIME CALL TO

23    MR. BLACKBURN'S WIFE.  HE ASKED THE APPLE STORE

24    EMPLOYEE TO MAKE ANOTHER CELL PHONE CALL TO

25    MR. BLACKBURN'S WIFE.  THIS IS THEIR EVIDENCE THAT
```

EXHIBIT 8 - PAGE 247

1   APPLE IS INDUCING SOMEBODY TO PERFORM THE METHOD OF THE

2   CLAIM.  IF ANYTHING, THIS IS EVIDENCE THAT

3   MR. BLACKBURN WAS ATTEMPTING TO INDUCE APPLE TO PERFORM

4   THE METHOD OF THE CLAIM.  THERE'S NO EVIDENCE HERE THAT

5   APPLE WOULD HAVE EVER DONE THESE THINGS IN NORMAL

6   OPERATION.  AND IF THERE WAS, THEY WOULD HAVE BROUGHT

7   YOU EVIDENCE.  THEY WOULD HAVE BROUGHT EVIDENCE OF THE

8   APPLE PROCEDURES USED AT THE STORE.  NONE OF THIS

9   HAPPENS IN A TYPICAL INSTANCE.  THIS ONLY HAPPENED AT

10  THE URGING OF MR. BLACKBURN.  SO THERE'S NO EVIDENCE OF

11  INDUCING INFRINGEMENT HERE IN THE CASE.

12              NOW, THE OTHER REASON THAT APPLE DOESN'T

13  INDUCE INFRINGEMENT IS THAT APPLE ACTUALLY DOES NOT

14  CONTROL THE POWER LEVEL THAT THE PHONE OPERATES AT.

15  THAT STEP IN THE METHOD OF THE CELL PHONE OPERATING AT

16  A POWER LEVEL ABOVE WI-FI, THAT'S OUT OF APPLE'S

17  CONTROL.  APPLE MERELY SENDS -- MERELY ALLOWS THE PHONE

18  TO COMMUNICATE TO AT&T AND VERIZON AND THOSE CELLULAR

19  NETWORKS.  THEY SET THE POWER LEVELS.  THEY TELL THE

20  PHONE, OPERATE AT 5 DBM OR OPERATE AT MINUS 3 DBM.  AND

21  THE PHONE JUST OPERATES TO THAT LEVEL.  APPLE CAN'T

22  CONTROL THAT.  APPLE DOESN'T CONTROL THAT.  AND BECAUSE

23  APPLE DOESN'T CONTROL THAT, THERE CAN BE NO INDUCING

24  INFRINGEMENT.

25              AND, AGAIN MR. NOELLERT TESTIFIED TO

EXHIBIT 8 - PAGE 248

1    THAT.  AND HE KNOWS.  IT'S HIS JOB.  AND DR. RODRIGUEZ

2    TESTIFIED TO THAT.  AND, AGAIN, DR. RODRIGUEZ IS THE

3    ONLY EXPERT YOU HAVE HEARD FROM THAT ACTUALLY HAS A

4    BACKGROUND IN THIS TECHNOLOGY AND ACTUALLY WORKS IN

5    THIS AREA AND UNDERSTANDS HOW THESE THINGS WORK.

6    DR. RODRIGUEZ CONFIRMED THAT IT'S THE CELL PHONE

7    COMPANIES THAT SET THE TRANSMIT POWER LEVEL.  APPLE

8    DOESN'T DO IT.

9              SO, AGAIN, APPLE BROUGHT FORTH

10   INFRINGEMENT -- NON-INFRINGEMENT BY LOOKING AT THE

11   CLAIMS AND GIVING YOU TESTIMONY OF MR. NOELLERT SHOWING

12   YOU THE POWER CURVES AND HOW THEY WORK, AND

13   DR. RODRIGUEZ WHO IS ACTUALLY AN EXPERT IN THIS FIELD.

14             YOU'RE GOING TO GET A VERDICT FORM BACK

15   IN THE JURY ROOM.  AND THAT VERDICT FORM IS GOING TO

16   HAVE A BUNCH OF QUESTIONS ON IT.  AND THE FIRST

17   QUESTION IS GOING TO BE ON DIRECT INFRINGEMENT.  AND

18   IT'S GOING TO SAY, "DID NETAIRUS PROVE BY A

19   PREPONDERANCE OF THE EVIDENCE THAT APPLE DIRECTLY

20   INFRINGED THE FOLLOWING ASSERTED CLAIMS OF '380

21   PATENT?"  ALL OF THESE CLAIMS HAVE THE POWER LEVEL

22   LIMITATION.  BECAUSE NETAIRUS DIDN'T PROVE THAT THAT'S

23   MET, THE ANSWER HERE HAS GOT TO BE "NO" BECAUSE THE

24   POWER LEVEL LIMITATION IS NOT THERE.

25             YOU'RE ALSO GOING TO HAVE ANOTHER

EXHIBIT 8 - PAGE 249

1    QUESTION, THIS TIME ON INDUCING INFRINGEMENT.  AND THE

2    VERDICT FORM IS GOING TO SAY, "DID NETAIRUS PROVE BY A

3    PREPONDERANCE OF THE EVIDENCE THAT APPLE INDUCED THE

4    INFRINGEMENT OF THE FOLLOWING CLAIMS?"  AGAIN, BECAUSE

5    THERE'S NO DIRECT INFRINGEMENT BY ANYBODY, THERE CAN BE

6    NO INDUCING.  AND BECAUSE APPLE DIDN'T DIRECT ANYBODY

7    TO PERFORM THIS METHOD, APPLE CAN'T BE INDUCING

8    INFRINGEMENT.  SO THIS HAS TO BE "NO" AS WELL.

9                 NOW, LET'S TALK ABOUT INVALIDITY.  AND I

10   WANT TO TALK ABOUT WRITTEN DESCRIPTION.  AND WHY IS

11   THIS IMPORTANT?  WELL, IT'S IMPORTANT BECAUSE THE

12   SPECIFICATION OF THE PATENT IS THE OFFICIAL RECORD OF

13   WHAT THE INVENTOR INVENTED.  AND IN OUR PATENT SYSTEM,

14   WE OUGHT TO GIVE THE INVENTORS THEIR DUE.  THEY OUGHT

15   TO BE ABLE TO CLAIM WHAT IT IS THEY PUT IN THEIR

16   SPECIFICATION.  OUR PATENT SYSTEM WORKS WHEN INVENTORS

17   GET PATENTS ON THINGS THAT THEY INVENT.  BUT YOU'VE GOT

18   TO HAVE A RECORD.  BECAUSE IF YOU DON'T HAVE A RECORD,

19   PEOPLE CAN MAKE STUFF UP.  PEOPLE CAN CLAIM THAT THEY

20   INVENTED SOMETHING THAT THEY DIDN'T REALLY INVENT.

21                 THE WRITTEN DESCRIPTION IS THAT OFFICIAL

22   RECORD.  IT'S TAKEN TO THE PATENT OFFICE.  IT'S DATE

23   STAMPED.  IT'S KEPT ON FILE.  IF THE CLAIMS DON'T MATCH

24   THAT, THE CLAIMS AREN'T VALID.  THE WRITTEN DESCRIPTION

25   TELLS YOU WHAT THE INVENTORS IS ENTITLED TO.

EXHIBIT 8 - PAGE 250

1           AGAIN, YOU'RE GOING TO GET SOME JURY

2    INSTRUCTIONS ON THIS.  AND IT SAYS -- HIS HONOR READ

3    YOU THIS, "A PATENT CLAIM IS INVALID IF THE PATENT DOES

4    NOT CONTAIN AN ADEQUATE WRITTEN DESCRIPTION OF THE

5    CLAIMED INVENTION."  AND -- EXCUSE ME.  THAT JURY

6    INSTRUCTION GOES ON TO SAY, "THE PURPOSE OF THIS

7    WRITTEN DESCRIPTION REQUIREMENT IS TO DEMONSTRATE THAT

8    THE INVENTOR WAS IN POSSESSION OF THE INVENTION AT THE

9    TIME THE APPLICATION WAS FILED."  SO THAT'S THE TEST.

10   WAS IT IN THE SPECIFICATION?

11           AND THIS IS HOW THE PROCESS WORKS.  WHEN

12   YOU FILE FOR A PATENT, YOU FILE TWO THINGS ACTUALLY.

13   YOU FILE A SPECIFICATION.  AND THAT'S THE RECORD.  THAT

14   CONTAINS ALL THE TECHNICAL DESCRIPTION.  IT CONTAINS

15   THE DIAGRAMS.  IT CONTAINS ALL OF THE THINGS DESCRIBED

16   IN YOUR INVENTION.  YOU ALSO FILE A SET OF CLAIMS.  AND

17   THESE ARE TWO SEPARATE DOCUMENTS.  THE REASON WHY

18   THEY'RE TWO SEPARATE DOCUMENTS IS THAT THE

19   SPECIFICATION HAS TO STAY FIXED.  IT CAN'T CHANGE.  THE

20   CLAIMS CAN CHANGE DEPENDING UPON HOW YOU NEGOTIATE WITH

21   THE PATENT OFFICE.

22           AGAIN, THOSE TWO DOCUMENTS COME TOGETHER

23   WHEN YOU GET A PATENT.  AND THEY'RE PUBLISHED TOGETHER

24   IN THE SAME DOCUMENT.  AND YOU'LL HAVE THE PATENT WITH

25   YOU IN THE JURY ROOM.  THAT'S DTX 1306.  THAT'S THE

EXHIBIT 8 - PAGE 251

```
1    MOST IMPORTANT PIECE OF EVIDENCE YOU'RE GOING TO HAVE

2    BACK THERE BECAUSE THAT'S THE OFFICIAL RECORD.  AND YOU

3    WILL SEE THE SPECIFICATION IS EVERYTHING UP TO THE

4    CLAIMS.  AND THE CLAIMS ARE WHAT FOLLOWS AFTER THAT.

5              THE SPECIFICATION CAN'T BE MODIFIED.  THE

6    CLAIMS CAN, BUT THE CLAIMS STILL HAVE TO MATCH THE

7    SPECIFICATION.  IF THEY DON'T, WRITTEN DESCRIPTION IS

8    NOT SATISFIED AND THE CLAIMS ARE INVALID.

9              SO LET'S LOOK AT THE TIME LINE.  WE

10   TALKED ABOUT THIS TIME LINE A FEW TIMES IN THE CASE.

11   BUT, IN 1997, MR. DITZIK FILES HIS SPECIFICATION.  AND

12   HE FILES A SET OF CLAIMS ALONG WITH THE SPEC.  AND THEY

13   MATCH.  MR. DITZIK CLAIMS THE RELAY CONCEPT IN HIS

14   ORIGINAL CLAIMS.  THAT'S WHAT WAS THERE.  THAT'S

15   PROPER.  THAT'S THE WAY THE SYSTEM IS SUPPOSED TO WORK.

16             AFTER THAT, A BUNCH THINGS COME OUT IN

17   THE PRESS, HANDHELD DEVICES THAT CAN SEND E-MAIL,

18   HANDHELD DEVICES THAT ARE PDA'S, HANDHELD DEVICES THAT

19   CAN ACCESS THE INTERNET.

20             MR. DITZIK'S OWN FILES INCLUDE EXHIBIT

21   DTX 686, WHICH IS AN ARTICLE FROM HANDHELD COMPUTING

22   MAGAZINE THAT HAD LOTS OF THESE NEW CONCEPTS IN IT.  HE

23   ALSO HAD IN HIS FILES DTX 677, WHICH WAS AN ARTICLE

24   FROM FORBES MAGAZINES THAT HAD LOTS OF THESE CONCEPTS

25   IN IT.
```

EXHIBIT 8 - PAGE 252

79

```
 1              MR. DITZIK, AFTER SEEING ALL OF THESE

 2    CONCEPTS IN THE PRESS, STARTS TO CHANGE HIS CLAIMS.

 3    AND HE CHANGES THEM EIGHT DIFFERENT TIMES IN THE

 4    PROCESS.  AND IN 2002, HE COMES UP WITH NEW CLAIMS THAT

 5    NOW CLAIM E-MAIL IN A HANDSET AND PDA'S IN A HANDSET.

 6              NOW, COUNSEL, DURING MR. BLACKBURN'S

 7    DIRECT EXAMINATION, TRIED TO POINT OUT THAT HE ACTUALLY

 8    HAD E-MAIL CLAIMS EARLIER THAN 2002.  WE DON'T AGREE

 9    THAT HE HAD THOSE IN THE CLAIMS.  BUT, REGARDLESS, THE

10    TESTIMONY IS UNCONTROVERTED THAT, IN 1997 WHEN HE FILED

11    THIS PATENT, HE HAD NO CLAIMS TO E-MAIL IN A HANDSET,

12    NO CLAIMS TO PDA IN A HANDSET.  IS WAS THIS RELAY

13    DEVICE.  AND ALL THAT FUNCTIONALITY THAT HE DISCUSSES

14    IN THE PATENT WAS IN THE COMPUTER, NOT IN THE HANDSET.

15              NOW, ON WRITTEN DESCRIPTION, THIS IS

16    APPLE'S BURDEN.  SO NOW THIS IS THE TIME THAT APPLE HAS

17    TO PUT UP ITS EVIDENCE OF WHETHER OR NOT THERE'S A

18    FAILURE OF WRITTEN DESCRIPTION HERE.  AND APPLE DID.

19    APPLE WENT THROUGH THE FILE HISTORY AND SHOWED YOU THE

20    CHANGES IN THE PATENT CLAIMS.  APPLE POINTED TO THE

21    '380 PATENT, WHICH IS THE BEST EVIDENCE OF WRITTEN

22    DESCRIPTION.  AND WE WENT THROUGH THE TESTIMONY OF

23    DR. RODRIGUEZ WHO IS AN EXPERT IN THIS FIELD.  HE READ

24    THE SPECIFICATION AND READ THE CLAIMS.

25              SO LET'S LOOK AT WHAT THE PROSECUTION
```

EXHIBIT 8 - PAGE 253

1    HISTORY SHOWS.  IN THE PROSECUTION HISTORY, IT'S CLEAR

2    THAT THERE WERE CLAIMS IN 1997.  THEY DIDN'T SAY

3    ANYTHING ABOUT A HANDSET THAT COULD DO E-MAIL OR A

4    HANDSET THAT COULD BE A PDA.  IF MR. DITZIK HAD

5    INVENTED A HANDSET THAT COULD SEND E-MAIL IN 1997, HE

6    WOULD HAVE PUT IT IN HIS CLAIMS.  HE WOULD HAVE CLAIMED

7    IT.  IT WOULD HAVE BEEN A BIG DEAL.  IT WOULD HAVE BEEN

8    A BIG CONCEPT FOR HIM.  HE WOULD HAVE PUT IT IN HIS

9    CLAIMS, AND HE DIDN'T.

10             LET'S GO THROUGH THE CLAIMS.  IN 1997,

11    THE PREAMBLE TO THE CLAIM WAS "A COMPUTER DISPLAY UNIT

12    WITH A COVER ASSEMBLY."

13             IN 2006, HE CHANGED IT TO "A METHOD FOR

14    HANDSET UNIT COMMUNICATION."  ALMOST COMPLETELY

15    DIFFERENT.

16             THE SECOND LIMITATION, "A FLAT PANEL

17    DISPLAY ASSEMBLY HAVING A FIXED DISPLAY DEVICE."  HE

18    CHANGED IT TO "TRANSMITTING FIRST DATA WIRELESSLY."

19    AGAIN, ALMOST COMPLETELY CHANGED.  THE ONLY TWO WORDS

20    IN COMMON ARE THE WORDS "A."

21             STEP B, "RECEIVING SECOND DATA VIA

22    WIRELESS COMMUNICATION."  COMPLETELY NEW.  THE OLD

23    LANGUAGE WAS, "EXPANDABLE HINGE MEANS."  A COMPLETELY

24    NEW LIMITATION HERE.

25             STEP C USED TO BE "A COVER ASSEMBLY

EXHIBIT 8 - PAGE 254

ROUGHLY THE SAME SIZE."  HE CHANGED IT COMPLETELY TO
"USING SAID HANDSET UNIT TO COMMUNICATE THIRD AND
FOURTH DATA."

STEP D, "EXPANDABLE HINGE MEANS ADAPTED
TO SO USERS COULD OPEN AND CLOSE IT."  HE CHANGED STEP
D TO "INCLUDING E-MAIL."

CLAIM 2 -- HE DID HAVE A CLAIM ON A
HANDSET IN CLAIM 2, A HANDSET THAT COULD DO THE RELAY
COMMUNICATION, THE RELAY VOICE.  IN CLAIM 2, HE CHANGED
THAT TO A "PDA."  COMPLETELY CHANGED IT.

CLAIM 3 WAS TO "A NOTEBOOK HAVING A
TWO-LEAF STRUCTURE THAT COULD OPEN AND CLOSE."  HE
CHANGED THAT TO A "CELL PHONE."  COMPLETELY CHANGED.

LOOKING AT MR. DITZIK'S ORIGINAL CLAIMS
SIDE-BY-SIDE TO HIS NEW CLAIMS, THEY'RE ALMOST
COMPLETELY DIFFERENT.  MR. DITZIK WAS CLAIMING THINGS
THAT HE DIDN'T DISCLOSE IN HIS ORIGINAL SPECIFICATION.
HE WAS CLAIMING THINGS THAT HE HAD READ ABOUT AFTER THE
FACT.  IN OUR PATENT SYSTEM, YOU CAN'T DO THAT.  THAT'S
NOT FAIR.  IT'S NOT PLAYING FAIR WITH EVERYBODY ELSE.

NOW, LET'S LOOK AT -- BACK TO THE TIME
LINE.  YOU CAN SEE THAT MR. DITZIK'S ORIGINAL CLAIMS
AND THE FINAL CLAIMS WERE INFLUENCED BY ALL OF THE
ARTICLES.  IN MR. DITZIK'S OWN FILES, IT DESCRIBES
THESE FEATURES, ARTICLES THAT MR. DITZIK NEVER

EXHIBIT 8 - PAGE 255

1    DISCLOSED TO THE PATENT OFFICE.

2              NOW, AGAIN, MR. DITZIK CONFIRMED THAT, AT

3    SOME POINT, HE JUST CHANGED ALL OF HIS CLAIMS.  HE

4    CANCELED THEM ALL AND JUST STARTED OVER AGAIN BECAUSE

5    IT WAS EASIER.  HE HAD MADE SO MANY CHANGES TO THE

6    CLAIMS.

7              MR. BLACKBURN CONFIRMED THAT MR. DITZIK'S

8    CHANGES AND ALL THIS BACK AND FORTH BETWEEN MR. DITZIK

9    AND THE PATENT OFFICE, THAT DOESN'T CHANGE THE STATE OF

10   THE WRITTEN DESCRIPTION.  THAT DOESN'T ADD WRITTEN

11   DESCRIPTION.

12             THE FACT THAT MR. DITZIK, IN 2013,

13   TESTIFIES ON THE STAND OF WHAT HE WAS THINKING ABOUT

14   BACK IN 2006 -- I'M SORRY, BACK IN 1997, THAT DOESN'T

15   MATTER AT ALL BECAUSE IT'S TOO EASY FOR PEOPLE TO MAKE

16   STUFF UP.  THE ONLY RECORD THAT'S IMPORTANT IS THE

17   FIXED RECORD OF THE SPECIFICATION.  AND YOU'LL HAVE

18   THAT IN THE JURY ROOM.  YOU CAN LOOK AT IT YOURSELF.

19   AND YOU'LL SEE THAT IT'S PRETTY CLEAR WHAT'S DESCRIBED

20   IN THE SPECIFICATION.  IT'S NOT -- COUNSEL AT ONE POINT

21   WAS INSINUATING, I GUESS, THAT THERE WAS TOO MUCH

22   TECHNICAL LANGUAGE IN THERE.  YOU WOULDN'T BE ABLE TO

23   UNDERSTAND IT.  YOU'LL BE ABLE TO UNDERSTAND IT.  IT'S

24   PRETTY CLEAR.  YOU CAN SEE WHAT HE INVENTED AND WHAT HE

25   DIDN'T.

EXHIBIT 8 - PAGE 256

```
1              NOW, AGAIN, WE SPENT A LOT OF TIME
2     LOOKING AT THE PATENT IN A WRITTEN DESCRIPTION ANALYSIS
3     BECAUSE THAT'S THE BEST EVIDENCE.  THE PATENT IS THE
4     BEST EVIDENCE OF WHAT WAS DESCRIBED BY MR. DITZIK AND
5     WHAT HIS INVENTION WAS.
6                   AND WE TOOK YOU THROUGH THE FACT THAT THE
7     SPECIFICATION DOESN'T HAVE E-MAIL GOING TO AND FROM A
8     HANDSET.  IT'S GOT E-MAIL IN THE LAPTOP, SURE, BUT NOT
9     E-MAIL GOING TO AND FROM THE HANDSET.  AND
10    MR. BLACKBURN CONFIRMED THIS YESTERDAY, THAT THERE'S NO
11    DISCLOSURE OF E-MAIL GOING TO AND FROM A HANDSET.  HE
12    CONFIRMED THAT IN HIS CROSS-EXAMINATION.
13                  THE SPECIFICATION DOESN'T DISCLOSE THE
14    HANDSET BEING A PDA.  AND, AGAIN, IF IT WAS IN THERE,
15    THEY WOULD HAVE SHOWED IT TO YOU.  IF THERE WAS A
16    SENTENCE IN THE SPECIFICATION THAT SAID, "THE HANDSET
17    IS A PDA," THEY WOULD HAVE POINTED THAT OUT.  IF THERE
18    WAS A SENTENCE THAT SAID, "THE HANDSET IS E-MAIL," THEY
19    WOULD HAVE POINTED THAT OUT TOO.
20                  AND, AGAIN, THE SPECIFICATION DOESN'T
21    DISCLOSE THE HANDSET SWITCHING BETWEEN HIGH AND LOW
22    POWER.  IT TALKS ABOUT SWITCHING VERY PLAINLY IN THE
23    LAPTOP, BUT NOT IN THE HANDSET.
24                  SO LET'S GO THROUGH THESE BRIEFLY.
25    AGAIN, THERE'S NO E-MAIL TO AND FROM A HANDSET.  THE
```

EXHIBIT 8 - PAGE 257

1   SPECIFICATION TALKS ABOUT E-MAIL IN THE COMPUTER SYSTEM

2   UP THERE ON THE LEFT CORNER.  THAT'S FROM THE

3   SPECIFICATION FROM THE PATENT.  AND IT SAYS THERE'S

4   E-MAIL IN THE COMPUTER SYSTEM.

5                   THERE'S ALSO A DIAGRAM.  WE WENT THROUGH

6   FIGURE 8 WHERE IT SAYS "E-MAIL."  AND, AGAIN, THAT'S

7   E-MAIL IN THE BASE UNIT.  E-MAIL IN THE BASE UNIT IN

8   THAT DIAGRAM.  NOT E-MAIL IN THE HANDSET.

9                   AND, AGAIN, WE LOOKED AT SOME TEXT FROM

10  THE SPECIFICATION.  THIS IS ACTUAL LANGUAGE FROM THE

11  SPECIFICATION.  AND IT SAYS, "E-MAIL FUNCTIONS MAY BE

12  IMPLEMENTED IN THE COMPUTER SYSTEM."  THERE'S NOT A

13  SINGLE SENTENCE THAT SAYS, "E-MAIL FUNCTIONS MAY BE

14  IMPLEMENTED IN THE HANDSET."  NOW, IF THAT WAS

15  MR. DITZIK'S IDEA, HE WOULD HAVE WRITTEN THAT IN THE

16  SPECIFICATION.  HE DIDN'T WRITE IT IN THERE BECAUSE IT

17  WASN'T HIS IDEA.

18                  AND, AGAIN, MR. BLACKBURN CONFIRMED THIS,

19  "THAT FIGURE 8 THAT WE LOOKED AT, "RUN E-MAIL PROGRAMS,

20  SO THAT'S POINTING TO FUNCTIONALITY IN THE BASE

21  STATION; CORRECT?"  "I BELIEVE SO, YEAH.  UH-HUH."  HE

22  AGREES.  THAT'S WHERE THE DISCLOSURE IS.

23                  AND, AGAIN, IN 1997, THERE WERE NO CLAIMS

24  THAT HAD HANDSET WITH E-MAIL OR PDA.  AND MR. BLACKBURN

25  AGREED WITH THAT.  THEY JUST WEREN'T THERE.

EXHIBIT 8 - PAGE 258

1          NOW, WE TALKED ABOUT PDA VERY BRIEFLY.

2     BUT IN THE BACKGROUND INVENTION, IT SAYS, "THE NOTEBOOK

3     COMPUTER IS CAPABLE OF BEING A PDA."  IT WAS TALKING

4     ABOUT THE NOTEBOOK COMPUTER, THE LAPTOP, THAT WAS THE

5     PDA, NOT THE HANDSET.

6          AND, AGAIN, THIS HIGH/LOW POWER

7     LIMITATION, HERE THE SPECIFICATION SPEAKS VERY PLAINLY.

8     IT SAYS, "THE BASE UNIT MAY BE DESIGNED TO ALLOW THE

9     USER TO SWITCH BETWEEN A HIGH OR LOW LEVEL TRANSMITTING

10    AND RECEIVING POWER LEVELS."  IT'S PRETTY

11    STRAIGHTFORWARD LANGUAGE.  IT'S NOT WRITTEN IN

12    TECHNICAL JARGON.  IT'S NOT SOMETHING THAT WE NEED AN

13    EXPERT TO INTERPRET.  IT SAYS THE BASE UNIT CAN DO

14    THAT.  THERE'S NOT A SENTENCE IN THE SPECIFICATION THAT

15    SAYS THE HANDSET CAN DO THAT.  IF THERE WAS, THEY WOULD

16    HAVE SHOWED IT TO YOU.  ONE OF THEIR EXPERTS WOULD HAVE

17    POINTED IT OUT OR MR. DITZIK WOULD HAVE POINTED IT OUT.

18         AND, AGAIN, MR. BLACKBURN AGREES THAT THE

19    SPECIFICATION NEVER TALKS ABOUT THE HANDSET SWITCHING

20    BETWEEN THE HIGH AND LOW POWER LEVELS.

21         NOW, MR. RODRIGUEZ ALSO POINTED OUT THAT

22    THE SPECIFICATION DOESN'T DISCLOSE THAT.  NOW, WHY IS

23    THAT IMPORTANT?  IT'S IMPORTANT BECAUSE IF THERE'S NO

24    WRITTEN DESCRIPTION OF A HANDSET SENDING E-MAIL, THE

25    CLAIMS ARE INVALID.  OR IF THERE'S NO WRITTEN

EXHIBIT 8 - PAGE 259

1    DESCRIPTION OF THE HANDSET SENDING -- OR BEING A PDA,

2    THE CLAIMS ARE INVALID.  OR IF THERE'S NO DESCRIPTION

3    OF THE HIGH/LOW POWER LIMITATION, THE CLAIMS ARE

4    INVALID.  MR. DITZIK NEEDED TO DESCRIBE ALL OF THE

5    LIMITATIONS THAT HE'S NOW CLAIMING IS HIS INVENTION,

6    THEY HAD TO BE IN THE SPECIFICATION.  IF THEY'RE NOT

7    THERE, THE CLAIMS ARE INVALID.  AND, AGAIN, MR.

8    RODRIGUEZ WENT THROUGH ALL OF THIS TESTIMONY.

9              YOU'LL HAVE A VERDICT FORM HERE TOO.  AND

10   IT'LL ASK YOU IF APPLE PROVED, BY CLEAR AND CONVINCING

11   EVIDENCE, THAT ANY OF THE CLAIMS LACKED WRITTEN

12   DESCRIPTION?  ALL OF THESE CLAIMS REQUIRE A HANDSET

13   THAT SENDS E-MAIL.  ALL OF THE CLAIMS REQUIRE A HANDSET

14   THAT'S A PDA.  AND ALL OF THE CLAIMS REQUIRE A HANDSET

15   THAT CAN SWITCH BETWEEN HIGH AND LOW POWER.  IF ANY OF

16   THOSE THINGS ARE MISSING FROM THE WRITTEN DESCRIPTION,

17   ALL OF THESE CLAIMS HAVE TO BE INVALID.

18             NOW, I WANT TO TALK ABOUT OBVIOUSNESS TOO

19   BECAUSE THAT'S PART OF WHAT YOU HEARD TESTIMONY ON.

20   AND, AGAIN, IF THE INVENTION WAS ALREADY OUT THERE AS

21   CLAIMED, IF IT WAS ALREADY OUT THERE, YOU CAN'T GET A

22   PATENT ON THAT EITHER.  AND THAT SORT OF MAKES SENSE IN

23   THE PATENT SYSTEM.  YOU CAN'T GET A PATENT ON SOMETHING

24   THAT ALREADY EXISTED.  AND THAT'S WHAT HAPPENED HERE.

25   BECAUSE EVEN THOUGH MR. DITZIK THOUGHT HIS CLAIMS WERE

EXHIBIT 8 - PAGE 260