**EXHIBIT 4**
**TO DECLARATION OF JOSEPH A. CULIG IN SUPPORT OF NETAIRUS' MOTION FOR A NEW TRIAL PURSUANT TO FED.R.CIV.P. 59**

1                    UNITED STATES DISTRICT COURT

2                    CENTRAL DISTRICT OF CALIFORNIA

3                              ---

4                    THE HONORABLE JOHN A. KRONSTADT

5               UNITED STATES DISTRICT JUDGE PRESIDING

6

7    NetAirus Technologies, Inc.,          )

8                         Plaintiff,       )

9                                          )

10   vs.                                   )    CV10-3257-JAK

11                                         )

12   Apple, Inc.,                          )

13                         Defendant.      )

14   _____      )

15

16

17          REPORTER'S TRANSCRIPT OF TRIAL PROCEEDINGS

18                    Day 5 - P.M. Session

19                    Los Angeles, California

20                 Tuesday, November 19, 2013

21

22   Pamela A. Batalo, CSR, FCRR, RMR
     Official Reporter
23   Roybal Federal Building
     255 East Temple Street
24   Room 181-I
     Los Angeles, California  90012
25   (213) 687-0446

EXHIBIT 4 - PAGE 083

```
 1   APPEARANCES:

 2

 3    FOR PLAINTIFF:        NIRO, SCAVONE, HALLER & NIRO

 4                          BY:  DEAN D. NIRO

 5                               RAYMOND P. NIRO

 6                               TAHITI ARSULOWICZ

 7                               ROBERT A. CONLEY

 8                               JOSEPH A. CULIG

 9                          181 W. MADISON STREET, SUITE 4600

10                          CHICAGO, IL 60602

11

12                          ORUM & ROTH, LLC

13                          BY:  MARK D. ROTH

14                          53 W. JACKSON BOULEVARD, SUITE 620

15                          CHICAGO, IL  60604

16

17    FOR DEFENDANT:        MILBANK, TWEED, HADLEY & MCCLOY, LLP

18                          BY:  MARK C. SCARSI

19                               HANNAH CANNOM

20                               CHRIS L. HOLM

21                               ASHLEE N. LIN

22                          601 S. FIGUEROA STREET

23                          LOS ANGELES, CA 90017

24

25
```

EXHIBIT 4 - PAGE 084

```
 1   APPEARANCES CONTINUED:

 2

 3    FOR DEFENDANT:          MILBANK, TWEED, HADLEY & MCCLOY, LLP

 4                            BY:  CHRISTOPHER J. GASPAR

 5                            ONE CHASE MANHATTAN PLAZA

 6                            NEW YORK, NY  10005

 7

 8                            JACKIE HARLOW

 9                            IP LITIGATION COULSEL

10                            APPLE

11                            1 INFINITE LOOP

12                            MS 36-3NYJ

13                            CUPERTINO, CA  95014

14

15

16

17

18

19

20

21

22

23

24

25
```

United States District Court, Central District of California

EXHIBIT 4 - PAGE 085

```
 1                      INDEX FOR NOVEMBER 19, 2013

 2

 3                        INDEX OF WITNESSES

 4
     WITNESSES:                                            PAGE
 5
     JEFFREY RODRIGUEZ
 6      DIRECT EXAMINATION BY MR. GASPAR                      6
        CROSS-EXAMINATION BY MR. DEAN NIRO                   36
 7      REDIRECT EXAMINATION BY MR. GASPAR                   67
     THOMAS BLACKBURN
 8      DIRECT EXAMINATION BY MR. ROTH                      103
        CROSS-EXAMINATION BY MR. SCARSI                     151
 9      REDIRECT EXAMINATION BY MR. ROTH                    169

10

11                            EXHIBITS

12

13   PLAINTIFF'S EXHIBITS:              MARKED      RECEIVED

14   107, 141, 142, 148, 195, 210, 217,             205

15   219, 233, 234, 235, 236, 237, 238,

16   307, 369, 376, 379, 383, 384, 385,

17   387, 396, 398, 427, 527, 530, 533,

18   535, 539, 545, 563, 579 AND 593

19   389                                            181

20   464                                            182

21   467                                            183

22   482                                            197

23   513                                            199

24

25
```

EXHIBIT 4 - PAGE 086

| DEFENSE EXHIBITS: | MARKED | RECEIVED |
|---|---|---|
| 655, 727, 845, 850, 853, 147 AT 141, AND 147 | | 206 |
| 710, 711, 853, 1306, 845, AND 850 | | 206 |
| 894, 895, 896, 897 AND 900 | | 204 |

United States District Court, Central District of California

EXHIBIT 4 - PAGE 087

| | |
|---|---|
| 1 | Los Angeles, California, Tuesday, November 19, 2013 |
| 2 | 10:26 a.m. |
| 3 | -oOo- |
| 4 | Jeffrey Rodriguez, previously sworn |
| 5 | (Jury Out) |
| 6 | THE COURT:  Back on the record.  No jurors are |
| 7 | present.  The evacuation drill is completed, so we will resume. |
| 8 | (Jury In) |
| 9 | THE COURT:  Please be seated.  Welcome back, Ladies |
| 10 | and Gentlemen. |
| 11 | Professor Rodriguez, would you please restate your |
| 12 | name. |
| 13 | THE WITNESS:  Jeffrey Rodriguez. |
| 14 | THE COURT:  Do you understand you remain under oath? |
| 15 | THE WITNESS:  Yes, I do. |
| 16 | THE COURT:  Thank you. |
| 17 | Mr. Gaspar, please proceed. |
| 18 | MR. GASPAR:  Thank you, your Honor. |
| 19 | DIRECT EXAMINATION |
| 20 | BY MR. GASPAR: |
| 21 | Q.  Professor Rodriguez, we have just had a fire drill and |
| 22 | evacuation.  Before we did, you were telling us about your |
| 23 | obviousness analysis; is that right? |
| 24 | A.  Yes. |
| 25 | Q.  You told us about the Nokia 9000 and the GSM standard, to |

1    Apple has induced any other entity to infringe the asserted

2    claims of the patent.

3    Q.    Now, let's get a little bit more specific about the reasons

4    for that set of conclusions.  Let me show you the claims again,

5    and in particular, Defendant's Demonstrative Exhibit 164.

6    Before -- while that's being put up, was there a particular part

7    of the asserted claims that you thought deserved particular

8    focus?

9    A.    Yes.

10   Q.    And which part was that?

11   A.    The element of the claims that requires two different power

12   transmit levels.

13   Q.    Two different power transmit levels?

14   A.    Yes.

15   Q.    Was that element found in all of the asserted claims?

16   A.    Yes.

17   Q.    What's being displayed here on Defendant's Demonstrative

18   Exhibit 164?

19   A.    Here we see part of the language from Claim 1 that requires

20   that the transmit power level of the handset unit when

21   transmitting to the local area communication base unit is lower

22   than when transmitting to the external wide area network.

23   Q.    Now, how does this claim element fit into your analysis

24   about infringement that you just testified about?

25   A.    Well, I examined the evidence that NetAirus had put forth

1    to determine whether or not they had shown that the Apple iPhone

2    4 actually performs this step of the claims.

3    Q.    Let's take a quick look at that.  Could I please have

4    Defendant's Demonstrative Exhibit 168.

5          What is being shown on the left-hand side of

6    Defendant's Demonstrative Exhibit 168?

7    A.    So the left-hand side of this slide shows an industry

8    standard probability curve, a distribution that indicates how

9    likely it is that a cellular phone device transmits at different

10   power levels.  And the way to interpret this graph is those --

11   those vertical blue bars, the height of each of those vertical

12   blue bars indicates what's the probability or how often does it

13   occur that such a cell phone transmits at that corresponding

14   power level.

15         What may be hard to read on this slide is that on that

16   bottom horizontal line, horizontal axis, it's showing different

17   transmit power levels.  So from the far left it starts at about

18   minus 50 dBm, which is a measurement of power, going up to a

19   maximum of like around 20 dBm on the far right side.

20         I've highlighted a position on that graph with that

21   vertical red line showing the location for 15 dBm, which is the

22   power level that the iPhone 4 uses when transmitting over a

23   Wi-Fi network.

24   Q.    Now, does this probability curve shown on the left-hand

25   side of the screen that's shown right now prove that Apple

EXHIBIT 4 - PAGE 090

35

1    infringes?

2    A.    No, it does not.

3    Q.    And why not?

4    A.    Well, for -- for the following reasons.  First of all, this

5    is just an industry standard curve that shows general patterns

6    in use of cell phones.  It does not refer specifically to a

7    scenario where the cell phones are transmitting email.  So that

8    would be a different type of analysis that would need to be

9    done.

10           But also it shows that for most of the normal usage,

11   the transmit power levels are at a level that's much lower than

12   the 15 dBm power level associated for Wi-Fi communication.

13   Q.    So let me now very quickly show you another probability

14   curve that we've seen in the case here.  This is on Defendant's

15   Demonstrative Exhibit 169.  Have you seen this before?

16   A.    Yes, I have.

17   Q.    Now, does this document show that Apple infringes?

18   A.    No, it does not.

19   Q.    And are the reasons the same as the ones you just mentioned

20   with regard to the earlier slide?

21   A.    Yes.  Again, this is just a generic chart that shows

22   general usage patterns for all cell phones, for representative

23   cell phones, and it again shows that most of the time the

24   transmit power is below the 15 dBm power level for Wi-Fi.  Only

25   about seven and a half percent of the time does such a phone

1  transmit at a higher power level.

2  Q.   So you said below 15, I believe?

3  A.   Yes.

4  Q.   Now, we've heard a lot about Wi-Fi radio transmit power and

5  also the cellular radio transmit power in the iPhone 4 during

6  this trial.  Have you been here for that testimony?

7  A.   Yes.

8  Q.   Now, based on your analysis, does Apple control the iPhone

9  4's cellular radio transmit power?

10 A.   No.  Apple would have no control over the cellular transmit

11 power for the iPhone.  As I explained, that's dictated by the

12 GSM standard.  The GSM standard requires that all cell phones on

13 the network comply with the adaptive power control feature of

14 the GSM cellular network.  So the iPhone 4 sets its power level

15 based on commands it receives from the cell towers.

16        MR. GASPAR:  At this point, your Honor, I will pass

17 the witness.

18        THE COURT:  Okay.  Thank you.

19        Mr. Niro, cross-examination.

20        MR. DEAN NIRO:  Your Honor, to help the witness and

21 the Court, we prepared some books of exhibits.  We will

22 approach.

23                    CROSS-EXAMINATION

24 BY MR. DEAN NIRO:

25 Q.   Good morning, Dr. Rodriguez.  I'd like to start by looking

1   and small.  It says, quote, the following is an examiner's

2   Statement of Reasons for allowance.

3            Do you see that?

4   A.   Yes.

5   Q.   Now, can I ask you to read the remainder of that page and

6   then the next page, which ends in 21, and tell me if there's any

7   statement at all in the examiner's Statement of Reasons for

8   allowance that mentions the written description rule.

9   A.   I see no mention of the written -- of written description.

10  It does not address written description at all.

11  Q.   In the Statement of Reasons for allowance?

12  A.   That's correct.

13  Q.   Okay.  My last set of questions concerns the last set of

14  questions that Mr. Niro asked you on cross-examination which

15  concerned the claims that emerged from the reexamination

16  procedure.

17            Do you remember those questions?

18  A.   Yes.

19  Q.   And is it your understanding that the asserted claims in

20  this case came out of the patent office after the reexam and

21  having been changed from what they were originally?

22  A.   Yes.  That's correct.

23  Q.   Now, thinking back to what the claims were originally

24  before they were changed and comparing that to the claims as

25  they emerged after reexamination that had been changed, was that

EXHIBIT 4 - PAGE 093

power level limitation that we discussed in the non-infringement portion of your direct examination altered at all?

A.    No, it was not.

Q.    Okay.  And you were asked on cross-examination whether you provided another non-infringement report after the reexamination ended; is that right?

A.    That's right.

Q.    And I think you said you did not provide another report; is that right?

A.    That's right.

Q.    Is there a reason why you didn't provide one?

A.    The -- the elements of those claims involving the power limitation hadn't changed and the non-infringement arguments that were in my analysis hadn't changed with respect to that, so the original claims that had been asserted were not practiced by the iPhone 4 because they don't practice the -- because there was no evidence provided whatsoever that the iPhone 4 practices that power requirement of the claims.  And after reexam, the exact same power requirement was still there in all those claims.  So still I have the same conclusion based on the same evidence that they have not shown that the iPhone 4 practices that power requirement.

        MR. GASPAR:  I have no further questions, your Honor.

        THE COURT:  Professor Rodriguez, thank you for your testimony.  You are excused.

United States District Court, Central District of California

EXHIBIT 4 - PAGE 094

78

```
1              Do you wish to call another witness?

2              MR. SCARSI:  No, your Honor.  At this point, defendant

3     Apple rests its case.

4              THE COURT:  Subject to the exhibit issue we have with

5     both sides; correct?

6              MR. GASPAR:  That is correct.

7              THE COURT:  Okay.  Do you wish to call any rebuttal

8     witness.

9              MR. DEAN NIRO:  We do have a rebuttal witness, your

10    Honor.

11             THE COURT:  Then let's do this.  One moment, please.

12             All right, Ladies and Gentlemen, we're going to take a

13    20-minute break here, give you a chance to have some lunch

14    without the fire drill alarm going off.  And we will resume in

15    about 20 minutes.  Thank you.  Do not discuss the case during

16    the break.

17                           (Jury Out)

18             THE COURT:  Okay.  Please be seated.

19             Are there -- the rebuttal -- is Mr. Blackburn the

20    rebuttal witness?

21             MR. DEAN NIRO:  Yes.  And Mr. Roth will be putting him

22    on.

23             THE COURT:  Are there any issues -- are there exhibit

24    issues with respect to Mr. Blackburn?

25             MR. SCARSI:  There are, your Honor.
```

United States District Court, Central District of California

EXHIBIT 4 - PAGE 095

| | |
|---|---|
| 1 | THE COURT:  All right.  I will reflect on Exhibit 589. |
| 2 | MR. SCARSI:  And to be clear, there were Apple |
| 3 | witnesses on the stand.  They could have introduced the document |
| 4 | then and they did not.  They objected to us bringing Mr. Buckley |
| 5 | into the trial, your Honor, and they didn't object to our |
| 6 | decision not to bring him. |
| 7 | MS. ARSULOWICZ:  One further point, your Honor, if I |
| 8 | may.  Apple never objected to the exact same documents for an |
| 9 | earlier time period that were redacted, and we have the relevant |
| 10 | portions from all the hearings. |
| 11 | THE COURT:  I don't think I need -- I'll reflect on |
| 12 | the issue of 589 because I think it looks like it's an issue |
| 13 | similar to other issues that I've -- to which you've alerted me |
| 14 | this morning.  I will reflect on that.  But it doesn't matter as |
| 15 | to the testimony of Mr. Blackburn. |
| 16 | In other words, Mr. Roth, you are talking about |
| 17 | whether you can make an argument.  You don't need an expert on |
| 18 | this. |
| 19 | What is the issue on 251? |
| 20 | MR. SCARSI:  Your Honor, 251 and the other |
| 21 | demonstrative with the same slide -- excuse me one second. |
| 22 | 251 and the other demonstrative with the same concept |
| 23 | on it, here what NetAirus appears to be doing is introducing a |
| 24 | new expert opinion that says that email, as the Court has |
| 25 | defined it, is not email if it's sent over a GSM network.  And |

EXHIBIT 4 - PAGE 096

1   the reason -- what it looks like they're doing is they're trying

2   to conflate the Court's use of the word *GSM messaging* as not

3   being part of the email construction, and trying to now argue

4   that if you send an email over a GSM network, it's no longer

5   email.  That's a brand new opinion.  It's not an opinion that

6   has ever been expressed by this expert.

7            It actually, your Honor, is confusing to the jury

8   because they're trying to, I think, misinterpret what the

9   Court's claim construction is.  The Court construed email as

10  being traditional email, sending from one domain to another, not

11  to include text messages like SMS text messaging, GSM text

12  messaging, COMS, X.400.  That was certainly the spirit of the

13  briefing on this and the declarations that were submitted.

14           This new opinion that sending an email over a GSM

15  network means it's no longer an email is really at odds with the

16  Court's construction and I believe confusing to the jury.

17           THE COURT:  Mr. Roth.

18           MR. ROTH:  I would like to respond to that.  There is

19  nothing that is confusing to the jury.  In fact, this -- what

20  we're doing is citing the exact language in the Court's order.

21  And they can certainly cross-examine Mr. Blackburn on that but

22  the order says that messaging protocol such as GSM, which is

23  exactly -- the exact protocol that Mr. Rodriguez has testified

24  about is not an email.

25           THE COURT:  Okay.  I understand.  Give me a few

EXHIBIT 4 - PAGE 097

```
 1    minutes.  I will look at these two issues.  Thanks.
 2                    (Recess taken)
 3         THE COURT:  All right.  Thank you.  Please be seated.
 4    We are back on the record in NetAirus vs. Apple.  No jurors are
 5    present.
 6         Mr. Scarsi, let me start with you.
 7         With respect to exhibit -- the Exhibit 589, is it your
 8    position that this isn't accurate?  With respect to the iPhone
 9    4.
10         MR. SCARSI:  I'm sorry, your Honor.  I didn't have it
11    in front of me.  So the exhibit that identifies the quantities
12    of the iPhone 4 sold, we're not -- we haven't taken a position
13    that this document is not accurate.
14         THE COURT:  Okay.  Why, then -- why can't -- if it's
15    a -- if you don't contest its accuracy and it was produced by
16    Apple as a business record, why can't it be admitted?
17         MR. SCARSI:  Well, the position of Apple is that they
18    could have admitted it through a witness, had they asked a
19    witness about it, but it doesn't just come into evidence because
20    it was produced in this case.  And we also don't think it's
21    actually relevant to any of the issues that the jury is going to
22    have to determine in the case.
23         THE COURT:  Well, it shows -- was any witness at any
24    deposition asked about this document?
25         MR. ROTH:  No, your Honor, because we were going to
```

EXHIBIT 4 - PAGE 098

96

```
1              THE COURT:  All right.
2              MR. GASPAR:  That it's an overstatement, not that
3    there is a particular quantification link.
4              THE COURT:  Wasn't he using the number -- wasn't he
5    justifying the lump sum royalty calculation that he made based
6    on examining the number of units sold after the patent reissue?
7              MR. GASPAR:  Not really, your Honor.  What he's doing
8    is he is comparing the lump sum payments in each of these five
9    and the number of patents and determining whether or not there
10   is an overstatement based on his actual analysis, which is
11   reducing down the --
12             THE COURT:  Wait a minute.  All right.
13             MR. GASPAR:  Or adjusting, I should say.
14             THE COURT:  We have kept the jury waiting too long.
15             With respect to -- I'll come back to this.  I will
16   make a determination, an ultimate determination later.  We don't
17   need that with respect to Mr. Blackburn.
18             With respect to Mr. -- the other exhibits at issue
19   which concerns the definition that I gave for email, the
20   definition needs a slight clarification because this issue
21   wasn't framed in quite this way at the time.
22             But where it says the word -- after -- GSM as used
23   here, email does not include the following types of messaging or
24   protocols, SMS, GSM.  It should say GSM texts or at least GSM
25   text messages, because email can be sent over GSM, and it's just
```

97

 1    the device then where you compose the email.  Depending on what

 2    the device is, the device can then decide to send that email

 3    through a GSM pipe where it comes up in someone else's email

 4    account as an email.

 5          So as long as the email meets the criteria of --

 6    user1@apple.com would send an email to user2@NetAirus.com, then

 7    it could be sent via GSM.  So the word -- anyway, to make this

 8    clear, *Email does not include the following types of messaging*

 9    *or protocols:  SMS, GSM text messaging, COMS, X.400* and so on.

10          I have made that similar change to the other terms

11    because I don't think that's an issue.  If it is, tell me.  And

12    if you each think that the text limitation should be applied to

13    each, I can do that but I think the GSM is the issue.

14          MR. ROTH:  Well, your Honor, I think that what we have

15    presented in our briefing and your ruling was that the GSM

16    protocol and messaging under GSM is simply not an email and --

17    the GSM protocol is not an email and that's how we limited the

18    claim in the reexamination and that was the exact language we

19    used and the exact language you took out of that portion of --

20          THE COURT:  I think an email can be -- I think -- the

21    way I have defined email an email can be sent through different

22    pipes.  But the distinction among other things was Apple was

23    seeking to use other devices that sent text messages and said

24    these are similar art.  And I said define email differently.

25    But I didn't -- it was not my intention to define -- in this

EXHIBIT 4 - PAGE 100

```
 1   definition to exclude a properly formatted email as defined
 2   being sent through a different pipe.  That was the distinction.
 3   I think Apple was trying to rely on other products.
 4           MR. SCARSI:  That's right, your Honor.  We were trying
 5   to broaden the definition of email to include text messages and
 6   your Honor overruled us.
 7           MR. ROTH:  May I have just one minute with my expert
 8   to see where this leads us?
 9           THE COURT:  Yes, you may.
10           How long is your --
11           MR. ROTH:  One hour.
12           THE COURT:  An hour on direct?  I want to finish him
13   today.
14           MR. NIRO:  I think we should finish, today,
15   your Honor.  And we have, in view of the examination of
16   Mr. Rodriguez, Dr. Rodriguez, with respect to the de minimis,
17   alleged de minimis infringement as a result of differentials and
18   power level, we think it's important to put before the jury a
19   very brief snippet of testimony from Mr. Knight that was not --
20   it had been designated but for one reason or another it wasn't
21   included in the video.  And that has to do -- he was designated
22   to testify about Apple Stores and there is one portion of his
23   deposition where he is asked to identify the number of Apple
24   Stores and the number of visitors.  And we'd like to get that in
25   the record, independent of whether any documents go in or not,
```

99

```
 1   simply because it would show the magnitude of infringing use at
 2   the Apple Stores, at the Genius Bars and so forth.  I think the
 3   numbers are 250 stores time 20,000 visitors per week times 50
 4   weeks is about 250 million per year.
 5             MR. SCARSI:  May I respond, your Honor?
 6             THE COURT:  Yes.
 7             MR. SCARSI:  Two points.  The first point is
 8   Dr. Rodriguez didn't testify that there was de minimis
 9   infringement.  I believe he testified that there was no
10   infringement because in normal use the phone operates in a range
11   such as the cell power level is below Wi-Fi.  That is point one.
12   So this de minimis use issue doesn't really come up.
13             The second thing is I haven't looked at the testimony
14   that they are referring to with respect to Mr. Knight, but I
15   believe he testified that he was not aware of the specific
16   numbers of visitors to the Apple Stores and visitors to the
17   Genius Bar.  I defended that deposition and I believe that was
18   the testimony.
19             THE COURT:  What's the page?
20             Tell you what.  Are you ready to proceed, Mr. Roth?
21             MR. ROTH:  Yes, your Honor.
22             THE COURT:  Let's proceed.  Meanwhile, Mr. Niro show
23   Mr. Scarsi while we are working the page and lines you propose
24   to play or read.  And then we will address that after this
25   testimony.
```

United States District Court, Central District of California

EXHIBIT 4 - PAGE 102

1    MR. NIRO:  We will read it, your Honor, for speed.  We

2    don't think we have to play it.

3    THE COURT:  Just a minute.  We've received a question

4    from one of the jurors, Juror No. 8, which is this:  *What was*

5    *date Apple contacted patent office re NetAirus and why and how*

6    *did they become interested in the 380 patent?  Why didn't they*

7    *contact Mr. Ditzik?*

8    Now, in this trial, I've not -- I didn't invite jurors

9    to submit questions and in many trials I do.  This is a question

10   that has been submitted.  When I do invite questions, I tell

11   jurors that I will confer with counsel before determining

12   whether or not their question is appropriate to answer.  Often

13   the questions are directed at a particular witness.  So

14   that's -- but here it's a more general question.

15   What's your view on this?

16   MR. NIRO:  Well, your Honor, I think the safest way is

17   just to advise the juror that the evidence that she and the

18   other jurors have heard would effectively answer that question.

19   Because she's saying *why didn't they.*  I don't know that there

20   is any witness who specifically was asked the question *why*

21   *didn't you*, but I think there is testimony around that subject.

22   MR. SCARSI:  If your Honor wanted to, we could answer

23   the question in our closing or your Honor could just simply tell

24   the juror the date the lawsuit was filed and the date that Apple

25   initiated the reexamination.

EXHIBIT 4 - PAGE 103

```
1              THE COURT:  I think the better thing for me to do is
2     this.  As I say, ordinarily I get questions that are to --
3     whether or not I will ask them of a particular witness.  And
4     they are not in deliberations, it's not a question coming out of
5     that context.  I think the better thing to tell Ms. Bellon is
6     thank you for your question, and that the counsel are aware of
7     the question and will be addressing that in their closing
8     arguments.
9              MR. NIRO:  That's fine, your Honor.
10             THE COURT:  How about that?
11             MR. SCARSI:  That's fine.
12             MR. NIRO:  Could you read the question again?
13             THE COURT:  Yes.  We will get you copies of it.
14             MR. NIRO:  Thank you.
15             MR. SCARSI:  Thank you, your Honor.
16             THE COURT:  Mr. Blackburn, could you come forward,
17    please.
18                        (Jury In)
19             THE COURT:  Please be seated.
20             All right, Ladies and Gentlemen, welcome back.  I
21    apologize for keeping you waiting longer than we expected.  We
22    were working on some issues that just arose.
23             A couple of things.  We will go -- there is --
24    there's -- just a moment.
25             Would you please restate your name.
```

```
 1              THE WITNESS:  Thomas Blackburn.
 2              THE COURT:  Mr. Blackburn, do you understand you
 3    remain under oath?
 4              THE WITNESS:  Yes, I do.
 5                   Thomas Blackburn, previously sworn
 6              THE COURT:  Mr. Blackburn will be the final live
 7    witness in the trial.  There may be some other evidence but he
 8    will be the final live witness.  It is our plan to complete his
 9    testimony today.
10              We will then plan to have you come back tomorrow; I
11    will read you the final jury instructions; each counsel will
12    have the opportunity to present closing arguments, first
13    plaintiff, then defendant, and then plaintiff may respond to
14    defendant.
15              After that, I will read you some concluding
16    instructions and the case will be presented to you for your
17    deliberations.
18              So we're on schedule.  I say that because again we had
19    the unexpected fire drill today as well as this longer pause
20    than expected but we're on schedule and very grateful for your
21    timeliness each day.
22              Second, Ms. Belton, you presented a question which is
23    being -- I don't have it in my hand at the moment, it's being
24    copied.  Ms. Bellon, excuse me.  Thank you for your question.
25              What I have conferred -- I've conferred with counsel
```

EXHIBIT 4 - PAGE 105