**EXHIBIT 5**
**TO DECLARATION OF JOSEPH A. CULIG IN SUPPORT OF NETAIRUS' MOTION FOR A NEW TRIAL PURSUANT TO FED.R.CIV.P. 59**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

HONORABLE JOHN A. KRONSTADT

UNITED STATES DISTRICT JUDGE PRESIDING

- - -

NETAIRUS TECHNOLOGIES, LLC,          )
                                     )
                  PLAINTIFF,         )
                                     )
VS.                                  )  CV10-3257-JAK
                                     )
APPLE, INC.,                         )
                                     )
                  DEFENDANT.         )
_____)

REPORTER'S TRANSCRIPT OF TRIAL PROCEEDINGS

**DAY SIX**

LOS ANGELES, CALIFORNIA

WEDNESDAY, NOVEMBER 20, 2013, 8:30 AM

_____

ALEXANDER T. JOKO, CSR NO. 12272
FEDERAL OFFICIAL COURT REPORTER
255 EAST TEMPLE STREET, ROOM 181-F
LOS ANGELES, CA 90012
AJ_CSR@YAHOO.COM

EXHIBIT 5 - PAGE 106

```
 1     APPEARANCES OF COUNSEL:

 2     FOR PLAINTIFF:      ORUM & ROTH LCC
                           BY:  MARK DANIEL ROTH
 3                         53 WEST JACKSON BOULEVARD
                           SUITE 620
 4                         CHICAGO, IL 60604-3750

 5                         NIRO HALLER AND NIRO LTD
                           BY:  RAYMOND P. NIRO, SR.
 6                               DEAN D. NIRO
                                 TAHITI ARSULOWICZ
 7                               ROBERT A. CONLEY
                                 JOSEPH A. CULIG
 8                         181 WEST MADISON STREET
                           SUITE 4600
 9                         CHICAGO, IL 60602

10
       FOR DEFENDANT:      MILBANK TWEED HADLEY AND MCCLOY LLP
11                         BY: MARK C. SCARSI
                                ASHLEY LIN
12                              HANNAH LYNN CANNOM
                                CHRIS L. HOLM
13                         601 SOUTH FIGUEROA STREET
                           3RD FLOOR
14                         LOS ANGELES, CA 90017

15                         CHRISTOPHER J. GASPAR
                           MILBANK TWEED HADLEY AND MCCLOY LLP
16                         1 CHASE MANHATTAN PLAZA
                           NEW YORK, NY 10005-1413
17
                           JACKIE HARLOW
18                         IP LITIGATION COUNSEL
                           APPLE
19                         1 INFINITE LOOP
                           MS 36-3NYJ
20                         CUPERTINO, CA 95014

21

22

23

24

25
```

EXHIBIT 5 - PAGE 107

```
 1        LOS ANGELES, CALIFORNIA; WEDNESDAY, NOVEMBER 20, 2013

 2                          8:30 AM

 3                      - - - - -

 4

 5

 6           (THE FOLLOWING PROCEEDINGS WERE HELD IN

 7        OPEN COURT OUTSIDE THE PRESENCE OF THE JURY:)

 8           THE COURT:  NETAIRUS TECHNOLOGIES VERSUS

 9     APPLE, CV10-03257.

10               WOULD YOU STATE YOUR APPEARANCES, PLEASE.

11           MR. NIRO:  RAY NIRO FOR THE PLAINTIFF

12     NETAIRUS.  AND I HAVE WITH ME ALL OF THE PEOPLE THAT

13     HAVE BEEN HERE PREVIOUSLY, MY SON DEAN, MARK ROTH AND

14     SO FORTH.

15           MR. SCARSI:  GOOD MORNING, YOUR HONOR.  MARK

16     SCARSI FOR APPLE.  AND THE ENTIRE TEAM IS HERE AS WELL.

17           THE COURT:  I'VE REVIEWED APPLE'S MOTION FOR

18     JUDGMENT.  I'M NOT PERSUADED THAT -- I THINK YOU HAVE

19     RAISED -- OBVIOUSLY, YOU'VE RAISED ISSUES; BUT I'M NOT

20     PERSUADED THAT, AT THIS STAGE, THE MATTER SHOULD BE

21     TAKEN FROM THE JURY.

22               WITH RESPECT TO THE DAMAGES ARGUMENT,

23     WHICH I KNOW WE MAY COME TO, THE ARGUMENT THAT IT CAN'T

24     BE MORE THAN $500,000, WITH RESPECT TO EACH OF THE

25     POINTS YOU HAVE MADE, I THINK THERE ARE -- AT THIS
```

EXHIBIT 5 - PAGE 108

```
1            AS I SAID YESTERDAY, THE EVIDENCE HAS NOW

2    BEEN PRESENTED.  THE NEXT THINGS WE WILL DO ARE THE

3    FOLLOWING:

4            I'M GOING TO READ YOU CERTAIN CLOSING

5    INSTRUCTIONS.  THEN WE'LL HEAR ARGUMENT FROM COUNSEL.

6    MR. NIRO WILL SPEAK FIRST.  AND THEN MR. SCARSI WILL

7    SPEAK.  AND THEN MR. NIRO WILL HAVE A LAST OPPORTUNITY

8    TO SPEAK AFTER MR. SCARSI DOES.

9            AFTER EACH OF THOSE PRESENTATIONS -- EACH

10   OF THEM HAS COMPLETED HIS PRESENTATION, I'LL READ YOU

11   FINAL INSTRUCTIONS, AND THEN YOUR DELIBERATIONS WILL

12   COMMENCE.

13           I PREVIOUSLY READ YOU CERTAIN

14   INSTRUCTIONS.  I'M NOT GOING TO RE-READ THOSE.

15   HOWEVER, YOU WILL HAVE COPIES OF ALL OF THE

16   INSTRUCTIONS WITH YOU IN THE JURY ROOM.

17           THERE ARE SOME -- THERE HAVE BEEN SOME

18   MINOR CORRECTIONS MADE TO SOME OF THE INSTRUCTIONS THAT

19   I PREVIOUSLY READ, BUT THEY'RE NOT -- I THINK --

20   THEY'RE INCLUDED IN WHAT I'M ABOUT TO READ.  AND I

21   DON'T THINK -- THEY SHOULDN'T CAUSE ANY ISSUES FOR YOU.

22   YOU'LL HAVE ALL -- AS I SAY, YOU'LL HAVE ALL OF THE

23   INSTRUCTIONS.

24           MEMBERS OF THE JURY, NOW THAT YOU HAVE

25   HEARD ALL OF THE EVIDENCE, IT IS MY DUTY TO INSTRUCT
```

EXHIBIT 5 - PAGE 109

1    YOU AS TO THE LAW OF THE CASE.  A COPY OF THESE

2    INSTRUCTIONS WILL BE SENT WITH YOU TO THE JURY ROOM

3    WHEN YOU DELIBERATE.

4            YOU MUST NOT INFER FROM THESE

5    INSTRUCTIONS OR FROM ANYTHING I MAY SAY OR DO AS

6    INDICATING THAT I HAVE AN OPINION REGARDING THE

7    EVIDENCE OR WHAT YOUR VERDICT SHOULD BE.

8            IT IS YOUR DUTY TO FIND THE FACTS FROM

9    ALL THE EVIDENCE IN THE CASE.  TO THOSE FACTS, YOU WILL

10   APPLY THE LAW AS I GIVE IT TO YOU.  YOU MUST FOLLOW THE

11   LAW AS I GIVE IT TO YOU WHETHER YOU AGREE WITH IT OR

12   NOT.  AND YOU MUST NOT BE INFLUENCED BY ANY PERSONAL

13   LIKES OR DISLIKES, OPINIONS, PREJUDICES OR SYMPATHY.

14   THAT MEANS THAT YOU MUST DECIDE THE CASE SOLELY ON THE

15   EVIDENCE BEFORE YOU.  YOU WILL RECALL THAT YOU TOOK AN

16   OATH TO DO SO.

17           IN FOLLOWING MY INSTRUCTIONS, YOU MUST

18   FOLLOW ALL OF THEM AND NOT SINGLE OUT SOME AND IGNORE

19   OTHERS.  THEY ARE ALL IMPORTANT.

20           AS I DID AT THE START OF THE CASE, I WILL

21   FIRST GIVE YOU A SUMMARY OF EACH SIDE'S CONTENTIONS IN

22   THIS CASE.  I WILL THEN PROVIDE YOU WITH DETAILED

23   INSTRUCTIONS ON WHAT EACH SIDE MUST PROVE TO WIN ON

24   EACH OF ITS CONTENTIONS.

25           AS I PREVIOUSLY TOLD YOU, NETAIRUS SEEKS

EXHIBIT 5 - PAGE 110

1    MONEY DAMAGES FROM APPLE FOR ALLEGEDLY INFRINGING THE

2    '380 PATENT BY USING METHODS THAT NETAIRUS ARGUES ARE

3    COVERED BY CLAIMS 3, 7, 9, 10, 11 AND 12 OF THE '380

4    PATENT.  THESE ARE THE ASSERTED CLAIMS OF THE '380

5    PATENT.

6                    NETAIRUS ALSO ARGUES THAT APPLE HAS

7    ACTIVELY INDUCED INFRINGEMENT OF THESE CLAIMS.  THE

8    PRODUCT THAT IS THE ALLEGED -- EXCUSE ME.

9                    THE PRODUCT THAT IS ALLEGED TO PRACTICE A

10   METHOD THAT INFRINGES IS APPLE'S I-PHONE 4.

11                   APPLE DENIES THAT IT HAS INFRINGED THE

12   ASSERTED CLAIMS OF THE PATENT AND ARGUES THAT, IN

13   ADDITION, THE CLAIMS OF THE '380 PATENT ARE INVALID.

14                   YOUR JOB IS TO DECIDE WHETHER APPLE HAS

15   INFRINGED THE ASSERTED CLAIMS OF THE '380 PATENT, AND

16   WHETHER ANY OF THE ASSERTED CLAIMS OF THE '380 PATENT

17   ARE INVALID.

18                   IF YOU DECIDE THAT ANY CLAIM OF THE '380

19   PATENT HAS BEEN INFRINGED AND IS NOT INVALID, YOU WILL

20   THEN NEED TO DECIDE ANY MONEY DAMAGES TO BE AWARDED TO

21   NETAIRUS TO COMPENSATE IT FOR THE INFRINGEMENT.

22                   THE FOLLOWING IS THE EVIDENCE YOU ARE TO

23   CONSIDER WHEN DECIDING WHAT THE FACTS ARE:

24                      ONE, THE SWORN TESTIMONY OF ANY WITNESS.

25                      TWO, THE EXHIBITS RECEIVED INTO EVIDENCE.

EXHIBIT 5 - PAGE 111

1      AND, THREE, ANY FACTS ON WHICH THE

2  PARTIES AGREE AND THAT I PROVIDE TO YOU AS AN AGREEMENT

3  BETWEEN THE PARTIES.

4      EVIDENCE MAY BE DIRECT OR CIRCUMSTANTIAL.

5  DIRECT EVIDENCE IS DIRECT PROOF OF A FACT SUCH AS

6  TESTIMONY BY A WITNESS ABOUT WHAT THAT WITNESS

7  PERSONALLY SAW OR HEARD OR DID.

8      CIRCUMSTANTIAL EVIDENCE IS PROOF OF ONE

9  OR MORE FACTS FROM WHICH YOU COULD FIND ANOTHER FACT.

10      YOU SHOULD CONSIDER BOTH KINDS OF

11  EVIDENCE.  THE LAW MAKES NO DISTINCTION BETWEEN THE

12  WEIGHT TO BE GIVEN TO EITHER DIRECT OR CIRCUMSTANTIAL

13  EVIDENCE.  IT IS FOR YOU TO DECIDE HOW MUCH WEIGHT TO

14  GIVE TO ANY EVIDENCE.

15      BY WAY OF EXAMPLE, IF YOU WAKE UP IN THE

16  MORNING AND SEE THAT THE SIDEWALK IS WET, YOU MAY FIND

17  FROM THAT FACT THAT IT RAINED DURING THE NIGHT.

18  HOWEVER, OTHER EVIDENCE, SUCH AS A TURNED ON GARDEN

19  HOSE, MAY PROVIDE A DIFFERENT EXPLANATION FOR THE

20  PRESENCE OF WATER ON THE SIDEWALK.  THEREFORE, BEFORE

21  YOU DECIDE THAT A FACT HAS BEEN PROVED BY

22  CIRCUMSTANTIAL EVIDENCE, YOU MUST CONSIDER ALL THE

23  EVIDENCE IN LIGHT OF REASON, EXPERIENCE AND COMMON

24  SENSE.

25      IN DECIDING THE FACTS IN THIS CASE, YOU

EXHIBIT 5 - PAGE 112

```
 1    MAY HAVE TO DECIDE WHICH TESTIMONY TO BELIEVE AND WHICH
 2    TESTIMONY NOT TO BELIEVE.  YOU MAY BELIEVE EVERYTHING A
 3    WITNESS SAYS OR PART OF IT OR NONE OF IT.
 4                   PROOF OF A FACT DOES NOT NECESSARILY
 5    DEPEND ON THE NUMBER OF WITNESSES WHO TESTIFY ABOUT IT.
 6    LIKEWISE, THE WEIGHT OF THE EVIDENCE AS TO A FACT DOES
 7    NOT NECESSARILY DEPEND ON THE NUMBER OF WITNESSES WHO
 8    TESTIFY ABOUT IT.
 9                   IN CONSIDERING THE TESTIMONY OF ANY
10    WITNESS, YOU MAY TAKE INTO ACCOUNT:  ONE, THE
11    OPPORTUNITY AND ABILITY OF THE WITNESS TO SEE OR HEAR
12    OR KNOW THE THINGS TESTIFIED TO.
13                   TWO, THE WITNESS' MEMORY.
14                   THREE, THE WITNESS' MANNER WHILE
15    TESTIFYING.
16                   FOUR, THE WITNESS' INTEREST IN THE
17    OUTCOME OF THE CASE AND ANY BIAS OR PREJUDICE THAT THE
18    WITNESS MAY HAVE.
19                   FIVE, WHETHER OTHER EVIDENCE CONTRADICTED
20    THE WITNESS' TESTIMONY.
21                   SIX, THE REASONABLENESS OF THE WITNESS'
22    TESTIMONY IN LIGHT OF ALL THE EVIDENCE.
23                   AND, SEVEN, ANY OTHER FACTORS THAT BEAR
24    ON BELIEVABILITY.
25                   SOME WITNESSES, BECAUSE OF EDUCATION OR
```

EXHIBIT 5 - PAGE 113

1   EXPERIENCE, ARE PERMITTED TO STATE OPINIONS AND THE

2   REASONS FOR THOSE OPINIONS.  OPINION TESTIMONY SHOULD

3   BE JUDGED JUST LIKE ANY OTHER TESTIMONY.  YOU MAY

4   ACCEPT IT OR REJECT IT AND GIVE IT AS MUCH WEIGHT AS

5   YOU THINK IT DESERVES CONSIDERING THE WITNESS'

6   EDUCATION AND EXPERIENCE, THE REASONS GIVEN FOR THE

7   OPINION AND ALL THE OTHER EVIDENCE IN THE CASE.

8          A DEPOSITION IS THE SWORN TESTIMONY OF A

9   WITNESS TAKEN BEFORE TRIAL.  THE WITNESS IS PLACED

10  UNDER OATH TO TELL THE TRUTH.  AND LAWYERS FOR EACH

11  PARTY MAY ASK QUESTIONS.  THE QUESTIONS AND ANSWERS ARE

12  RECORDED.  YOU SHOULD CONSIDER DEPOSITION TESTIMONY

13  PRESENTED TO YOU IN COURT IN LIEU OF LIVE TESTIMONY

14  INSOFAR AS POSSIBLE IN THE SAME WAY AS IF THE WITNESS

15  HAD BEEN PRESENT TO TESTIFY.

16          EVIDENCE WILL BE PRESENTED TO YOU IN THE

17  FORM OF ANSWERS OF ONE OF THE PARTIES TO WRITTEN

18  INTERROGATORIES SUBMITTED BY THE OTHER PARTY.  THESE

19  ANSWERS WERE GIVEN IN WRITING AND UNDER OATH BEFORE THE

20  ACTUAL TRIAL IN RESPONSE TO QUESTIONS THAT WERE

21  SUBMITTED IN WRITING UNDER ESTABLISHED COURT

22  PROCEDURES.  YOU SHOULD CONSIDER THE ANSWERS, INSOFAR

23  AS POSSIBLE, IN THE SAME WAY AS IF THEY WERE MADE FROM

24  THE WITNESS STAND.  JUST A MINUTE.

25          IN REACHING YOUR VERDICT, YOU MAY

EXHIBIT 5 - PAGE 114

1   CONSIDER ONLY THE TESTIMONY AND EXHIBITS RECEIVED INTO

2   EVIDENCE.  CERTAIN THINGS ARE NOT EVIDENCE.  AND YOU

3   MAY NOT CONSIDER THEM IN DECIDING WHAT THE FACTS ARE.

4   I WILL LIST THEM FOR YOU:

5              ONE, ARGUMENTS AND STATEMENTS BY LAWYERS

6   ARE NOT EVIDENCE.  THE LAWYERS ARE NOT WITNESSES.  WHAT

7   THEY HAVE SAID IN THEIR OPENING STATEMENTS, WILL SAY IN

8   THEIR CLOSING ARGUMENTS AND AT OTHER TIMES IS INTENDED

9   TO HELP YOU INTERPRET THE EVIDENCE.  BUT IT IS NOT

10  EVIDENCE.  IF THE FACTS, AS YOU REMEMBER THEM, DIFFER

11  FROM THE WAY THE LAWYERS HAVE STATED THEM, YOUR MEMORY

12  OF THEM CONTROLS.

13             TWO, QUESTIONS AND OBJECTIONS BY LAWYERS

14  ARE NOT EVIDENCE.  ATTORNEYS HAVE A DUTY TO THEIR

15  CLIENTS TO OBJECT WHEN THEY BELIEVE A QUESTION IS

16  IMPROPER UNDER THE RULES OF EVIDENCE.  YOU SHOULD NOT

17  BE INFLUENCED BY THE OBJECTION OR BY THE COURT'S RULING

18  ON IT.

19             THREE, TESTIMONY THAT HAS BEEN EXCLUDED

20  OR STRICKEN OR THAT YOU HAVE BEEN INSTRUCTED TO

21  DISREGARD IS NOT EVIDENCE AND MUST NOT BE CONSIDERED.

22  IN ADDITION, SOMETIMES TESTIMONY AND EXHIBITS ARE

23  RECEIVED ONLY FOR A LIMITED PURPOSE.  WHEN I HAVE GIVEN

24  A LIMITING INSTRUCTION, YOU MUST FOLLOW IT.

25             FOUR, ANYTHING YOU MAY HAVE SEEN OR HEARD

EXHIBIT 5 - PAGE 115

1   WHEN THE COURT WAS NOT IN SESSION IS NOT EVIDENCE.  YOU

2   ARE TO DECIDE THE CASE SOLELY ON THE EVIDENCE RECEIVED

3   AT THE TRIAL.

4              CERTAIN CHARTS AND SUMMARIES NOT RECEIVED

5   IN EVIDENCE HAVE BEEN SHOWN TO YOU IN ORDER TO HELP

6   EXPLAIN THE CONTENTS OF BOOKS, RECORDS, DOCUMENTS OR

7   OTHER EVIDENCE IN THE CASE.  THEY ARE NOT THEMSELVES

8   EVIDENCE OR PROOF OF ANY FACTS.  IF THEY DO NOT

9   CORRECTLY REFLECT THE FACT OR FIGURES SHOWN BY THE

10  EVIDENCE IN THE CASE, YOU SHOULD DISREGARD THESE CHARTS

11  AND SUMMARIES AND DETERMINE THE FACTS FROM THE

12  UNDERLYING EVIDENCE.

13             WHEN A PARTY HAS THE BURDEN OF PROOF ON

14  ANY CLAIM OR AFFIRMATIVE DEFENSE BY A PREPONDERANCE OF

15  THE EVIDENCE, IT MEANS YOU MUST BE PERSUADED BY THE

16  EVIDENCE THAT THE CLAIM OR AFFIRMATIVE DEFENSE IS MORE

17  PROBABLY TRUE THAN NOT TRUE.

18             WHEN A PARTY HAS THE BURDEN OF PROVING

19  ANY CLAIM OR DEFENSE BY CLEAR AND CONVINCING EVIDENCE,

20  IT MEANS YOU MUST BE LEFT WITH A CLEAR CONVICTION,

21  BASED ON THE EVIDENCE, THAT THE CLAIM OR DEFENSE HAS

22  BEEN PROVEN.  THIS IS A HIGHER STANDARD OF PROOF THAN

23  PROOF BY A PREPONDERANCE OF THE EVIDENCE.

24             YOU SHOULD BASE YOUR DECISION ON ALL OF

25  THE EVIDENCE REGARDLESS OF WHICH PARTY PRESENTED IT.

EXHIBIT 5 - PAGE 116

1           BEFORE YOU CAN DECIDE MANY OF THE ISSUES

2     IN THIS CASE, YOU WILL NEED TO UNDERSTAND THE ROLE OF

3     PATENT, QUOTE, "CLAIMS," CLOSED QUOTE.  THE PATENT

4     CLAIMS ARE THE NUMBERED SENTENCES AT THE END OF EACH

5     PATENT.  THE CLAIMS ARE IMPORTANT BECAUSE IT IS THE

6     WORDS OF THE CLAIMS THAT DEFINE WHAT A PATENT COVERS.

7           THE FIGURES AND TEXT IN THE REST OF THE

8     PATENT PROVIDE A DESCRIPTION AND/OR EXAMPLES OF THE

9     INVENTION AND PROVIDE A CONTEXT FOR THE CLAIMS.  BUT IT

10    IS THE CLAIMS THAT DEFINE THE BREADTH OF THE PATENT'S

11    COVERAGE.  EACH CLAIM IS EFFECTIVELY TREATED AS IF IT

12    WERE A SEPARATE PATENT.  AND EACH CLAIM MAY COVER MORE

13    OR LESS THAN ANOTHER CLAIM.  THEREFORE, WHAT A PATENT

14    COVERS DEPENDS IN TURN ON WHAT EACH OF ITS CLAIMS

15    COVERS.

16           YOU WILL FIRST NEED TO UNDERSTAND WHAT

17    EACH CLAIM COVERS IN ORDER TO DECIDE WHETHER OR NOT

18    THERE IS INFRINGEMENT OF THE CLAIM AND TO DECIDE

19    WHETHER OR NOT THE CLAIM IS INVALID.  THE LAW SAYS THAT

20    IT IS MY ROLE TO DEFINE THE TERMS OF THE CLAIMS.  AND

21    IT IS YOUR ROLE TO APPLY MY DEFINITIONS TO THE ISSUES

22    THAT YOU ARE ASKED TO DECIDE IN THIS CASE.  THEREFORE,

23    AS I EXPLAINED TO YOU AT THE START OF THE CASE, I HAVE

24    DETERMINED THE MEANING OF THE CLAIMS.  AND I WILL

25    PROVIDE TO YOU MY DEFINITIONS OF CERTAIN CLAIM TERMS.

EXHIBIT 5 - PAGE 117

1    YOU MUST ACCEPT MY DEFINITIONS OF THESE WORDS IN THE

2    CLAIMS AS BEING CORRECT.  IT IS YOUR JOB TO TAKE THESE

3    DEFINITIONS AND APPLY THEM TO THE ISSUES THAT YOU ARE

4    DECIDING, INCLUDING THE ISSUES OF INFRINGEMENT AND

5    VALIDITY.

6                I WILL NOW EXPLAIN HOW A CLAIM DEFINES

7    WHAT IT COVERS.  A CLAIM SETS FORTH, IN WORDS, A SET OF

8    REQUIREMENTS.  EACH CLAIM SETS FORTH ITS REQUIREMENTS

9    IN A SINGLE SENTENCE.  THE ASSERTED CLAIMS OF THE '380

10   PATENT ARE METHOD CLAIMS.  THEREFORE, IF PERFORMANCE OF

11   A METHOD SATISFIES EACH OF THESE REQUIREMENTS, THEN IT

12   IS COVERED BY THE CLAIM.

13               THERE CAN BE SEVERAL CLAIMS IN A PATENT.

14   EACH CLAIM MAY BY NARROWER OR BROADER THAN ANOTHER

15   CLAIM BY SETTING FORTH MORE OR FEWER REQUIREMENTS.

16               THE COVERAGE OF A PATENT IS ASSESSED

17   CLAIM BY CLAIM.

18               IN PATENT LAW, THE REQUIREMENTS OF A

19   CLAIM ARE OFTEN REFERRED TO AS "CLAIM ELEMENTS" OR

20   "CLAIM LIMITATIONS."  WHEN A THING, IN THIS CASE A

21   METHOD, MEETS ALL OF THE REQUIREMENTS OF A CLAIM, THE

22   CLAIM IS SAID TO COVER THAT THING, AND THAT THING IS

23   SAID TO FALL WITHIN THE SCOPE OF THAT CLAIM.  IN OTHER

24   WORDS, A CLAIM COVERS A METHOD WHERE EACH OF THE CLAIM

25   ELEMENTS OR LIMITATIONS IS PRESENT IN THAT METHOD.

EXHIBIT 5 - PAGE 118

1        SOMETIMES THE WORDS IN A PATENT CLAIM ARE

2    DIFFICULT TO UNDERSTAND.  AND, THEREFORE, IT IS

3    DIFFICULT TO UNDERSTAND WHAT REQUIREMENTS THESE WORDS

4    IMPOSE.  IT IS MY JOB TO EXPLAIN TO YOU THE MEANING OF

5    THE WORDS IN THE CLAIMS AND THE REQUIREMENTS THESE

6    WORDS IMPOSE.

7        AS I JUST INSTRUCTED YOU, THERE ARE

8    CERTAIN SPECIFIC TERMS THAT I HAVE DEFINED.  AND YOU

9    ARE TO APPLY THE DEFINITIONS THAT I PROVIDE TO YOU.

10        BY UNDERSTANDING THE MEANINGS OF THE

11   WORDS IN A CLAIM AND BY UNDERSTANDING THAT THE WORDS IN

12   A CLAIM SET FORTH THE REQUIREMENTS THAT A METHOD MUST

13   MEET IN ORDER TO BE COVERED BY THAT CLAIM, YOU WILL BE

14   ABLE TO UNDERSTAND THE SCOPE OF COVERAGE OF EACH

15   CLAIM -- EXCUSE ME, THE SCOPE OF COVERAGE FOR EACH

16   CLAIM.  ONCE YOU UNDERSTAND WHAT EACH CLAIM COVERS,

17   THEN YOU ARE PREPARED TO DECIDE THE ISSUES THAT YOU

18   WILL BE ASKED TO DECIDE SUCH AS INFRINGEMENT AND

19   INVALIDITY.

20        THIS CASE INVOLVES TWO TYPES OF PATENT

21   CLAIMS, INDEPENDENT CLAIMS AND DEPENDENT CLAIMS.  AN

22   INDEPENDENT CLAIM SETS FORTH ALL OF THE REQUIREMENTS

23   THAT MUST BE MET IN ORDER TO BE COVERED BY THAT CLAIM.

24   THUS, IT IS NOT NECESSARY TO LOOK AT ANY OTHER CLAIM TO

25   DETERMINE WHAT AN INDEPENDENT CLAIM COVERS.

EXHIBIT 5 - PAGE 119

1        IN THIS CASE, CLAIM 7 OF THE '380 PATENT

2   IS AN INDEPENDENT CLAIM.

3        THE REMAINDER OF THE ASSERTED CLAIMS IN

4   THE '380 PATENT ARE DEPENDENT CLAIMS.

5        A DEPENDENT CLAIM DOES NOT ITSELF RECITE

6   ALL OF THE REQUIREMENTS OF THE CLAIM, BUT REFERS TO

7   ANOTHER CLAIM FOR SOME OF ITS REQUIREMENTS.  IN THIS

8   WAY, THE CLAIM DEPENDS ON ANOTHER CLAIM.

9        A DEPENDENT CLAIM INCORPORATES ALL OF THE

10  REQUIREMENTS OF THE CLAIMS TO WHICH IT REFERS.  THE

11  DEPENDENT CLAIM THEN ADDS ITS OWN ADDITIONAL

12  REQUIREMENTS.

13       TO DETERMINE WHAT A DEPENDENT CLAIM

14  COVERS, IT IS NECESSARY TO LOOK AT BOTH THE DEPENDENT

15  CLAIM AND ANY OTHER CLAIMS TO WHICH IT REFERS.

16       A METHOD THAT MEETS ALL OF THE

17  REQUIREMENTS OF BOTH THE DEPENDENT CLAIM AND THE CLAIMS

18  TO WHICH IT REFERS IS COVERED BY THAT DEPENDENT CLAIM.

19       IN THIS CASE, ASSERTED CLAIMS 3 AND 9

20  THROUGH 12 OF THE '380 PATENT ARE DEPENDENT CLAIMS.

21       I WILL NOW EXPLAIN TO YOU THE MEANING OF

22  SOME OF THE WORDS OF THE CLAIMS IN THIS CASE.  IN DOING

23  SO, I WILL EXPLAIN SOME OF THE REQUIREMENTS OF THE

24  CLAIMS.  AS I HAVE PREVIOUSLY INSTRUCTED YOU, YOU MUST

25  ACCEPT MY DEFINITION OF THESE WORDS IN THE CLAIMS AS

EXHIBIT 5 - PAGE 120

1   CORRECT.  FOR ANY WORDS IN THE CLAIM FOR WHICH I HAVE

2   NOT PROVIDED YOU WITH A DEFINITION, YOU SHOULD APPLY

3   THEIR COMMON MEANING.  YOU SHOULD NOT TAKE MY

4   DEFINITION OF THE LANGUAGE OF THE CLAIMS AS AN

5   INDICATION THAT I HAVE A VIEW REGARDING HOW YOU SHOULD

6   DECIDE THE ISSUES THAT YOU ARE BEING ASKED TO DECIDE,

7   SUCH AS INFRINGEMENT AND INVALIDITY.  THESE ISSUES ARE

8   YOURS TO DECIDE.

9            THE TERM "HANDSET" MEANS A WIRELESS

10  DEVICE DESIGNED TO PERFORM AND READILY CAPABLE OF

11  PERFORMING ITS INTENDED FUNCTIONS WHILE BEING HELD IN

12  THE USER'S HAND.

13           A CLAIM LIMITATION REQUIRING THAT THE

14  DEVICE COMMUNICATE SELECTIVELY IS NOT LIMITED TO

15  AUTOMATED SELECTION.  INSTEAD, IT EMBRACES BOTH MANUAL

16  AND AUTOMATED SELECTION.  THE PHRASE "WHEREIN SAID

17  HANDSET UNIT IS CONFIGURED TO A PERSONAL DIGITAL

18  ASSISTANT, PDA, HAVING PDA FUNCTIONS IN ADDITION TO

19  HANDSET UNIT COMMUNICATION FUNCTIONS" MEANS THAT THE

20  HANDSET UNIT IS DESIGNED TO OR ADAPTED TO PERFORM THE

21  FUNCTIONS OF A PERSONAL DIGITAL ASSISTANT, PDA, HAVING

22  PDA FUNCTIONS IN ADDITION TO HANDSET UNIT COMMUNICATION

23  FUNCTIONS.

24           THE TERM "PDA" MEANS A DEVICE FOR

25  MANAGING PERSONAL INFORMATION SUCH AS CONTACTS, NOTES

EXHIBIT 5 - PAGE 121

1    AND SCHEDULES.

2              THE TERM "E-MAIL" MEANS COMMUNICATIONS

3    BETWEEN A FIRST USER AT ONE DOMAIN TO A SECOND USER AT

4    THE SAME OR A DIFFERENT DOMAIN.  E.G., USER 1 AT

5    APPLE.COM WOULD SEND E-MAIL TO USER 2 AT NETAIRUS.COM.

6              E-MAIL DOES NOT INCLUDE -- EXCUSE ME.

7    E-MAIL DOES NOT INCLUDE THE FOLLOWING TYPES OF

8    MESSAGING OR PROTOCOLS:  SMA, GMS TEXT MESSAGING, COMS,

9    X.400 OR FACSIMILE FAX NOTE.

10             THE PHRASE "LOCAL AREA COMMUNICATIONS

11   BASE UNIT" MEANS A DEVICE LOCATED NEARBY THE HANDSET

12   THAT CAN SEND AND RECEIVE WIRELESS COMMUNICATIONS TO

13   AND FROM THE HANDSET AND CAN RELAY COMMUNICATIONS

14   BETWEEN THE HANDSET AND AN EXTERNAL WIDE AREA NETWORK.

15             I WILL NOW INSTRUCT YOU ON THE RULES YOU

16   MUST FOLLOW IN DECIDING WHETHER NETAIRUS HAS PROVEN

17   THAT APPLE HAS INFRINGED ONE OR MORE OF THE ASSERTED

18   CLAIMS OF THE '380 PATENT.

19             TO PROVE INFRINGEMENT OF ANY CLAIM,

20   NETAIRUS MUST PERSUADE YOU THAT IT IS MORE LIKELY THAN

21   NOT THAT APPLE HAS INFRINGED THAT CLAIM.

22             A PATENT'S CLAIMS DEFINE WHAT IS COVERED

23   BY THE PATENT.

24             METHOD CLAIMS ARE DIRECTLY INFRINGED ONLY

25   WHEN A SINGLE PARTY CAN BE CHARGED WITH PERFORMING EACH

EXHIBIT 5 - PAGE 122

1     STEP OF THE ASSERTED PATENT CLAIM.

2                 TO PROVE DIRECT INFRINGEMENTS IN THIS

3     CASE, NETAIRUS MUST PROVE THAT APPLE ALONE, NOT ITS

4     CUSTOMERS OR SOME OTHER PARTY, PERFORMED EACH STEP OF

5     THE ASSERTED PATENT CLAIM USING AN ACCUSED I-PHONE 4.

6                 DECIDING WHETHER A CLAIM HAS BEEN

7     DIRECTLY INFRINGED IS A TWO-STEP PROCESS.  THE FIRST

8     STEP IS TO DECIDE THE MEANING OF THE PATENT CLAIM.  I

9     HAVE ALREADY MADE THIS DECISION, AND I HAVE ALREADY

10    INSTRUCTED YOU AS TO THE MEANING OF THE ASSERTED PATENT

11    CLAIMS.

12                THE SECOND STEP IS TO DECIDE WHETHER

13    APPLE HAS USED AN ACCUSED I-PHONE 4 WITHIN THE

14    UNITED STATES TO PRACTICE A METHOD COVERED BY AN

15    ASSERTED CLAIM OF THE '380 PATENT.  YOU, THE JURY, MAKE

16    THIS DECISION.

17                WITH ONE EXCEPTION, YOU MUST CONSIDER

18    EACH OF THE ASSERTED CLAIMS OF THE PATENT INDIVIDUALLY

19    AND DECIDE WHETHER A USE OF APPLE'S ACCUSED I-PHONE 4

20    PRACTICED A METHOD THAT INFRINGES THAT CLAIM.  THE ONE

21    EXCEPTION TO CONSIDERING CLAIMS INDIVIDUALLY CONCERNS

22    DEPENDENT CLAIMS.  A DEPENDENT CLAIM INCLUDES ALL OF

23    THE REQUIREMENTS OF A PARTICULAR INDEPENDENT CLAIM,

24    PLUS ADDITIONAL REQUIREMENTS OF ITS OWN.  AS A RESULT,

25    IF YOU FIND THAT AN INDEPENDENT CLAIM IS NOT INFRINGED,

EXHIBIT 5 - PAGE 123

1    YOU MUST ALSO FIND THAT ITS DEPENDENT CLAIMS ARE NOT

2    INFRINGED.

3              ON THE OTHER HAND, IF YOU FIND THAT AN

4    INDEPENDENT CLAIM HAS BEEN INFRINGED, YOU MUST STILL

5    SEPARATELY DECIDE WHETHER THE ADDITIONAL REQUIREMENTS

6    OF ITS DEPENDENT CLAIMS HAVE ALSO BEEN INFRINGED.

7              WHETHER OR NOT APPLE KNEW A USE OF

8    APPLE'S ACCUSED I-PHONE 4 INFRINGED OR EVEN KNEW OF THE

9    '380 PATENT DOES NOT MATTER IN DETERMINING DIRECT

10   INFRINGEMENT.

11             NETAIRUS ARGUES THAT APPLE HAS ACTIVELY

12   INDUCED OTHERS TO INFRINGE THE '380 PATENT.  IN ORDER

13   FOR THERE TO BE INDUCEMENT OF INFRINGEMENT BY APPLE,

14   SOMEONE ELSE MUST DIRECTLY INFRINGE A CLAIM OF THE '380

15   PATENT.  IF THERE'S NO DIRECT INFRINGEMENT BY ANYONE,

16   THERE CAN BE NO INDUCED INFRINGEMENT.

17             IN ORDER TO BE LIABLE FOR INDUCEMENT OF

18   INFRINGEMENT, APPLE MUST, ONE, HAVE INTENTIONALLY TAKEN

19   ACTION THAT ACTUALLY INDUCED DIRECT INFRINGEMENT BY

20   ANOTHER; TWO, HAVE BEEN AWARE OF THE '380 PATENT; AND,

21   THREE, HAVE KNOWN THAT THE ACTS IT WAS CAUSING WOULD BE

22   INFRINGING.

23             IF APPLE DID NOT KNOW OF THE EXISTENCE OF

24   THE PATENT OR THAT THE ACTS IT WAS INDUCING WERE

25   INFRINGING, IT CANNOT BE LIABLE FOR INDUCEMENT UNLESS

EXHIBIT 5 - PAGE 124

1    IT ACTUALLY BELIEVED THAT IT WAS HIGHLY PROBABLE ITS

2    ACTIONS WOULD ENCOURAGE INFRINGEMENT OF A PATENT, AND

3    IT TOOK INTENTIONAL ACTS TO AVOID LEARNING THE TRUTH.

4              IT IS NOT ENOUGH THAT APPLE WAS MERELY

5    INDIFFERENT TO THE POSSIBILITY THAT IT MIGHT ENCOURAGE

6    INFRINGEMENT OF A PATENT, NOR IS IT ENOUGH THAT APPLE

7    TOOK A RISK THAT WAS SUBSTANTIAL AND UNJUSTIFIED.

8              IF YOU FIND THAT APPLE WAS AWARE OF THE

9    PATENT, BUT BELIEVED THAT THE ACTS IT ENCOURAGED DID

10   NOT INFRINGE THAT PATENT, APPLE CANNOT BE LIABLE FOR

11   INDUCEMENT.

12             IN DETERMINING WHETHER APPLE KNEW THAT

13   THE INDUCED ACTS WOULD BE INFRINGING, YOU MAY CONSIDER

14   WHETHER APPLE HAD A GOOD FAITH BELIEF THAT THE '380

15   PATENT IS INVALID.

16             I WILL NOW INSTRUCT YOU ON THE RULES YOU

17   MUST FOLLOW IN DECIDING WHETHER APPLE HAS PROVEN THAT

18   CLAIMS 3, 7 AND 9 THROUGH 12 OF THE '380 PATENT ARE

19   INVALID.  BEFORE DISCUSSING THE SPECIFIC RULES, I WANT

20   TO REMIND YOU ABOUT THE STANDARD OF PROOF THAT APPLIES

21   TO THIS DEFENSE.  TO PROVE INVALIDITY OF ANY PATENT

22   CLAIM, APPLE MUST PERSUADE YOU THAT IT IS HIGHLY

23   PROBABLE THAT THE CLAIM IS INVALID.

24             DURING THIS CASE, APPLE INTRODUCED

25   EVIDENCE OF WHAT IT CONTENDS WAS PRIOR ART THAT WAS NOT

EXHIBIT 5 - PAGE 125

1  CONSIDERED BY THE UNITED STATES PATENT AND TRADEMARK

2  OFFICE, PTO.  APPLE CONTENDS THAT SUCH PRIOR ART

3  INVALIDATES CERTAIN CLAIMS OF THE '380 PATENT.  IN

4  DECIDING THE ISSUE OF INVALIDITY, YOU MAY TAKE INTO

5  ACCOUNT WHETHER OR NOT THE PTO CONSIDERED SUCH PRIOR

6  ART.

7           NOT ALL INNOVATIONS ARE PATENTABLE.  A

8  PATENT CLAIM IS INVALID IF THE CLAIMED INVENTION WOULD

9  HAVE BEEN OBVIOUS TO A PERSON OF ORDINARY SKILL IN THE

10  FIELD ON APRIL 4, 1997.  THIS MEANS THAT EVEN IF ALL OF

11  THE REQUIREMENTS OF THE CLAIM CANNOT BE FOUND IN A

12  SINGLE PRIOR ART REFERENCE THAT WOULD ANTICIPATE THE

13  CLAIM OR CONSTITUTE A STATUTORY BAR TO THAT CLAIM, A

14  PERSON OF ORDINARY SKILL IN THE FIELD OF WIRELESS

15  COMMUNICATIONS WHO KNEW ABOUT ALL THIS PRIOR ART WOULD

16  HAVE COME UP WITH THE CLAIMED INVENTION.

17           THE ULTIMATE CONCLUSION OF WHETHER A

18  CLAIM IS OBVIOUS SHOULD BE BASED UPON YOUR

19  DETERMINATION OF SEVERAL FACTUAL DECISIONS.  FIRST, YOU

20  MUST DECIDE THE LEVEL OF ORDINARY SKILL IN THE FIELD

21  THAT SOMEONE WOULD HAVE HAD AT THE TIME THE CLAIMED

22  INVENTION WAS MADE.  IN DECIDING THE LEVEL OF ORDINARY

23  SKILL, YOU SHOULD CONSIDER ALL THE EVIDENCE INTRODUCED

24  AT TRIAL, INCLUDING THE LEVELS OF EDUCATION AND

25  EXPERIENCE OF PERSONS WORKING IN THE FIELD, THE TYPES

EXHIBIT 5 - PAGE 126

26

1  OF PROBLEMS ENCOUNTERED IN THE FIELD AND THE

2  SOPHISTICATION OF THE TECHNOLOGY.

3              NETAIRUS CONTENDS THAT THE LEVEL OF

4  ORDINARY SKILL IN THE FIELD WAS CHARACTERIZED BY AN

5  UNDERGRADUATE DEGREE IN ELECTRICAL ENGINEERING AND ONE

6  YEAR OF INDUSTRY EXPERIENCE WORKING ON A PARTICULAR

7  TYPE OF COMMUNICATION.

8              APPLE CONTENDS THAT THE LEVEL OF ORDINARY

9  SKILL IN THE FIELD WAS CHARACTERIZED BY AT LEAST AN

10  UNDERGRADUATE DEGREE IN ELECTRICAL ENGINEERING OR

11  COMPUTER ENGINEERING AND ONE OR TWO YEARS EXPERIENCE OR

12  POST-GRADUATE STUDY IN A FIELD THAT RELATES TO WIRELESS

13  COMMUNICATIONS.

14              SECOND, YOU MUST DECIDE THE SCOPE AND

15  CONTENT OF THE PRIOR ART.  IN ORDER TO BE CONSIDERED AS

16  PRIOR ART TO THE '380 PATENT, THESE REFERENCES MUST BE

17  REASONABLY RELATED TO THE CLAIMED INVENTION OF THAT

18  PATENT.  A REFERENCE IS REASONABLY RELATED IF IT IS IN

19  THE SAME FIELD AS THE CLAIMED INVENTION OR IS FROM

20  ANOTHER FIELD TO WHICH A PERSON OF ORDINARY SKILL IN

21  THE FIELD WOULD LOOK TO SOLVE A KNOWN PROBLEM.

22              THIRD, YOU MUST DECIDE WHAT DIFFERENCE,

23  IF ANY, EXISTED BETWEEN THE CLAIMED INVENTION AND THE

24  PRIOR ART.

25              FINALLY, YOU SHOULD CONSIDER ANY OF THE

EXHIBIT 5 - PAGE 127

1   FOLLOWING FACTORS THAT YOU FIND HAVE BEEN SHOWN BY THE

2   EVIDENCE:  ONE, COMMERCIAL SUCCESS OF A PRODUCT DUE TO

3   THE MERITS OF THE CLAIMED INVENTION.

4            TWO, A LONG FELT NEED FOR THE SOLUTION

5   PROVIDED BY THE CLAIMED INVENTION.

6            THREE, UNSUCCESSFUL ATTEMPTS BY OTHERS TO

7   FIND THE SOLUTION PROVIDED BY THE CLAIMED INVENTION.

8            FOUR, COPYING OF THE CLAIMED INVENTION BY

9   OTHERS.

10           FIVE, UNEXPECTED AND SUPERIOR RESULTS

11  FROM THE CLAIMED INVENTION.

12           SIX, ACCEPTANCE BY OTHERS OF THE CLAIMED

13  INVENTIONS AS SHOWN BY PRAISE FROM OTHERS IN THE FIELD

14  OR FROM THE LICENSING OF THE CLAIMED INVENTION.

15           SEVEN, OTHER EVIDENCE TENDING TO SHOW

16  NONOBVIOUSNESS.

17           EIGHT, INDEPENDENT INVENTION OF THE

18  CLAIMED INVENTION BY OTHERS BEFORE OR AT ABOUT THE SAME

19  TIME AS THE NAMED INVENTOR THOUGHT OF IT.

20           AND, NINE, OTHER EVIDENCE TENDING TO SHOW

21  OBVIOUSNESS.

22           THE PRESENCE OF ANY OF THE FACTORS ONE

23  THROUGH SEVEN MAY BE CONSIDERED BY YOU AS AN INDICATION

24  THAT THE CLAIMED INVENTION WOULD NOT HAVE BEEN OBVIOUS

25  AT THE TIME THAT THE CLAIMED INVENTION WAS MADE.

EXHIBIT 5 - PAGE 128

```
1              AND THE PRESENCE OF FACTORS EIGHT AND
2     NINE MAY BE CONSIDERED BY YOU AS AN INDICATION THAT THE
3     CLAIMED INVENTION WOULD HAVE BEEN OBVIOUS AT SUCH TIME.
4     ALTHOUGH YOU SHOULD CONSIDER ANY EVIDENCE OF THESE
5     FACTORS, THE RELEVANCE AND IMPORTANCE OF ANY OF THEM TO
6     YOUR DECISION ON WHETHER THE CLAIMED INVENTION WOULD
7     HAVE BEEN OBVIOUS IS UP TO YOU.
8              A PATENT CLAIM COMPOSED OF SEVERAL
9     ELEMENTS IS NOT PROVED OBVIOUS MERELY BY DEMONSTRATING
10    THAT EACH OF ELEMENTS WAS INDEPENDENTLY KNOWN IN THE
11    PRIOR ART.
12             IN EVALUATING WHETHER SUCH A CLAIM WOULD
13    HAVE BEEN OBVIOUS, YOU MAY CONSIDER WHETHER APPLE HAS
14    IDENTIFIED A REASON THAT WOULD HAVE PROMPTED A PERSON
15    OF ORDINARY SKILL IN THE FIELD TO COMBINE THE ELEMENTS
16    OR CONCEPTS FROM THE PRIOR ART IN THE SAME WAY AS IN
17    THE CLAIMED INVENTION.
18             THERE'S NO SINGLE WAY TO DEFINE THE LINE
19    BETWEEN TRUE INVENTIVENESS ON THE ONE HAND, WHICH IS
20    PATENTABLE, AND THE APPLICATION OF COMMON SENSE AND
21    ORDINARY SKILL TO SOLVE A PROBLEM ON THE OTHER HAND,
22    WHICH IS NOT PATENTABLE.
23             FOR EXAMPLE, MARKET FORCES OR OTHER
24    DESIGN INCENTIVES MAY BE WHAT PRODUCED A CHANGE RATHER
25    THAN TRUE INVENTIVENESS.  YOU MAY CONSIDER WHETHER THE
```

EXHIBIT 5 - PAGE 129

1    CHANGE WAS MERELY THE PREDICTABLE RESULT OF USING PRIOR

2    ART ELEMENTS ACCORDING TO THEIR KNOWN FUNCTIONS OR

3    WHETHER IT WAS THE RESULT OF TRUE INVENTIVENESS.

4              YOU MAY ALSO CONSIDER WHETHER THERE'S

5    SOME TEACHING OR SUGGESTION IN THE PRIOR ART TO MAKE

6    THE MODIFICATION OR COMBINATION OF ELEMENTS CLAIMED IN

7    THE PATENT.

8              ALSO, YOU MAY CONSIDER WHETHER THE

9    INNOVATION APPLIES A KNOWN TECHNICIAN THAT HAD BEEN

10   USED TO IMPROVE A SIMILAR DEVICE OR METHOD IN A SIMILAR

11   WAY.

12             YOU MAY ALSO CONSIDER WHETHER THE CLAIMED

13   INVENTION WOULD HAVE BEEN OBVIOUS TO TRY.  MEANING,

14   THAT THE CLAIMED INNOVATION WAS ONE OF A RELATIVELY

15   SMALL NUMBER OF POSSIBLE APPROACHES TO THE PROBLEM WITH

16   A REASONABLE EXPECTATION OF SUCCESS BY THOSE SKILLED IN

17   THE ART.

18             HOWEVER, YOU MUST BE CAREFUL NOT TO

19   DETERMINE OBVIOUSNESS USING THE BENEFIT OF HINDSIGHT.

20   MANY TRUE INVENTIONS MIGHT SEEM OBVIOUS AFTER THE FACT.

21   YOU SHOULD PUT YOURSELF IN THE POSITION OF A PERSON OF

22   ORDINARY SKILL IN THE FIELD AT THE TIME THE CLAIMED

23   INVENTION WAS MADE.  AND YOU SHOULD NOT CONSIDER WHAT

24   IS KNOWN TODAY OR WHAT IS LEARNED FROM THE TEACHING OF

25   THE PATENT.

EXHIBIT 5 - PAGE 130

```
 1              IN ADDITION, A PATENT CLAIM IS INVALID IF
 2      THE PATENT DOES NOT CONTAIN AN ADEQUATE WRITTEN
 3      DESCRIPTION OF THE CLAIMED INVENTION.  THE PURPOSE OF
 4      THIS WRITTEN DESCRIPTION REQUIREMENT IS TO DEMONSTRATE
 5      THAT THE INVENTOR WAS IN POSSESSION OF THE INVENTION AT
 6      THE TIME THE APPLICATION -- THE PURPOSE OF THIS WRITTEN
 7      DESCRIPTION REQUIREMENT IS TO DEMONSTRATE THAT THE
 8      INVENTOR WAS IN POSSESSION OF THE INVENTION AT THE TIME
 9      OF THE APPLICATION -- EXCUSE ME, I'M SORRY.  LET ME
10      TRY -- LET ME START OVER.
11              IN ADDITION, THE PATENT CLAIM IS INVALID
12      IF THE PATENT DOES NOT CONTAIN AN ADEQUATE WRITTEN
13      DESCRIPTION OF THE CLAIMED INVENTION.  THE PURPOSE OF
14      THIS WRITTEN DESCRIPTION REQUIREMENT IS TO DEMONSTRATE
15      THAT THE INVENTOR WAS IN POSSESSION OF THE INVENTION AT
16      THE TIME THE APPLICATION FOR THE PATENT WAS FILED EVEN
17      THOUGH THE CLAIMS MAY HAVE BEEN CHANGED OR NEW CLAIMS
18      ADDED SINCE THAT TIME.
19              THE WRITTEN DESCRIPTION REQUIREMENT IS
20      SATISFIED IF A PERSON OF ORDINARY SKILL IN THE FIELD
21      READING THE ORIGINAL PATENT APPLICATION AT THE TIME IT
22      WAS FILED WOULD HAVE RECOGNIZED THAT THE PATENT
23      APPLICATION DESCRIBED THE INVENTION AS CLAIMED EVEN
24      THOUGH THE DESCRIPTION MAY NOT USE THE EXACT WORDS
25      FOUND IN THE CLAIM.
```

EXHIBIT 5 - PAGE 131

1    A REQUIREMENT IN THE CLAIM NEED NOT BE

2  SPECIFICALLY DISCLOSED IN THE PATENT APPLICATION AS

3  ORIGINALLY FILED IF A PERSON OF ORDINARY SKILL WOULD

4  UNDERSTAND THAT THE MISSING REQUIREMENT IS NECESSARILY

5  IMPLIED IN THE PATENT APPLICATION AS ORIGINALLY FILED.

6    I WILL INSTRUCT YOU ABOUT THE MEASURE OF

7  DAMAGES.  BY INSTRUCTING YOU ON DAMAGES, I AM NOT

8  SUGGESTING WHICH PARTY SHOULD WIN ON ANY ISSUE.

9    IF YOU FIND THAT APPLE INFRINGED ANY

10  VALID CLAIM OF THE '380 PATENT, YOU MUST THEN DETERMINE

11  THE AMOUNT OF MONEY DAMAGES TO BE AWARDED TO NETAIRUS

12  TO COMPENSATE IT FOR THE INFRINGEMENT.

13    THE AMOUNT OF THOSE DAMAGES MUST BE

14  ADEQUATE TO COMPENSATE NETAIRUS FOR THE INFRINGEMENT.

15    A DAMAGES AWARD SHOULD PUT THE

16  PATENTHOLDER IN A APPROXIMATELY THE FINANCIAL POSITION

17  IT WOULD HAVE BEEN IN HAD THE INFRINGEMENT NOT

18  OCCURRED.  BUT IN NO EVENT MAY THE DAMAGES AWARD BE

19  LESS THAN A REASONABLE ROYALTY.

20    YOU SHOULD KEEP IN MIND THAT THE DAMAGES

21  YOU AWARD ARE MEANT TO COMPENSATE THE PATENTHOLDER AND

22  NOT TO PUNISH AN INFRINGER.

23    NETAIRUS HAS THE BURDEN TO PERSUADE YOU

24  OF THE AMOUNT OF ITS DAMAGES.  YOU SHOULD AWARD ONLY

25  THOSE DAMAGES THAT NETAIRUS MORE LIKELY THAN NOT

EXHIBIT 5 - PAGE 132

1   SUFFERED.  WHILE NETAIRUS IS NOT REQUIRED TO PROVE ITS

2   DAMAGES WITH MATHEMATICAL PRECISION, IT MUST PROVE THEM

3   WITH REASONABLE CERTAINTY.  NETAIRUS IS NOT ENTITLED TO

4   DAMAGES THAT ARE REMOTE OR SPECULATIVE.

5               A ROYALTY IS A PAYMENT MADE TO A

6   PATENTHOLDER IN EXCHANGE FOR THE RIGHT TO MAKE, USE OR

7   SELL THE CLAIMED INVENTION.  THIS RIGHT IS CALLED A

8   "LICENSE."  A REASONABLE ROYALTY IS THE PAYMENT FOR THE

9   LICENSE THAT WOULD HAVE RESULTED FROM A HYPOTHETICAL

10  NEGOTIATION BETWEEN THE PATENTHOLDER AND THE INFRINGER

11  TAKING PLACE IN OCTOBER 2012.  IN CONSIDERING THE

12  NATURE OF THIS NEGOTIATION, YOU MUST ASSUME THAT THE

13  PATENTHOLDER AND THE INFRINGER WOULD HAVE ACTED

14  REASONABLY AND WOULD HAVE ENTERED INTO A LICENSE

15  AGREEMENT.

16              YOU MUST ALSO ASSUME THAT BOTH PARTIES

17  BELIEVED THE PATENT WAS VALID AND INFRINGED.  YOUR ROLE

18  IS TO DETERMINE WHAT THE RESULT OF THAT NEGOTIATION

19  WOULD HAVE BEEN.

20              THE TEST FOR DAMAGES IS, WHAT ROYALTY

21  WOULD HAVE RESULTED FROM THE HYPOTHETICAL NEGOTIATION,

22  AND NOT SIMPLY WHAT EITHER PARTY WOULD HAVE PREFERRED.

23  A WAY TO CALCULATE A ROYALTY IS TO DETERMINE A ONE-TIME

24  LUMP SUM PAYMENT THAT THE INFRINGER WOULD HAVE PAID AT

25  THE TIME OF THE HYPOTHETICAL NEGOTIATION FOR A LICENSE

EXHIBIT 5 - PAGE 133

1    COVERING ALL SALES OF THE LICENSED PRODUCT, BOTH PAST

2    AND FUTURE.  WHEN A ONE-TIME LUMP SUM IS PAID, THE

3    INFRINGER PAYS A SINGLE PRICE FOR A LICENSE COVERING

4    BOTH PAST AND FUTURE INFRINGING SALES.

5                   IT IS UP TO YOU BASED ON THE EVIDENCE TO

6    DECIDE WHAT ROYALTY IS APPROPRIATE IN THIS CASE.

7                   IN DETERMINING THE REASONABLE ROYALTY,

8    YOU SHOULD CONSIDER ALL THE FACTS KNOWN AND AVAILABLE

9    TO THE PARTIES AT THE TIME THE INFRINGEMENT BEGAN.

10   SOME OF THE KINDS OF FACTORS THAT YOU MAY CONSIDER IN

11   MAKING YOUR DETERMINATION ARE:

12                  ONE, THE ROYALTIES RECEIVED BY THE

13   PATENTEE FOR THE LICENSING OF THE PATENT-IN-SUIT

14   PROVING OR TENDING TO PROVE AN ESTABLISHED ROYALTY.

15                  TWO, THE RATES PAID BY THE LICENSEE FOR

16   THE USE OF OTHER PATENTS COMPARABLE TO THE

17   PATENT-IN-SUIT.

18                  THREE, THE NATURE AND SCOPE OF THE

19   LICENSE AS EXCLUSIVE OR NONEXCLUSIVE OR AS RESTRICTED

20   OR NON-RESTRICTED IN TERMS OF TERRITORY OR WITH RESPECT

21   TO WHOM THE MANUFACTURED PRODUCT MAY BE SOLD.

22                  FOUR, THE LICENSOR'S ESTABLISHED POLICY

23   AND MARKETING PROGRAM TO MAINTAIN HIS OR HER PATENT

24   MONOPOLY BY NOT LICENSING OTHERS TO USE THE INVENTION

25   OR BY GRANTING LICENSES UNDER SPECIAL CONDITIONS

EXHIBIT 5 - PAGE 134

1    DESIGNED TO PRESERVE THAT MONOPOLY.

2                FIVE, THE COMMERCIAL RELATIONSHIP BETWEEN

3    THE LICENSOR AND LICENSEE SUCH AS WHETHER THEY ARE

4    COMPETITORS IN THE SAME TERRITORY, IN THE SAME LINE OF

5    BUSINESS OR WHETHER THEY HAVE INVENTOR AND PROMOTER.

6                SIX, THE EFFECT OF SELLING THE PATENTED

7    SPECIALTY IN PROMOTING SALES OF OTHER PRODUCTS OF THE

8    LICENSEE, THE EXISTING VALUE OF THE INVENTION TO THE

9    LICENSOR AS A GENERATOR OF SALES OF HIS NON-PATENTED

10   ITEMS, AND THE EXTENT OF SUCH DERIVATIVE OR CONVOY

11   SALES.

12               SEVEN, THE DURATION OF THE PATENT AND THE

13   TERM OF THE LICENSE.

14               EIGHT, THE ESTABLISHED PROFITABILITY OF

15   THE PRODUCT MADE UNDER THE PATENTS, ITS COMMERCIAL

16   SUCCESS AND ITS CURRENT POPULARITY.

17               NINE, THE UTILITY AND ADVANTAGES OF THE

18   PATENTED PROPERTY OVER OLD MODES OR DEVICES, IF ANY,

19   THAT HAD BEEN USED FOR WORKING OUT SIMILAR RESULTS.

20               TEN, THE NATURE OF THE PATENTED

21   INVENTION, THE CHARACTER OF THE COMMERCIAL EMBODIMENT

22   OF IT AS OWNED AND PRODUCED BY THE LICENSOR, AND THE

23   BENEFITS TO THOSE WHO HAVE USED THE INVENTION.

24               ELEVEN, THE EXTENT TO WHICH THE INFRINGER

25   HAS MADE USE OF THE INVENTION AND ANY EVIDENCE

EXHIBIT 5 - PAGE 135

1    PROBATIVE OF THE VALUE OF THAT USE.

2              TWELVE, THE PORTION OF THE PROFIT OR OF

3    THE SELLING PRICE THAT MAY BE CUSTOMARY IN THE

4    PARTICULAR BUSINESS OR INCOMPARABLE BUSINESS TO ALLOW

5    FOR THE USE OF THE INVENTION OR ANALOGOUS INVENTIONS.

6              THIRTEEN, THE PORTION OF THE REALIZABLE

7    PROFITS THAT SHOULD BE CREDITED TO THE INVENTION AS

8    DISTINGUISHED FROM NON-PATENTED ELEMENTS, THE

9    MANUFACTURING PROCESS, BUSINESS RISKS OR SIGNIFICANT

10   FEATURES OR IMPROVEMENTS ADDED BY THE INFRINGER.

11             FOURTEEN, THE OPINION AND TESTIMONY OF

12   THE QUALIFIED EXPERTS.

13             FIFTEEN, THE AMOUNT THAT A LICENSOR -

14   SUCH AS THE PATENTEE - AND A LICENSEE - SUCH AS THE

15   INFRINGER - WOULD HAVE AGREED UPON AT THE TIME THE

16   INFRINGEMENT BEGAN IF BOTH HAD BEEN REASONABLY AND

17   VOLUNTARILY TRYING TO REACH AN AGREEMENT.  THAT IS, THE

18   AMOUNT WHICH A PRUDENT LICENSEE WHO DESIRED, AS A

19   BUSINESS PROPOSITION, TO OBTAIN A LICENSE TO

20   MANUFACTURE AND SELL A PARTICULAR ARTICLE EMBODYING

21   THE PATENTED INVENTION WOULD HAVE BEEN WILLING TO PAY

22   AS A ROYALTY AND, YET, BE ABLE TO MAKE A REASONABLE

23   PROFIT, AND WHICH AMOUNT WOULD HAVE BEEN ACCEPTABLE BY

24   A PRUDENT PATENTEE WHO WAS WILLING TO GRANT A LICENSE.

25             NO ONE FACTOR IS DISPOSITIVE.  AND YOU

EXHIBIT 5 - PAGE 136

 1    CAN AND SHOULD CONSIDER THE EVIDENCE THAT IS PRESENTED

 2    TO YOU IN THIS CASE ON EACH OF THESE FACTORS.  YOU MAY

 3    ALSO CONSIDER ANY OTHER FACTORS WHICH, IN YOUR MIND,

 4    WOULD HAVE INCREASED OR DECREASED THE ROYALTY THE

 5    INFRINGER WOULD HAVE BEEN WILLING TO PAY AND THE

 6    PATENTHOLDER WOULD HAVE BEEN WILLING TO ACCEPT ACTING

 7    AS NORMAL PRUDENT BUSINESS PEOPLE.

 8              THE FINAL FACTOR ESTABLISHES THE

 9    FRAMEWORK WHICH YOU SHOULD USE IN DETERMINING A

10    REASONABLE ROYALTY.  THAT IS, THE PAYMENT THAT WOULD

11    HAVE RESULTED FROM A NEGOTIATION BETWEEN THE

12    PATENTHOLDER AND THE INFRINGER TAKING PLACE AT A TIME

13    WHEN THE INFRINGEMENT BEGAN.

14              IN ORDER TO RECOVER DAMAGES FOR INDUCED

15    INFRINGEMENT, NETAIRUS MUST EITHER PROVE THAT THE USE

16    OF THE I-PHONE 4 NECESSARILY INFRINGES THE '380 PATENT,

17    OR PROVE ACTS OF DIRECT INFRINGEMENT BY OTHERS THAT

18    WERE INDUCED BY APPLE.

19              BECAUSE THE AMOUNT OF DAMAGES FOR INDUCED

20    INFRINGEMENT IS LIMITED BY THE NUMBER OF INSTANCES OF

21    DIRECT INFRINGEMENT, NETAIRUS MUST FURTHER PROVE THE

22    NUMBER OF DIRECT ACTS OF INFRINGEMENT OF THE '380

23    PATENT.  FOR EXAMPLE, BY SHOWING INDIVIDUAL ACTS OF

24    DIRECT INFRINGEMENT OR BY SHOWING THAT USE OF A

25    PARTICULAR CLASS OF PRODUCTS NECESSARILY PERFORMS A

EXHIBIT 5 - PAGE 137

```
 1     METHOD THAT DIRECTLY INFRINGES.

 2               LET ME TALK TO COUNSEL FOR A MOMENT,

 3     PLEASE.

 4               (SIDEBAR)

 5          THE COURT:  ANY OBJECTIONS TO THE INSTRUCTIONS

 6     AS READ, MR. SCARSI?

 7          MR. SCARSI:  NO, YOUR HONOR.

 8          THE COURT:  MR. NIRO?

 9          MR. NIRO:  NO, NOT AS READ.

10          THE COURT:  ONE MINUTE.

11               I DID NOT READ ONE OF THE INSTRUCTIONS,

12     WHICH I'M SHOWING YOU.  IT SAYS, "CERTAIN CHARTS AND

13     SUMMARIES HAVE BEEN RECEIVED INTO EVIDENCE."

14          MR. SCARSI:  WE NOTED THAT, YOUR HONOR.  AND I

15     THINK THAT'S CORRECT NOT TO READ IT.

16          MR. NIRO:  THERE WEREN'T ANY.

17          THE COURT:  VERY GOOD.  THANK YOU.

18               (THE FOLLOWING PROCEEDINGS WERE HELD IN

19               OPEN COURT IN THE PRESENCE OF THE JURY:)

20          THE COURT:  MR. NIRO, WOULD YOU LIKE TO

21     PROCEED WITH YOUR CLOSING ARGUMENT?

22          MR. NIRO:  THANK YOU, YOUR HONOR.

23          THE COURT:  THANK YOU.

24          MR. NIRO:  AND THANK YOU, LADIES AND GENTLEMEN

25     OF THE JURY.
```

EXHIBIT 5 - PAGE 138

1    COURT'S INSTRUCTION, AND THE EVIDENCE THAT'S PRESENTED.

2    THE MOST COMPELLING OF WHICH IS THEIR OWN ADMISSIONS AS

3    TO WHAT COUNTS AND HOW THAT COMPARES TO WHAT'S IN THE

4    PATENTED INVENTION.

5              THANK YOU.  I'LL BE BACK AFTER MR. SCARSI

6    PRESENTS HIS CLOSING.

7         THE COURT:  THANK YOU, MR. NIRO.

8              MR. SCARSI, WOULD YOU PLEASE PROCEED.

9         MR. SCARSI:  THANK YOU VERY MUCH, YOUR HONOR.

10             LADIES AND GENTLEMEN OF THE JURY, THANK

11   YOU FOR YOUR TIME AND ATTENTION THIS PAST WEEK.  I KNOW

12   IT'S BEEN A LONG WEEK.  WE'VE HAD SOME LONG DAYS.

13   WE'VE GONE THROUGH A LOT OF TECHNICAL SUBJECT MATTER.

14   AND WE HAVE TAKEN YOU AWAY FROM YOUR JOBS AND YOUR

15   FAMILY.  AND WE APPRECIATE YOUR SERVICE BECAUSE YOU ARE

16   A CRITICAL PART OF THIS PROCESS.

17             NOW THAT THE EVIDENCE IS CLOSED, SOMEONE

18   NEEDS TO LISTEN TO THE ARGUMENTS AND SIFT THROUGH THE

19   EVIDENCE AND DECIDE WHO IS GIVING IT TO YOU STRAIGHT,

20   WHO IS TELLING THE TRUTH AND WHO IS RIGHT.  AND THAT'S

21   YOUR JOB, A CRITICAL ONE.  AND WE THANK YOU FOR IT.

22             BEFORE I GET TO MY SLIDES, THERE WAS A

23   FEW THINGS I WANTED TO CLEAR UP FROM WHAT MR. NIRO SAID

24   IN OPENING AND WHAT MR. NIRO JUST SAID IN CLOSING.

25   FIRST WAS THIS NOTION THAT MR. DITZIK DIDN'T WANT TO BE

EXHIBIT 5 - PAGE 139

1    HERE.  THIS IS ALL APPLE'S FAULT THAT WE'RE HERE.  HE

2    JUST WANTED TO TALK TO APPLE ABOUT LICENSING.  AND YOU

3    KNOW FROM THE EVIDENCE THAT THAT'S NOT TRUE.

4    MR. DITZIK TESTIFIED ON THE STAND THAT HE NEVER

5    CONTACTED APPLE.  HE JUST FILED A LAWSUIT.  AND, IN

6    FACT, THE FIRST TIME APPLE HEARD ABOUT THE PATENT, THE

7    '380 PATENT, WAS WHEN APPLE GOT SERVED WITH THE

8    COMPLAINT.  I KNOW THERE WAS A QUESTION ABOUT THAT FROM

9    THE JURY.  AND THE REEXAMINATION HAPPENED AFTER THAT

10   POINT, AFTER MR. DITZIK SUED APPLE.

11            NOW, WHY DID MR. DITZIK SUE APPLE?  WHY

12   DIDN'T HE TALK TO APPLE?  WELL, HE DIDN'T EXPLAIN THAT

13   TO YOU.  BUT WE THINK IT'S BECAUSE HE KNOWS SOMETHING

14   ABOUT THIS PATENT.  HE KNOWS THAT THE PATENT CLAIMS

15   DON'T MATCH THE DISCLOSURE.  THAT'S A PROBLEM.  IT'S A

16   PROBLEM FOR THIS PATENT.  AND HE KNOWS THAT THAT WOULD

17   HAVE COME UP HAD HE SAT DOWN WITH APPLE AND DISCUSSED

18   THE PATENT.  AND HE FIGURED IF HE JUST FILED THE

19   LAWSUIT, MAYBE APPLE WOULD JUST PAY HIM OFF FOR FILING

20   A LAWSUIT.

21            BUT THERE'S A PROBLEM.  COMPANIES LIKE

22   APPLE, THEY CAN'T JUST PAY PEOPLE OFF FOR INVALID

23   PATENTS.  BECAUSE IF THEY DID, THE NEXT DAY THEY WOULD

24   HAVE 15 MORE LAWSUITS ON THEIR HANDS.  AND THEN INSTEAD

25   OF HAVING A COMPANY THAT HIRES ENGINEERS TO DEVELOP AND

EXHIBIT 5 - PAGE 140

1    DESIGN PRODUCTS, THEY WOULD BE DOING NOTHING BUT HIRING

2    LAWYERS TO DEFEND LAWSUITS.  AND THAT MIGHT BE GOOD FOR

3    US LAWYERS, IT'S NOT GOOD FOR THE COMPANIES, AND IT'S

4    NOT GOOD FOR THE ECONOMY.

5                 NOW, ONE OTHER POINT I WANTED TO JUST

6    BRIEFLY BRING UP.  MR. NIRO TALKED A LOT ABOUT THE

7    REEXAMINATION AND ABOUT THE PATENT OFFICE PROCEEDINGS.

8    AND HE TELLS YOU THAT YOU DON'T NEED TO DO ANYTHING

9    BECAUSE THE PATENT OFFICE HAS ALREADY DONE IT.  THAT'S

10   NOT YOUR JOB, HE TELLS YOU.  YOU SHOULD JUST TAKE WHAT

11   THE PATENT OFFICE DID.  BUT HE'S WRONG ABOUT THAT.

12   THAT IS YOUR JOB.  YOU KNOW SOMETHING ABOUT THE PATENT

13   OFFICE AFTER SITTING THROUGH THE TESTIMONY THIS WEEK.

14   YOU KNOW, FIRST OF ALL, THAT THE PATENT OFFICE HAS A

15   LOT OF WORK.  THEY'RE DOING HUNDREDS OF THOUSANDS OF

16   PATENT APPLICATIONS.  SOMETIMES THEY MAKE MISTAKES.

17   AND YOU SAW EVIDENCE IN THIS CASE OF SOME MISTAKES THAT

18   THE PATENT OFFICE MADE.  THE PATENT OFFICE, AT ONE

19   POINT, HELPED MR. DITZIK WRITE CLAIMS.  AND THEN OTHER

20   EXAMINERS INVALIDATED THOSE CLAIMS.  THEY SAID THOSE

21   CLAIMS WERE INVALID.

22                 YOU ALSO SAW EVIDENCE OF THE PATENT

23   OFFICE GOING BACK AND FORTH AND BACK AND FORTH ON THIS

24   WRITTEN DESCRIPTION ISSUE.  AGAIN, THE PATENT OFFICE

25   DOESN'T ALWAYS GET IT RIGHT.

EXHIBIT 5 - PAGE 141

1          YOU KNOW SOMETHING ELSE ABOUT THE PATENT

2     OFFICE HERE, THE PATENT OFFICE DIDN'T HAVE THIS SIMON

3     AND NOKIA ARTICLES THAT DR. RODRIGUEZ RELIED ON.  WE

4     HAD PLENTY OF TESTIMONY ON THAT.  AND WE ACTUALLY

5     DRILLED DOWN TO THAT ONE DOCUMENT THAT HAD AN EXHIBIT A

6     HIGHLIGHTED.  AND, APPARENTLY, THAT WAS THE DISCLOSURE

7     OF DR. RODRIGUEZ'S EARLY EXPERT REPORT.  BUT MR. DITZIK

8     ADMITTED AND MR. BLACKBURN ADMITTED THAT THOSE ARTICLES

9     THAT DR. RODRIGUEZ CITED NEVER WENT TO THE PATENT

10     OFFICE.  SO THE PATENT OFFICE DOESN'T HAVE ALL THE

11     FACTS.

12          NOW, YOU HEARD SOMETHING ELSE ABOUT THE

13     PATENT OFFICE.  YOU HEARD THAT THE PATENT OFFICE

14     PROCEEDINGS ARE SOMETHING -- THEY'RE CALLED "EX PARTE

15     PROCEEDINGS."  NOW, EX PARTE IS A LATIN WORD.  AND IT

16     MEANS "ONE-SIDED."  THE PATENT OFFICE PROCEEDINGS ARE

17     ONE-SIDED.  THAT MEANS THAT MR. DITZIK IS THE ONLY ONE

18     THAT CAN TALK TO THE PATENT OFFICE ON BEHALF OF HIM AND

19     HIS PATENT.  AND THE REEXAMINATION, ALTHOUGH APPLE DID

20     FILE THE REEXAMINATION AFTER MR. DITZIK SUED APPLE, THE

21     REEXAMINATION, APPLE REQUESTED IT.  BUT AFTER THAT,

22     APPLE COULDN'T PRESENT ANY ARGUMENT TO THE PATENT

23     OFFICE.  IT'S ONE-SIDED PROCEEDINGS, EX PARTE

24     ONE-SIDED.

25          NOW, UNDER OUR LAW WHEN SOMEBODY SUES

EXHIBIT 5 - PAGE 142

1    SOMEBODY ON A PATENT, WE SAY EX PARTE PROCEEDINGS.

2    THEY'RE NOT GOOD ENOUGH.  ONE-SIDED PROCEEDINGS AREN'T

3    RIGHT BECAUSE YOU NEED TO HEAR FROM BOTH SIDES.  YOU,

4    THE JURY, ARE PART OF THE PATENT SYSTEM.  YOU, THE

5    JURY, ARE THE ONLY GROUP THAT GETS TO HEAR ALL THE

6    EVIDENCE, ALL THE ARTICLES, EVERYTHING ANYBODY CAN

7    BRING TO BEAR.  AND IT'S NOT EX PARTE.  YOU CAN HEAR

8    FROM BOTH SIDES.  THAT'S WHY WE BRING THESE QUESTIONS

9    TO A JURY.

10              IF IT WAS AS IF MR. NIRO SAID IT OUGHT TO

11   BE, WE WOULDN'T EVEN HAVE -- JURIES WOULDN'T BE ALLOWED

12   TO JUDGE VALIDITY OF PATENTS.  BUT YOU ARE HERE BECAUSE

13   IT'S NOT AN EX PARTE PROCEEDING.  IT'S NOT ONE-SIDED.

14   IT'S BOTH SIDES.

15              NOW, MY JOB IN CLOSING ARGUMENT IS TO TRY

16   TO SIFT THROUGH THE EVIDENCE AND HIGHLIGHT FOR YOU WHAT

17   I THINK THE EVIDENCE SHOWS.  AND SO I'VE PREPARED SOME

18   SLIDES TO DO THAT.

19              FIRST, I WAS GOING TO TALK ABOUT

20   INFRINGEMENT AND TALK TO YOU ABOUT HOW THE EVIDENCE

21   SHOWS THERE, AND THEN INVALIDITY.  AND I'M GOING TO BE

22   TALKING ABOUT BOTH THE WRITTEN DESCRIPTION THING WE

23   TALKED ABOUT AND THE OBVIOUSNESS SECTION OF THAT.  AND

24   THEN I'M GOING TO GO THROUGH AND SHOW YOU SOME SLIDES

25   THAT I THINK HELP TO SHOW WHY, BY FINDING THE PATENT TO

EXHIBIT 5 - PAGE 143

```
1    BE NOT INFRINGED AND INVALID, YOU'RE DOING THE RIGHT

2    THING IN THIS CASE.  YOU'RE DOING THE FAIR THING.

3                SO LET'S TALK ABOUT NON-INFRINGEMENT.

4    YOU'RE GOING TO HEAR -- HAVE JURY INSTRUCTIONS.  AND

5    HIS HONOR READ YOU THE JURY INSTRUCTIONS HERE.  AND FOR

6    INFRINGEMENT, NETAIRUS HAS TO PROVE IT.  THEY'VE GOT TO

7    PROVE DIRECT INFRINGEMENT.  AND THEY'VE GOT SHOW THAT

8    APPLE ALONE, NOT ITS CUSTOMERS OR SOME OTHER PARTY,

9    PERFORMED EACH STEP OF THE CLAIMS.  NOW, THIS IS AN

10   IMPORTANT INSTRUCTION BECAUSE IT TELLS YOU, TO PROVE

11   INFRINGEMENT, THEY'VE GOT TO PROVE EACH STEP.  THAT

12   MEANS IF THERE'S ONE STEP MISSING, THERE'S NO

13   INFRINGEMENT.

14                MR. NIRO TOOK DR. RODRIGUEZ TO TASK FOR

15   NOT GOING THROUGH EVERY STEP OF THE CLAIM ON

16   INFRINGEMENT.  BUT UNDER THE LAW, DR. RODRIGUEZ ONLY

17   HAS TO SHOW ONE TO FIND NON-INFRINGEMENT.  IF ONE THING

18   IS MISSING, THERE'S NO INFRINGEMENT.  THAT'S WHAT THE

19   JUDGE'S INSTRUCTION SAYS.  THAT'S WHAT THE TEST IS.

20   YOU'VE GOT TO HAVE EVERYTHING.  SO IF ONE THING IS

21   MISSING, THERE'S NO INFRINGEMENT.

22                NOW, LET'S LOOK AT THE EVIDENCE.  AGAIN,

23   IT'S NETAIRUS' JOB TO PROVE THIS INFRINGEMENT.  IT'S

24   NOT APPLE'S JOB TO PROVE NON-INFRINGEMENT.  NETAIRUS

25   HAS TO PROVE IT.  THEY'VE GOT TO CONVINCE YOU THAT
```

EXHIBIT 5 - PAGE 144

THERE'S INFRINGEMENT.  AND THEY HAD THREE MAIN PIECES

OF EVIDENCE HERE -- OR THREE GROUPS OF EVIDENCE.  THEY

HAVE MR. DITZIK'S TESTIMONY.  THEY HAVE MR. BLACKBURN'S

TESTING.  AND THEN THEY HAD MR. BLACKBURN'S VISIT TO

THE APPLE STORE.  AND I WANT TO TALK ABOUT EACH ONE OF

THESE SEPARATELY.

FIRST OF ALL, MR. DITZIK'S TESTIMONY.

NOW, MR. DITZIK TESTIFIED, ESSENTIALLY, THAT HE

INVENTED THE I-PHONE.  HE INVENTED THE FEATURES OF THE

PHONE.  THEY WERE ALL IN HIS PATENT.  AND I THINK THE

ARGUMENT GOES, SINCE HE INVENTED THE I-PHONE AND APPLE

MAKES THE I-PHONE, APPLE MUST INFRINGE.  BUT, AGAIN,

WHEN YOU SEE MR. DITZIK'S ACTUAL PATENT, YOU WILL

REALIZE THAT THAT EVIDENCE JUST DOESN'T HOLD UP.

AND I'LL JUST COMMENT ON, MR. NIRO IN

CLOSING, DIDN'T SHOW YOU THE PATENT FIGURES, DIDN'T

TALK ABOUT THE PATENT, DIDN'T HIGHLIGHT THE CLAIMS.

WE'RE HERE TO TALK ABOUT THE PATENT.  THAT'S WHAT THIS

CASE IS ABOUT.

SO LET'S LOOK AT SOME OF MR. DITZIK'S

TESTIMONY.  MR. NIRO ASKED HIM ON DIRECT WHAT HE WAS

WORKING ON.  HE SAID, "CELL PHONE SYSTEMS."  AND

MR. NIRO SAID, "LET'S STOP AND TALK ABOUT THAT.  DID

YOU INVENT THAT TECHNOLOGY?"  MR. DITZIK SAID HE

INVENTED CELL PHONE SYSTEMS.  MR. NIRO SHOWED YOU THIS

EXHIBIT 5 - PAGE 145

1   CHART IN HIS CLOSING, ALL THESE FEATURES OF THE

2   I-PHONE, 19 DIFFERENT FEATURES.  APPARENTLY, HE'S TAKEN

3   THE POSITION THAT MR. DITZIK INVENTED ALL OF THOSE

4   FEATURES OF THE I-PHONE.  AGAIN, THAT'S NOT IN HIS

5   PATENT.  YOU WON'T FIND A SINGLE PATENT CLAIM THAT'S

6   GOT ALL THESE 19 FEATURES IN IT.  AND, CERTAINLY, YOU

7   WON'T FIND IT IN THE DISCLOSURE.

8              MR. DITZIK -- AGAIN, THIS IS ONE

9   NETAIRUS' SLIDES.  HE SAYS HE INVENTED ALL THESE

10  FEATURES IN THE PHONE.  APPARENTLY, MR. DITZIK INVENTED

11  A CALCULATOR IN A PHONE.  MR. DITZIK INVENTED CONTACTS

12  IN A PHONE.  MR. DITZIK INVENTED FACETIME.  THIS IS ALL

13  OF THEIR TESTIMONY.  AND, AGAIN, IT DOESN'T MATCH

14  WHAT'S ACTUALLY IN THE PATENT.

15             THIS IS WHAT'S IN THE PATENT.  MR. DITZIK

16  DID INVENT SOMETHING.  HE INVENTED A CONCEPT CALLED --

17  HE CALLED THIS "RELAY CONCEPT."  ESSENTIALLY, WHAT THAT

18  WAS IS, TRYING TO USE YOUR LAPTOP COMPUTER -- THAT HAD

19  EXISTED AT THE TIME -- TRYING TO USE YOUR LAPTOP

20  COMPUTER AS YOUR CELL PHONE.

21             AND WHAT'S THE POINT OF THAT?  WELL, IF

22  YOUR LAPTOP COMPUTER IS YOUR CELL PHONE, YOU CAN TAKE

23  THE HANDSET OUT OF THE COMPUTER.  AND YOU CAN TALK ON

24  THE HANDSET THROUGH THE COMPUTER TO THE CELL TOWER.

25  THE POINT BEHIND THAT IS, YOU WOULD HAVE LOW POWER BY

EXHIBIT 5 - PAGE 146

```
 1    YOUR HEAD, AND YOU WOULDN'T HAVE TO HAVE ANY HEALTH
 2    RISKS TO HAVE HIGH POWER THERE.  AND THAT'S RIGHT IN
 3    THE SPECIFICATION ITSELF.  IT'S RIGHT IN THE PATENT.
 4    THAT'S MR. DITZIK'S IDEA.  HE DID HAVE AN IDEA.  HE DID
 5    COME UP WITH AN INVENTION.  THIS IS MR. DITZIK'S
 6    INVENTION, LOW ELECTRICAL POWER BY YOUR HEAD AND USING
 7    YOUR LAPTOP AS THE -- SORT OF A RELAY DEVICE.
 8                  AND WE TALKED WITH HIM ABOUT THAT.  WE
 9    TRIED TO ESTABLISH THAT THAT WAS HIS INVENTION.  AND HE
10    AGREED THAT EVERY CLAIM HE FILED WITH THE ORIGINAL
11    SPECIFICATION HAD THIS RELAY CONCEPT.  THE WORD WAS IN
12    ALL OF THE CLAIMS.  THAT WAS MR. DITZIK'S INVENTION.
13                  AND, AGAIN, WE SAID THIS RELAY CONCEPT,
14    THE RELAY DEVICE IS IN THE NOTEBOOK COMPUTER, USING THE
15    NOTEBOOK COMPUTER TO RELAY COMMUNICATIONS FROM THE
16    EARSET OR THE HANDSET TO THE WIDE AREA NETWORK.  HIS
17    INVENTION WAS USING THE COMPUTER AS A CELL PHONE SO YOU
18    CAN HAVE LOW ELECTRICAL POWER BY YOUR HEAD.  AND,
19    AGAIN, THIS IS NOT THE I-PHONE.
20                  MR. DITZIK DID NOT INVENT PUTTING
21    TECHNOLOGY SUCH AS E-MAIL, PDA, WEB BROWSER, SIRI,
22    FACETIME, HE DIDN'T INVENT PUTTING ALL THOSE THINGS ON
23    THE PHONE.  IF HE DID, YOU WOULD BE ABLE TO SEE IT IN
24    THE PATENT.  AND IF IT WAS IN THE PATENT, COUNSEL WOULD
25    HAVE SHOWED IT TO YOU.
```

EXHIBIT 5 - PAGE 147

1        THE BEST EVIDENCE OF WHAT MR. DITZIK

2    INVENTED -- IN FACT, THE ONLY LEGALLY RECOGNIZABLE

3    EVIDENCE IS IN THE SPECIFICATION.  IF IT WAS THERE, YOU

4    WOULD HAVE SEEN IT BY NOW.  AND YOU WOULD HAVE SEEN IT

5    IN MR. NIRO'S CLOSING.

6        NOW, WHAT'S THE NEXT PIECE OF EVIDENCE

7    THEY HAVE TO TRY TO PROVE INFRINGEMENT?  AND, AGAIN,

8    IT'S THEIR BURDEN TO PROVE INFRINGEMENT.  IT WAS

9    MR. BLACKBURN'S TESTING.  MR. BLACKBURN, IT'S IMPORTANT

10   TO NOTE, HAD NO EXPERIENCE TESTING CELL PHONE POWER.

11   WE ASKED HIM, "HAVE YOU SEEN ANY DOCUMENTS THAT SHOWED

12   THE TYPICAL TRANSMIT POWER FOR CELL PHONES?"  HE SAYS,

13   "I HAD NOT SEEN THOSE DOCUMENTS, NO."  WE ASKED HIM,

14   "IT'S TRUE THAT, PRIOR TO THIS CASE, YOU HAVEN'T SEEN

15   ANY TEST DATA FOR CELL PHONES?"  HE SAID, "I HAVE NOT

16   SEEN TEST DATA FROM AN ACTUAL PHONE."  DIDN'T HAVE

17   EXPERIENCE DOING THIS.

18       AND, AGAIN, YOU KNOW THAT THE POWER

19   LEVELS ARE MEASURED WITH THIS CONCEPT CALLED "DBM."

20   AND MR. NOELLERT TESTIFIED TO THIS.  IT'S, ESSENTIALLY,

21   TAKING DECIBELS RELATIVE TO MILLIWATTS.  AND HE

22   TESTIFIED IT'S ON A LOGARITHMIC SCALE.  MR. BLACKBURN

23   DIDN'T EVEN UNDERSTAND THIS.  HE DIDN'T EVEN KNOW WHAT

24   "DBM" STOOD FOR.

25       NOW, I'M NOT TAKING HIM TO TASK FOR NOT

EXHIBIT 5 - PAGE 148

1    KNOWING THAT BECAUSE, CERTAINLY, I DIDN'T KNOW THAT

2    BEFORE THIS CASE.  BUT HE PUTS HIMSELF OUT AS AN

3    EXPERT.  HE PUTS HIMSELF OUT AS SOMEBODY THAT'S GOT

4    SPECIALIZED KNOWLEDGE ON THIS.  AND IT TURNED OUT HE

5    DIDN'T HAVE ANY.

6             NOW, LET'S TALK ABOUT HIS TESTING.  WE

7    ASKED MR. BLACKBURN ABOUT THE DEVICE HE USED FOR HIS

8    TESTING.  AND HE WOULDN'T GIVE US THE MODEL NUMBER.  WE

9    ASKED HIM, "IS THERE A MANUAL WITH A COMPANY NAME ON IT

10   SOMEWHERE?"  HE WOULDN'T -- HE SAID, "NO."

11            HE SHOWED US A MANUAL THAT HAD NO COMPANY

12   NAME, NO COPYRIGHT DATE, NO PAGE NUMBERS.  WE ASKED

13   HIM, "CAN YOU TELL US SOMETHING ABOUT THIS METER SO WE

14   CAN EVALUATE IT?  SO WE CAN LOOK AT YOUR TESTING?  DO

15   YOU HAVE THE RECEIPT?"  "YEAH, I HAVE THE RECEIPT; BUT

16   IT'S AT HOME."  "CAN WE HAVE IT?"  "I WILL LOOK FOR

17   IT."  WE ASKED HIM ON THE STAND TODAY, "DO YOU HAVE THE

18   RECEIPT?"  "I DON'T HAVE IT."  WE NEED TO KNOW

19   SOMETHING ABOUT THIS METER.

20            WE FOUND OUT SOMETHING YESTERDAY ABOUT

21   THE METER THAT WAS PRETTY INTERESTING.  YOU'LL SEE IN

22   THE SPECIFICATIONS THAT THE METER MEASURES UP TO 300

23   MEGAWATTS.  THAT'S WHAT THE METER CAN MEASURE UP TO.

24   MR. BLACKBURN TESTIFIED YESTERDAY THAT WI-FI IS AT 400

25   MEGAWATTS.  HIS METER WOULDN'T EVEN TEST THE WI-FI HE

EXHIBIT 5 - PAGE 149

1    WAS TRYING TO TEST.  AND, AGAIN, WE DON'T KNOW ANYTHING

2    ABOUT THIS METER.  HE WOULDN'T GIVE IT TO US.

3              I THOUGHT IT WAS INTERESTING.  I EXPECTED

4    HIM TO BRING IT HERE.  I FIGURED WE HAD TALKED SO MUCH

5    ABOUT THE TESTING IN THIS LITIGATION BACK AND FORTH,

6    THAT I THOUGHT FOR SURE HE WAS GOING TO BRING THE METER

7    ON THE STAND.  HE HAD HIS I-PHONE 4.  YOU SAW THAT.

8    WHY DIDN'T HE BRING HIS METER AND DO SOME TESTING?  IF

9    IT WAS RELIABLE TESTING, IF IT PROVED SOMETHING, IF IT

10   PROVED INFRINGEMENT, HE WOULD HAVE DONE IT FOR YOU ON

11   THE STAND.  IF HE COULD DO IT AT A BUNCH OF STARBUCKS

12   IN SAN JOSE AND HE CAN DO IT AT THE APPLE STORE, HE

13   CERTAINLY COULD HAVE BROUGHT IT TO COURT.  AND HE

14   DIDN'T BRING THE METER.

15             BUT I DON'T THINK HE ACTUALLY DID ANY OF

16   THIS TESTING.  AND LET'S TALK BRIEFLY ABOUT IT.  HIS

17   FIRST REPORT THAT HE PUT OUT WAS IN JUNE 2011.  NO TEST

18   RESULTS IN THE REPORT.  HE JUST ASSUMED THAT THE POWER

19   LEVEL LIMITATION WAS MET.  THAT WAS THE SUBSTANCE OF

20   HIS INFRINGEMENT ANALYSIS WAS, I'M JUST GOING TO ASSUME

21   THE POWER LEVEL WAS MET.

22             DR. RODRIGUEZ SUBMITS A REPORT, SHOWS THE

23   CURVES THAT SHOW THE TRANSMIT POWER AND SAYS, "DOESN'T

24   LOOK LIKE THERE'S INFRINGEMENT."

25             MR. BLACKBURN COMES BACK A WEEK LATER --

EXHIBIT 5 - PAGE 150

```
1    EXCUSE ME, 10 DAYS LATER AFTER GETTING DR. RODRIGUEZ'S

2    REPORT AND NOW SAYS, "I HAVE DONE TESTING."  HE SAYS,

3    "I'VE DONE TESTING WITH THIS RF METER."  AND HE SAYS --

4    AND THIS IS THE PARAGRAPH WHERE HE SAYS THAT THE METER

5    ONLY MEASURES UP TO 3 GIGAHERTZ.  THAT'S 300 MEGAHERTZ,

6    WHICH MEANS IT WOULDN'T EVEN CATCH THE WI-FI SIGNAL.

7    AND HE GIVES US HIS SPECIFIC TEST RESULTS.  HE TELLS US

8    A RANGE OF VALUES THAT HE WAS ABLE TO GLEAN FROM THAT.

9              AND WE SAY TO HIM, "CAN WE HAVE THE

10   BACK-UP?  CAN WE HAVE YOUR NOTES AND THINGS?"  AND SO

11   HE SAYS, "SURE."  HE COMES BACK AND GIVES US HIS NOTES.

12   WHAT HAPPENS WHEN WE LOOK AT THE NOTES AND WE LOOK AT

13   THE TEST RESULTS?  WE REALIZE THAT THE TEST RESULTS ARE

14   DATED JULY 25TH.  HIS NOTES WHERE HE SAYS HE TOOK THE

15   TESTING ARE DATED A WEEK LATER, JULY 11TH.  NOW,

16   MR. NIRO SAID HE DID LATER TESTING.  BUT IF YOU

17   REMEMBER THE TESTIMONY ON THE STAND, I ASKED HIM, "DID

18   YOU DO ANY OTHER TESTING?"  HE SAID, "I DID SOME

19   TESTING IN 2013."  I SAID, "DID YOU DO ANY TESTING

20   BETWEEN JUNE 25TH AND 2013?"  HE SAID, "NO."  SO THIS

21   CAN ONLY TELL YOU ONE THING.  IT CAN TELL THAT THE TEST

22   RESULTS WERE MADE UP, BUT I THINK THAT'S THE EVIDENCE

23   HERE.

24              NOW, LET'S TALK ABOUT THE EXPERTS BECAUSE

25   MR. NIRO LIKES TO TELL YOU THAT THE EXPERTS CANCEL
```

EXHIBIT 5 - PAGE 151

1    THEMSELVES OUT, THAT YOU GOT AN EXPERT HERE AND AN

2    EXPERT THERE.  YOU CAN JUST IGNORE THEM BECAUSE THEY

3    CANCEL EACH OTHER OUT.  BUT THAT'S NOT TRUE.  IT'S NOT

4    TRUE IN THIS CASE BECAUSE DR. RODRIGUEZ HAS BEEN

5    WORKING IN THIS FIELD FOR SOME 20-SOMETHING YEARS.

6    HE'S BEEN WORKING IN THIS FIELD CONTINUOUSLY.  HE'S

7    WRITTEN ARTICLES.  HE'S BEEN INVOLVED IN THE IEEE.  HE

8    KNOWS THIS STUFF.  THIS IS HIS JOB.  THIS IS THE FIELD

9    THAT HE WORKS IN.

10                MR. BLACKBURN DOESN'T KNOW THIS STUFF.

11   HE DIDN'T KNOW ABOUT POWER LEVEL TESTING BEFORE THE

12   CASE STARTED, DIDN'T KNOW WHAT DBM WAS.  HE CERTAINLY

13   DIDN'T DO ANY OF HIS OWN TESTS.

14                DR. RODRIGUEZ SUBMITTED SEVERAL EXPERT

15   REPORTS IN THIS CASE.  AND IN EACH REPORT, HE DESCRIBED

16   THE BACKGROUND OF THE TECHNOLOGY, HOW IT ALL WORKS.  IT

17   ALL CAME FROM DR. RODRIGUEZ'S EXPERIENCE.

18                MR. BLACKBURN'S EXPERIENCE CAME FROM

19   WIKIPEDIA.  IT CAME FROM THE WEB.  MR. BLACKBURN,

20   BEFORE THIS CASE, WENT ONLINE -- OR HAD SOMEBODY GO

21   ONLINE AND PULL A BUNCH OF STUFF OFF THE WEB, AND HE

22   COPIED IT VERBATIM INTO HIS REPORT.

23                THE EXPERTS DON'T CANCEL EACH OTHER OUT.

24   MR. BLACKBURN CANCELED HIMSELF OUT.

25                DR. RODRIGUEZ TESTIFIED IN THIS CASE

EXHIBIT 5 - PAGE 152

1    ABOUT POWER LEVELS ALONG WITH MR. NOELLERT.  AND

2    MR. NOELLERT TOLD YOU THAT, IN TYPICAL OPERATION OF THE

3    APPLE I-PHONE 4, IT GOES FROM MINUS 13 TO POSITIVE 5.

4    HE SAID THAT'S THE RANGE ON THAT DBM SCALE, AND THAT

5    WOULD BE THE TYPICAL RANGE OF THE PHONE.  WHY IS THAT

6    TESTIMONY IMPORTANT?  WELL, IT'S IMPORTANT FOR TWO

7    REASONS:  ONE, IT WAS UNCONTROVERTED.  NOBODY DISPUTED

8    THIS TESTIMONY IN THE RECORD.  NETAIRUS DIDN'T BRING IN

9    A SINGLE WITNESS TO TELL YOU THAT MR. NOELLERT WAS

10   WRONG.  THEY DIDN'T DISPUTE THIS AT ALL.  THIS IS

11   UNCONTROVERTED TESTIMONY.

12              AND WHY IS IT IMPORTANT?  IT ACTUALLY

13   PROVES NON-INFRINGEMENT.  MR. NOELLERT SAID THE PHONE

14   OPERATES SUCH THAT IT'S IN THIS SECTION THAT I'VE

15   HIGHLIGHTED HERE.  AND THAT RED LINE IS WHERE THE WI-FI

16   SIGNAL IS.  ACCORDING TO MR. NOELLERT'S TESTIMONY,

17   TESTIMONY THAT WAS UNCONTROVERTED IN THIS CASE,

18   TESTIMONY THAT NOBODY DISPUTED, THERE'S NO

19   INFRINGEMENT.

20              AND, NOW, MR. BLACKBURN DIDN'T COME UP

21   WITH ANY RELIABLE EVIDENCE.  BUT HE DID DO ONE THING.

22   HE ACTUALLY CORROBORATED THE FACT THAT THERE'S NO

23   INFRINGEMENT BASED ON BILL NOELLERT'S TESTIMONY.  HE

24   SAID, IF THE CELL PHONE IS OPERATING SUCH THAT THE CELL

25   POWER IS LESS THAN WI-FI POWER, IT'S NOT INFRINGING.

EXHIBIT 5 - PAGE 153

1    THAT WOULD BE CORRECT.  HE SAID, "YEAH, THAT WOULD BE

2    CORRECT."  SO MR. NOELLERT'S TESTIMONY, WHICH WAS

3    UNCONTROVERTED IN THIS CASE, CONFIRMS THAT THERE'S NO

4    INFRINGEMENT.  AND MR. BLACKBURN AGREES WITH THAT

5    RELATIONSHIP.  IF THE POWER LEVELS ARE LIKE

6    MR. NOELLERT TESTIFIED TO, THERE'S NO INFRINGEMENT.

7    AND THERE'S NOT A STITCH OF EVIDENCE IN THE RECORD THAT

8    MR. NOELLERT IS NOT CORRECT.  AND, I MEAN, THIS IS HIS

9    JOB.  HE KNOWS HOW THESE PHONES WORK.  HE TOLD YOU THAT

10   HE'S FOCUSED ON THAT NORMAL RANGE BECAUSE THAT'S HOW HE

11   DOES OPTIMIZATION.  THAT'S WHY HE TRIES TO TINKER WITH

12   THE ELECTRONICS, MAKE THEM WORK A LITTLE BIT BETTER

13   DURING THAT NORMAL POWER RANGE.  THAT TESTIMONY

14   ESTABLISHES NON-INFRINGEMENT.

15              AND, AGAIN, THIS WAS NETAIRUS' JOB.  THEY

16   WERE SUPPOSED TO PROVE INFRINGEMENT.  THEY DIDN'T PROVE

17   INFRINGEMENT AT ALL.  IN FACT, THEY HAD NO COMPETENT

18   EVIDENCE OF IT.  APPLE PROVED NON-INFRINGEMENT.

19              NOW -- AND, AGAIN, DR. RODRIGUEZ

20   CONFIRMED THAT BECAUSE THIS POWER LEVEL THING IS IN

21   EVERY CLAIM, ALL YOU HAVE TO DO IS SHOW THIS ONE THING

22   ISN'T MET, AND YOU'VE GOT NON-INFRINGEMENT.

23              NOW LET'S TALK ABOUT THIS INDUCING

24   INFRINGEMENT ISSUE HERE.  AND THIS IS -- REQUIRES TWO

25   THINGS, AS YOU HEARD IN THE JURY INSTRUCTIONS.  THERE'S

EXHIBIT 5 - PAGE 154

```
 1     GOT TO BE PROOF THAT SOMEBODY INFRINGED.  AND THERE'S

 2     GOT TO BE PROOF THAT APPLE DIRECTED OR INDUCED THAT

 3     PERSON TO INFRINGE.  SO APPLE HAS GOT TO INTENTIONALLY

 4     INDUCE SOMEBODY TO PERFORM THE METHOD OF THE CLAIM.

 5     AND I DON'T THINK WE EVEN GET TO INDUCING INFRINGEMENT

 6     BECAUSE THEY HAVEN'T SHOWN DIRECT INFRINGEMENT.

 7     THERE'S NO DIRECT INFRINGEMENT, SO THERE CAN BE NO

 8     INDUCING INFRINGEMENT.  IF THERE'S NO DIRECT

 9     INFRINGEMENT, THEN THIS TEST FAILS.

10                 BUT WE'LL TALK ABOUT WHAT NETAIRUS TRIED

11     TO SHOW WITH RESPECT TO INDUCING INFRINGEMENT.  AND

12     THIS WAS THEIR THIRD SET OF EVIDENCE.  THIS IS

13     MR. BLACKBURN'S VISIT TO THE APPLE STORE.  AND HERE,

14     APPARENTLY, MR. BLACKBURN TESTIFIED THAT HE VISITED AN

15     APPLE STORE.  AND HE HAD A PRETTY SUBSTANTIAL

16     INTERACTION WITH AN APPLE STORE EMPLOYEE WHERE HE ASKED

17     THE APPLE STORE EMPLOYEE TO SEND AN E-MAIL OVER WI-FI.

18     HE ASKED THE APPLE STORE EMPLOYEE TO SEND AN E-MAIL

19     OVER CELL.  AND HE ASKED THE APPLE STORE EMPLOYEE TO

20     CHECK HIS CONTACTS.  HE ASKED THE APPLE STORE EMPLOYEE

21     TO PUT A CALENDAR APPOINTMENT IN THERE.  HE ASKED AN

22     APPLE STORE EMPLOYEE TO MAKE A FACETIME CALL TO

23     MR. BLACKBURN'S WIFE.  HE ASKED THE APPLE STORE

24     EMPLOYEE TO MAKE ANOTHER CELL PHONE CALL TO

25     MR. BLACKBURN'S WIFE.  THIS IS THEIR EVIDENCE THAT
```

EXHIBIT 5 - PAGE 155

1    APPLE IS INDUCING SOMEBODY TO PERFORM THE METHOD OF THE

2    CLAIM.  IF ANYTHING, THIS IS EVIDENCE THAT

3    MR. BLACKBURN WAS ATTEMPTING TO INDUCE APPLE TO PERFORM

4    THE METHOD OF THE CLAIM.  THERE'S NO EVIDENCE HERE THAT

5    APPLE WOULD HAVE EVER DONE THESE THINGS IN NORMAL

6    OPERATION.  AND IF THERE WAS, THEY WOULD HAVE BROUGHT

7    YOU EVIDENCE.  THEY WOULD HAVE BROUGHT EVIDENCE OF THE

8    APPLE PROCEDURES USED AT THE STORE.  NONE OF THIS

9    HAPPENS IN A TYPICAL INSTANCE.  THIS ONLY HAPPENED AT

10   THE URGING OF MR. BLACKBURN.  SO THERE'S NO EVIDENCE OF

11   INDUCING INFRINGEMENT HERE IN THE CASE.

12                NOW, THE OTHER REASON THAT APPLE DOESN'T

13   INDUCE INFRINGEMENT IS THAT APPLE ACTUALLY DOES NOT

14   CONTROL THE POWER LEVEL THAT THE PHONE OPERATES AT.

15   THAT STEP IN THE METHOD OF THE CELL PHONE OPERATING AT

16   A POWER LEVEL ABOVE WI-FI, THAT'S OUT OF APPLE'S

17   CONTROL.  APPLE MERELY SENDS -- MERELY ALLOWS THE PHONE

18   TO COMMUNICATE TO AT&T AND VERIZON AND THOSE CELLULAR

19   NETWORKS.  THEY SET THE POWER LEVELS.  THEY TELL THE

20   PHONE, OPERATE AT 5 DBM OR OPERATE AT MINUS 3 DBM.  AND

21   THE PHONE JUST OPERATES TO THAT LEVEL.  APPLE CAN'T

22   CONTROL THAT.  APPLE DOESN'T CONTROL THAT.  AND BECAUSE

23   APPLE DOESN'T CONTROL THAT, THERE CAN BE NO INDUCING

24   INFRINGEMENT.

25                AND, AGAIN MR. NOELLERT TESTIFIED TO

EXHIBIT 5 - PAGE 156

1    THAT.  AND HE KNOWS.  IT'S HIS JOB.  AND DR. RODRIGUEZ

2    TESTIFIED TO THAT.  AND, AGAIN, DR. RODRIGUEZ IS THE

3    ONLY EXPERT YOU HAVE HEARD FROM THAT ACTUALLY HAS A

4    BACKGROUND IN THIS TECHNOLOGY AND ACTUALLY WORKS IN

5    THIS AREA AND UNDERSTANDS HOW THESE THINGS WORK.

6    DR. RODRIGUEZ CONFIRMED THAT IT'S THE CELL PHONE

7    COMPANIES THAT SET THE TRANSMIT POWER LEVEL.  APPLE

8    DOESN'T DO IT.

9              SO, AGAIN, APPLE BROUGHT FORTH

10   INFRINGEMENT -- NON-INFRINGEMENT BY LOOKING AT THE

11   CLAIMS AND GIVING YOU TESTIMONY OF MR. NOELLERT SHOWING

12   YOU THE POWER CURVES AND HOW THEY WORK, AND

13   DR. RODRIGUEZ WHO IS ACTUALLY AN EXPERT IN THIS FIELD.

14             YOU'RE GOING TO GET A VERDICT FORM BACK

15   IN THE JURY ROOM.  AND THAT VERDICT FORM IS GOING TO

16   HAVE A BUNCH OF QUESTIONS ON IT.  AND THE FIRST

17   QUESTION IS GOING TO BE ON DIRECT INFRINGEMENT.  AND

18   IT'S GOING TO SAY, "DID NETAIRUS PROVE BY A

19   PREPONDERANCE OF THE EVIDENCE THAT APPLE DIRECTLY

20   INFRINGED THE FOLLOWING ASSERTED CLAIMS OF '380

21   PATENT?"  ALL OF THESE CLAIMS HAVE THE POWER LEVEL

22   LIMITATION.  BECAUSE NETAIRUS DIDN'T PROVE THAT THAT'S

23   MET, THE ANSWER HERE HAS GOT TO BE "NO" BECAUSE THE

24   POWER LEVEL LIMITATION IS NOT THERE.

25             YOU'RE ALSO GOING TO HAVE ANOTHER

EXHIBIT 5 - PAGE 157

```
1    QUESTION, THIS TIME ON INDUCING INFRINGEMENT.  AND THE

2    VERDICT FORM IS GOING TO SAY, "DID NETAIRUS PROVE BY A

3    PREPONDERANCE OF THE EVIDENCE THAT APPLE INDUCED THE

4    INFRINGEMENT OF THE FOLLOWING CLAIMS?"  AGAIN, BECAUSE

5    THERE'S NO DIRECT INFRINGEMENT BY ANYBODY, THERE CAN BE

6    NO INDUCING.  AND BECAUSE APPLE DIDN'T DIRECT ANYBODY

7    TO PERFORM THIS METHOD, APPLE CAN'T BE INDUCING

8    INFRINGEMENT.  SO THIS HAS TO BE "NO" AS WELL.

9              NOW, LET'S TALK ABOUT INVALIDITY.  AND I

10   WANT TO TALK ABOUT WRITTEN DESCRIPTION.  AND WHY IS

11   THIS IMPORTANT?  WELL, IT'S IMPORTANT BECAUSE THE

12   SPECIFICATION OF THE PATENT IS THE OFFICIAL RECORD OF

13   WHAT THE INVENTOR INVENTED.  AND IN OUR PATENT SYSTEM,

14   WE OUGHT TO GIVE THE INVENTORS THEIR DUE.  THEY OUGHT

15   TO BE ABLE TO CLAIM WHAT IT IS THEY PUT IN THEIR

16   SPECIFICATION.  OUR PATENT SYSTEM WORKS WHEN INVENTORS

17   GET PATENTS ON THINGS THAT THEY INVENT.  BUT YOU'VE GOT

18   TO HAVE A RECORD.  BECAUSE IF YOU DON'T HAVE A RECORD,

19   PEOPLE CAN MAKE STUFF UP.  PEOPLE CAN CLAIM THAT THEY

20   INVENTED SOMETHING THAT THEY DIDN'T REALLY INVENT.

21              THE WRITTEN DESCRIPTION IS THAT OFFICIAL

22   RECORD.  IT'S TAKEN TO THE PATENT OFFICE.  IT'S DATE

23   STAMPED.  IT'S KEPT ON FILE.  IF THE CLAIMS DON'T MATCH

24   THAT, THE CLAIMS AREN'T VALID.  THE WRITTEN DESCRIPTION

25   TELLS YOU WHAT THE INVENTORS IS ENTITLED TO.
```

EXHIBIT 5 - PAGE 158

1        AGAIN, YOU'RE GOING TO GET SOME JURY

2   INSTRUCTIONS ON THIS.  AND IT SAYS -- HIS HONOR READ

3   YOU THIS, "A PATENT CLAIM IS INVALID IF THE PATENT DOES

4   NOT CONTAIN AN ADEQUATE WRITTEN DESCRIPTION OF THE

5   CLAIMED INVENTION."  AND -- EXCUSE ME.  THAT JURY

6   INSTRUCTION GOES ON TO SAY, "THE PURPOSE OF THIS

7   WRITTEN DESCRIPTION REQUIREMENT IS TO DEMONSTRATE THAT

8   THE INVENTOR WAS IN POSSESSION OF THE INVENTION AT THE

9   TIME THE APPLICATION WAS FILED."  SO THAT'S THE TEST.

10  WAS IT IN THE SPECIFICATION?

11       AND THIS IS HOW THE PROCESS WORKS.  WHEN

12  YOU FILE FOR A PATENT, YOU FILE TWO THINGS ACTUALLY.

13  YOU FILE A SPECIFICATION.  AND THAT'S THE RECORD.  THAT

14  CONTAINS ALL THE TECHNICAL DESCRIPTION.  IT CONTAINS

15  THE DIAGRAMS.  IT CONTAINS ALL OF THE THINGS DESCRIBED

16  IN YOUR INVENTION.  YOU ALSO FILE A SET OF CLAIMS.  AND

17  THESE ARE TWO SEPARATE DOCUMENTS.  THE REASON WHY

18  THEY'RE TWO SEPARATE DOCUMENTS IS THAT THE

19  SPECIFICATION HAS TO STAY FIXED.  IT CAN'T CHANGE.  THE

20  CLAIMS CAN CHANGE DEPENDING UPON HOW YOU NEGOTIATE WITH

21  THE PATENT OFFICE.

22       AGAIN, THOSE TWO DOCUMENTS COME TOGETHER

23  WHEN YOU GET A PATENT.  AND THEY'RE PUBLISHED TOGETHER

24  IN THE SAME DOCUMENT.  AND YOU'LL HAVE THE PATENT WITH

25  YOU IN THE JURY ROOM.  THAT'S DTX 1306.  THAT'S THE

EXHIBIT 5 - PAGE 159

1   MOST IMPORTANT PIECE OF EVIDENCE YOU'RE GOING TO HAVE

2   BACK THERE BECAUSE THAT'S THE OFFICIAL RECORD.  AND YOU

3   WILL SEE THE SPECIFICATION IS EVERYTHING UP TO THE

4   CLAIMS.  AND THE CLAIMS ARE WHAT FOLLOWS AFTER THAT.

5            THE SPECIFICATION CAN'T BE MODIFIED.  THE

6   CLAIMS CAN, BUT THE CLAIMS STILL HAVE TO MATCH THE

7   SPECIFICATION.  IF THEY DON'T, WRITTEN DESCRIPTION IS

8   NOT SATISFIED AND THE CLAIMS ARE INVALID.

9            SO LET'S LOOK AT THE TIME LINE.  WE

10  TALKED ABOUT THIS TIME LINE A FEW TIMES IN THE CASE.

11  BUT, IN 1997, MR. DITZIK FILES HIS SPECIFICATION.  AND

12  HE FILES A SET OF CLAIMS ALONG WITH THE SPEC.  AND THEY

13  MATCH.  MR. DITZIK CLAIMS THE RELAY CONCEPT IN HIS

14  ORIGINAL CLAIMS.  THAT'S WHAT WAS THERE.  THAT'S

15  PROPER.  THAT'S THE WAY THE SYSTEM IS SUPPOSED TO WORK.

16            AFTER THAT, A BUNCH THINGS COME OUT IN

17  THE PRESS, HANDHELD DEVICES THAT CAN SEND E-MAIL,

18  HANDHELD DEVICES THAT ARE PDA'S, HANDHELD DEVICES THAT

19  CAN ACCESS THE INTERNET.

20            MR. DITZIK'S OWN FILES INCLUDE EXHIBIT

21  DTX 686, WHICH IS AN ARTICLE FROM HANDHELD COMPUTING

22  MAGAZINE THAT HAD LOTS OF THESE NEW CONCEPTS IN IT.  HE

23  ALSO HAD IN HIS FILES DTX 677, WHICH WAS AN ARTICLE

24  FROM FORBES MAGAZINES THAT HAD LOTS OF THESE CONCEPTS

25  IN IT.

EXHIBIT 5 - PAGE 160

1          MR. DITZIK, AFTER SEEING ALL OF THESE

2     CONCEPTS IN THE PRESS, STARTS TO CHANGE HIS CLAIMS.

3     AND HE CHANGES THEM EIGHT DIFFERENT TIMES IN THE

4     PROCESS.  AND IN 2002, HE COMES UP WITH NEW CLAIMS THAT

5     NOW CLAIM E-MAIL IN A HANDSET AND PDA'S IN A HANDSET.

6          NOW, COUNSEL, DURING MR. BLACKBURN'S

7     DIRECT EXAMINATION, TRIED TO POINT OUT THAT HE ACTUALLY

8     HAD E-MAIL CLAIMS EARLIER THAN 2002.  WE DON'T AGREE

9     THAT HE HAD THOSE IN THE CLAIMS.  BUT, REGARDLESS, THE

10    TESTIMONY IS UNCONTROVERTED THAT, IN 1997 WHEN HE FILED

11    THIS PATENT, HE HAD NO CLAIMS TO E-MAIL IN A HANDSET,

12    NO CLAIMS TO PDA IN A HANDSET.  IS WAS THIS RELAY

13    DEVICE.  AND ALL THAT FUNCTIONALITY THAT HE DISCUSSES

14    IN THE PATENT WAS IN THE COMPUTER, NOT IN THE HANDSET.

15          NOW, ON WRITTEN DESCRIPTION, THIS IS

16    APPLE'S BURDEN.  SO NOW THIS IS THE TIME THAT APPLE HAS

17    TO PUT UP ITS EVIDENCE OF WHETHER OR NOT THERE'S A

18    FAILURE OF WRITTEN DESCRIPTION HERE.  AND APPLE DID.

19    APPLE WENT THROUGH THE FILE HISTORY AND SHOWED YOU THE

20    CHANGES IN THE PATENT CLAIMS.  APPLE POINTED TO THE

21    '380 PATENT, WHICH IS THE BEST EVIDENCE OF WRITTEN

22    DESCRIPTION.  AND WE WENT THROUGH THE TESTIMONY OF

23    DR. RODRIGUEZ WHO IS AN EXPERT IN THIS FIELD.  HE READ

24    THE SPECIFICATION AND READ THE CLAIMS.

25          SO LET'S LOOK AT WHAT THE PROSECUTION

EXHIBIT 5 - PAGE 161

```
 1    HISTORY SHOWS.  IN THE PROSECUTION HISTORY, IT'S CLEAR
 2    THAT THERE WERE CLAIMS IN 1997.  THEY DIDN'T SAY
 3    ANYTHING ABOUT A HANDSET THAT COULD DO E-MAIL OR A
 4    HANDSET THAT COULD BE A PDA.  IF MR. DITZIK HAD
 5    INVENTED A HANDSET THAT COULD SEND E-MAIL IN 1997, HE
 6    WOULD HAVE PUT IT IN HIS CLAIMS.  HE WOULD HAVE CLAIMED
 7    IT.  IT WOULD HAVE BEEN A BIG DEAL.  IT WOULD HAVE BEEN
 8    A BIG CONCEPT FOR HIM.  HE WOULD HAVE PUT IT IN HIS
 9    CLAIMS, AND HE DIDN'T.
10             LET'S GO THROUGH THE CLAIMS.  IN 1997,
11    THE PREAMBLE TO THE CLAIM WAS "A COMPUTER DISPLAY UNIT
12    WITH A COVER ASSEMBLY."
13             IN 2006, HE CHANGED IT TO "A METHOD FOR
14    HANDSET UNIT COMMUNICATION."  ALMOST COMPLETELY
15    DIFFERENT.
16             THE SECOND LIMITATION, "A FLAT PANEL
17    DISPLAY ASSEMBLY HAVING A FIXED DISPLAY DEVICE."  HE
18    CHANGED IT TO "TRANSMITTING FIRST DATA WIRELESSLY."
19    AGAIN, ALMOST COMPLETELY CHANGED.  THE ONLY TWO WORDS
20    IN COMMON ARE THE WORDS "A."
21             STEP B, "RECEIVING SECOND DATA VIA
22    WIRELESS COMMUNICATION."  COMPLETELY NEW.  THE OLD
23    LANGUAGE WAS, "EXPANDABLE HINGE MEANS."  A COMPLETELY
24    NEW LIMITATION HERE.
25             STEP C USED TO BE "A COVER ASSEMBLY
```

EXHIBIT 5 - PAGE 162

1    ROUGHLY THE SAME SIZE." HE CHANGED IT COMPLETELY TO

2    "USING SAID HANDSET UNIT TO COMMUNICATE THIRD AND

3    FOURTH DATA."

4                STEP D, "EXPANDABLE HINGE MEANS ADAPTED

5    TO SO USERS COULD OPEN AND CLOSE IT." HE CHANGED STEP

6    D TO "INCLUDING E-MAIL."

7                CLAIM 2 -- HE DID HAVE A CLAIM ON A

8    HANDSET IN CLAIM 2, A HANDSET THAT COULD DO THE RELAY

9    COMMUNICATION, THE RELAY VOICE. IN CLAIM 2, HE CHANGED

10   THAT TO A "PDA." COMPLETELY CHANGED IT.

11               CLAIM 3 WAS TO "A NOTEBOOK HAVING A

12   TWO-LEAF STRUCTURE THAT COULD OPEN AND CLOSE." HE

13   CHANGED THAT TO A "CELL PHONE." COMPLETELY CHANGED.

14               LOOKING AT MR. DITZIK'S ORIGINAL CLAIMS

15   SIDE-BY-SIDE TO HIS NEW CLAIMS, THEY'RE ALMOST

16   COMPLETELY DIFFERENT. MR. DITZIK WAS CLAIMING THINGS

17   THAT HE DIDN'T DISCLOSE IN HIS ORIGINAL SPECIFICATION.

18   HE WAS CLAIMING THINGS THAT HE HAD READ ABOUT AFTER THE

19   FACT. IN OUR PATENT SYSTEM, YOU CAN'T DO THAT. THAT'S

20   NOT FAIR. IT'S NOT PLAYING FAIR WITH EVERYBODY ELSE.

21               NOW, LET'S LOOK AT -- BACK TO THE TIME

22   LINE. YOU CAN SEE THAT MR. DITZIK'S ORIGINAL CLAIMS

23   AND THE FINAL CLAIMS WERE INFLUENCED BY ALL OF THE

24   ARTICLES. IN MR. DITZIK'S OWN FILES, IT DESCRIBES

25   THESE FEATURES, ARTICLES THAT MR. DITZIK NEVER

EXHIBIT 5 - PAGE 163

 1    DISCLOSED TO THE PATENT OFFICE.

 2              NOW, AGAIN, MR. DITZIK CONFIRMED THAT, AT

 3    SOME POINT, HE JUST CHANGED ALL OF HIS CLAIMS.  HE

 4    CANCELED THEM ALL AND JUST STARTED OVER AGAIN BECAUSE

 5    IT WAS EASIER.  HE HAD MADE SO MANY CHANGES TO THE

 6    CLAIMS.

 7              MR. BLACKBURN CONFIRMED THAT MR. DITZIK'S

 8    CHANGES AND ALL THIS BACK AND FORTH BETWEEN MR. DITZIK

 9    AND THE PATENT OFFICE, THAT DOESN'T CHANGE THE STATE OF

10    THE WRITTEN DESCRIPTION.  THAT DOESN'T ADD WRITTEN

11    DESCRIPTION.

12              THE FACT THAT MR. DITZIK, IN 2013,

13    TESTIFIES ON THE STAND OF WHAT HE WAS THINKING ABOUT

14    BACK IN 2006 -- I'M SORRY, BACK IN 1997, THAT DOESN'T

15    MATTER AT ALL BECAUSE IT'S TOO EASY FOR PEOPLE TO MAKE

16    STUFF UP.  THE ONLY RECORD THAT'S IMPORTANT IS THE

17    FIXED RECORD OF THE SPECIFICATION.  AND YOU'LL HAVE

18    THAT IN THE JURY ROOM.  YOU CAN LOOK AT IT YOURSELF.

19    AND YOU'LL SEE THAT IT'S PRETTY CLEAR WHAT'S DESCRIBED

20    IN THE SPECIFICATION.  IT'S NOT -- COUNSEL AT ONE POINT

21    WAS INSINUATING, I GUESS, THAT THERE WAS TOO MUCH

22    TECHNICAL LANGUAGE IN THERE.  YOU WOULDN'T BE ABLE TO

23    UNDERSTAND IT.  YOU'LL BE ABLE TO UNDERSTAND IT.  IT'S

24    PRETTY CLEAR.  YOU CAN SEE WHAT HE INVENTED AND WHAT HE

25    DIDN'T.

EXHIBIT 5 - PAGE 164

83

```
 1              NOW, AGAIN, WE SPENT A LOT OF TIME

 2      LOOKING AT THE PATENT IN A WRITTEN DESCRIPTION ANALYSIS

 3      BECAUSE THAT'S THE BEST EVIDENCE.  THE PATENT IS THE

 4      BEST EVIDENCE OF WHAT WAS DESCRIBED BY MR. DITZIK AND

 5      WHAT HIS INVENTION WAS.

 6              AND WE TOOK YOU THROUGH THE FACT THAT THE

 7      SPECIFICATION DOESN'T HAVE E-MAIL GOING TO AND FROM A

 8      HANDSET.  IT'S GOT E-MAIL IN THE LAPTOP, SURE, BUT NOT

 9      E-MAIL GOING TO AND FROM THE HANDSET.  AND

10      MR. BLACKBURN CONFIRMED THIS YESTERDAY, THAT THERE'S NO

11      DISCLOSURE OF E-MAIL GOING TO AND FROM A HANDSET.  HE

12      CONFIRMED THAT IN HIS CROSS-EXAMINATION.

13              THE SPECIFICATION DOESN'T DISCLOSE THE

14      HANDSET BEING A PDA.  AND, AGAIN, IF IT WAS IN THERE,

15      THEY WOULD HAVE SHOWED IT TO YOU.  IF THERE WAS A

16      SENTENCE IN THE SPECIFICATION THAT SAID, "THE HANDSET

17      IS A PDA," THEY WOULD HAVE POINTED THAT OUT.  IF THERE

18      WAS A SENTENCE THAT SAID, "THE HANDSET IS E-MAIL," THEY

19      WOULD HAVE POINTED THAT OUT TOO.

20              AND, AGAIN, THE SPECIFICATION DOESN'T

21      DISCLOSE THE HANDSET SWITCHING BETWEEN HIGH AND LOW

22      POWER.  IT TALKS ABOUT SWITCHING VERY PLAINLY IN THE

23      LAPTOP, BUT NOT IN THE HANDSET.

24              SO LET'S GO THROUGH THESE BRIEFLY.

25      AGAIN, THERE'S NO E-MAIL TO AND FROM A HANDSET.  THE
```

EXHIBIT 5 - PAGE 165

1    SPECIFICATION TALKS ABOUT E-MAIL IN THE COMPUTER SYSTEM

2    UP THERE ON THE LEFT CORNER.  THAT'S FROM THE

3    SPECIFICATION FROM THE PATENT.  AND IT SAYS THERE'S

4    E-MAIL IN THE COMPUTER SYSTEM.

5                 THERE'S ALSO A DIAGRAM.  WE WENT THROUGH

6    FIGURE 8 WHERE IT SAYS "E-MAIL."  AND, AGAIN, THAT'S

7    E-MAIL IN THE BASE UNIT.  E-MAIL IN THE BASE UNIT IN

8    THAT DIAGRAM.  NOT E-MAIL IN THE HANDSET.

9                 AND, AGAIN, WE LOOKED AT SOME TEXT FROM

10   THE SPECIFICATION.  THIS IS ACTUAL LANGUAGE FROM THE

11   SPECIFICATION.  AND IT SAYS, "E-MAIL FUNCTIONS MAY BE

12   IMPLEMENTED IN THE COMPUTER SYSTEM."  THERE'S NOT A

13   SINGLE SENTENCE THAT SAYS, "E-MAIL FUNCTIONS MAY BE

14   IMPLEMENTED IN THE HANDSET."  NOW, IF THAT WAS

15   MR. DITZIK'S IDEA, HE WOULD HAVE WRITTEN THAT IN THE

16   SPECIFICATION.  HE DIDN'T WRITE IT IN THERE BECAUSE IT

17   WASN'T HIS IDEA.

18                 AND, AGAIN, MR. BLACKBURN CONFIRMED THIS,

19   "THAT FIGURE 8 THAT WE LOOKED AT, "RUN E-MAIL PROGRAMS,

20   SO THAT'S POINTING TO FUNCTIONALITY IN THE BASE

21   STATION; CORRECT?"  "I BELIEVE SO, YEAH.  UH-HUH."  HE

22   AGREES.  THAT'S WHERE THE DISCLOSURE IS.

23                 AND, AGAIN, IN 1997, THERE WERE NO CLAIMS

24   THAT HAD HANDSET WITH E-MAIL OR PDA.  AND MR. BLACKBURN

25   AGREED WITH THAT.  THEY JUST WEREN'T THERE.

EXHIBIT 5 - PAGE 166

1              NOW, WE TALKED ABOUT PDA VERY BRIEFLY.

2      BUT IN THE BACKGROUND INVENTION, IT SAYS, "THE NOTEBOOK

3      COMPUTER IS CAPABLE OF BEING A PDA."  IT WAS TALKING

4      ABOUT THE NOTEBOOK COMPUTER, THE LAPTOP, THAT WAS THE

5      PDA, NOT THE HANDSET.

6              AND, AGAIN, THIS HIGH/LOW POWER

7      LIMITATION, HERE THE SPECIFICATION SPEAKS VERY PLAINLY.

8      IT SAYS, "THE BASE UNIT MAY BE DESIGNED TO ALLOW THE

9      USER TO SWITCH BETWEEN A HIGH OR LOW LEVEL TRANSMITTING

10     AND RECEIVING POWER LEVELS."  IT'S PRETTY

11     STRAIGHTFORWARD LANGUAGE.  IT'S NOT WRITTEN IN

12     TECHNICAL JARGON.  IT'S NOT SOMETHING THAT WE NEED AN

13     EXPERT TO INTERPRET.  IT SAYS THE BASE UNIT CAN DO

14     THAT.  THERE'S NOT A SENTENCE IN THE SPECIFICATION THAT

15     SAYS THE HANDSET CAN DO THAT.  IF THERE WAS, THEY WOULD

16     HAVE SHOWED IT TO YOU.  ONE OF THEIR EXPERTS WOULD HAVE

17     POINTED IT OUT OR MR. DITZIK WOULD HAVE POINTED IT OUT.

18             AND, AGAIN, MR. BLACKBURN AGREES THAT THE

19     SPECIFICATION NEVER TALKS ABOUT THE HANDSET SWITCHING

20     BETWEEN THE HIGH AND LOW POWER LEVELS.

21             NOW, MR. RODRIGUEZ ALSO POINTED OUT THAT

22     THE SPECIFICATION DOESN'T DISCLOSE THAT.  NOW, WHY IS

23     THAT IMPORTANT?  IT'S IMPORTANT BECAUSE IF THERE'S NO

24     WRITTEN DESCRIPTION OF A HANDSET SENDING E-MAIL, THE

25     CLAIMS ARE INVALID.  OR IF THERE'S NO WRITTEN

EXHIBIT 5 - PAGE 167

1    DESCRIPTION OF THE HANDSET SENDING -- OR BEING A PDA,

2    THE CLAIMS ARE INVALID.  OR IF THERE'S NO DESCRIPTION

3    OF THE HIGH/LOW POWER LIMITATION, THE CLAIMS ARE

4    INVALID.  MR. DITZIK NEEDED TO DESCRIBE ALL OF THE

5    LIMITATIONS THAT HE'S NOW CLAIMING IS HIS INVENTION,

6    THEY HAD TO BE IN THE SPECIFICATION.  IF THEY'RE NOT

7    THERE, THE CLAIMS ARE INVALID.  AND, AGAIN, MR.

8    RODRIGUEZ WENT THROUGH ALL OF THIS TESTIMONY.

9              YOU'LL HAVE A VERDICT FORM HERE TOO.  AND

10   IT'LL ASK YOU IF APPLE PROVED, BY CLEAR AND CONVINCING

11   EVIDENCE, THAT ANY OF THE CLAIMS LACKED WRITTEN

12   DESCRIPTION?  ALL OF THESE CLAIMS REQUIRE A HANDSET

13   THAT SENDS E-MAIL.  ALL OF THE CLAIMS REQUIRE A HANDSET

14   THAT'S A PDA.  AND ALL OF THE CLAIMS REQUIRE A HANDSET

15   THAT CAN SWITCH BETWEEN HIGH AND LOW POWER.  IF ANY OF

16   THOSE THINGS ARE MISSING FROM THE WRITTEN DESCRIPTION,

17   ALL OF THESE CLAIMS HAVE TO BE INVALID.

18             NOW, I WANT TO TALK ABOUT OBVIOUSNESS TOO

19   BECAUSE THAT'S PART OF WHAT YOU HEARD TESTIMONY ON.

20   AND, AGAIN, IF THE INVENTION WAS ALREADY OUT THERE AS

21   CLAIMED, IF IT WAS ALREADY OUT THERE, YOU CAN'T GET A

22   PATENT ON THAT EITHER.  AND THAT SORT OF MAKES SENSE IN

23   THE PATENT SYSTEM.  YOU CAN'T GET A PATENT ON SOMETHING

24   THAT ALREADY EXISTED.  AND THAT'S WHAT HAPPENED HERE.

25   BECAUSE EVEN THOUGH MR. DITZIK THOUGHT HIS CLAIMS WERE

EXHIBIT 5 - PAGE 168